# EXHIBIT 1

**EXECUTION VERSION**

# TERM LOAN CREDIT AGREEMENT

**Dated as of May 30, 2025**

**by and among**

**SYNERGY CHC CORP.,**
**as Borrower,**

**EACH SUBSIDIARY OF THE BORROWER**
**LISTED AS A GUARANTOR ON THE SIGNATURE PAGES HERETO,**
**as Guarantors,**

**THE LENDERS FROM TIME TO TIME PARTY HERETO,**
**as Lenders,**

**ACP AGENCY, LLC,**
**as Administrative Agent,**

**and**

**ACP AGENCY, LLC,**
**as Collateral Agent**

# Table of Contents

**Page**

ARTICLE I DEFINITIONS; CERTAIN TERMS....1

**Section 1.1.** **Definitions**....1
**Section 1.2.** **Terms Generally**....48
**Section 1.3.** **Certain Matters of Construction**....49
**Section 1.4.** **Accounting and Other Terms**....49
**Section 1.5.** **Pro Forma Calculations.**....50
**Section 1.6.** **Time References**....50
**Section 1.7.** **Obligation to Make Payments in Dollars**....51
**Section 1.8.** **Interest Rates Disclaimer**....51

ARTICLE II THE LOANS....51

**Section 2.1.** **Commitments**....51
**Section 2.2.** **Making the Loans**....52
**Section 2.3.** **Repayment of Loans; Evidence of Debt**....52
**Section 2.4.** **Interest**....53
**Section 2.5.** **Reduction of Commitment; Prepayment of Loans**....54
**Section 2.6.** **Fees**....58
**Section 2.7.** **Term SOFR Rate Option; Benchmark Replacement**....59
**Section 2.8.** **Funding Losses**....61
**Section 2.9.** **Taxes**....62
**Section 2.10.** **Increased Costs and Reduced Return**....65
**Section 2.11.** **Changes in Law; Impracticability or Illegality**....66
**Section 2.12.** **Replacement of Lenders**....67
**Section 2.13.** **Incremental Facilities**....68

ARTICLE III [INTENTIONALLY OMITTED]....69

ARTICLE IV APPLICATION OF PAYMENTS; DEFAULTING LENDERS....69

**Section 4.1.** **Payments; Computations and Statements**....69
**Section 4.2.** **Sharing of Payments**....70
**Section 4.3.** **Apportionment of Payments**....71
**Section 4.4.** **Defaulting Lenders**....72

ARTICLE V CONDITIONS TO LOANS....73

**Section 5.1.** **Conditions Precedent to Effectiveness**....73

**Section 5.2.** **Conditions Precedent to All Loans** .....78
**Section 5.3.** **Conditions Subsequent to Effecitveness** .....78

ARTICLE VI REPRESENTATIONS AND WARRANTIES .....80

**Section 6.1.** **Representations and Warranties** .....80

ARTICLE VII COVENANTS OF THE LOAN PARTIES AND OTHER COLLATERAL MATTERS .....89

**Section 7.1.** **Affirmative Covenants** .....89
**Section 7.2.** **Negative Covenants** .....100
**Section 7.3.** **Financial Covenants** .....106

ARTICLE VIII EVENTS OF DEFAULT .....107

**Section 8.1.** **Events of Default** .....107

ARTICLE IX AGENTS .....111

**Section 9.1.** **Appointment** .....111
**Section 9.2.** **Nature of Duties; Delegation** .....112
**Section 9.3.** **Rights, Exculpation, Etc.** .....112
**Section 9.4.** **Reliance** .....113
**Section 9.5.** **Indemnification** .....113
**Section 9.6.** **Agents Individually** .....114
**Section 9.7.** **Successor Agent** .....114
**Section 9.8.** **Collateral Matters** .....115
**Section 9.9.** **Agency for Perfection** .....117
**Section 9.10.** **No Reliance on any Agent's Customer Identification Program** .....118
**Section 9.11.** **No Third-Party Beneficiaries** .....118
**Section 9.12.** **No Fiduciary Relationship** .....118
**Section 9.13.** **Reports; Confidentiality; Disclaimers** .....118
**Section 9.14.** **Collateral Custodian** .....119
**Section 9.15.** **Collateral Agent May File Proofs of Claim** .....119
**Section 9.16.** **Erroneous Distribution.** .....120

ARTICLE X GUARANTY .....120

**Section 10.1.** **Guaranty** .....120
**Section 10.2.** **Guaranty Absolute** .....120
**Section 10.3.** **Waiver** .....121
**Section 10.4.** **Continuing Guaranty; Assignments** .....122
**Section 10.5.** **Subrogation** .....122

**Section 10.6. Contribution** ....................................................................... 122

ARTICLE XI MISCELLANEOUS ....................................................................... 123

**Section 11.1. Notices, Etc.** ....................................................................... 123
**Section 11.2. Amendments, Etc.** ....................................................................... 125
**Section 11.3. No Waiver; Remedies, Etc.** ....................................................................... 127
**Section 11.4. Expenses; Taxes; Attorneys' Fees** ....................................................................... 127
**Section 11.5. Right of Set-off** ....................................................................... 128
**Section 11.6. Severability** ....................................................................... 129
**Section 11.7. Assignments and Participations** ....................................................................... 129
**Section 11.8. Counterparts** ....................................................................... 133
**Section 11.9. Governing Law** ....................................................................... 133
**Section 11.10. Consent to Jurisdiction; Service of Process and Venue** ................ 133
**Section 11.11. Waiver of Jury Trial, Etc.** ....................................................................... 135
**Section 11.12. Consent by the Agents and Lenders** ....................................................................... 135
**Section 11.13. No Party Deemed Drafter** ....................................................................... 135
**Section 11.14. Reinstatement; Certain Payments** ....................................................................... 135
**Section 11.15. Indemnification; Limitation of Liability for Certain Damages** .... 136
**Section 11.16. Records** ....................................................................... 137
**Section 11.17. Binding Effect** ....................................................................... 137
**Section 11.18. Highest Lawful Rate** ....................................................................... 137
**Section 11.19. Confidentiality** ....................................................................... 138
**Section 11.20. Public Disclosure** ....................................................................... 139
**Section 11.21. Integration** ....................................................................... 139
**Section 11.22. USA PATRIOT Act** ....................................................................... 139
**Section 11.23. Judgment Currency** ....................................................................... 140
**Section 11.24. Waiver of Immunity** ....................................................................... 140
**Section 11.25. English Language** ....................................................................... 140

SCHEDULE AND EXHIBITS


| | |
|---|---|
| Schedule 1.1(A) | Lenders and Lenders' Commitments |
| Schedule 1.1(B) | Effective Date Payoff Debt |
| Schedule 6.1(e) | Capitalization; Subsidiaries |
| Schedule 6.1(f) | Litigation |
| Schedule 6.1(o) | Facilities; Real Property |
| Schedule 6.1(p) | Employee and Labor Matters |
| Schedule 6.1(q) | Environmental Matters |
| Schedule 6.1(r) | Insurance |
| Schedule 6.1(u) | Deposit, Securities and Commodities Accounts |
| Schedule 6.1(v) | Intellectual Property |
| Schedule 6.1(w) | Material Contracts |
| Schedule 6.1(bb) | Name; Jurisdiction of Organization; Organizational ID Number; Chief Place of Business; Chief Executive Office; FEIN |
| Schedule 7.2(a) | Existing Liens |
| Schedule 7.2(b) | Existing Indebtedness |
| Schedule 7.2(e) | Existing Investments |
| Schedule 7.2(j) | Existing Transactions with Affiliates |
| Schedule 7.2(k) | Limitations on Dividends and Other Payment Restrictions |

| | |
|---|---|
| Exhibit A | Form of Joinder Agreement |
| Exhibit B | Form of Security Agreement |
| Exhibit C | Form of Information Certificate |
| Exhibit D | Form of Assignment and Acceptance |
| Exhibit E | Form of Notice of Borrowing |
| Exhibit F | Form of Term SOFR Rate Notice |
| Exhibit G | Form of Compliance Certificate |
| Exhibit H | Forms of U.S. Tax Compliance Certificate |

# TERM LOAN CREDIT AGREEMENT

This **TERM LOAN CREDIT AGREEMENT**, dated as of May 30, 2025, is by and among **SYNERGY CHC CORP.**, a Nevada corporation (the "**Borrower**"), each subsidiary of the Borrower listed as a "Guarantor" on the signature pages hereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder, each, a "**Guarantor**" and, collectively, the "**Guarantors**"), the lenders from time to time party hereto (each, a "**Lender**" and, collectively, the "**Lenders**"), **ACP AGENCY, LLC** ("**ACP**"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**"), and ACP, as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**", and, together with the Administrative Agent, each, an "**Agent**" and, collectively, the "**Agents**").

R E C I T A L S:

The Borrower has asked the Lenders to enter into this Agreement (i) to extend credit to the Borrower consisting of (a) a term loan in the aggregate principal amount of $15,000,000, and (b) a delayed draw term loan in the aggregate principal amount of up to $2,500,000, and (ii) which contemplates that, subject to the satisfaction of certain conditions, the Borrower may request, from time to time, incremental term loans in an aggregate principal amount not to exceed $2,500,000 pursuant to an incremental facility, which may be provided subject to the discretion of the Administrative Agent. The proceeds of the term loan shall be used to repay existing indebtedness of the Borrower, for general corporate purposes of the Borrower and to pay the Transaction Costs and the proceeds of the delayed draw term loan will be used to pay the outstanding obligations of the Borrower under each of the Atrium Settlement Agreement and the Vitabest Settlement Agreement. The Agents and the Lenders are willing to enter into this Agreement and the Lenders are severally, and not jointly, willing to extend such credit to the Borrower subject to the terms and conditions hereinafter set forth.

In consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

## ARTICLE I
## <u>DEFINITIONS; CERTAIN TERMS</u>

**Section 1.1. <u>Definitions</u>**. As used in this Agreement, the following terms shall have the respective meanings indicated below:

"**ABL Facility**" means a revolving credit facility or other asset-based lending facility entered into by one or more of the Loan Parties, provided that:

(a) the terms, conditions, covenants and documentation of such ABL Facility (including, without limitation, an intercreditor agreement among the administrative agent, the collateral agent, and the lenders under the ABL Facility and the Agents, and an amendment to this Agreement), shall each be in form and substance satisfactory to the Agents in their reasonable discretion; and

(b) all or a portion of the proceeds of such ABL Facility will be used to immediately prepay the Obligations under this Agreement in accordance with the terms set forth in Section 2.5(c)(vii), and no ABL Facility shall be incurred unless and until such prepayment has been (or concurrently will be) made.

"**Account**" has the meaning specified therefor in the UCC.

"**Account Debtor**" means, with respect to any Person, each debtor, customer or obligor in any way obligated on or in connection with any Account of such Person.

"**ACP**" has the meaning specified therefor in the preamble to this Agreement.

"**Acquisition**" means the acquisition (whether by means of a merger, consolidation or otherwise) of all of the Equity Interests of any Person or all or substantially all of the assets of any Person or any division or business line of any other Person.

"**Action**" has the meaning specified therefor in Section 11.12.

"**Administrative Agent**" has the meaning specified therefor in the preamble to this Agreement.

"**Administrative Agent's Account**" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract or otherwise. Notwithstanding anything herein to the contrary, in no event shall any Agent or any Lender be considered an "Affiliate" of any Loan Party.

"**Agent**" and "**Agents**" have the respective meanings specified therefor in the preamble to this Agreement

"**Agent Advances**" has the meaning specified therefor in Section 9.8(a).

"**Aggregate Payments**" has meaning specified therefor in Section 10.6.

"**Agreement**" means this Term Loan Credit Agreement, including all amendments, restatements, amendments and restatements, modifications and supplements and any exhibits or schedules to any of the foregoing, and shall refer to this Agreement as the same may be in effect at the time such reference becomes operative.

"**Anti-Corruption Laws**" means all Requirements of Law concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**"), the UK Bribery Act of 2010, and the anti-bribery and anti-corruption laws and regulations of those jurisdictions in which the Loan Parties do business.

"**Anti-Money Laundering Laws**" means all Requirements of Law concerning or relating to terrorism or money laundering, including, without limitation, the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT Act and the Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5332 and 12 U.S.C. §§ 1818(s), 1820(b) and §§ 1951-1959) and the rules and regulations thereunder, and any law prohibiting or directed against the financing or support of terrorist activities (e.g., 18 U.S.C. §§ 2339A and 2339B), and the anti-terrorism and anti-money laundering laws and regulations of those jurisdictions in which the Loan Parties do business.

"**Applicable Margin**" means, as of any date of determination, with respect to the interest rate of (a) any Reference Rate Loan or any portion thereof, 7.50% per annum, and (b) any Term SOFR Rate Loan or any portion thereof, 8.50% per annum.

"**Applicable Premium**" means as of the date of the occurrence of an Applicable Premium Trigger Event:

(i) during the period from and after the Effective Date up to and including the date that is the first anniversary of the Effective Date (the "**First Period**"), an amount equal to the greater of (A) the aggregate amount of interest (including interest payable in cash, in kind or deferred) which would have otherwise been payable on the amount of all Obligations (other than the Applicable Premium) outstanding on the date of such Applicable Premium Trigger Event from such date until the date that is the first anniversary of the Effective Date, and (B) 3.0% times the aggregate amount of the outstanding principal amount of the Term Loan on the date of such Applicable Premium Trigger Event;

(ii) during the period after the first anniversary of the Effective Date up to and including the date that is the second anniversary of the Effective Date (the "**Second Period**"), an amount equal to 2.0% times the aggregate amount of the outstanding principal amount of the Term Loan on the date of such Applicable Premium Trigger Event;

(iii) during the period after the second anniversary of the Effective Date up to and including the date that is the third anniversary of the Effective Date (the "**Third Period**"), an amount equal to 1.0% times the aggregate amount of the outstanding principal amount of the Term Loan on the date of such Applicable Premium Trigger Event; and

(iv) thereafter, zero.

"**Applicable Premium Trigger Event**" means:

(a) any payment by any Loan Party of all, or any part, of the principal balance of any Term Loan for any reason (including, without limitation, any optional prepayment or mandatory prepayment (other than (x) any regularly scheduled quarterly amortization payment made pursuant to Section 2.3(a) and (y) any mandatory prepayment required pursuant to Sections

2.5(c)(i), 2.5(c)(iv), 2.5(c)(v) and 2.5(c)(vii)) whether before or after (i) the occurrence of an Event of Default, or (ii) the commencement of any Insolvency Proceeding, and notwithstanding any acceleration (for any reason) of the Obligations;

(b) the acceleration of the Obligations for any reason, including, without limitation, acceleration in accordance with Section 8.1, including as a result of the commencement of an Insolvency Proceeding;

(c) the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in any Insolvency Proceeding, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any Insolvency Proceeding to any Agent for the account of the Lenders in full or partial satisfaction of the Obligations; or

(d) the termination of this Agreement for any reason.

"**ASPE**" means Accounting Standards for Private Enterprises.

"**Assignment and Acceptance**" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Collateral Agent (and the Administrative Agent, if applicable), in accordance with Section 11.7 and substantially in the form of <u>Exhibit D</u> or such other form acceptable to the Collateral Agent.

"**Atrium Settlement Agreement**" means that certain Confidential Settlement Agreement and Mutual General Release, dated effective as of December 28, 2023, by and between the Borrower and HVL, LLC d/b/a Atrium Innovations.

"**Authorized Officer**" means, with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, treasurer or other financial officer performing similar functions, president or executive vice president of such Person.

"**Available Tenor**" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.7(e).

"**Bankruptcy Code**" means Title 11 of the United States Code, as amended from time to time and any successor statute or any similar federal or state law for the relief of debtors.

"**Benchmark**" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the

extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.7(e).

"**Benchmark Replacement**" means, with respect to any Benchmark Transition Event, the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent (in consultation with the Borrower) giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment; provided, that if the Benchmark Replacement would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"**Benchmark Replacement Adjustment**" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by the Administrative Agent (in consultation with the Borrower) giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"**Benchmark Replacement Date**" means the earliest to occur of the following events with respect to the then-current Benchmark:

(i) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(ii) in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (i) or (ii) above with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Start Date**" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date, and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"**Benchmark Unavailability Period**" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.7(e) and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.7(e).

"**Board of Directors**" means with respect to (a) any corporation, the board of directors of the corporation or any committee thereof duly authorized to act on behalf of such board, (b) a partnership, the board of directors of the general partner of the partnership, (c) a limited liability company, the managing member or members or any controlling committee or board of directors of such company or the sole member or the managing member thereof, and (d) any other Person, the board or committee of such Person serving a similar function.

"**Board of Governors**" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"**Borrower**" has the meaning specified therefor in the preamble to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required to close.

"**Canadian Defined Benefit Pension Plan**" means a Canadian Pension Plan which contains a "defined benefit provision", as defined in subsection 147.1(1) of the Income Tax Act (Canada).

"**Canadian Guarantors**" means (i) Synergy CHC Inc. and (ii) each other Person organized under the laws of Canada which guarantees, pursuant to Section 7.1(b) or otherwise, all or any part of the Obligations, in each case, other than any Excluded Subsidiary.

"**Canadian Pension Plan**" means a "registered pension plan", as that term is defined in subsection 248(1) of the Income Tax Act (Canada), or a pension plan that is required to be registered under, or is subject to other Canadian federal or provincial legislation with respect to pension benefit standards, which is or was sponsored, administered or contributed to, or required to be contributed to, by any obligated party or under which any obligated party has any actual or potential liability, including, without limitation, a Canadian Defined Benefit Pension Plan, but does not include the Canada Pension Plan or the Quebec Pension Plan as maintained by the Government of Canada or the Province of Quebec, respectively.

"**Canadian Security Documents**" means, collectively, the Canadian form of (i) Guaranty from the Canadian Guarantors, (ii) Security Agreement from the Canadian Guarantors and any Loan Parties with Collateral in Canada as determined by the Agents and (iii) Intellectual Property Security Agreement from the Canadian Guarantors and any Loan Parties with Registered Intellectual Property in Canada with CIPO as determined by the Agents, each in form and substance satisfactory to the Agents.

"**Capital Expenditures**" means, with respect to any Person for any period, the sum of (a) the aggregate of all expenditures by such Person and its Subsidiaries during such period that in accordance with GAAP are or should be included in "property, plant and equipment" or in a similar fixed asset account on its balance sheet, whether such expenditures are paid in cash or financed, including all Capitalized Lease Obligations, obligations under synthetic leases and capitalized software costs that are paid or due and payable during such period and (b) to the extent not covered by clause (a) above, the aggregate of all expenditures by such Person and its

Subsidiaries during such period to acquire by purchase or otherwise the business or fixed assets of, or the Equity Interests of, any other Person; provided that the term "Capital Expenditures" shall not include any such expenditures which constitute (i) expenditures by a Loan Party made in connection with the acquisition, replacement, substitution or restoration of such Loan Party's assets pursuant to Section 2.5(c)(vi) from the Net Cash Proceeds of Dispositions and Extraordinary Receipts consisting of insurance proceeds or condemnation awards, (ii) expenditures financed with the proceeds received from the sale or issuance of Equity Interests so long as (A) the Borrower is not required to make a prepayment of the Loans with such proceeds pursuant to Section 2.5(c)(iii) and (B) such proceeds are not commingled with any Loan Party's funds and are deposited in an account subject to a Control Agreement and used exclusively to fund such expenditures, (iii) [reserved], (iv) expenditures that are accounted for as capital expenditures of such Person and that actually are paid for by a third party (excluding any Loan Party) and for which no Loan Party has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period), and (v) the purchase price of equipment that is purchased substantially contemporaneously with the trade in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time.

"**Capitalized Lease**" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property by such Person as lessee that is required under GAAP to be capitalized on the balance sheet of such Person.

"**Capitalized Lease Obligations**" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"**Cash Equivalents**" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within six months from the date of acquisition thereof; (b) commercial paper, maturing not more than one year after the date of issue rated P 1 by Moody's or A 1 by Standard & Poor's; (c) certificates of deposit maturing not more than one year after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $500,000,000; (d) repurchase agreements entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof; (e) money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition; (f) marketable Tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's, in each case, maturing within one year from the date of acquisition thereof; and (g) in the case of any Canadian Guarantor, cash and cash equivalents that are substantially equivalent in such jurisdiction to those described in clauses (a) through (f) above in respect of each country that is a member of the Organization for Economic Co-operation and Development.

"**Change in Law**" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Change of Control**" means each occurrence of any of the following:

(a) [reserved];

(b) the acquisition, directly or indirectly, by any person or group (within the meaning of Section 13(d)(3) of the Exchange Act) (other than Mr. Jack Ross) of beneficial ownership of more than 30% of the aggregate outstanding voting or economic power of the Equity Interests of the Borrower;

(c) during any period of 24 consecutive months, individuals who at the beginning of such period constituted the Board of Directors of the Borrower (together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Borrower was approved by, or subsequently ratified by, a vote of at least a majority of the directors of the Borrower then still in office who were either directors at the beginning of such period, or whose election or nomination for election was previously approved) cease for any reason to constitute a majority of the Board of Directors of the Borrower;

(d) the Borrower shall cease to have beneficial ownership (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of 100% of the aggregate voting and economic power of the Equity Interests of each other Loan Party and each of its Subsidiaries (other than in connection with any transaction permitted pursuant to Section 7.2(c)), free and clear of all Liens (other than Permitted Specified Liens); or

(e) a "Change of Control" (or any comparable term or provision) under or with respect to any Material Indebtedness of the Borrower or any of its Subsidiaries.

"**CIP Regulations**" has the meaning specified therefor in Section 9.10.

"**CIPO**" means Canadian Intellectual Property Office.

"**Collateral**" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations; provided that and for the avoidance of doubt, "Collateral" shall not include property and assets specifically excluded from such definition in the Security Agreement.

"**Collateral Agent**" has the meaning specified therefor in the preamble to this Agreement.

"**Collateral Documents**" has the meaning specified therefor in Section 11.2(b)(iii).

"**Collections**" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and Tax refunds).

"**Commitments**" means, with respect to each Lender, such Lender's Initial Term Loan Commitment, Delayed Draw Term Loan Commitment and any Incremental Term Loan Commitment.

"**Commodity Exchange Act**" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"**Compliance Certificate**" means a Compliance Certificate, substantially in the form of Exhibit G hereto, duly executed by an Authorized Officer of the Borrower.

"**Conforming Changes**" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Reference Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage or match funding provisions (including Section 2.8) and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Adjusted EBITDA**" means, with respect to any Person and its Subsidiaries for any period, in each case, determined on a consolidated basis in accordance with GAAP, the result of:

(a) the Consolidated Net Income of such Person and its Subsidiaries for such period, plus, at the option of Borrower, to the extent a Permitted Acquisition has been consummated during such period, the Consolidated Net Income attributable to the target of such

Permitted Acquisition (but only that portion of Consolidated Net Income attributable to the portion of such period that occurred prior to the date of consummation of such Permitted Acquisition);

plus

(b) without duplication, the sum of each of the following amounts of such Person and its Subsidiaries for such period to the extent deducted in determining the Consolidated Net Income of such Person and its Subsidiaries for such period:

(i) any provision for United States federal income Taxes or other state or local Taxes measured by net income;

(ii) Consolidated Net Interest Expense;

(iii) any depreciation and amortization expense;

(iv) any unusual, one-time, extraordinary or nonrecurring losses, expenses, costs, fees or charges (and corresponding tax consequences);

(v) any non-cash items decreasing Consolidated Net Income;

(vi) Transaction Costs paid within 90 days after the Effective Date;

(vii) reimbursement of costs and expenses of the Board of Directors of Borrower;

(viii) reimbursement of out-of-pocket costs and expenses related to any Permitted Acquisitions (whether or not such Permitted Acquisition is consummated); provided, however, that, unless otherwise approved by the Administrative Agent, the aggregate amount added back pursuant to this clause shall not exceed $500,000 in any period of twelve (12) consecutive fiscal months of the Borrower and its Subsidiaries;

(ix) any non-cash stock-based compensation expenses; and

(x) other non-cash charges approved by the Administrative Agent;

minus

(c) without duplication, the sum of each of the following amounts of such Person and its Subsidiaries for such period to the extent included in determining the Consolidated Net Income of such Person and its Subsidiaries for such period:

(i) any credit for United States federal income Taxes or other Taxes measured by net income;

(ii) any unusual one-time, extraordinary or nonrecurring gains or income (and corresponding tax consequences); and

(iii) any non-cash items increasing Consolidated Net Income, including non-cash gains from foreign exchange transactions.

"**Consolidated Net Income**" means, with respect to any Person, for any period, the consolidated net income (or loss) of such Person and its Subsidiaries for such period; provided, however, that the following shall be excluded: (a) the net income of any other Person in which such Person or one of its Subsidiaries has a joint interest with a third-party (which interest does not cause the net income of such other Person to be consolidated into the net income of such Person), except to the extent of the amount of dividends or distributions paid to such Person or Subsidiary, (b) the net income of any Subsidiary of such Person that is, on the last day of such period, subject to any restriction or limitation on the payment of dividends or the making of other distributions, to the extent of such restriction or limitation, and (c) the net income of any other Person arising prior to such other Person becoming a Subsidiary of such Person or merging or consolidating into such Person or its Subsidiaries.

"**Consolidated Net Interest Expense**" means, with respect to any Person for any period, (a) gross interest expense of such Person and its Subsidiaries for such period determined on a consolidated basis and in accordance with GAAP (including, without limitation, interest expense paid to Affiliates of such Person), less (b) the sum of (i) interest income for such period and (ii) gains for such period on Hedging Agreements (to the extent not included in interest income above and to the extent not deducted in the calculation of gross interest expense), plus (c) the sum of (i) losses for such period on Hedging Agreements (to the extent not included in gross interest expense) and (ii) the upfront costs or fees for such period associated with Hedging Agreements (to the extent not included in gross interest expense), in each case, determined on a consolidated basis and in accordance with GAAP.

"**Consolidated Senior Net Leverage Ratio**" means, with respect to any Person and its Subsidiaries for any period, the ratio of (a) all Indebtedness described in clauses (a), (c), (d), (e) and (f) in the definition thereof of such Person and its Subsidiaries on a consolidated basis as of the end of such period (excluding any Subordinated Indebtedness of such Person and its Subsidiaries then outstanding), less the amount of Unrestricted Cash and Cash Equivalents of such Person or any of its Subsidiaries for such period in an amount not to exceed $4,000,000, to (b) Consolidated Adjusted EBITDA of such Person and its Subsidiaries for such period.

"**Consulting Services Agreement**" means that certain Sales and Marketing Consultant and Distribution Agreement, dated as of April 2, 2014, between Kenek Brand Inc. and Synergy CHC Corp. (f/k/a Synergy Strips Corp.), as in effect on the Effective Date.

"**Contingent Indemnity Obligations**" means any Obligation constituting a contingent, unliquidated indemnification obligation of any Loan Party, in each case, to the extent (a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made or is reasonably anticipated to be made with respect thereto.

"**Contingent Obligation**" means, with respect to any Person, any obligation of such Person guaranteeing or intending to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other Person (the "**primary obligor**") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty,

endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, and (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"**Contractual Obligation**" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"**Control Agreement**" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance satisfactory to the Collateral Agent, among the Collateral Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable UCC) over such account to the Collateral Agent.

"**Controlled Account**" means any deposit account, any securities account, commodity account, securities entitlement or commodity contract subject to a Control Agreement.

"**Current Value**" has the meaning specified therefor in Section 7.1(n).

"**Debtor Relief Law**" means the Bankruptcy Code and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States or other applicable jurisdiction from time to time in effect.

"**Default**" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"**Defaulting Lender**" means any Lender that (a) has failed to (i) fund all or any portion of its Loans on the date such Loans were required to be funded hereunder unless such

Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder on the date when due, (b) has notified the Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder, or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity. Notwithstanding anything to the contrary herein, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Borrower and each Lender.

"**Delayed Draw Term Loan**" means the loans made by the Delayed Draw Term Loan Lender to the Borrower during the Delayed Draw Term Loan Availability Period pursuant to Section 2.1(a)(ii).

"**Delayed Draw Term Loan Availability Period**" means the period beginning twelve (12) Business Days after the Effective Date (or such earlier date as agreed to by the Administrative Agent in its sole discretion) and ending on the Delayed Draw Term Loan Commitment Expiration Date (or such later date as agreed to by the Administrative Agent in its sole discretion).

"**Delayed Draw Term Loan Commitment Expiration Date"** means the earliest to occur of (a) the date on which all or any portion of the Delayed Draw Term Loan Commitments have been drawn, (b) thirty (30) days after the commencement of the Delayed Draw Term Loan Availability Period, (c) the date on which the Delayed Draw Term Loan Commitments are terminated and permanently reduced to zero in accordance with Section 2.5(a)(ii) and (d) the date of the acceleration of the Loans and any other Obligations in accordance with the terms of this

Agreement. For the avoidance of doubt, upon the funding of any portion of the Delayed Draw Term Loan Commitments, the remaining unfunded portion of such Delayed Draw Term Loan Commitments shall automatically be terminated and permanently reduced to zero.

"**Delayed Draw Term Loan Commitments**" means, with respect to the Delayed Draw Term Loan Lender, the commitment of such Delayed Draw Term Loan Lender to make the Delayed Draw Term Loan to the Borrower in the amount set forth in Schedule 1.1(A) hereto or in the Assignment and Acceptance pursuant to which such Delayed Draw Term Loan Lender became a Lender under this Agreement, as such commitment may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"**Delayed Draw Term Loan Lender**" means a Lender with a Delayed Draw Term Loan Commitment or a Delayed Draw Term Loan.

"**Disbursement Letter**" means a disbursement letter, in form and substance satisfactory to the Collateral Agent, by and among the Loan Parties, the Agents, the Lenders and the other Persons party thereto, and the related funds flow memorandum describing the sources and uses of all cash payments in connection with the Transactions to occur on the Effective Date.

"**Disposition**" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person. For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts, (b) any disposition of property through a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, (c) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification) or (d), any sale of merchant accounts (or any rights thereto (including, without limitation, any rights to any residual payment stream with respect thereto)) by any Loan Party.

"**Disqualified Equity Interests**" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payments of dividends or distributions in cash, or (d) is convertible into or exchangeable for (i) Indebtedness or (ii) any other Equity Interests that would constitute Disqualified Equity Interests, in each case of clauses (a) through (d), prior to the date that is six months after the Stated Term Loan Maturity Date.

"**Dollar**", "**Dollars**" and the symbol "**$**" each means lawful money of the United States of America.

"**Domestic Subsidiary**" means any Subsidiary that is organized and existing under the laws of the United States or any state or commonwealth thereof or under the laws of the District of Columbia.

"**Effective Date**" has the meaning specified therefor in Section 5.1.

"**Effective Date Payoff Debt**" means all of the Indebtedness listed on Schedule 1.1(B).

"**Employee Plan**" means an employee benefit plan within the meaning of Section 3(3) of ERISA (other than a Multiemployer Plan), that any Loan Party or any of its ERISA Affiliates maintains, sponsors or contributes to or is obligated to contribute to.

"**Environmental Claim**" means any complaint, investigation, summons, citation, notice, directive, order, claim, litigation, judicial or administrative proceeding, judgment, letter or other communication by or from any Person or Governmental Authority involving any alleged or actual (a) violation of or liability under any Environmental Law, or (b) manufacture, use, handling, generation, transportation, storage, treatment, Release, threatened Release, or disposal or exposure to any Hazardous Materials.

"**Environmental Law**" means any Requirement of Law relating to or concerning (i) the protection of the environment, natural resources, human health or safety, or (ii) the manufacture, use, handling, generation, transportation, storage, treatment, Release, threatened Release, or disposal of or exposure to any Hazardous Material.

"**Environmental Liability**" means all liabilities (contingent or otherwise, known or unknown), monetary obligations, losses (including monies paid in settlement), damages, natural resource damages, costs and expenses (including all reasonable fees, costs, client charges and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest arising directly or indirectly as a result of or based upon (a) any Environmental Claim, (b) any actual, alleged or threatened non-compliance with Environmental Law or Environmental Permit, (c) any actual, alleged or threatened Release of or exposure to Hazardous Materials, (d) any Remedial Action, (e) any environmental condition or (f) any contract, agreement or other arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**Environmental Lien**" means any Lien in favor of any Governmental Authority for Environmental Liability.

"**Environmental Permit**" means any permit, license, authorization, approval, registration or entitlement required by or issued pursuant to any Environmental Law or by any Governmental Authority pursuant to Environmental Law.

"**Equity Interests**" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations, or other ownership, profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting, and (b) all securities convertible into or exchangeable for any of the foregoing and all

warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

"**Equity Issuance**" means either (a) the sale or issuance by any Loan Party or any of its Subsidiaries of any shares of its Equity Interests or (b) the receipt by the Borrower of any cash capital contributions.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time. References to sections of ERISA shall be construed also to refer to any successor sections.

"**ERISA Affiliate**" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" or under "common control" within the meaning of Sections 414(b), (c), (m) or (o) of the Internal Revenue Code or Sections 4001(a)(14) or 4001(b)(1) of ERISA.

"**ERISA Event**" means (a) the occurrence of a Reportable Event with respect to any Pension Plan; (b) the failure to meet the minimum funding standards of Section 412 or 430 of the Internal Revenue Code or Section 302 or 303 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA) or the failure to make a contribution or installment required under Section 412 or 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (c) a determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA); (d) a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Internal Revenue Code or Section 305 of ERISA; (e) the filing of a notice of intent to terminate a Pension Plan or the treatment of an amendment to a Pension Plan as a termination under Section 4041 of ERISA; (f) the withdrawal by any Loan Party or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to any Loan Party or any of its ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA; (g) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition that might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan; (h) the imposition of liability on any Loan Party or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069(a) of ERISA or by reason of the application of Section 4212(c) of ERISA; (i) the withdrawal of any Loan Party or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan or the receipt by any Loan Party or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (j) the occurrence of an act or omission which could give rise to imposition on any Loan Party or any of its ERISA Affiliates of fines, penalties, taxes or related charges under Section 4975 or 4971 of the Internal Revenue Code or under Section 409, 502(c), (i) or (l), or 4071 of ERISA in respect of any Employee Plan; (k) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent, upon any Loan

Party or any of its ERISA Affiliates; (l) the assertion of a claim (other than routine claims for benefits) against any Employee Plan or the assets thereof, or against any Loan Party or any of its ERISA Affiliates in connection with any Employee Plan or Multiemployer Plan; (m) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any such Pension Plan (or such other Employee Plan) to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; (n) the imposition on any Loan Party of any material fine, excise tax or penalty with respect to any Employee Plan or Multiemployer Plan resulting from any noncompliance with any Requirements of Law; or (o) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Erroneous Distribution**" has the meaning specified therefor in Section 9.16.

"**Event of Default**" has the meaning specified therefor in Section 8.1.

"**Excess Cash Flow**" means, with respect to any Person for any period, an amount (if positive) equal to: (a) Consolidated Adjusted EBITDA of such Person and its Subsidiaries for such period, less (b) the sum of, without duplication, (i) all cash principal payments on the Loans made during such period, and all cash principal payments on other Indebtedness (other than Indebtedness incurred under this Agreement) of such Person or any of its Subsidiaries during such period to the extent such other Indebtedness is permitted to be incurred, and such payments are permitted to be made, under this Agreement (but, in the case of revolving loans, only to the extent that the revolving credit commitment in respect thereof is permanently reduced by the amount of such payments), (ii) all Consolidated Net Interest Expense to the extent paid or payable in cash during such period, (iii) the cash portion of Capital Expenditures made by such Person and its Subsidiaries during such period to the extent permitted to be made under this Agreement (excluding Capital Expenditures to the extent financed through the incurrence of Indebtedness or through an Equity Issuance), (iv) all scheduled loan servicing fees and other similar fees in respect of Indebtedness of such Person or any of its Subsidiaries paid in cash during such period, to the extent such Indebtedness is permitted to be incurred, and such payments are permitted to be made, under this Agreement, (v) income Taxes paid in cash by such Person and its Subsidiaries for such period, (vi) all cash expenses, cash charges, cash losses and other cash items that were added back in the determination of Consolidated Adjusted EBITDA for such period, (vii) the excess, if any, of Working Capital at the end of such period over Working Capital at the beginning of such period (or minus the excess, if any, of Working Capital at the beginning of such period over Working Capital at the end of such period), (viii) to the extent added back in the determination of Consolidated Adjusted EBITDA, reimbursement of costs and expenses of the Board of Directors of Borrower paid in cash during such period and not to exceed $500,000 in any Fiscal Year, (ix) reimbursement of out-of-pocket costs and expenses related to any Permitted Acquisitions paid in cash and not to exceed $500,000, and (x) all other cash charges or expenses added back to Consolidated Adjusted EBITDA during such measurement period.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Excluded Account**" means any (a) deposit account specifically and exclusively used for payroll, payroll Taxes and other employee wage and benefit payments to or for the benefit

of any Loan Party's employees, (b) zero balance accounts which are swept into a Controlled Account (both before and after giving effect to any exercise of cash dominion or control over such Controlled Account), and (c) other deposit accounts with funds on deposit averaging less than $100,000; provided, however, that if, as of the last Business Day of any calendar month, the balance in any such deposit account described in this clause (c) exceeds $50,000, then the Loan Parties shall, within five (5) Business Days after the end of such month, transfer or cause to be transferred the portion of such excess above $50,000 to a Controlled Account.

"**Excluded Equity Issuance**" means (a) in the event that the Borrower or any of its Subsidiaries forms any Subsidiary in accordance with this Agreement, the issuance by such Subsidiary of Equity Interests to the Borrower or such Subsidiary, as applicable, (b) the issuance of Equity Interests by the Borrower to any Person that is an equity holder of the Borrower prior to such issuance (an "**Equity Holder**") so long as (i) such Equity Holder did not acquire any Equity Interests of the Borrower so as to become an Equity Holder concurrently with, or in contemplation of, the issuance of such Equity Interests to such Equity Holder and (ii) such issuance does not result in the receipt of cash proceeds by the Borrower or any of its Subsidiaries, (c) the issuance of Equity Interests of the Borrower to directors, officers and employees of the Borrower and its Subsidiaries pursuant to employee stock option plans (or other employee incentive plans or other compensation arrangements) approved by the Board of Directors of the Borrower, and in each case in accordance with this Agreement, and (d) the issuance of Equity Interests by a Subsidiary of the Borrower to its parent or member in connection with the contribution by such parent or member to such Subsidiary of the proceeds of an issuance described in clauses (a) – (c) above.

"**Excluded Subsidiary**" means any Foreign Subsidiary which is not organized or incorporated in a Qualified Jurisdiction and which is a "controlled foreign corporation" as defined under Section 957 of the Internal Revenue Code ("**CFC**"); provided that immediately upon the effectiveness of any amendment of the Internal Revenue Code to allow any such Person described herein to guarantee the Obligations, without material adverse tax consequences to the Borrower and its Subsidiaries, such Person shall not be an Excluded Subsidiary and (unless the Collateral Agent consents otherwise in writing), shall execute and deliver the agreements, instruments and other documents required by Section 7.1(b).

"**Excluded Swap Obligation**" means, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason not to constitute an "eligible contract participant" as defined in the Commodity Exchange Act at the time the guarantee of such Guarantor becomes effective with respect to such related Swap Obligation.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are

Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower under Section 2.12(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.9, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.9(d) and (d) any withholding Taxes imposed under FATCA.

"**Executive Order No. 13224**" means the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, as the same has been, or shall hereafter be, renewed, extended, amended or replaced.

"**Extraordinary Receipts**" means any cash received by the Borrower or any of its Subsidiaries not in the ordinary course of business (and not consisting of proceeds described in Section 2.5(c)(ii) or (iii)), including, without limitation, (a) foreign, United States, state or local Tax refunds, (b) pension plan reversions, (c) proceeds of insurance (other than to the extent such insurance proceeds are (i) immediately payable to a Person that is not the Borrower or any of its Subsidiaries in accordance with applicable Requirements of Law or with Contractual Obligations entered into in the ordinary course of business or (ii) proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not an Affiliate of the Borrower or any of its Subsidiaries) and (g) any purchase price adjustment received in connection with any purchase agreement.

"**Facility**" means the real property owned or leased by a Loan Party and identified on Schedule 6.1(o) and any New Facility hereafter acquired by the Borrower or any of its Subsidiaries, including, without limitation, in the case of a fee interest, the land on which each such facility is located, all buildings and other improvements thereon, and all fixtures located thereat or used in connection therewith.

"**Fair Share**" has the meaning specified therefor in Section 10.6.

"**Fair Share Contribution Amount**" has the meaning specified therefor in Section 10.6.

"**FASB ASC**" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal, Tax or regulatory legislation, rules or official practices adopted

pursuant to any intergovernmental agreement entered into in connection with the implementation of Sections 1471 through 1474 of the Internal Revenue Code and the Treasury Regulations thereunder.

"**FCPA**" has the meaning specified therefor in the definition of "Anti-Corruption Laws".

"**Federal Funds Rate**" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Fee Letter**" means the fee letter, dated as of the date hereof, among the Loan Parties and the Agents.

"**Financial Statements**" means (a) the audited consolidated balance sheet of the Borrower and its Subsidiaries for the Fiscal Years ended December 31, 2023 and December 31, 2024, and the related consolidated statement of operations, shareholders' equity and cash flows for the Fiscal Years then ended, and (b) the unaudited consolidated balance sheet of the Borrower and its Subsidiaries for the three months ended March 31, 2025, and the related consolidated statement of operations, shareholder's equity and cash flows for such period.

"**Fiscal Year**" means the fiscal year of the Borrower and its Subsidiaries ending on December 31 of each year.

"**Fixed Charge Coverage Ratio**" means, with respect to any Person for any period, the ratio of (a) Consolidated Adjusted EBITDA of such Person and its Subsidiaries for such period minus Capital Expenditures made by such Person and its Subsidiaries during such period not financed with the proceeds of Equity Interests or Indebtedness, to (b) the sum of (i) all principal of Indebtedness described in clauses (a), (c), (d), (e) and (f) in the definition thereof of such Person and its Subsidiaries (excluding any Subordinated Indebtedness of such Person and its Subsidiaries then outstanding) scheduled to be paid or prepaid during such period to the extent there is an equivalent permanent reduction in the commitments thereunder, plus (ii) Consolidated Net Interest Expense of such Person and its Subsidiaries for such period, plus (iii) income Taxes paid or payable by such Person and its Subsidiaries during such period, plus (iv) cash dividends or distributions paid, or the purchase, redemption or other acquisition or retirement for value (including in connection with any merger or consolidation), by such Person or any of its Subsidiaries, in respect of the Equity Interests of such Person or any of its Subsidiaries (other than dividends or distributions paid by a Loan Party to any other Loan Party) during such period, plus (v) all management, consulting, monitoring, and advisory fees paid by such Person or any of its Subsidiaries to any of its Affiliates during such period.

"**Flood Insurance Laws**" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (b) the Flood Disaster Protection Act of

1973 as now or hereafter in effect or any successor statute thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC § 4001, *et seq.*), as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

"**Floor**" means 4.00%.

"**Foreign Lender**" has the meaning specified therefor in Section 2.9(d)(i)(B).

"**Foreign Sovereign Immunities Act**" means the US Foreign Sovereign Immunities Act of 1976 (28 U.S.C. Sections 1602-1611), as amended.

"**Foreign Subsidiary**" means any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"**Funding Losses**" has the meaning specified therefor in Section 2.8.

"**GAAP**" means (a) when used in reference to the Canadian Guarantor, the ASPE in Canada from time to time established by the Canadian Accounting Standards Board applied on a consistent basis, and (b) when used in any other context, generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis, provided that for the purpose of Section 7.3 and the definitions used therein, "GAAP" shall mean ASPE, or generally accepted accounting principles in the United States, as applicable, in effect on the date hereof, provided further that if there occurs after the date of this Agreement any change in GAAP that affects in any respect the calculation of any covenant contained in Section 7.3, the Collateral Agent and the Borrower shall negotiate in good faith amendments to the provisions of this Agreement that relate to the calculation of such covenant with the intent of having the respective positions of the Lenders and the Borrower after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the covenants in Section 7.3 shall be calculated as if no such change in GAAP has occurred.

"**Governing Documents**" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization, governance and capitalization; and (d) with respect to any of the entities described above, any other agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"**Governmental Authority**" means any nation or government, any federal, state, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or

pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Guaranteed Obligations**" has the meaning specified therefor in Section 10.1.

"**Guarantor**" means (a) each Subsidiary of the Borrower listed as a "Guarantor" on the signature pages hereto, and (b) each other Person which guarantees, pursuant to Section 7.1(b) or otherwise, all or any part of the Obligations.

"**Guaranty**" means (a) the guaranty of each Guarantor party hereto contained in Article X and (b) each other guaranty, in form and substance satisfactory to the Collateral Agent, made by any other Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders guaranteeing all or part of the Obligations.

"**Hazardous Material**" means any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic or hazardous substance, hazardous waste, special waste or solid waste or words of similar import under any Environmental Law or that is otherwise regulated under or for which liability or standards of care are imposed pursuant to any Environmental Law, including, without limitation, petroleum, polychlorinated biphenyls; asbestos-containing materials, urea formaldehyde-containing materials radioactive materials and toxic mold.

"**Hedging Agreement**" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"**Highest Lawful Rate**" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"**Holdout Lender**" has the meaning specified therefor in Section 11.2(c).

"**Increased Amount Date**" has the meaning specified therefor in Section 2.13(a).

"**Incremental Amendment**" has the meaning specified therefor in Section 2.13(b).

"**Incremental Term Loan Commitment**" means the commitment of any Incremental Term Loan Lender to make Incremental Term Loans pursuant to Section 2.13 and as further set forth in any Incremental Amendment, as such commitment may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"**Incremental Term Loan Lender**" means a Lender with an Incremental Term Loan Commitment or an Incremental Term Loan.

"**Incremental Term Loans**" means, collectively, the loans made by the Incremental Term Loan Lenders to the Borrower pursuant to Section 2.13 and any Incremental Amendment.

"**Indebtedness**" means, with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money; (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables or other accounts payable incurred in the ordinary course of such Person's business and not outstanding for more than 90 days after the date such payable was created and any earn-out, purchase price adjustment or similar obligation until such obligation appears in the liabilities section of the balance sheet of such Person); (c) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (d) all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property; (e) all Capitalized Lease Obligations of such Person; (f) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (g) all obligations and liabilities, calculated on a basis satisfactory to the Agents and in accordance with accepted practice, of such Person under Hedging Agreements; (h) all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, tax ownership/operating lease, off-balance sheet financing or similar financing; (i) all Contingent Obligations; (j) all Disqualified Equity Interests; and (k) all obligations referred to in clauses (a) through (j) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness. The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"**Indemnified Matters**" has the meaning specified therefor in Section 11.15(a).

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Indemnitees**" has the meaning specified therefor in Section 11.15(a).

"**Information Certificate**" means a certificate in the form of Exhibit C.

"**Initial Term Loan**" means the loans made by the Initial Term Loan Lender to the Borrower on the Effective Date pursuant to Section 2.1(a)(i).

"**Initial Term Loan Commitments**" means, with respect to each Initial Term Loan Lender, the commitment of such Initial Term Loan Lender to make the Initial Term Loan to the

Borrower in the amount set forth in Schedule 1.1(A) hereto or in the Assignment and Acceptance pursuant to which such Initial Term Loan Lender became a Lender under this Agreement, as such commitment may be terminated or reduced from time to time in accordance with the terms of this Agreement.

"**Initial Term Loan Lender**" means a Lender with an Initial Term Loan Commitment or an Initial Term Loan.

"**Insolvency Proceeding**" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"**Intellectual Property**" has the meaning specified therefor in the Security Agreement.

"**Intellectual Property Contracts**" means all written agreements concerning Intellectual Property, including without limitation license agreements, technology consulting agreements, confidentiality agreements, co-existence agreements, consent agreements and non-assertion agreements.

"**Intellectual Property Security Agreement**" means the appropriate Intellectual Property Security Agreement, substantially in the form of Exhibit B to the Security Agreement, made by each Loan Party holding any Intellectual Property, in favor of the Collateral Agent for the benefit of the Secured Parties, or the equivalent form governed by the laws of such other jurisdiction.

"**Intercompany Subordination Agreement**" means an Intercompany Subordination Agreement made by the Borrower and its Subsidiaries in favor of the Collateral Agent for the benefit of the Agents and the Lenders, in form and substance reasonably satisfactory to the Collateral Agent.

"**Interest Period**" means, with respect to each Term SOFR Rate Loan, a period commencing on the date of the making of such Term SOFR Rate Loan (or the continuation of a Term SOFR Rate Loan or the conversion of a Reference Rate Loan to a Term SOFR Rate Loan) and ending one or three months thereafter; provided, however, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to clauses (c)-(f) below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon Term SOFR from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is one or three months after the date on which the Interest Period began, as applicable, (e) no tenor that has been removed from this definition pursuant to Section 2.7(e) shall be available for specification in any Notice of Borrowing or Term SOFR Rate Notice,

and (f) the Borrower may not elect an Interest Period which will end after the Stated Term Loan Maturity Date.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended.

"**Inventory**" means, with respect to any Person, all goods and merchandise of such Person leased or held for sale or lease by such Person, including, without limitation, all raw materials, work-in-process and finished goods, and all packaging, supplies and materials of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account or cash.

"**Investment**" means, with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding Accounts arising in the ordinary course of business), capital contributions or acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities), Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (b) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or (c) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.

"**Joinder Agreement**" means a Joinder Agreement, substantially in the form of Exhibit A hereto, duly executed by a Subsidiary of a Loan Party and made a party hereto as a Borrower or a Guarantor pursuant to Section 7.1(b).

"**Knight**" means Knight Therapeutics International S.A.

"**Knight Agreement**" means that certain Distribution, License and Supply Agreement made in favor of Knight, dated as of January 22, 2015 (as amended, restated, supplemented or otherwise modified from time to time prior to the date hereof).

"**Lease**" means any lease, sublease or license of, or other agreement granting a possessory interest in, real property to which any Loan Party or any of its Subsidiaries is a party as lessor, lessee, sublessor, sublessee, licensor or licensee.

"**Lender**" has the meaning specified therefor in the preamble to this Agreement.

"**Lien**" means any mortgage, deed of trust, deed to secure debt, pledge, lien (statutory or otherwise), security interest, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"**Liquidity**" means, as of any date of determination, the sum of (a) any availability under any ABL Facility, if applicable, on such date and (b) aggregate amount of Unrestricted Cash.

"**Loan**" means the Term Loans or any portion thereof, or any Agent Advance made by an Agent or a Lender to the Borrower pursuant to Article II or Section 9.8, as the case may be.

"**Loan Account**" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrower, in which the Borrower will be charged with all Loans made to, and all other Obligations incurred by, the Borrower.

"**Loan Document**" means this Agreement, any Control Agreement, the Disbursement Letter, any Guaranty, the Fee Letter, the Intercompany Subordination Agreement, any Joinder Agreement, any Mortgage, any Security Agreement, any Intellectual Property Security Agreement, any UCC Filing Authorization Letter, any PPSA financing statements, any Subordination Agreement, any other pledge or security agreement, any other subordination agreement, any landlord waiver, any collateral access agreement, any Information Certificate and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.

"**Loan Party**" means the Borrower and any Guarantor.

"**Material Adverse Effect**" means a material adverse effect on any of (a) the operations, assets, liabilities, or financial condition of the Loan Parties taken as a whole, (b) the ability of the Loan Parties taken as a whole to perform any of their obligations under any Loan Document, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies of any Agent or any Lender under any Loan Document, or (e) the validity, perfection or priority of any Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral.

"**Material Contract**" means, with respect to any Person, (a) each of the Sanders Notes, (b) the Consulting Services Agreement, (c) each contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $500,000 or more in any Fiscal Year, and (d) all other contracts or agreements as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.

"**Material Indebtedness**" means (a) any Indebtedness in an amount equal to or greater than $500,000 and (b) any Sanders Note.

"**Moody's**" means Moody's Investors Service, Inc. and any successor thereto.

"**Mortgage**" means a mortgage, deed of trust or deed to secure debt, covering a fee interest, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders, securing the Obligations and delivered to the Collateral Agent.

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed, or has been obligated to contribute, to at any time during the preceding the six calendar years.

"**Net Cash Proceeds**" means, with respect to, any issuance or incurrence of any Indebtedness, any Equity Issuance, any Disposition or the receipt of any Extraordinary Receipts by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (a) in the case of any Disposition or the receipt of any Extraordinary Receipts consisting of insurance proceeds or condemnation awards, the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection therewith (other than Indebtedness under this Agreement), (b) reasonable expenses related thereto incurred by such Person or such Subsidiary in connection therewith (including, but not limited to, sales commissions and legal, accounting and investment banking fees, commissions and expenses), (c) transfer Taxes paid to any taxing authorities by such Person or such Subsidiary in connection therewith, (d) any portion of such proceeds deposited in an escrow account pursuant to the documentation relating to any Disposition (provided that such amounts shall be treated as Net Cash Proceeds upon their release from such escrow account to the applicable Loan Party) and (e) net income Taxes to be paid in connection therewith (after taking into account any Tax credits or deductions and any tax sharing arrangements), in each case, to the extent, but only to the extent, that the amounts so deducted are (i) actually paid to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (ii) properly attributable to such transaction or to the asset that is the subject thereof.

"**New Facility**" has the meaning specified therefor in Section 7.1(n).

"**Notice of Borrowing**" has the meaning specified therefor in Section 2.2(a).

"**Obligations**" means all present and future indebtedness (including Agent Advances), obligations, and liabilities of each Loan Party to the Agents and the Lenders arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 8.1. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal, interest, charges, expenses, fees, premiums (including the Applicable Premium), attorneys' fees and disbursements, indemnities and other amounts payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent or any Lender (in its sole discretion) may elect to pay or advance on behalf of such Person. Notwithstanding any of the foregoing, Obligations shall not include any Excluded Swap Obligations.

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become

a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Participant Register**" has the meaning specified therefor in Section 11.7(i).

"**Payment Office**" means the Administrative Agent's office located at 600 Lexington Ave., 14th Floor New York, New York 10022, or at such other office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Borrower.

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means an Employee Plan that is subject to Section 412 of the Internal Revenue Code, Section 302 of ERISA or Title IV of ERISA maintained, sponsored or contributed to, or for which there is an obligation to contribute to, by any Loan Party or any of its ERISA Affiliates at any time during the preceding six calendar years.

"**Periodic Term SOFR Determination Day**" has the meaning specified in the definition of "Term SOFR".

"**Permitted Acquisition**" means any Acquisition by a Person to the extent that each of the following conditions shall have been satisfied:

(a) no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the proposed Acquisition;

(b) to the extent the Acquisition will be financed in whole or in part with the proceeds of any Loan, the conditions set forth in Section 5.2 shall have been satisfied;

(c) the Borrowers shall have furnished to the Agents at least twenty (20) Business Days (or such shorter period as the Agents may agree in their sole discretion) prior to the consummation of such Acquisition (i) an executed term sheet and/or commitment letter (setting forth in reasonable detail the terms and conditions of such Acquisition) and, at the request of any Agent, such other information and documents that any Agent may request, including, without limitation, drafts of the respective agreements, instruments or other documents pursuant to which such Acquisition is to be consummated (including, without limitation, any related management, non-compete, employment, option or other material agreements), any schedules to such agreements, instruments or other documents and all other material ancillary agreements, instruments or other documents to be executed or delivered in connection therewith, (ii) pro forma financial statements of the Borrower and its Subsidiaries after the consummation of such

Acquisition, (iii) a certificate of the chief financial officer of the Borrower, demonstrating on a pro forma basis compliance, as at the end of the most recently ended fiscal quarter for which internally prepared financial statements are available, with all covenants set forth in Section 7.3 after the consummation of such Acquisition, and (iv) copies of such other agreements, instruments or other documents as any Agent shall reasonably request;

(d) such Acquisition shall be effected in such a manner so that the acquired assets or Equity Interests are owned by a Loan Party and, if effected by merger or consolidation involving such Loan Party, such Loan Party shall be the continuing or surviving Person;

(e) the Loan Parties shall have Liquidity in an amount equal to or greater than $2,500,000 immediately after giving effect to the consummation of the proposed Acquisition;

(f) the assets being acquired (other than a de minimis amount of assets in relation to the assets being acquired) are located within a Qualified Jurisdiction or the Person whose Equity Interests are being acquired is organized in a jurisdiction located within a Qualified Jurisdiction;

(g) such Acquisition shall be consensual and shall have been approved by the board of directors of the Person whose Equity Interests or assets are proposed to be acquired and shall not have been preceded by an unsolicited tender offer for such Equity Interests by, or proxy contest initiated by, any Borrower or any of its Subsidiaries or an Affiliate thereof;

(h) any such Subsidiary (and its equityholders) shall execute and deliver the agreements, instruments and other documents required by Section 7.1(b) on or prior to the date of the consummation of such Acquisition (or such later date as may be agreed by the Agent); and

(i) such Acquisition shall be subject to the Agent's prior written approval (such approval not to be unreasonably withheld).

"**Permitted Business**" means the manufacture and provision of consumer health care, beauty, and lifestyle products and any business similar in nature to such business conducted by the Borrower and its Subsidiaries on the Effective Date and any business reasonably ancillary, incidental, complementary or related to the business conducted by Borrower and its Subsidiaries on the Effective Date or a reasonable extension, development or expansion thereof, in each case, as determined in good faith by the Board of Directors of the Borrower.

"**Permitted Disposition**" means:

(a) sale of Inventory in the ordinary course of business;

(b) licensing, on a non-exclusive basis, Intellectual Property rights in the ordinary course of business;

(c) leasing or subleasing assets in the ordinary course of business;

(d) (i) the lapse of Registered Intellectual Property of the Borrower and its Subsidiaries to the extent not economically desirable in the conduct of their business or (ii) the abandonment of Intellectual Property rights in the ordinary course of business so long as (in each, case under clauses (i) and (ii)), (A) with respect to copyrights, such copyrights are not material revenue generating copyrights, and (B) such lapse is not materially adverse to the interests of the Secured Parties;

(e) any involuntary loss, damage or destruction of property;

(f) any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(g) so long as no Event of Default has occurred and is continuing or would result therefrom, transfers of assets (i) from any Loan Party to another Loan Party, and (ii) from any Subsidiary that is not a Loan Party to a Loan Party;

(h) Dispositions of cash and/or Cash Equivalents;

(i) Dispositions of assets that would constitute a Permitted Restricted Payment or a Permitted Investment;

(j) Disposition of obsolete or worn-out equipment in the ordinary course of business;

(k) so long as no Default or Event of Default has occurred and is continuing or would result therefrom, Disposition of property or assets not otherwise permitted in clauses (a) through (j) above for cash in an aggregate amount not less than the fair market value of such property or assets where no less than 75% of the consideration is received in cash; provided that the Net Cash Proceeds of such Dispositions (including the proposed Disposition) in the case of this clause (k), do not exceed $350,000 in the aggregate in any Fiscal Year; and

(l) Dispositions of assets acquired by a Loan Party pursuant to a Permitted Acquisition consummated within 12 months of the date of the proposed disposition so long as (i) the consideration received for the assets to be so disposed is at least equal to the fair market value of such assets, (ii) the assets to be so disposed are not necessary or economically desirable in connection with the business of Loan Parties, and (iii) the assets to be disposed of are readily identifiable as assets acquired pursuant to the subject Permitted Acquisition.

Net Cash Proceeds in all cases are to be paid to the Collateral Agent for the benefit of the Agents and the Lenders pursuant to and to the extent required under the terms of Section 2.5(c)(ii) or applied as provided in Section 2.5(c)(vi).

"**Permitted Indebtedness**" means:

(a) any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents;

(b) any other Indebtedness listed on Schedule 7.2(b), and any Permitted Refinancing Indebtedness in respect of such Indebtedness;

(c) Permitted Purchase Money Indebtedness and any Permitted Refinancing Indebtedness in respect of such Indebtedness;

(d) Permitted Intercompany Investments;

(e) Indebtedness incurred in the ordinary course of business under performance, surety, statutory and appeal bonds;

(f) Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during such period;

(g) Indebtedness in respect of Taxes, assessments or other governmental charges to the extent that payment thereof shall not at the time be required to be made in accordance with Section 7.1(c)(ii);

(h) the incurrence by any Loan Party of Indebtedness under Hedging Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with such Loan Party's operations and not for speculative purposes;

(i) Indebtedness incurred in respect of credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business;

(j) customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business;

(k) Indebtedness in respect of cash management obligations (including ordinary course overdraft obligations) and netting services, automatic clearinghouse and similar arrangements in connection with deposit accounts in the ordinary course of business;

(l) Indebtedness under an ABL Facility incurred after the Effective Date;

(m) Subordinated Indebtedness consisting of (i) Indebtedness evidenced by the Sanders Notes and (ii) other Indebtedness in an original principal amount not to exceed $500,000 at any time outstanding with respect to all such Indebtedness under this clause (ii), and in each case with respect to the foregoing clauses (i) – (ii), so long as (A) no Event of Default has occurred and is continuing or would result therefrom, (B) such Indebtedness is not incurred for working capital purposes, (C) such Indebtedness does not mature prior to the date that is 91 days after the Stated Term Loan Maturity Date, (D) such Indebtedness does not amortize until 91 days after the Stated Term Loan Maturity Date, (E) such Indebtedness does not permit payment of interest

thereon in cash or Cash Equivalents, except with respect to the Sanders Notes and subject to compliance with the Sanders Notes Interest Payment Conditions, and (F) such Indebtedness is subject to a Subordination Agreement;

(n) contingent liabilities in respect of any indemnification obligation, adjustment of purchase price, non-compete, or similar obligation of any Loan Party incurred in connection with the consummation of one or more Permitted Acquisitions;

(o) unsecured Indebtedness of any Loan Party in respect of earn-outs owing to sellers of assets or Equity Interests to such Loan Party that is incurred in connection with the consummation of one or more Permitted Acquisitions so long as such unsecured Indebtedness is on terms and conditions acceptable to the Administrative Agent; and

(p) Indebtedness of a Person whose assets or Equity Interests are acquired by a Loan Party in a Permitted Acquisition in an aggregate amount not to exceed $250,000 at any one time outstanding; provided, that, such Indebtedness (i) is either purchase money Indebtedness or a Capitalized Lease with respect to equipment or mortgage financing with respect to real property, (ii) was in existence prior to the date of such Permitted Acquisition, and (iii) was not incurred in connection with, or in contemplation of, such Permitted Acquisition.

"**Permitted Intercompany Investments**" means Investments made by (a) a Loan Party to or in another Loan Party, (b) a Subsidiary that is not a Loan Party to or in another Subsidiary that is not a Loan Party, (c) a Subsidiary that is not a Loan Party to or in a Loan Party, so long as, in the case of a loan or advance, the parties thereto are party to the Intercompany Subordination Agreement, (d) loans or advances to an employee of any Loan Party other than loans in an aggregate amount (for all Loan Parties) not to exceed $100,000 provided that such loans are used to purchase Equity Interests in Borrower and at the time of the loan no Default or Event of Default exists, and (e) a Loan Party to or in a Subsidiary that is not a Loan Party so long as (i) the aggregate amount of all such Investments made by the Loan Parties to or in Subsidiaries that are not Loan Parties does not exceed $250,000 at any time outstanding, (ii) no Default or Event of Default has occurred and is continuing either before or after giving effect to such Investment, and (iii) Liquidity is not less than $2,500,000 after giving effect to such Investment.

"**Permitted Investments**" means:

(a) Investments in cash and Cash Equivalents;

(b) Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c) advances made in connection with purchases of goods or services in the ordinary course of business;

(d) Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries;

(e) Investments existing on the date hereof, as set forth on Schedule 7.2(e), but not any increase in the amount thereof as set forth in such Schedule or any other modification of the terms thereof;

(f) Permitted Intercompany Investments;

(g) [reserved];

(h) payroll, commissions, travel and similar advances made to employees to cover matters that are expected at the time of such advances ultimately to be treated as expenses of the Loan Parties or any of their Subsidiaries for accounting purposes and that are made in the ordinary course of business;

(i) Investments consisting of endorsements for collection or deposit in the ordinary course of business;

(j) security deposits provided to landlords, utility companies and governmental authorities in the ordinary course of business;

(k) so long as no Default or Event of Default has occurred and is continuing or would result therefrom, any other Investments in an aggregate amount, together with the aggregate amount of Investments made pursuant to clause (m) below, not to exceed $250,000 at any time outstanding;

(l) Permitted Acquisitions; and

(m) Investments held by a Person acquired in a Permitted Acquisition, provided that (i) such Investments were not made in contemplation of or in connection with such Permitted Acquisition and were in existence on the date of such Permitted Acquisition, (ii) the aggregate amount of such Investments, together with the aggregate amount of Investments made pursuant to clause (k) above, shall not exceed $250,000 at any time outstanding, and (iii) such Investments are not to be amended, increased, renewed, extended or otherwise modified after the consummation of such Permitted Acquisition in any manner that is adverse to the interests of the Agent.

"**Permitted Liens**" means:

(a) Liens securing the Obligations;

(b) Liens for Taxes, assessments and governmental charges the payment of which is not required under Section 7.1(c)(ii);

(c) Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than 30 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d) Liens described on Schedule 7.2(a), provided that any such Lien shall only secure the Indebtedness that it secures on the Effective Date and any Permitted Refinancing Indebtedness in respect thereof;

(e) purchase money Liens on equipment acquired or held by any Loan Party or any of its Subsidiaries in the ordinary course of its business to secure Permitted Purchase Money Indebtedness so long as such Lien only (i) attaches to such property and (ii) secures the Indebtedness that was incurred to acquire such property or any Permitted Refinancing Indebtedness in respect thereof;

(f) deposits and pledges of cash securing (i) obligations incurred in respect of workers' compensation, unemployment insurance or other forms of governmental insurance or benefits, (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations, or (iii) obligations on surety or appeal bonds, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g) with respect to any Facility, easements, zoning restrictions and similar encumbrances on real property and minor irregularities in the title thereto that do not (i) secure obligations for the payment of money or (ii) materially impair the value of such property or its use by any Loan Party or any of its Subsidiaries in the normal conduct of such Person's business;

(h) Liens of landlords and mortgagees of landlords (i) arising by statute or under any Lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord or (iii) for amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(i) the title and interest of a lessor or sublessor in and to personal property leased or subleased (other than through a Capitalized Lease), in each case extending only to such personal property;

(j) non-exclusive licenses of Intellectual Property rights in the ordinary course of business;

(k) judgment liens (other than for the payment of Taxes, assessments or other governmental charges) securing judgments and other proceedings not constituting an Event of Default under Section 8.1(j);

(l) rights of set-off or bankers' liens upon deposits of cash in favor of banks or other depository institutions, solely to the extent incurred in connection with the maintenance of such deposit accounts in the ordinary course of business;

(m) Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of "Permitted Indebtedness";

(n) Liens securing Indebtedness permitted by clause (l) of the definition of "Permitted Indebtedness", provided that such Liens shall be subject to an intercreditor agreement and other documentation satisfactory in form and substance to the Agents in their sole discretion;

(o) [reserved];

(p) other Liens which do not secure Indebtedness for borrowed money or letters of credit and as to which the aggregate amount of the obligations secured thereby does not exceed $250,000;

(q) Liens solely on any cash earnest money deposits made by a Loan Party in connection with any letter of intent or purchase agreement with respect to a Permitted Acquisition in an amount not to exceed five percent (5%) of the purchase price of such Permitted Acquisition; and

(r) Liens assumed by any Loan Party in connection with a Permitted Acquisition that secure Indebtedness of a Person whose assets or Equity Interests are acquired by a Loan Party in a Permitted Acquisition which Indebtedness is permitted under clause (p) of the definition of "Permitted Indebtedness".

"**Permitted Purchase Money Indebtedness**" means, as of any date of determination, Indebtedness (other than the Obligations, but including Capitalized Lease Obligations) incurred to finance the acquisition of any fixed assets secured by a Lien permitted under clause (e) of the definition of "Permitted Liens"; provided that (a) such Indebtedness is incurred within 30 days after such acquisition, (b) such Indebtedness when incurred shall not exceed the purchase price of the asset financed and (c) the aggregate principal amount of all such Indebtedness shall not exceed $200,000 at any time outstanding.

"**Permitted Refinancing Indebtedness**" means the extension of maturity, refinancing or modification of the terms of Indebtedness so long as:

(a) after giving effect to such extension, refinancing or modification, the amount of such Indebtedness is not greater than the amount of Indebtedness outstanding immediately prior to such extension, refinancing or modification;

(b) such extension, refinancing or modification does not result in a shortening of the average weighted maturity (measured as of the extension, refinancing or modification) of the Indebtedness so extended, refinanced or modified;

(c) such extension, refinancing or modification is pursuant to terms that are not less favorable to the Loan Parties and the Lenders than the terms of the Indebtedness (including, without limitation, terms relating to the collateral (if any) and subordination (if any)) being extended, refinanced or modified; and

(d) the Indebtedness that is extended, refinanced or modified is not recourse to any Loan Party or any of its Subsidiaries that is liable on account of the obligations other than

those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed or extended.

"**Permitted Restricted Payments**" means any of the following Restricted Payments made by:

(a) any Subsidiary of the Borrower to the Borrower;

(b) fees paid by the Borrower to independent directors in an aggregate amount in any Fiscal Year not to exceed $250,000, provided such directors' fees are customary and reasonable for directors in a similar business to the Permitted Business;

(c) bonuses paid or other comparable payments made by the Borrower to the Borrower's officers and members of management by the Borrower in amounts materially consistent with the past compensation practice of the Borrower and customary and reasonable for officers and members of management in a business similar to the Permitted Business;

(d) any compensation paid, directly or indirectly, to any one Person pursuant to any employment agreements, consulting services contracts (including the Consulting Services Agreement), management services contracts, labor services contracts or similar agreements or arrangements for the services of such Person (whether pursuant to one agreement or multiple agreements) as approved by the Board of Directors, in such amounts as approved by the Board of Directors, provided that the amount of such compensation paid in cash shall not exceed $1,000,000 for any Fiscal Year; and

(e) the Borrower to pay dividends in the form of Qualified Equity Interests.

"**Permitted Specified Liens**" means Permitted Liens described in clauses (a), (b) and (c) of the definition of "Permitted Liens", and, solely in the case of Section 7.1(b)(i), including clauses (g), (h) and (i) of the definition of "Permitted Liens".

"**Person**" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"**Pledged Promissory Note**" means that certain Amended and Restated Promissory Note, dated August 28, 2024, made by Boombod Ltd., a UK Corporation, to the order of the Borrower, in the original principal amount of $4,424,547.

"**Post-Default Rate**" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 2.0%, or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any Loan then outstanding prior to an Event of Default plus 2.0%.

"**PPSA**" shall mean the *Personal Property Security Act* (or any successor statutes) as the same may, from time to time, be in effect in the Province of Ontario or a similar act or statute as in effect in such other jurisdiction in Canada for purposes of the provisions of this Agreement.

"**Pro Rata Share**" means, with respect to:

(a) an Initial Term Loan Lender's obligation to make the Initial Term Loan and the right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Initial Term Loan Lender's Initial Term Loan Commitment, by (ii) the Total Initial Term Loan Commitment, provided that if the Total Initial Term Loan Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the Initial Term Loan and any Agent Advances and the denominator shall be the aggregate unpaid principal amount of the Initial Term Loan and any Agent Advances;

(b) a Delayed Draw Term Loan Lender's obligation to make the Delayed Draw Term Loan and the right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Delayed Draw Term Loan Lender's Delayed Draw Term Loan Commitment, by (ii) the Total Delayed Draw Term Loan Commitment, provided that if the Total Delayed Draw Term Loan Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the Delayed Draw Term Loan and any Agent Advances and the denominator shall be the aggregate unpaid principal amount of the Delayed Draw Term Loan and any Agent Advances;

(c) an Incremental Term Loan Lender's obligation to make any Incremental Term Loan and the right to receive payments of interest, fees, and principal with respect thereto, the percentage obtained by dividing (i) such Incremental Term Loan Lender's Incremental Term Loan Commitment, by (ii) the Total Incremental Term Loan Commitment, provided that if the Total Incremental Term Loan Commitment has been reduced to zero, the numerator shall be the aggregate unpaid principal amount of such Lender's portion of the Incremental Term Loan and any Agent Advances and the denominator shall be the aggregate unpaid principal amount of the Incremental Term Loan and any Agent Advances; and

(d) all other matters (including, without limitation, the indemnification obligations arising under Section 9.5), the percentage obtained by dividing (i) (i) such Lender's portion of the unpaid principal amount of the Loans and the Agent Advances, by (ii) the aggregate unpaid principal amount of the Loans and the Agent Advances held by all Lenders.

"**Process Agent**" has the meaning specified therefor in Section 11.10(c).

"**Projections**" means financial projections of the Borrower and its Subsidiaries delivered pursuant to Section 6.1(g)(ii), as updated from time to time pursuant to Section 7.1(a)(vi).

"**Qualified Equity Interests**" means, with respect to any Person, all Equity Interests of such Person that are not Disqualified Equity Interests.

"**Qualified Jurisdictions**" means the United States and Canada, in each case, including any states, provinces or other similar local units therein.

"**Real Property Deliverables**" means each of the following agreements, instruments and other documents in respect of each Facility, each in form and substance reasonably satisfactory to the Collateral Agent:

(a) a Mortgage duly executed by the applicable Loan Party;

(b) evidence of the recording of each Mortgage in such office or offices as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect the Lien purported to be created thereby or to otherwise protect the rights of the Collateral Agent and the Lenders thereunder;

(c) a Title Insurance Policy with respect to each Mortgage;

(d) a current ALTA survey and a surveyor's certificate, certified to the Collateral Agent and to the issuer of the Title Insurance Policy with respect thereto by a professional surveyor licensed in the state in which such Facility is located and reasonably satisfactory to the Collateral Agent;

(e) (i) a certificate of an Authorized Officer of the applicable Loan Party certifying as to a true, correct and complete list, as of the date of such certificate, of all "Buildings" (as defined by the applicable Flood Insurance Laws) located on real property that is subject to a Mortgage, (ii) a life of loan flood hazard determination with respect to all such Buildings, or such other evidence reasonably satisfactory to the Collateral Agent that such Buildings are not then located in a flood hazard area, (iii) if such real property is located in a special flood hazard area, evidence of flood insurance in such amounts as are acceptable to the Collateral Agent and required under applicable Flood Insurance Laws, and (iv) such other certificates or notices reasonably required by the Collateral Agent to facilitate compliance with any applicable Flood Insurance Laws;

(f) an opinion of counsel, satisfactory to the Collateral Agent, in the state where such Facility is located with respect to the enforceability of the Mortgage to be recorded and such other matters as the Collateral Agent may reasonably request;

(g) an ASTM 1527-13 Phase I Environmental Site Assessment ("**Phase I ESA**") (and if reasonably requested by the Collateral Agent based upon the results of such Phase I ESA, a Phase II Environmental Site Assessment), by an independent firm reasonably satisfactory to the Collateral Agent; and

(h) such other agreements, instruments, appraisals and other documents (including guarantees and opinions of counsel) as the Collateral Agent may reasonably require.

"**Recipient**" means any Agent, any Lender, as applicable.

"**Reference Rate**" means, for any period, the greatest of (a) 6.0% per annum, (b) the Federal Funds Rate plus 0.50% per annum, (c) Term SOFR (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis) plus 1.00% per annum, and (d) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the

Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

“**Reference Rate Loan**” means each portion of a Loan that bears interest at a rate determined by reference to the Reference Rate.

“**Reference Rate Term SOFR Determination Day**” has the meaning specified in the definition of “Term SOFR”.

“**Register**” has the meaning specified therefor in Section 11.7(f).

“**Registered Intellectual Property**” means Intellectual Property that is issued, registered, renewed or the subject of a pending application.

“**Registered Loans**” has the meaning specified therefor in Section 11.7(f).

“**Regulation T**”, “**Regulation U**” and “**Regulation X**” mean, respectively, Regulations T, U and X of the Board of Governors or any successor, as the same may be amended or supplemented from time to time.

“**Related Fund**” means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

“**Related Parties**” means, with respect to any Person, such Person’s Affiliates and the direct and indirect equityholders, partners, directors, officers, employees, agents, consultants, trustees, administrators, managers, advisors and representatives of such Person and of such Person’s Affiliates.

“**Release**” means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

“**Relevant Governmental Body**” means the Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board or the Federal Reserve Bank of New York, or any successor thereto.

“**Remedial Action**” means any action (a) to correct or address any actual, alleged or threatened non-compliance with any Environmental Law or Environmental Permit, or (b) to clean up, remove, remediate, contain, treat, monitor, assess, evaluate, investigate, prevent, minimize or in any other way address any environmental condition or the presence, Release or threatened Release of any Hazardous Material (including the performance of pre-remedial studies and investigations and post-remedial operation and maintenance activities).

“**Replacement Lender**” has the meaning specified therefor in Section 11.2(c).

"**Report**" has the meaning specified therefor in Section 9.13(a).

"**Reportable Event**" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"**Required Lenders**" means Lenders whose Pro Rata Shares (calculated in accordance with clause (b) of the definition thereof) aggregate at least 50.1%.

"**Requirements of Law**" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities), and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Resignation Effective Date**" has the meaning specified therefor in Section 9.7(a).

"**Restricted Payment**" means (a) the declaration or payment of any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, together with any payment or distribution pursuant to a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, (b) the making of any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Loan Party or any direct or indirect parent of any Loan Party, now or hereafter outstanding, (c) the making of any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party, now or hereafter outstanding, (d) the return of any Equity Interests to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or make any other distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities thereto as such, or (e) the payment of any management, consulting, monitoring or advisory fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting, monitoring, advisory or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party.

"**Sale and Leaseback Transaction**" means, with respect to the Borrower or any of its Subsidiaries, any arrangement, directly or indirectly, with any Person whereby the Borrower or any of its Subsidiaries shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

“**Sanctioned Country**” means, at any time, a country or territory that is the subject or target of any Sanctions that broadly prohibit dealings with that country or territory (which, as of the Effective Date, include Crimea, Cuba, Iran, North Korea, Sudan and Syria).

“**Sanctioned Person**” means, at any time, (a) any Person listed in OFAC’s Specially Designated Nationals and Blocked Persons List, OFAC’s Sectoral Sanctions Identification List, and any other Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty’s Treasury of the United Kingdom, Germany, Canada, Australia, or other relevant sanctions authority, (b) a Person that resides in, is organized in or located in, or has a place of business in, a country or territory named on any list referred to in clause (a) of this definition or a country or territory that is designated as a “Non-Cooperative Jurisdiction” by the Financial Action Task Force on Money Laundering, or whose subscription funds are transferred from or through any such jurisdiction (each of the foregoing in this clause (b), a “**Sanction Target**”), or a Person that owns 50% or more of the Equity Interests of, or is otherwise controlled by, or is acting on behalf of, one or more Sanction Targets, (c) any Person with whom or with which a U.S. Person is prohibited from dealing under any of the Sanctions or (d) any Person owned or controlled by any Person or Persons described in clause (a) or (b).

“**Sanctions**” means Requirements of Law concerning or relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by OFAC, the U.S. Department of State, the European Union or Her Majesty’s Treasury of the United Kingdom.

“**Sanction Target**” has the meaning specified therefor in the definition of “Sanctioned Person”.

“**Sanders Notes**” means (a) those certain Senior Subordinated Debentures, dated as of March 8, 2022, issued by the Borrower to certain clients of Don A. Sanders, as noteholders, in the original aggregate principal amount of $6,000,000, (b) that certain promissory note, dated as of February 10, 2022, issued by the Borrower in favor of Don A. Sanders, in the original principal amount of $2,000,000.

“**Sanders Notes Interest Payment Conditions**” means, with respect to any payment of interest on any Sanders Note, the satisfaction of the following conditions:

(a) as of the date of any such interest payment and immediately after giving effect thereto, no Default or Event of Default has occurred and is continuing;

(b) Liquidity (prior to and after giving effect to such payment) shall not be less than $2,000,000;

(c) the Fixed Charge Coverage Ratio of the Borrower and its Subsidiaries for the period of 12 fiscal months of the Borrower and its Subsidiaries most recently ended prior to such payment (and, for the avoidance of doubt, without giving effect to such payment for purposes of determining Consolidated Net Interest Expense), shall be not less than 1.20 to 1.00; and

(d) the Administrative Agent shall have received a certificate of an Authorized Officer of the Borrower certifying as to compliance with the preceding clauses and demonstrating (in reasonable detail) the calculation required thereby.

"**Sanders Notes Principal Payment Conditions**" means, with respect to any payment or prepayment of principal on any Sanders Note, the satisfaction of the following conditions:

(a) as of the date of any such principal payment and immediately after giving effect thereto, no Default or Event of Default has occurred and is continuing;

(b) Liquidity (prior to and after giving effect to such payment) shall not be less than $4,000,000;

(c) the Fixed Charge Coverage Ratio of the Borrower and its Subsidiaries for the period of 12 fiscal months of the Borrower and its Subsidiaries most recently ended prior to such payment (and, for the avoidance of doubt, without giving effect to such payment for purposes of determining Consolidated Net Interest Expense), shall be not less than 1.20 to 1.00;

(d) the Consolidated Senior Net Leverage Ratio of the Borrower and its Subsidiaries as of the end of such fiscal quarter of the Borrower ending on or most recently preceding the date of such payment or prepayment was less than 2.75 to 1.00;

(e) such payment or prepayment is made using only Net Cash Proceeds of an Equity Issuance which are not required to be applied as a mandatory prepayment pursuant to Section 2.5(c)(v) in an amount not to exceed fifty percent (50%) of such Net Cash Proceeds; and

(f) the Administrative Agent shall have received a certificate of an Authorized Officer of the Borrower certifying as to compliance with the preceding clauses and demonstrating (in reasonable detail) the calculation required thereby.

"**Sanders Subordination Agreements**" means, collectively, the Subordination Agreements, dated as of the date hereof, between ACP , on the one hand, and each counterparty to a Sanders Note, on the other hand.

"**SEC**" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"**Secured Party**" means any Agent, and any Lender.

"**Securities Act**" means the Securities Act of 1933, as amended, or any similar federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"**Securitization**" has the meaning specified therefor in Section 11.7(l).

"**Security Agreement**" means the Pledge and Security Agreement, substantially in the form of Exhibit B, made by the Loan Parties in favor of the Collateral Agent for the benefit of the Secured Parties securing the Obligations, or the equivalent form governed by the laws of such other jurisdiction.

"**SOFR**" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**Solvent**" means, with respect to any Person on a particular date, that on such date (a) the fair value of the property of such Person is not less than the total amount of the liabilities of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its existing debts as they become absolute and matured, (c) such Person is able to realize upon its assets and pay its debts and other liabilities, contingent obligations and other commitments as they mature in the normal course of business, (d) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay as such debts and liabilities mature, and (e) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute unreasonably small capital.

"**Standard & Poor's**" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. and any successor thereto.

"**Stated Term Loan Maturity Date**" means May 30, 2029.

"**Subordinated Indebtedness**" means Indebtedness of any Loan Party the terms of which (including, without limitation, payment terms, interest rates, maturity dates, covenants, remedies, defaults and other material terms) are reasonably satisfactory to the Collateral Agent and which Indebtedness, among other things, has been expressly subordinated in right of payment to all Indebtedness of such Loan Party under the Loan Documents (a) pursuant to a Subordination Agreement or (b) otherwise on terms and conditions satisfactory to the Collateral Agent.

"**Subordination Agreement**" shall mean a subordination agreement, in form and substance reasonably acceptable to the Collateral Agent, entered into by any Person from time to time in favor of the Collateral Agent in connection with any Indebtedness, pursuant to which, among other things, the Indebtedness owing from any Loan Party and/or the Liens securing such Indebtedness granted by any Loan Party to such Person are subordinated in right of payment and/or priority to the Obligations and the Liens created under the Loan Documents, as such agreement may be amended, restated, supplemented or otherwise modified form time to time in accordance with its terms. For the avoidance of doubt, the Sanders Subordination Agreement and the Intercompany Subordination Agreement are all also included in the term "Subordination Agreement."

"**Subsidiary**" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or

other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company, or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association or other entity business is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by such Person. References to a Subsidiary shall mean a Subsidiary of the Borrower unless the context expressly provides otherwise.

"**Swap Obligation**" means, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"**Taxes**" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Termination Date**" means the first date on which all of the Obligations are paid in full in cash and all of the Commitments of the Lenders are terminated.

"**Term Loan**" means, collectively, the Initial Term Loans, the Delayed Draw Term Loans and any Incremental Term Loans.

"**Term Loan Commitment**" means, collectively, the Initial Term Loan Commitment, the Delayed Draw Term Loan Commitment and any Incremental Term Loan Commitment.

"**Term Loan Lender**" means a Lender with (a) a Term Loan Commitment or a Term Loan or (b) an Incremental Term Loan Commitment or an Incremental Term Loan.

"**Term Loan Maturity Date**" means the earlier of (a) the Stated Term Loan Maturity Date, and (b) the date on which the Term Loan (including any Incremental Term Loan) shall become due and payable in accordance with the terms of this Agreement.

"**Term SOFR**" means:

(a) for any calculation with respect to a Term SOFR Rate Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "**Periodic Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference

Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day; and

(b) for any calculation with respect to a Reference Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "**Reference Rate Term SOFR Determination Day**") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Reference Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Reference Rate Term SOFR Determination Day;

provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"**Term SOFR Administrator**" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"**Term SOFR Rate Deadline**" has the meaning specified therefor in Section 2.7(a).

"**Term SOFR Rate Loan**" means each portion of a Loan that bears interest at a rate determined by reference to Term SOFR.

"**Term SOFR Rate Notice**" means a written notice substantially in the form of Exhibit F hereto.

"**Term SOFR Rate Option**" has the meaning specified therefor in Section 2.7(a).

"**Term SOFR Reference Rate**" means the forward-looking term rate based on SOFR.

"**Title Insurance Policy**" means a mortgagee's loan policy, in form and substance satisfactory to the Collateral Agent, together with all endorsements made from time to time thereto, issued to the Collateral Agent by or on behalf of a title insurance company selected by or otherwise satisfactory to the Collateral Agent, insuring the Lien created by a Mortgage in an amount and on terms and with such endorsements satisfactory to the Collateral Agent, delivered to the Collateral Agent.

"**Total Commitment**" means the sum of the Total Initial Term Loan Commitment, the Total Delayed Draw Term Loan Commitment and any Total Incremental Term Loan Commitment.

**"Total Delayed Draw Term Loan Commitment**" means the sum of the amounts of the Delayed Draw Term Loan Lenders' Delayed Draw Term Loan Commitments.

"**Total Incremental Term Loan Commitment**" means the sum of the amounts of the Incremental Term Loan Lenders' Incremental Term Loan Commitments.

"**Total Initial Term Loan Commitment**" means the sum of the amounts of the Initial Term Loan Lenders' Initial Term Loan Commitments.

"**Transaction Costs**" means the reasonable and documented out-of-pocket fees, costs and expenses incurred by Borrower and its subsidiaries in connection with the consummation of the Transactions.

"**Transactions**" means, collectively, the transactions to occur on or about the Effective Date pursuant to the Loan Documents, including (a) the execution, delivery and performance of the Loan Documents and the making of the Loans hereunder and (b) the payment of all fees and expenses to be paid on or prior to the Effective Date and owing in connection with the foregoing.

"**UCC**" or "**Uniform Commercial Code**" has the meaning specified therefor in Section 1.4(b).

"**UCC Filing Authorization Letter**" means a letter duly executed by each Loan Party authorizing the Collateral Agent to file appropriate financing statements on Form UCC-1 without the signature of such Loan Party in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by each Security Agreement and each Mortgage.

"**Unadjusted Benchmark Replacement**" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"**Unrestricted Cash**" means, as of any date of determination, the aggregate amount of unrestricted cash on-hand of the Loan Parties maintained in deposit accounts in the name of a Loan Party in the United States as of such date that are Controlled Accounts.

"**USA PATRIOT Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001) as amended by the USA Patriot Improvement and Reauthorization Act of 2005 (Pub. L. 109-177, March 9, 2006) and as the same may have been or may be further renewed, extended, amended, or replaced.

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets

Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S. Tax Compliance Certificate**" has the meaning specified therefor in Section 2.9(d)(i)(B)(3).

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"**Vitabest Settlement Agreement**" means that certain Confidential Settlement Agreement and Mutual General Release, dated effective as of March 27, 2024, by and between the Borrower and Vitabest Nutrition, Inc.

"**WARN**" has the meaning specified therefor in Section 6.1(p).

"**Withholding Agent**" means any Loan Party and the Administrative Agent.

"**Working Capital**" means, at any date of determination thereof, (a) the sum, for any Person and its Subsidiaries, of (i) the unpaid face amount of all Accounts of such Person and its Subsidiaries as at such date of determination, plus (ii) the aggregate amount of prepaid expenses and other current assets of such Person and its Subsidiaries as at such date of determination (other than cash, Cash Equivalents and any Indebtedness owing to such Person or any of its Subsidiaries by Affiliates of such Person), minus (b) the sum, for such Person and its Subsidiaries, of (i) the unpaid amount of all accounts payable of such Person and its Subsidiaries as at such date of determination, plus (ii) the aggregate amount of all accrued expenses of such Person and its Subsidiaries as at such date of determination (other than the current portion of long-term debt and all accrued interest and taxes).

**Section 1.2.** **Terms Generally**. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, amendments and restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

**Section 1.3. <u>Certain Matters of Construction</u>**. References in this Agreement to "determination" by any Agent include good faith estimates by such Agent (in the case of quantitative determinations) and good faith beliefs by such Agent (in the case of qualitative determinations). A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders. Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of any Agent, any agreement entered into by any Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by any Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by any Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agents and the Lenders. Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other Loan Document, such phrase shall mean and refer to (i) the actual knowledge of a senior officer of any Loan Party or (ii) the knowledge that a senior officer would have obtained if such officer had engaged in good faith and diligent performance of such officer's duties, including the making of such reasonably specific inquiries as may be necessary of the employees or agents of such Loan Party and a good faith attempt to ascertain the existence or accuracy of the matter to which such phrase relates. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

**Section 1.4. <u>Accounting and Other Terms</u>**.

(a) Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP. For purposes of determining compliance with any incurrence or expenditure tests set forth in Section 7.1, 7.2 and 7.3, any amounts so incurred or expended (to the extent incurred or expended in a currency other than Dollars) shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the aggregate amount outstanding at any time and it is expressed in terms of Dollars, all outstanding amounts originally incurred or spent in currencies other than Dollars shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange

rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time). Notwithstanding the foregoing, (i) with respect to the accounting for leases as either operating leases or capital leases and the impact of such accounting in accordance with FASB ASC 842 on the definitions and covenants herein, GAAP as in effect on December 31, 2018 shall be applied, (ii) for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded and (iii) with respect to revenue recognition and the impact of such accounting in accordance with FASB ASC 606 on the definitions and covenants herein, GAAP as in effect on December 31, 2017 shall be applied.

(b) All terms used in this Agreement which are defined in Article 8 or 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "**UCC**" or "**Uniform Commercial Code**") and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute, except as any Agent may otherwise determine.

**Section 1.5. <u>Pro Forma Calculations.</u>**

In connection with the calculation of any ratio or other financial covenant hereunder (including any component definitions thereof) on a "pro forma basis", or giving "pro forma effect" to compliance of any transaction for a particular period:

(a) the incurrence, repayment or retirement of any Indebtedness by such Person and its Subsidiaries since the first day of such period shall be deemed to have been incurred, repaid or retired on the first day of such period; provided that (i) interest on Indebtedness bearing a floating interest rate will be computed as if the rate at the time of computation had been the applicable rate for the entire period, (ii) if such Indebtedness bears, at the option of such Person and its Subsidiaries, a fixed or floating rate of interest, interest thereon will be computed by applying, at the option of such Person, either the fixed or floating rate and (iii) the amount of Indebtedness under a revolving credit facility will be computed based upon the average daily balance of such Indebtedness during such period; and

(b) the Acquisition (whether by purchase, merger or otherwise) or Disposition (whether by sale, merger or otherwise) of any property or assets acquired or disposed of by such Person and its Subsidiaries since the first day of such period shall be deemed to have occurred on the first day of such period.

**Section 1.6. <u>Time References</u>**. Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern Daylight Saving Time, as in effect in New York City on such day. For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until"

each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to any Secured Party, such period shall in any event consist of at least one full day.

**Section 1.7. Obligation to Make Payments in Dollars**. All payments to be made by any Loan Party of principal, interest, fees and other Obligations under any Loan Document shall be made in Dollars in same day funds, and no obligation of any Loan Party to make any such payment shall be discharged or satisfied by any payment other than payments made in Dollars in same day funds.

**Section 1.8. Interest Rates Disclaimer**. The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Reference Rate, the Term SOFR Reference Rate or Term SOFR, any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Reference Rate, the Term SOFR Reference Rate, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Administrative Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of the Reference Rate, the Term SOFR Reference Rate, Term SOFR or any other Benchmark, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Reference Rate or the Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

## ARTICLE II
## THE LOANS

**Section 2.1. Commitments**.

(a) Subject to the terms and conditions and relying upon the representations and warranties herein set forth herein, (i) each Initial Term Loan Lender severally agrees to make the Initial Term Loan to the Borrower on the Effective Date, in an aggregate principal amount not to exceed the amount of such Lender's Initial Term Loan Commitment and (ii) each Delayed Draw Term Loan Lender severally agrees to make the Delayed Draw Term Loan to the Borrower during the Delayed Draw Term Loan Availability Period, in an aggregate principal amount not to exceed the amount of such Lender's Delayed Draw Term Loan Commitment.

(b) Notwithstanding the foregoing, the aggregate principal amount of the Term Loans shall not exceed the Total Commitment. Any principal amount of the Term Loan which is repaid or prepaid may not be reborrowed.

**Section 2.2. Making the Loans.**

(a) The Borrower shall give the Administrative Agent prior written notice (in substantially the form of Exhibit E hereto (a "**Notice of Borrowing**")), not later than 12:00 noon (New York City time) on the date which is twelve (12) Business Days prior to the date of the proposed Loan (or such shorter period as the Administrative Agent is willing to accommodate from time to time, but in no event later than 12:00 noon (New York City time) on the borrowing date of the proposed Loan). Such Notice of Borrowing shall be irrevocable and shall specify (i) the principal amount of the proposed Loan, (ii) in the case of Loans requested on the Effective Date, (iii) whether the Loan is requested to be a Reference Rate Loan or a Term SOFR Rate Loan and, in the case of a Term SOFR Rate Loan, the initial Interest Period with respect thereto, (iv) the use of proceeds of such proposed Loan, and (v) the proposed borrowing date, which must be a Business Day, and, (x) with respect to the Initial Term Loan, must be the Effective Date and (y) with respect to the Delayed Draw Term Loan, must be during the Delayed Draw Term Loan Availability Period. The Administrative Agent and the Lenders may act without liability upon the basis of written, telecopied or telephonic notice believed by the Administrative Agent in good faith to be from the Borrower (or from any Authorized Officer thereof designated in writing purportedly from the Borrower to the Administrative Agent). Each Borrower hereby waives the right to dispute the Administrative Agent's record of the terms of any such telephonic Notice of Borrowing. The Administrative Agent and each Lender shall be entitled to rely conclusively on any Authorized Officer's authority to request a Loan on behalf of the Borrower until the Administrative Agent receives written notice to the contrary. The Administrative Agent and the Lenders shall have no duty to verify the authenticity of the signature appearing on any written Notice of Borrowing.

(b) Each Notice of Borrowing pursuant to this Section 2.2 shall be irrevocable and the Borrower shall be bound to make a borrowing in accordance therewith. The Delayed Draw Term Loan shall be made in a minimum amount of $500,000 or in an integral multiple of $500,000 in excess thereof up to the amount of the Total Delayed Draw Term Loan Commitment.

(c) All Loans under this Agreement shall be made by the Lenders simultaneously and proportionately to their Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligations to make a Loan requested hereunder, nor shall the Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, and each Lender shall be obligated to make the Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

**Section 2.3. Repayment of Loans; Evidence of Debt.**

(a) The outstanding principal amount of the Term Loan shall be repayable on the following dates and in the following amounts set forth opposite such dates:

| Date | Amount |
|---|---|
| January 1, 2026<br>April 1, 2026<br>July 1, 2026<br>October 1, 2026 | $175,000 |
| January 1, 2027 and the first day of each quarter thereafter | $350,000 |

; provided, however, that the last such installment shall be in the amount necessary to repay in full the unpaid principal amount of the Term Loan. The outstanding unpaid principal amount of the Term Loan and all Agent Advances, and all accrued and unpaid interest thereon, shall be due and payable on the Term Loan Maturity Date.

(b) Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c) The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d) The entries made in the accounts maintained pursuant to Section 2.3(b) or 2.3(c) shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement and (ii) in the event of any conflict between the entries made in the accounts maintained pursuant to Section 2.3(b) and the accounts maintained pursuant to Section 2.3(c) maintained pursuant to Section 2.3(c) and control.

(e) Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in a form furnished by and reasonably acceptable to the Administrative Agent. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 11.7) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

**Section 2.4. Interest.**

(a) Term Loans; Agent Advances. Subject to the terms of this Agreement, at the option of the Borrower, the Term Loan or any portion thereof shall be either a Reference Rate Loan or a Term SOFR Rate Loan. Each portion of the Term Loan that is a Reference Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until repaid, at a rate per annum equal to the Reference Rate plus the Applicable Margin, and each portion of the Term Loan that is a Term SOFR Rate Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of the Term Loan until repaid, at a rate per annum equal to Term SOFR for the Interest Period in effect for the Term Loan (or such portion thereof) plus the Applicable Margin. Pursuant to Section 9.8(a), each Agent Advance shall be a Reference Rate Loan and shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Agent Advance until repaid, at a rate per annum equal to the Reference Rate plus the Applicable Margin.

(b) Default Interest. To the extent permitted by law and notwithstanding anything to the contrary in this Section, upon the occurrence and during the continuance of an Event of Default, at the election of the Required Lenders, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(c) Interest Payment. Interest on each Loan shall be payable monthly in cash, in arrears, on the first day of each month, commencing on the first day of the month following the month in which such Loan is made and at maturity (whether upon demand, by acceleration or otherwise). Interest at the Post-Default Rate shall be payable on demand. Each Borrower hereby authorizes the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account pursuant to Section 4.1 with the amount of any interest payment due hereunder.

(d) General. All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

(e) Term SOFR Conforming Changes. In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

**Section 2.5. Reduction of Commitment; Prepayment of Loans.**

(a) Reduction of Commitments.

(i) Initial Term Loan. The Initial Term Loan Commitment shall terminate on the earlier to occur of (A) the funding of the Initial Term Loan, and (B) 5:00 p.m. (New York City time) on the Effective Date.

(ii) Delayed Draw Term Loan. The Total Delayed Draw Term Loan Commitment shall terminate at 5:00 p.m. (New York City time) on the Delayed Draw Term Loan Commitment Expiration Date

(b) Optional Prepayment.

(i) Term Loan; Agent Advances. The Borrower may, at any time and from time to time, upon at least three (3) Business Days' prior written notice to the Administrative Agent, prepay the principal of the Term Loan or any Agent Advance, in whole or in part. Each prepayment made pursuant to this Section 2.5(b)(i) shall be accompanied by the payment of (A) accrued interest to the date of such payment on the amount prepaid and (B) the Applicable Premium, if any, payable in connection with such prepayment of the Term Loan. Each such prepayment shall be applied against the remaining installments of principal due on the Term Loan in the inverse order of maturity.

(ii) Termination of Agreement. The Borrower may, upon at least ten (10) Business Days prior written notice to the Administrative Agent, terminate this Agreement by paying to the Administrative Agent, in cash, the Obligations in full, plus the Applicable Premium, if any, payable in connection with such termination of this Agreement; provided that such notice may provide that it is conditioned upon the consummation of other financing or the consummation of a sale of Equity Interests, in which case, such notice may be revoked or extended by the Borrower if any such condition is not satisfied prior to the date of termination of this Agreement in such notice. If the Borrower has sent a notice of termination pursuant to this Section 2.5(b)(ii), then the Lenders' obligations to extend credit hereunder shall terminate and the Borrower shall be obligated to repay the Obligations in full, plus the Applicable Premium, if any, payable in connection with such termination of this Agreement on the date set forth as the date of termination of this Agreement in such notice.

(c) Mandatory Prepayment.

(i) Within ten (10) calendar days of the date that audited annual financial statements are required to be delivered to the Agents and the Lenders pursuant to Section 7.1(a)(iii), commencing with the delivery to the Agents and the Lenders of the financial statements for the Fiscal Year ended December 31, 2025 or, if such financial statements are not delivered to the Agents and the Lenders on the date such statements are required to be delivered pursuant to Section 7.1(a)(iii), on the date such statements are required to be delivered to the Agents and the Lenders pursuant to Section 7.1(a)(iii), the Borrower shall, if the Consolidated Senior Net Leverage Ratio of the Borrower and its Subsidiaries as of the end of such Fiscal Year is (A) equal to or greater than 3.00 to 1.00, prepay the outstanding principal amount of the Loans in accordance with Section 2.5(d) in an amount equal to 50% of the Excess Cash Flow of the Borrower and its Subsidiaries for such Fiscal Year, (B) less than 3.00 to 1.00 but equal to or greater than 2.75 to 1.00, prepay the outstanding principal amount of the Loans in accordance with Section 2.5(d) in an amount equal to 25% of the Excess Cash Flow of the Borrower and its Subsidiaries for such

Fiscal Year, and (C) less than 2.75 to 1.00, there shall be no such repayment obligation; provided that, the Excess Cash Flow prepayment for the Fiscal Year ended December 31, 2025 shall be calculated based solely on the portion of such Fiscal Year occurring on and after the Effective Date, and Excess Cash Flow for the portion of such Fiscal Year ending prior to the Effective Date shall be excluded from the calculation of the Excess Cash Flow prepayment amount.

(ii) Immediately upon any Disposition (excluding Dispositions which qualify as Permitted Dispositions under clauses (a), (b), (c), (d), (e), (f) (provided in respect of clauses (e) and (f) such exclusion shall not exclude such proceeds from constituting Extraordinary Receipts), or (g) of the definition of "Permitted Disposition") by any Loan Party or its Subsidiaries, the Borrower shall prepay the outstanding principal amount of the Loans in accordance with Section 2.5(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition to the extent that the aggregate amount of Net Cash Proceeds received by all Loan Parties and their Subsidiaries shall exceed $50,000 for all such Dispositions in any Fiscal Year. Nothing contained in this Section 2.5(c)(ii) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 7.2(c)(ii).

(iii) Upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrower shall prepay the outstanding amount of the Loans in accordance with Section 2.5(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith. The provisions of this Section 2.5(c)(iii) shall not be deemed to be implied consent to any such issuance or incurrence otherwise prohibited by the terms and conditions of this Agreement.

(iv) Upon the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, the Borrower shall prepay the outstanding principal of the Loans in accordance with Section 2.5(d) (A) if any Default or Event of Default has occurred and is continuing on the date such Person receives such Net Cash Proceeds, in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith and (B) so long no Default or Event of Default has occurred and is continuing on the date such Person receives such Net Cash Proceeds, an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith to the extent the aggregate amount of Extraordinary Receipts received by all Loan Parties and their Subsidiaries shall exceed $50,000 in any Fiscal Year.

(v) Upon an Equity Issuance (other than any Excluded Equity Issuances), the Borrower shall prepay the outstanding amount of the Loans in accordance with Section 2.5(d) in an amount equal to (A) 25% of the Net Cash Proceeds received by such Person in connection therewith if the Consolidated Senior Net Leverage Ratio of the Borrower and its Subsidiaries as of the end of such fiscal quarter of the Borrower ending on or most recently preceding the date of the receipt of such proceeds was equal to or greater than 3.00 to 1.00 and (B) 0% of the Net Cash Proceeds received by such Person in connection therewith if the Consolidated Senior Net Leverage Ratio of the Borrower and its Subsidiaries as of the end of such fiscal quarter of the Borrower ending on or most recently preceding the date of the receipt of such proceeds was less than 3.00 to 1.00. The provisions of this Section 2.5(c)(v) shall not be deemed to be implied consent to any such issuance or sale otherwise prohibited by the terms and conditions of this Agreement.

(vi) Notwithstanding the foregoing, with respect to Net Cash Proceeds received by any Loan Party or any of its Subsidiaries in connection with a Disposition or the receipt of Extraordinary Receipts consisting of insurance proceeds or condemnation awards that are required to be used to prepay the Obligations pursuant to Section 2.5(c)(ii) or 2.5(c)(iv), as the case may be, up to $250,000 in the aggregate in any Fiscal Year of the Net Cash Proceeds from all such Dispositions and Extraordinary Receipts shall not be required to be so used to prepay the Obligations to the extent that such Net Cash Proceeds are used to purchase, replace, repair or restore properties or assets (other than current assets) used in such Person's business; provided that, (A) no Default or Event of Default has occurred and is continuing on the date such Person receives such Net Cash Proceeds, (B) the Borrower delivers a certificate to the Administrative Agent at least three (3) days prior to the proposed consummation date of such Disposition or anticipated receipt of insurance proceeds or condemnation awards, as the case may be, stating that such Net Cash Proceeds shall be used to purchase, replace, repair or restore properties or assets used in the Permitted Business within a period specified in such certificate not to exceed 180 days after the date of receipt of such Net Cash Proceeds (which certificate shall set forth estimates of the Net Cash Proceeds to be so expended), (C) such Net Cash Proceeds are deposited in a Controlled Account, and (D) upon the earlier of (1) the expiration of the period specified in the relevant certificate furnished to the Administrative Agent pursuant to clause (B) above or (2) the occurrence of a Default or an Event of Default, such Net Cash Proceeds, if not theretofore so used, shall be used to prepay the Obligations in accordance with Section 2.5(c)(ii) or 2.5(c)(iv) as applicable.

(vii) Upon the incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness under an ABL Facility, the Borrower shall prepay the outstanding amount of the Loans in accordance with Section 2.5(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith, up to an amount equal to the amount by which the aggregate principal amount of the Term Loans funded under this Agreement as of such date exceeds $15,000,000. The provisions of this Section 2.5(c)(vii) shall not be deemed to be implied consent to the ABL Facility in contravention of any of the terms and conditions of this Agreement.

(d) Application of Payments. Each prepayment pursuant to subsections (c)(i), (c)(ii), (c)(iii), (c)(iv), (c)(v), (c)(vi) and (c)(vii) above shall be applied first, ratably, to any outstanding Agent Advances until paid in full; and second, ratably, to the Term Loan, until paid in full. Each such prepayment of the Term Loan shall be applied against the remaining installments of principal of the Term Loan in the inverse order of maturity. Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, if the Administrative Agent has elected, or has been directed by the Collateral Agent or the Required Lenders, to apply payments in respect of any Obligations in accordance with Section 4.3(b), prepayments required under Section 2.5(c) shall be applied in the manner set forth in Section 4.3(b).

(e) Interest and Fees. Any prepayment made pursuant to this Section 2.5 shall be accompanied by (i) accrued interest on the principal amount being prepaid to the date of prepayment, (ii) any Funding Losses payable pursuant to Section 2.8 and (iii) the Applicable Premium, if any, payable in connection with such prepayment of the Loans to the extent required under Section 2.6.

(f) Cumulative Prepayments. Except as otherwise expressly provided in this Section 2.5, payments with respect to any subsection of this Section 2.5 are in addition to payments made or required to be made under any other subsection of this Section 2.5.

**Section 2.6. Fees.**

(a) Applicable Premium.

(i) Upon the occurrence of an Applicable Premium Trigger Event, the Borrower shall pay to the Administrative Agent, for the account of the Lenders in accordance with their Pro Rata Shares, the Applicable Premium.

(ii) Any Applicable Premium payable in accordance with this Section 2.6(a) shall be presumed to be equal to the liquidated damages sustained by the Lenders as the result of the occurrence of the Applicable Premium Trigger Event and the Loan Parties agree that it is reasonable under the circumstances currently existing. THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING APPLICABLE PREMIUM IN CONNECTION WITH ANY ACCELERATION.

(iii) The Loan Parties expressly agree that: (A) the Applicable Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Applicable Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Applicable Premium; (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph; (E) their agreement to pay the Applicable Premium is a material inducement to Lenders to provide the Commitments and make the Loans; and (F) the Applicable Premium represents a good faith, reasonable estimate and calculation of the lost profits or damages of the Agents and the Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the Agents and the Lenders or profits lost by the Agents and the Lenders as a result of such Applicable Premium Trigger Event.

(iv) Nothing contained in this Section 2.6(a) shall permit any prepayment of the Loans or reduction of the Commitments not otherwise permitted by the terms of this Agreement or any other Loan Document.

(b) Audit and Collateral Monitoring Fees. The Borrower acknowledges that pursuant to Section 7.1(f), representatives of the Agents may visit any or all of the Loan Parties and/or conduct inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations of any or all of the Loan Parties at any time and from time to time during normal business hours, and at any reasonable time following reasonable advance written notice (but in no event less than two (2) Business Days unless has occurred and is continuing). The Borrower agrees to pay (i) $1,500 per day per examiner plus the examiner's reasonable out-of-pocket costs and reasonable expenses incurred in connection with all such visits, inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations, and (ii) the cost of all visits, inspections, audits, physical counts, valuations,

appraisals, environmental site assessments and/or examinations conducted by a third party on behalf of the Agents; provided that so long as no Event of Default shall have occurred and be continuing, the Borrower shall not be obligated to reimburse the Agents for more than (A) one (1) inspection visits in any calendar year and (B) one (1) audit, physical count, valuation, appraisal, environmental site assessment and/or examination during any calendar year; provided further that if an Event of Default has occurred and is continuing, all such inspections, audits, physical counts, valuations, appraisals, environmental site assessments and/or examinations of any or all of the Loan Parties during such occurrence and continuation shall be at the expense of the Borrower.

(c) Fee Letter. As and when due and payable under the terms of the Fee Letter, the Borrower shall pay the fees set forth in the Fee Letter.

**Section 2.7. Term SOFR Rate Option; Benchmark Replacement.**

(a) The Borrower may, at any time and from time to time, so long as no Default or Event of Default has occurred and is continuing, elect to have interest on all or a portion of the Loans be charged at a rate of interest based upon Term SOFR (the "**Term SOFR Rate Option**") by notifying the Administrative Agent prior to 12:00 p.m. noon (New York City time) at least three Business Days prior to (i) the proposed borrowing date of a Loan (as provided in Section 2.2), (ii) in the case of the conversion of a Reference Rate Loan to a Term SOFR Rate Loan, the commencement of the proposed Interest Period or (iii) in the case of the continuation of a Term SOFR Rate Loan as a Term SOFR Rate Loan, the last day of the then current Interest Period (the "**Term SOFR Rate Deadline**"). Notice of the Borrower's election of the Term SOFR Rate Option for a permitted portion of the Loans and an Interest Period pursuant to this Section 2.7(a) shall be made by delivery to the Administrative Agent of (A) a Notice of Borrowing (in the case of the initial making of a Loan) in accordance with Section 2.2 or (B) a Term SOFR Rate Notice prior to the Term SOFR Rate Deadline (or by telephonic notice received by the Administrative Agent before the Term SOFR Rate Deadline (to be confirmed by delivery to the Administrative Agent of a Term SOFR Rate Notice received by the Administrative Agent prior to 5:00 p.m. (New York City time) on the same day)). Promptly upon its receipt of each such Term SOFR Rate Notice, the Administrative Agent shall provide a copy thereof to each of the Lenders. Each Term SOFR Rate Notice shall be irrevocable and binding on the Borrower.

(b) Interest on Term SOFR Rate Loans shall be payable in accordance with Section 2.4(c). On the last day of each applicable Interest Period, unless the Borrower properly has exercised the Term SOFR Rate Option with respect thereto, the interest rate applicable to such Term SOFR Rate Loans automatically shall convert to the rate of interest then applicable to Reference Rate Loans of the same type hereunder. At any time that a Default or an Event of Default has occurred and is continuing, the Borrower no longer shall have the option to request that any portion of the Loans bear interest at Term SOFR and the Administrative Agent shall have the right to convert the interest rate on all outstanding Term SOFR Rate Loans to the rate of interest then applicable to Reference Rate Loans of the same type hereunder prior to the last day of the then current Interest Period.

(c) Notwithstanding anything to the contrary contained in this Agreement, the Borrower (i) shall have not more than three (3) Term SOFR Rate Loans in effect at any given time,

and (ii) only may exercise the Term SOFR Rate Option for Term SOFR Rate Loans of at least $500,000 and integral multiples of $100,000 in excess thereof.

(d) The Borrower may prepay Term SOFR Rate Loans at any time; provided, however, that in the event that Term SOFR Rate Loans are prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any mandatory prepayment pursuant to Section 2.5(c) or any application of payments or proceeds of Collateral in accordance with Section 4.3 or 4.4 or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, the Borrower shall indemnify, defend and hold the Agents and the Lenders and their participants harmless against any and all Funding Losses in accordance with Section 2.8.

(e) Benchmark Replacement Setting.

(i) Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.7(e) will occur prior to the applicable Benchmark Transition Start Date. No Hedging Agreement shall be deemed to be a "Loan Document" for purposes of this Section 2.7(e).

(ii) Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii) Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Borrower and the Lenders of (A) the implementation of any Benchmark Replacement and (B) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.7(e) and (y) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.7(e)(iii), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this

Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.7(e).

(iv) Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (2) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v) Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a borrowing of, conversion to or continuation of Term SOFR Rate Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to Reference Rate Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Reference Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Reference Rate.

**Section 2.9. Funding Losses**. In connection with each Term SOFR Rate Loan, the Borrower shall indemnify, defend, and hold the Agents and the Lenders harmless against any loss, cost, or expense incurred by any Agent or any Lender, including any loss, cost or expense arising from the liquidation or redeployment of funds or from any fees payable, as a result of (a) the payment of any principal of any Term SOFR Rate Loan other than on the last day of an Interest Period applicable thereto (including as a result of a Default or an Event of Default or any mandatory prepayment required pursuant to Section 2.5(c)), (b) the conversion of any Term SOFR Rate Loan other than on the last day of the Interest Period applicable thereto (including as a result of a Default or an Event of Default) or (c) the failure to borrow, convert, continue or prepay any Term SOFR Rate Loan on the date specified in any Notice of Borrowing or Term SOFR Rate Notice delivered pursuant hereto (such losses, costs, and expenses, collectively, "**Funding Losses**"). A certificate of an Agent or a Lender delivered to the Borrower setting forth any amount or amounts that such Agent or such Lender is entitled to receive pursuant to this Section 2.8 shall

be conclusive absent manifest error. The Borrower shall pay such Agent or such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

**Section 2.10. Taxes.**

(a) Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any and all Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of any Withholding Agent) requires the deduction or withholding of any Taxes from or in respect of any such payment, (i) the applicable Withholding Agent shall be entitled to make such deduction or withholding, (ii) the applicable Withholding Agent shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law and (iii) if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased by the amount necessary such that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 2.9) the applicable Recipient receives the amount equal to the sum it would have received had no such deduction or withholding been made.

(b) In addition, each Loan Party shall pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes, or at the option of the Administrative Agent timely reimburse it for the payment of any Other Taxes by any Secured Party. Each Loan Party shall deliver to each Secured Party official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

(c) The Loan Parties hereby jointly and severally indemnify and agree to hold each Secured Party harmless from and against Indemnified Taxes (including, without limitation, Indemnified Taxes imposed on any amounts payable under this Section 2.9) paid or payable by such Secured Party or required to be withheld or deducted from a payment to such Secured Party and any expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally asserted. Such indemnification shall be paid within ten days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Indemnified Taxes. A certificate as to the amount of such payment or liability delivered to the Borrower by a Secured Party (with a copy to the Administrative Agent) or by the Administrative Agent on its own behalf or on behalf of another Secured Party shall be conclusive absent manifest error.

(d) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such

documentation (other than such documentation set forth in Sections 2.9(d)(i)(A), (i)(B) and (i)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i) Without limiting the generality of the foregoing,

(A) any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Lender that is not a U.S. Person (a "**Foreign Lender**") shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit H-1 hereto to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or Exhibit H-3, IRS Form W-9, or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Administrative Agent in writing of its legal inability to do so.

(e) Each Lender shall severally indemnify the Administrative Agent, within ten days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 11.7(i) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f) If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.9 (including by the payment of additional amounts pursuant to this Section 2.9), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments

made under this Section 2.9 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g) The obligations of the Loan Parties under this Section 2.9 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**Section 2.11. <u>Increased Costs and Reduced Return</u>.**

(a) If any Secured Party shall have determined that any Change in Law shall (i) subject such Secured Party, or any Person controlling such Secured Party to any Tax, duty or other charge with respect to this Agreement or any Loan made by such Agent or such Lender (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of "Excluded Taxes" and (C) Connection Income Taxes); (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Secured Party or any Person controlling such Secured Party or (iii) impose on such Secured Party or any Person controlling such Secured Party any other condition regarding this Agreement or any Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost (other than Taxes) to such Secured Party of making any Loan, or agreeing to make any Loan, or to reduce any amount received or receivable by such Secured Party hereunder, then, upon demand by such Secured Party, the Borrower shall pay to such Secured Party such additional amounts as will compensate such Secured Party for such increased costs or reductions in amount.

(b) If any Secured Party shall have determined that any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Secured Party or any Person controlling such Secured Party, and such Secured Party determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained, such Secured Party's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Secured Party's or such other controlling Person's capital to a level below that which such Secured Party or such controlling Person could have achieved but for such circumstances as a consequence of any Loans made or maintained, or any agreement to make Loans, or such Secured Party's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such

Secured Party's or such other controlling Person's policies with respect to capital adequacy), then, upon demand by such Secured Party, the Borrower shall pay to such Secured Party from time to time such additional amounts as will compensate such Secured Party for such cost of maintaining such increased capital or such reduction in the rate of return on such Secured Party's or such other controlling Person's capital.

(c) All amounts payable under this Section 2.10 shall bear interest from the date that is ten (10) days after the date of demand by any Secured Party until payment in full to such Secured Party at the Reference Rate. A certificate of such Secured Party claiming compensation under this Section 2.10, specifying the event herein above described and the nature of such event shall be submitted by such Secured Party to the Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and such Secured Party's reasons for invoking the provisions of this Section 2.10, and shall be final and conclusive absent manifest error.

(d) Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 2.10 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e) The obligations of the Loan Parties under this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

**Section 2.12. Changes in Law; Impracticability or Illegality**.

(a) Term SOFR may be adjusted by the Administrative Agent with respect to any Lender on a prospective basis to take into account any additional or increased costs to such Lender of maintaining or obtaining any deposits or increased costs due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at Term SOFR. In any such event, the affected Lender shall give the Borrower and the Administrative Agent notice of such a determination and adjustment and the Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, the Borrower may, by notice to such affected Lender (i) require such Lender to furnish to the Borrower a statement setting forth the basis for adjusting Term SOFR and the method for determining the amount of such adjustment or (ii) repay the Term SOFR Rate Loans with respect to which such adjustment is made (together with any amounts due under Section 2.9).

(b) In the event that any change in market conditions or any law, regulation, treaty, or directive, or any change therein or in the interpretation of application thereof, shall at any time after the date hereof, in the reasonable opinion of any Lender, make it unlawful or impractical for such Lender to fund or maintain Term SOFR Rate Loans or to continue such funding or maintaining, or to determine or charge interest rates at Term SOFR, such Lender shall give notice of such changed circumstances to the Borrower and the Administrative Agent, and the Administrative Agent promptly shall transmit the notice to each other Lender and (i) in the case of any Term SOFR Rate Loans of such Lender that are outstanding, the date specified in such Lender's notice shall be deemed to be the last day of the Interest Period of such Term SOFR Rate Loans, and interest upon the Term SOFR Rate Loans of such Lender thereafter shall accrue interest at the rate then applicable to Reference Rate Loans of the same type hereunder and (ii) the Borrower shall not be entitled to elect the Term SOFR Rate Option (including in any borrowing, conversion or continuation then being requested) until such Lender determines that it would no longer be unlawful or impractical to do so.

(c) The obligations of the Loan Parties under this Section 2.11 shall survive after the occurrence of the Termination Date and the termination of this Agreement.

**Section 2.13. Replacement of Lenders.**

(a) [Reserved].

(b) If any Lender is a Defaulting Lender, then the Borrower may, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 11.7), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i) the Borrower shall have paid to the Agents any assignment fees specified in Section 11.7;

(ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts then due and payable to it hereunder and under the other Loan Documents (including any amounts under Sections 2.8 and 2.9) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(iii) [reserved]; and

(iv) such assignment does not conflict with applicable law. Prior to the effective date of such assignment, the assigning Lender shall execute and deliver an Assignment and Acceptance, subject only to the conditions set forth above. If the assigning Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such assignment, the assigning Lender shall be deemed to have executed and delivered such Assignment and Acceptance. Any such assignment shall be made in accordance with the terms of Section 11.7.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

**Section 2.14. <u>Incremental Facilities</u>.**

(a) From time to time, the Borrower may by written notice to Administrative Agent request the establishment of one or more Incremental Term Loan Commitments, in each case, in a minimum amount of $1,000,000 and integral multiples of $500,000 in excess thereof, and in an aggregate amount of all such Commitments not to exceed $2,500,000 during the term of this Agreement. Each such notice shall (x) specify the date (an "**Increased Amount Date**") on which the Borrower proposes that the Incremental Term Loan Commitments shall be effective, which shall be a date not less than twenty (20) Business Days after the date on which such notice is delivered to the Administrative Agent and (y) include an outline, in reasonable detail, of the proposed use of proceeds of such Incremental Term Loans, which such proposed use shall be subject to the approval of the Administrative Agent in its sole discretion. Upon receipt of such notice, and in any event within five (5) Business Days thereafter, the Administrative Agent shall advise the Borrower if the proposed use of proceeds are acceptable to the Administrative Agent and shall promptly notify the Lenders holding Term Loans of the requested increase and each Lender holding Term Loans shall have the right to commit to the Incremental Term Loan Commitments in proportion to its Pro Rata Share of the Term Loans outstanding immediately before giving effect to such Incremental Term Loans. Each Lender holding Term Loans shall notify the Administrative Agent within five (5) Business Days following such notice from the Administrative Agent, if and to what extent, such Lender holding Term Loans commits to the requested Incremental Term Loan Commitments. Any Lender holding Term Loans not responding within such period shall be deemed to have declined to provide an Incremental Term Loan Commitment. If a Lender holding Term Loans fails to so commit to the full requested Incremental Term Loan Commitments, the Administrative Agent may, in its sole discretion, arrange for one or more other lenders to provide such remainder of the requested Incremental Term Loan Commitments, which such other lenders may be existing Lenders or any other Persons that are eligible assignees pursuant to Section 11.7.

(b) Such Incremental Term Loan Commitments shall become effective as of such Increased Amount Date; provided that (i) no Default or Event of Default shall exist on such Increased Amount Date before or after giving effect to such Incremental Term Loan Commitments; (ii) each of the conditions set forth in Section 5.2 shall be satisfied; (iii) the Borrower and its Subsidiaries shall be in compliance on a pro form basis with each of the covenants set forth in Section 7.3 as of the last day of the most recently ended Fiscal Quarter after giving effect to the funding of such Incremental Term Loans, as if made on the last day of such recently ended Fiscal Quarter; (iv) the Incremental Term Loans shall be effected pursuant to one or more amendment or joinder agreements (each, and "**Incremental Amendment**") executed and delivered by the Loan Parties, the Agents and each Incremental Term Loan Lender, and each of which such Incremental Term Loans shall be recorded in the Register and shall be subject to the requirements set forth in Section 2.9; (v) the Borrower shall deliver a certificate of an Authorized Officer certifying the proposed use of the proceeds the Incremental Term Loan, as approved by the Administrative Agent, and certifying that the conditions precedent to the making of such Incremental Term Loan under this Section 2.13 have been satisfied, and (vi) the Borrower shall

deliver or cause to be delivered any legal opinions or other documents reasonably requested by the Administrative Agent in connection with any such transaction. In the event any Incremental Term Loans are not funded on the applicable Increased Amount Date, the Borrower shall make any payments required pursuant to Section 2.8(c) in connection with such Incremental Term Loan Commitments. In no event shall the provisions of this Section 2.13 or any other provision of this Agreement or any other Loan Document be deemed to create any obligation on the part of any Lender to agree to any increase in any Commitment and the Borrower and the other Loan Parties each agree that any such increase shall be at the sole option of each Lender.

(c) On any Increased Amount Date on which any Incremental Term Loan Commitments of any tranche are effective, subject to the satisfaction of the foregoing terms and conditions, (i) each Incremental Term Loan Lender shall make an Incremental Term Loan to the Borrower in an amount equal to its Incremental Term Loan Commitment, and (ii) each Incremental Term Loan Lender shall become a Lender hereunder with respect to the Incremental Term Loan Commitment and the Incremental Term Loans made pursuant thereto.

(d) The Incremental Term Loans and Incremental Term Loan Commitments shall be on the same terms and conditions as the Term Loans (including as to security) and such other terms and conditions as shall be agreed by the Incremental Term Loan Lenders and the Agents. The maturity date of any Incremental Term Loan shall be the Term Loan Maturity Date. Each Incremental Amendment may, without the consent of any other Lenders, effect such amendments to this Agreement and the other Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to effect the provisions of this Section 2.13.

## ARTICLE III
## [INTENTIONALLY OMITTED]

## ARTICLE IV
## APPLICATION OF PAYMENTS; DEFAULTING LENDERS

### Section 4.1. Payments; Computations and Statements.

(a) The Borrower will make each payment under this Agreement not later than 3:00 pm (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Account. All payments received by the Administrative Agent after 3:00 pm (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day. All payments shall be made by the Borrower without set-off, counterclaim, recoupment, deduction or other defense to the Agents and the Lenders. Except as provided in Section 2.2, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement. The Lenders and the Borrower hereby authorize the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account of the Borrower with any amount due and payable by the Borrower under any Loan Document. Each of the Lenders and the Borrower agrees that the Administrative Agent shall have the right to make such charges whether or not any Default or Event of Default shall

have occurred and be continuing or whether any of the conditions precedent in Section 5.2 have been satisfied. Any amount charged to the Loan Account of the Borrower shall be deemed Obligations. The Lenders and the Borrower confirm that any charges which the Administrative Agent may so make to the Loan Account of the Borrower as herein provided will be made as an accommodation to the Borrower and solely at the Administrative Agent's discretion, provided that the Administrative Agent shall from time to time upon the request of the Collateral Agent, charge the Loan Account of the Borrower with any amount due and payable under any Loan Document. Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be. All computations of fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days. Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b) The Administrative Agent shall provide the Borrower, promptly after the end of each calendar month, a summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances in the Loan Account of the Borrower during such month, the amounts and dates of all Loans made to the Borrower during such month, the amounts and dates of all payments on account of the Loans to the Borrower during such month and the Loans to which such payments were applied, the amount of interest accrued on the Loans to the Borrower during such month, and the amount and nature of any charges to the Loan Account made during such month on account of fees, commissions, expenses and other Obligations. All entries on any such statement shall be presumed to be correct and, 30 days after the same is sent, shall be final and conclusive absent manifest error.

**Section 4.2. Sharing of Payments**. Except as provided in Section 2.2, if any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered, and (b) the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender and any payment of an amendment, consent or waiver fee to consenting Lenders pursuant to an effective amendment, consent or waiver with respect to this Agreement), or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, other than to any Loan Party or any Subsidiary thereof (as to which the provisions of this Section shall apply). The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law, exercise all of its rights (including the

Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

**Section 4.3.** **Apportionment of Payments**. Subject to Section 2.2:

(a) All payments of principal and interest in respect of outstanding Loans, all payments of fees (other than the fees set forth in Section 2.6 and to the extent set forth in any written agreement among the Agents and the Lenders) and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made.

(b) After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the direction of the Collateral Agent or the Required Lenders shall, apply all payments in respect of any Obligations, including without limitation, all proceeds of the Collateral, subject to the provisions of this Agreement,

(i) first, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agents until paid in full;

(ii) second, to pay interest then due and payable in respect of the Agent Advances until paid in full;

(iii) third, to pay principal of the Agent Advances until paid in full;

(iv) fourth, ratably to pay the Obligations in respect of any fees (other than any Applicable Premium), expense reimbursements, indemnities and other amounts then due and payable to the Term Loan Lenders until paid in full;

(v) fifth, ratably to pay interest then due and payable in respect of the Term Loan until paid in full;

(vi) sixth, ratably to pay principal of the Term Loan until paid in full;

(vii) seventh, ratably to pay the Obligations in respect of any Applicable Premium then due and payable to the Lenders until paid in full; and

(viii) eighth, to the ratable payment of all other Obligations then due and payable.

(c) For purposes of Section 4.3(b) (other than clause (viii) thereof), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not the same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding, except to the extent that default or

overdue interest (but not any other interest) and loan fees, each arising from or related to a default, are disallowed in any Insolvency Proceeding; provided, however, that for the purposes of clause (viii), "paid in full" means payment in cash of all amounts owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not the same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(d) In the event of a direct conflict between the priority provisions of this Section 4.3 and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this Section 4.3 shall control and govern.

**Section 4.4. Defaulting Lenders**. Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a) Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 11.2.

(b) The Administrative Agent shall not be obligated to transfer to such Defaulting Lender any payments made by the Borrower to the Administrative Agent for such Defaulting Lender's benefit, and, in the absence of such transfer to such Defaulting Lender, the Administrative Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Pro Rata Shares (without giving effect to the Pro Rata Shares of such Defaulting Lender) (but only to the extent that such Defaulting Lender's Loans were funded by the other Lenders) or, if so directed by the Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Loans were not funded by the other Lenders), retain the same to be re-advanced to the Borrower as if such Defaulting Lender had made such Loans to the Borrower. Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrower for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.

(c) Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrower to replace the Defaulting Lender in accordance with Section 2.12 with one or more substitute Lenders, and the Defaulting Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Defaulting Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given. Prior to the effective date of such replacement, the Defaulting Lender shall execute and deliver an Assignment and Acceptance, subject only to the Defaulting Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If the Defaulting Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Defaulting Lender shall be deemed to have executed and

delivered such Assignment and Acceptance. The replacement of any Defaulting Lender shall be made in accordance with the terms of Section 11.7.

(d) The operation of this Section shall not be construed to increase or otherwise affect the Commitments of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by the Borrower of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.

(e) This Section shall remain effective with respect to such Lender until either (i) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable or (ii) the non-Defaulting Lenders, the Agents, and the Borrower shall have waived such Defaulting Lender's default in writing, and the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Loans and pays to the Agents all amounts owing by such Defaulting Lender in respect thereof; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

## ARTICLE V
## CONDITIONS TO LOANS

**Section 5.1. Conditions Precedent to Effectiveness**. This Agreement shall become effective as of the Business Day (the "**Effective Date**") when each of the following conditions precedent shall have been satisfied in a manner satisfactory to the Agents:

(a) Payment of Fees, Etc. The Borrower shall have paid on or before the Effective Date all fees, costs, expenses and taxes then payable pursuant to Sections 2.6 (including the Fee Letter) and 11.4.

(b) Representations and Warranties; No Event of Default. The following statements shall be true and correct: (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the Effective Date are true and correct on and as of the Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Effective Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(c) Legality. The making of the initial Loans shall not contravene any law, rule or regulation applicable to any Secured Party.

(d) Delivery of Documents. The Agents shall have received on or before the Effective Date the following, each in form and substance satisfactory to the Agents and, unless indicated otherwise, dated the Effective Date and, if applicable, duly executed by the Persons party thereto:

(i) subject Section 5.3, a Security Agreement, together with (A) the original stock certificates representing all of the Equity Interests and all promissory notes required to be pledged thereunder, accompanied by undated stock powers executed in blank and other proper instruments of transfer, and registration pages and executed irrevocable proxies with respect to such Equity Interests, and (B) each Intellectual Property Security Agreement, executed by each Loan Party as required thereunder, for filing in the United States Patent and Trademark Office or the United States Copyright Office, as applicable;

(ii) a UCC Filing Authorization Letter, dated and effective as of May 29, 2025, authorizing the Collateral Agent (or its designee) to complete the filing of appropriate financing statements on Form UCC-1 in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by each Security Agreement;

(iii) the results of searches for any effective UCC financing statements, tax Liens or judgment Liens filed against any Loan Party or its property, which results shall not show any such Liens (other than Permitted Liens acceptable to the Collateral Agent);

(iv) the Canadian Security Documents duly executed by the parties thereto;

(v) an acknowledgment of PPSA verification statements dated and effective as of the Effective Date, confirming receipt by the Loan Parties of all appropriate PPSA financing statements in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by the Canadian Security Documents;

(vi) the results of searches for any effective PPSA financing statements filed against any Loan Party or its property, which results shall not show any such Liens (other than Permitted Liens acceptable to the Collateral Agent);

(vii) an executed notice of security interest in Intellectual Property to be registered with CIPO in respect of the security interests purported to be created by the Canadian Security Documents;

(viii) [reserved];

(ix) the Information Certificate;

(x) the Disbursement Letter;

(xi) the Fee Letter;

(xii) the Intercompany Subordination Agreement;

(xiii) the Sanders Subordination Agreements;

(xiv) a certificate of an Authorized Officer of each Loan Party, certifying (A) as to copies of the Governing Documents of such Loan Party, together with all amendments thereto (including, without limitation, a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified as of a recent date not more than 30 days prior to the Effective Date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction), (B) as to a copy of the resolutions or written consents of such Loan Party authorizing (1) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (2) the execution, delivery and performance by such Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith, (C) the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document (in the case of a Borrower, including, without limitation, Notices of Borrowing, Term SOFR Rate Notices and all other notices under this Agreement and the other Loan Documents) to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such authorized officers and (D) as to the matters set forth in Section 5.1(b);

(xv) a certificate of the chief financial officer of the Borrower (A) certifying that all tax returns required to be filed by the Loan Parties have been filed and that all taxes upon the Loan Parties or their properties, assets, and income (including real property taxes and payroll taxes) have been paid, (B) attaching a copy of the Financial Statements and the Projections described in Section 6.1(g) and certifying as to the compliance with the representations and warranties set forth in Section 6.1(g) and Section 6.1(gg)(ii) and as to satisfaction of the minimum Liquidity requirements in Section 5.1(i) and (C) certifying that after giving effect to all Loans to be made on the Effective Date all liabilities of the Loan Parties are current;

(xvi) a certificate of the chief financial officer of each Loan Party, certifying that each such Loan Party (after giving effect to the Loans made on the Effective Date) is Solvent;

(xvii) a certificate of an Authorized Officer of the Borrower certifying that (A) the Material Contracts (delivered separately to the Agents on or prior to the Effective Date), in each case as in effect on the Effective Date, are true, complete and correct copies thereof, and (B) such agreements remain in full force and effect and that none of the Loan Parties has breached or defaulted in any of its obligations under such agreements;

(xviii) a certificate of the appropriate official(s) of the jurisdiction of organization and, except to the extent such failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, each jurisdiction of foreign qualification of each Loan Party certifying as of a recent date not more than 30 days prior to the Effective Date as to the

subsistence in good standing of, and, if applicable, the payment of taxes by, such Loan Party in such jurisdictions;

(xix) an opinion of (A) Nelson Mullins Riley & Scarborough LLP, counsel to the Loan Parties, (B) Fennemore Law, Nevada special local counsel to the Borrower, and (C) Stewart McKelvey, counsel to the Canadian Guarantors, in each case as to such matters as the Agents may reasonably request;

(xx) subject to Section 5.3, evidence of the insurance coverage required by Section 7.1 and the terms of each Security Agreement, in each case, where requested by the Collateral Agent, with such endorsements as to the named insureds or loss payees thereunder as the Collateral Agent may request and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon 30 days' prior written notice to the Collateral Agent and each such named insured or loss payee, together with evidence of the payment of all premiums due in respect thereof for such period as the Collateral Agent may request;

(xxi) subject to Section 5.3, landlord waivers, in form and substance satisfactory to the Collateral Agent, executed by each landlord with respect to each of the Leases set forth on Schedule III to the Security Agreement and collateral access agreements to the extent required by Section 7.1(m);

(xxii) subject to Section 5.3, all Control Agreements required for the Loan Parties to comply with the Loan Documents, each duly executed by, in addition to the applicable Loan Party, the applicable financial institution;

(xxiii) to the extent requested at least three (3) Business Days prior to the Effective Date, all documentation and other information required by regulatory authorities under applicable "know your customer" rules and Anti-Money Laundering Laws, including the USA PATRIOT Act;

(xxiv) evidence satisfactory to the Agents that a Process Agent has been properly appointed by each Canadian Guarantor in accordance with Section 11.10(c);

(xxv) copies of the Consulting Services Agreement and the Material Contracts as in effect on the Effective Date, certified as true and correct copies thereof by an Authorized Officer of the Borrower, together with a certificate of an Authorized Officer of the Borrower stating that such agreements remain in full force and effect and that none of the Loan Parties have breached or defaulted in any of their obligations under the Material Contracts; and

(xxvi) such other agreements, instruments, approvals, opinions and other documents, each satisfactory to the Agents in form and substance, as any Agent may reasonably request.

(e) Material Adverse Effect. The Agents shall have determined, in their reasonable judgment, that no event or development shall have occurred since December 31, 2024 which could reasonably be expected to have a Material Adverse Effect.

(f) Payment of Effective Date Payoff Debt; Discharge of Liens. The Agents shall have received in connection with the payment of the Effective Date Payoff Debt (i) payoff letters duly executed by the appropriate lender(s) thereunder, at least three (3) Business Day prior (or such shorter period as agreed to by the Agents in their sole discretion) to the proposed funding date of the Loans, and in form and substance acceptable the Agents, providing, among other things, (A) the payoff amount for payment in full of the Effective Date Payoff Debt and any related per diem, (B) that upon receipt by such lender(s) of such payment in full the automatic termination, release and discharge of all (1) Liens and other security interests with respect to the Effective Date Payoff Debt, and (2) all security, guaranty and other loan documents thereto, and (C) authorizing filing (1) UCC-3 termination statements for all UCC-1 financing statements, (2) PPSA discharges for all PPSA financing statements and (3) CIPO discharges for all CIPO registrations, in each case filed in respect of the Effective Date Payoff Debt and covering any portion of the Collateral and any termination of security interests in Intellectual Property for each assignment for security recorded by such lenders at the United States Patent and Trademark Office or the United States Copyright Office and covering any Intellectual Property of the Loan Parties and (ii) concurrently, or substantially concurrently, with the funding of the initial Loans on the Effective Date, wire confirmations evidencing the payment in full of the Effective Date Payoff Debt in accordance with the amounts set forth in such payoff letters.

(g) Consolidated Senior Net Leverage Ratio. After giving effect to all Loans to be made on the Effective Date, the Consolidated Senior Net Leverage Ratio of the Borrower and its Subsidiaries for the 12 months ended March 31, 2025 calculated on a pro forma basis shall not be greater than 2.75 to 1.00. The Borrower shall deliver to the Administrative Agent a certificate of an Authorized Officer of the Borrower certifying as to the matters set forth above and containing reasonably detailed calculation of such ratio.

(h) Approvals. All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans or the conduct of the Loan Parties' business shall have been obtained and shall be in full force and effect.

(i) Liquidity. After giving effect to all Loans to be made on the Effective Date, Liquidity shall not be less than $3,000,000 after the repayment of the Existing Debt and the payment of all fees and expenses under the Loan Documents; provided that, for the purposes of calculating Liquidity under this Section 5.1(d)(i) only, "Unrestricted Cash" shall include unrestricted cash on-hand of the Loan Parties maintained in deposit accounts in the name of a Loan Party in the United States whether or not such deposit accounts are Controlled Accounts. The Borrower shall deliver to the Collateral Agent a certificate of the chief financial officer or other senior officer of the Borrower certifying as to the matters set forth above and containing the calculation of Liquidity and certifying that the accounts payable of the Loan Parties and their Subsidiaries have been maintained and managed in the ordinary course of business and consistent with historical practices, and that such Liquidity amount does not reflect any delays or deferrals of payment obligations.

(j) Minimum Consolidated Adjusted EBITDA. The Consolidated Adjusted EBITDA of the Borrower and its Subsidiaries for the twelve (12) consecutive fiscal months of the Borrower and its Subsidiaries ending on March 31, 2025 is no less than $7,000,000.

(k) Due Diligence. The Agents shall have completed their business, legal and collateral due diligence with respect to each Loan Party and the results thereof shall be acceptable to the Agents, in their sole and absolute discretion.

(l) Security Interests. The Loan Documents shall create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable first priority security interest in the Collateral secured thereby (subject only to Permitted Liens).

(m) Litigation. There shall exist no claim, action, suit, investigation, litigation or proceeding (including, without limitation, shareholder or derivative litigation) pending or threatened in any court or before any arbitrator or governmental authority which relates to the Loans or which, in the opinion of the Agents, is reasonably likely to be adversely determined, and that, if adversely determined, would reasonably be expected to have a Material Adverse Effect.

(n) Notice of Borrowing. The Administrative Agent shall have received a Notice of Borrowing pursuant to Section 2.2.

**Section 5.2. Conditions Precedent to All Loans**. The obligation of any Agent or any Lender to make any Loan after the Effective Date is subject to the fulfillment, in a manner satisfactory to the Administrative Agent, of each of the following conditions precedent:

(a) Payment of Fees, Etc. The Borrower shall have paid all fees, costs, expenses and taxes then payable by the Borrower pursuant to this Agreement and the other Loan Documents, including, without limitation, Sections 2.6 and 11.4.

(b) Representations and Warranties; No Event of Default. The following statements shall be true and correct, and the submission by the Borrower to the Administrative Agent of a Notice of Borrowing with respect to each such Loan, and the Borrower's acceptance of the proceeds of such Loan shall each be deemed to be a representation and warranty by each Loan Party on the date of such Loan that: (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the date of such Loan are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), (ii) at the time of and after giving effect to the making of such Loan and the application of the proceeds thereof, no Default or Event of Default has occurred and is continuing or would result from the making of the Loan to be made on such date and (iii) the conditions set forth in this Section 5.2 have been satisfied as of the date of such request.

(c) Legality. The making of such Loan shall not contravene any law, rule or regulation applicable to any Secured Party.

(d) Notices. The Administrative Agent shall have received a Notice of Borrowing pursuant to Section 2.2.

(e) Additional Conditions for Delayed Draw Term Loan. The proceeds of the Delayed Draw Term Loan will be used to repay in full the outstanding obligations of the Borrower under each of the Atrium Settlement Agreement and the Vitabest Settlement Agreement.

**Section 5.3. Conditions Subsequent to Effectiveness**. As an accommodation to the Loan Parties, the Agents and the Lenders have agreed to execute this Agreement and to make the Loans on the Effective Date notwithstanding the failure by the Loan Parties to satisfy the conditions set forth below on or before the Effective Date. In consideration of such accommodation, the Loan Parties agree that, in addition to all other terms, conditions and provisions set forth in this Agreement and the other Loan Documents, including, without limitation, those conditions set forth in Section 5.1, the Loan Parties shall satisfy each of the conditions subsequent set forth below on or before the date applicable thereto (it being understood that (i) the failure by the Loan Parties to perform or cause to be performed any such condition subsequent on or before the date applicable thereto shall constitute an Event of Default and (ii) to the extent that the existence of any such condition subsequent would otherwise cause any representation, warranty or covenant in this Agreement or any other Loan Document to be breached, the Required Lenders hereby waive such breach for the period from the Effective Date until the date on which such condition subsequent is required to be fulfilled pursuant to this Section 5.3):

(a) within ten (10) Business Days after the Effective Date (or such longer period as the Collateral Agent may agree in its sole discretion), to the extent not delivered by the Effective Date, deliver to the Collateral Agent the deliverables relating to Pledged Interests (as defined in the Security Agreement) required pursuant to Section 4(a) of the Security Agreement;

(b) within ten (10) days after the Effective Date (or such longer period as the Agents may agree in their sole discretion), to the extent not delivered by the Effective Date, deliver to the Collateral Agent the evidence of insurance required pursuant to Section 5.1(d)(xx);

(c) within thirty (30) days after the Effective Date (or such longer period as the Collateral Agent may agree in its sole discretion), to the extent not delivered by the Effective Date, deliver to the Collateral Agent all landlord waivers and collateral access agreements, as the case may be, required pursuant to Section 5.1(d)(xxi);

(d) within thirty (30) days after the Effective Date (or such longer period as the Collateral Agent may agree in its sole discretion), to the extent not delivered by the Effective Date, deliver to the Collateral Agent all Control Agreements required pursuant to Section 5.1(d)(xxii);

(e) within five (5) Business Days after the Effective Date (or such longer period as the Agents may agree in their sole discretion), deliver to the Agents a consent, in form and substance reasonably satisfactory to the Agents, providing that, notwithstanding any term, condition or restriction set forth in the Knight Agreement, Knight consents to (i) the grant of the security interests in and Liens on the Collateral (including the Intellectual Property associated with the Licensed Products (as defined in the Knight Agreement)) in favor the Secured Parties pursuant

to the Loan Documents, and (ii) the exercise by any of the Secured Parties of their rights and remedies under the Loan Documents and applicable law with respect to the Collateral, including, without limitation, any foreclosure, sale, transfer or other enforcement right of or with respect to the Collateral; provided that any such sale or transfer of the Intellectual Property associated with the Licensed Products shall be made subject to the license granted in favor of Knight pursuant to the Knight Agreement;

(f) within ten (10) Business Days after the Effective Date (or such longer period as the Agents may agree in their sole discretion), deliver to the Agents (i) evidence that Hand MD Corp. has been reinstated and is in good standing with the Delaware Secretary of State and (ii) executed copies of such agreements, instruments and other documents required by Section 7.1(b), in each case with respect to the foregoing clauses (i) and (ii), in form and substance satisfactory to the Agents;

(g) within five (5) Business Days after the Effective Date (or such longer period as the Collateral Agent may agree in its sole discretion), deliver evidence satisfactory to the Agents that the Canadian Guarantor has filed the required registration under the Extra-Provincial Corporations Act (Ontario), to the extent required under applicable law; and

(h) within five (5) Business Days after the Effective Date (or such longer period as the Collateral Agent may agree in its sole discretion), deliver to the Collateral Agent evidence of the filing of a UCC-3 termination statement with respect to the UCC-1 financing statement (Initial Filing Number 2024402520-9) filed on May 1, 2024 with the Nevada Secretary of State by Middesk, Inc. as secured party against the Borrower as debtor; and

(i) within five (5) Business Days after the Effective Date (or such longer period as the Collateral Agent may agree in its sole discretion), deliver evidence satisfactory to the Agents that the Borrower has filed the required transfer of all Registered Intellectual Property in the name of any predecessor in interest with CIPO or the United States Patent and Trademark Office, as applicable, and with respect to such Registered Intellectual Property in the United States, an executed Intellectual Property Security Agreement to be filed with the United States Patent and Trademark Office and, forthwith upon receipt of confirmation from CIPO and the United States Patent and Trademark Office that such Registered Intellectual Property was successfully transferred to the Borrower, evidence of such completed transfers, provided further that the Collateral Agent shall thereafter be irrevocably authorized and directed to register its security interest in such Registered Intellectual Property with CIPO in accordance with the Canadian Security Documents and to complete any and all ancillary documents in connection therewith.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

**Section 6.1. Representations and Warranties**. Each Loan Party hereby represents and warrants to the Secured Parties as follows:

(a) Organization, Good Standing, Etc. Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing under the laws of the state or jurisdiction of its organization, (ii) has all requisite power

and authority to conduct its business as now conducted and as presently contemplated and, in the case of the Borrower, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (solely for the purposes of this subclause (iii)) where the failure to be so qualified and in good standing could not reasonably be expected to have a Material Adverse Effect.

(b) Authorization, Etc. The execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene (A) any of its Governing Documents, (B) any applicable Requirement of Law or (C) any material Contractual Obligation binding on or otherwise affecting it or any of its properties (including the Material Contracts) by which such Loan Party is bound, (iii) do not and will not result in or require the creation of any Lien (other than pursuant to any Loan Document) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties, except, in the case of clauses (ii)(B), (ii)(C) and (iv), to the extent where such contravention, default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal could not reasonably be expected to have a Material Adverse Effect.

(c) Governmental Approvals. No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party other than (i) filings and recordings with respect to Collateral to be made, or otherwise delivered to the Collateral Agent for filing or recordation, on the Effective Date or (ii) such as have been obtained and are in full force and effect.

(d) Enforceability of Loan Documents. This Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(e) Capitalization. On the Effective Date, after giving effect to the transactions contemplated hereby to occur on the Effective Date, the authorized Equity Interests of the Borrower and each of its Subsidiaries and the issued and outstanding Equity Interests of the Borrower and each of its Subsidiaries are as set forth on Schedule 6.1(e) hereto. All of the issued and outstanding shares of Equity Interests of the Borrower and each of its Subsidiaries have been validly issued and are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights. All Equity Interests of such Subsidiaries of the Borrower are owned by the Borrower free and clear of all Liens (other than Permitted Specified Liens). Except as described on Schedule 6.1(e) hereto, there are no outstanding debt or equity securities of the Borrower or any of its Subsidiaries and no outstanding obligations of the Borrower or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights

for the purchase or acquisition from the Borrower or any of its Subsidiaries, or other obligations of the Borrower or any of its Subsidiaries to issue, directly or indirectly, any shares of Equity Interests of the Borrower or any of its Subsidiaries.

(f) Litigation. Except as set forth on Schedule 6.1(f), there is no pending or, to the knowledge of any Loan Party, threatened action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (i) could reasonably be expected to have a Material Adverse Effect or (ii) relates to this Agreement or any other Loan Document or any transaction contemplated hereby or thereby.

(g) Financial Statements.

(i) The Financial Statements, copies of which have been delivered to each Agent and each Lender, fairly present the consolidated financial condition of the Borrower and its Subsidiaries as at the respective dates thereof and the consolidated results of operations of the Borrower and its Subsidiaries for the fiscal periods ended on such respective dates, all in accordance with GAAP. All material indebtedness and other liabilities (including, without limitation, Indebtedness, liabilities for taxes, long-term leases and other unusual forward or long-term commitments), direct or contingent, of the Borrower and its Subsidiaries are set forth in the Financial Statements. Since December 31, 2024, no event or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(ii) The Borrower has heretofore furnished to each Agent and each Lender (A) projected monthly balance sheets, income statements and statements of cash flows of the Borrower and its Subsidiaries for the Fiscal Year 2025, and (B) projected quarterly balance sheets, income statements and statements of cash flows of the Borrower and its Subsidiaries for the Fiscal Years 2026 through 2028 which projected financial statements shall be updated from time to time pursuant to Section 7.1(a)(vi).

(h) Compliance with Law, Etc. No Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any material Requirement of Law, or (iii) any material term of any material Contractual Obligation (including, without limitation, any Material Contract) binding on or otherwise affecting it or any of its properties.

(i) ERISA. (i) Each Loan Party and each Employee Plan is in compliance with all Requirements of Law in all material respects, including ERISA, the Internal Revenue Code and the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, (ii) no ERISA Event has occurred nor is reasonably expected to occur with respect to any Employee Plan or Multiemployer Plan, (iii) the most recent annual report (Form 5500 Series) with respect to each Pension Plan, including any required Schedule B (Actuarial Information) thereto, copies of which have been filed with the Internal Revenue Service and delivered to the Agents, is complete and correct and fairly presents the funding status of such Pension Plan, and since the date of such report, there has been no material adverse change in such funding status, and (iv) each Employee Plan that is intended to be a qualified plan under Section 401(a) of the Internal Revenue Code has been determined by the Internal Revenue Service to be qualified under Section 401(a) of the Internal Revenue Code and the trust related thereto is exempt from federal income tax under Section 501(a) of the Internal

Revenue Code. Copies of each agreement entered into with the PBGC, the U.S. Department of Labor or the Internal Revenue Service with respect to any Employee Plan have been delivered to the Agents. Other than as set forth on Schedule 6.1(p), no Loan Party or any of its ERISA Affiliates has incurred any liability to the PBGC which remains outstanding other than the payment of premiums, and there are no premium payments which have become due which are unpaid. There are no pending or, to the best knowledge of any Loan Party, threatened claims, actions, proceedings or lawsuits (other than claims for benefits in the normal course) asserted or instituted against (A) any Employee Plan or its assets, (B) any fiduciary with respect to any Employee Plan, or (C) any Loan Party or any of its ERISA Affiliates with respect to any Employee Plan. Except as required by Section 4980B of the Internal Revenue Code, no Loan Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides health benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or any of its ERISA Affiliates or has any obligation to provide any such benefits for any current employee after such employee's termination of employment.

(j) Taxes, Etc. (i) All United States federal income Tax returns and all other material state and local Tax returns and other reports required by applicable Requirements of Law to be filed by any Loan Party have been timely filed and (ii) all required Taxes imposed upon any Loan Party or any property of any Loan Party which have become due and payable on or prior to the date hereof have been paid, except (A) unpaid Taxes in an aggregate amount at any one time not in excess of $50,000, or (B) Taxes contested in good faith by proper proceedings which stay the imposition of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP.

(k) Regulations T, U and X. No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

(l) Nature of Business.

(i) No Loan Party is engaged in any business other than the Permitted Business.

(ii) The Borrower does not have any material liabilities (other than liabilities arising under the Loan Documents and the Sanders Notes), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(m) Adverse Agreements, Etc. No Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n) Permits, Etc. Each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business and Facility currently owned, leased, managed or operated, or to be acquired, by such Person, except to the extent the failure to have or be in compliance therewith could not reasonably be expected to have a Material Adverse Effect. No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect.

(o) Properties.

(i) Each Loan Party owns (with good and marketable title in the case of owned real property, subject only to the matters permitted by the following sentence), or has valid leasehold interests in or valid licenses to use, all property and assets material to its business, free and clear of all Liens except Permitted Liens and minor defects in title to the extent such defects do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes, in each case, in any material respect. All such property and assets are generally in good operating order and condition, ordinary wear and tear excepted.

(ii) Schedule 6.1(o) sets forth a complete and accurate list, as of the Effective Date, of the address of each Facility owned or leased by each Loan Party, and identifies the interest (fee or leasehold) of such Loan Party therein. As of the Effective Date, each Loan Party has valid leasehold interests in the Leases described on Schedule 6.1(o) to which it is a party. True, complete and correct copies of each such Lease have been made available to the Administrative Agent on or prior to the Effective Date except as otherwise set forth on Schedule 6.1(o). As of the Effective Date, each such Lease is valid and enforceable in accordance with its terms in all material respects and is in full force and effect subject to laws affecting the enforcement of creditors' rights generally and by general principles of equity. To the knowledge of each Loan Party, no consent or approval of any landlord or other third party in connection with any such Lease is necessary for any Loan Party to enter into and execute the Loan Documents to which it is a party, except as set forth on Schedule 6.1(o). Except as set forth on Schedule 6.1(o), to the knowledge of any Loan Party, as of the Effective Date, (A) no other party to any such Lease is in default of its material obligations thereunder, (B) no Loan Party (or any other party to any such Lease) has at any time delivered or received any notice of material default which remains uncured under any such Lease and (C) no event has occurred which, with the giving of notice or the passage of time or both, would constitute a material default under any such Lease.

(p) Employee and Labor Matters. Except as set forth on Schedule 6.1(p), (i) each Loan Party and its Subsidiaries is in compliance with all Requirements of Law in all material respects pertaining to employment and employment practices, terms and conditions of employment, wages and hours, and occupational safety and health, (ii) no Loan Party or any Subsidiary is party to any collective bargaining agreement, nor has any labor union been recognized as the representative of the employees of any Loan Party of Subsidiary, (iii) there is no unfair labor practice complaint pending or, to the best knowledge of any Loan Party, threatened against any Loan Party or any Subsidiary before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party or any Subsidiary which arises

out of or under any collective bargaining agreement, (iv) there has been no strike, work stoppage, slowdown, lockout, or other labor dispute pending or threatened against any Loan Party or any Subsidiary, and (v) to the best knowledge of each Loan Party, no labor organization or group of employees has made a pending demand for recognition or certification, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed, with the National Labor Relations Board or any other labor relations tribunal or authority. No Loan Party or Subsidiary has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("**WARN**") or any similar Requirement of Law, which remains unpaid or unsatisfied. All material payments due from any Loan Party or Subsidiary on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party or Subsidiary.

(q) Environmental Matters. Except as set forth on Schedule 6.1(q) hereto, (i) no Loan Party or any of its Subsidiaries is in violation of any Environmental Law, (ii) each Loan Party and its Subsidiaries has, and is in compliance with, all Environmental Permits for its respective operations and businesses, except to the extent any failure to have or be in compliance therewith could not reasonably be expected to have a Material Adverse Effect, (iii) there has been no Release of Hazardous Materials at any properties currently or formerly owned, leased or operated by any Loan Party, its Subsidiaries or a respective predecessor in interest or at any disposal or treatment facility which received Hazardous Materials generated by any Loan Party, its Subsidiaries or any respective predecessor in interest, which in any case of the foregoing could reasonably be expected to have a Material Adverse Effect, (iv) there are no pending or threatened Environmental Claims against, or Environmental Liability of, any Loan Party, its Subsidiaries or any respective predecessor in interest that could reasonably be expected to have a Material Adverse Effect, (v) neither any Loan Party nor any of its Subsidiaries is performing or responsible for any Remedial Action that could reasonably be expected to have a Material Adverse Effect, and (vi) the Loan Parties have provided to the Collateral Agent and Lenders true and complete copies of all material environmental reports, audits and investigations in the possession or control of any Loan Party or any of its Subsidiaries with respect to the operations and business of the Loan Parties and its Subsidiaries.

(r) Insurance. Each Loan Party maintains all insurance required by Section 7.1(h). Schedule 6.1(r) sets forth a list of all such insurance maintained by or for the benefit of each Loan Party on the Effective Date.

(s) Use of Proceeds. The proceeds of the Initial Term Loans shall be used to (a) pay the Effective Date Payoff Debt, (b) pay the Transaction Costs, and (c) for general corporate purposes of the Borrower. The proceeds of the Delayed Draw Term Loan will be used to repay in full the outstanding obligations of the Borrower under each of the Atrium Settlement Agreement and the Vitabest Settlement Agreement.

(t) Solvency. After giving effect to the transactions contemplated by this Agreement and before and after giving effect to each Loan, each Loan Party is, and the Loan Parties on a consolidated basis are, Solvent. No transfer of property is being made by any Loan Party and no obligation is being incurred by any Loan Party in connection with the transactions

contemplated by this Agreement or the other Loan Documents with the intent to hinder, delay or defraud either present or future creditors of such Loan Party.

(u) Location of Deposit, Securities and Commodities Accounts. Schedule 6.1(u) sets forth a complete and accurate list as of the Effective Date of all deposit accounts, all securities, commodities and other accounts maintained with any financial institution, securities intermediary or broker dealer and all other similar accounts maintained by each Loan Party, together with a brief description thereof (i.e., the name and address of the financial institution, intermediary or broker dealer at which such deposit or other account is maintained, the account number, the purpose thereof and whether such account is (or will be) subject to a Control Agreement or is an Excluded Account).

(v) Intellectual Property. Each Loan Party owns or licenses or otherwise has the right to use all Intellectual Property rights that are necessary for the operation of its Permitted Business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Set forth on Schedule 6.1(v) hereto is a complete and accurate list as of the Effective Date of (i) each item of Registered Intellectual Property owned by each Loan Party, (ii) each material work of authorship owned by each Loan Party and which is not Registered Intellectual Property and (iii) each material Intellectual Property Contract to which each Loan Party is bound. No Loan Party and no product or service of any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or threatened, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. To the knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code pertaining to Intellectual Property is pending or proposed, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(w) Material Contracts. Set forth on Schedule 6.1(w) hereto is a complete and accurate list as of the Effective Date of all Material Contracts of each Loan Party, showing the parties and subject matter thereof and amendments and modifications thereto. Each such Material Contract (i) is in full force and effect and is binding upon and enforceable against each Loan Party that is a party thereto and, to the best knowledge of such Loan Party, all other parties thereto in accordance with its terms, (ii) has not been otherwise amended or modified, and (iii) is not in default due to the action of any Loan Party or, to the best knowledge of any Loan Party, any other party thereto.

(x) Investment Company Act. None of the Loan Parties is (i) an "investment company", "affiliated person", "promoter" of, or "principal underwriter" of or for, an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(y) Customers and Suppliers. There exists no actual or threatened termination, cancellation or limitation of, or modification to or change in, the business relationship between (i) any Loan Party, on the one hand, and any customer or any group thereof, on the other hand, whose

agreements with any Loan Party are individually or in the aggregate material to the business or operations of such Loan Party, or (ii) any Loan Party, on the one hand, and any supplier or any group thereof, on the other hand, whose agreements with any Loan Party are individually or in the aggregate material to the business or operations of such Loan Party; and there exists no present state of facts or circumstances that could give rise to or result in any such termination, cancellation, limitation, modification or change.

(z) No Bankruptcy Filing. No Loan Party or any Subsidiary of a Loan Party is contemplating either an Insolvency Proceeding or the liquidation of all or a major portion of such Loan Party's or such Subsidiary's assets or property, and no Loan Party or any Subsidiary of a Loan Party has any knowledge of any Person contemplating an Insolvency Proceeding against it.

(aa) Interrelated Business. The Loan Parties and their Subsidiaries make up a related organization of various entities constituting a single economic and business enterprise so that the Loan Parties and their Subsidiaries share an identity of interests such that any benefit received by any one of them benefits the others. From time to time each Loan Party may render services to or for the benefit of the other Loan Parties or their Subsidiaries, purchase or sell and supply goods to or from or for the benefit of the others, make loans, advances and provide other financial accommodations to or for the benefit of the other Loan Parties (including inter alia, the payment by such Loan Party of creditors of the other Loan Parties and their Subsidiaries and guarantees by such Loan Party of indebtedness of the other Loan Parties and their Subsidiaries and provides administrative, marketing, payroll and management services to or for the benefit of the other Loan Parties and their Subsidiaries).

(bb) Name; Jurisdiction of Organization; Organizational ID Number; Chief Executive Office; FEIN. Schedule 6.1(bb) together with any updated Information Certificate delivered after the Effective Date, sets forth a complete and accurate list of (i) the exact legal name of each Loan Party, (ii) the jurisdiction of organization of each Loan Party, (iii) the organizational identification number of each Loan Party (or indicates that such Loan Party has no organizational identification number), (iv) the chief executive office, registered office and/or place of effective management of each Loan Party, and (v) the U.S. federal employer identification number of each Loan Party.

(cc) Security Interests. The Collateral Documents create in favor of the Collateral Agent, a legal, valid and enforceable security interest in the Collateral secured thereby. Upon the filing of the UCC-1 financing statements, PPSA financing statements, or other applicable financing statements and applications for registrations described in Section 5.1(d), and the filing or recording of intellectual property security agreements or other applicable intellectual property security documents in the appropriate U.S. intellectual property filing or registration office, as applicable, (i) such security interests in and Liens on the Collateral granted thereby shall be perfected, first priority security interests (subject only to Permitted Liens) in assets that can be perfected by such filings or recordings, and (ii) no further recordings or filings are or will be required in connection with the creation, perfection or enforcement of such security interests and Liens, other than (A) the filing of continuation statements in accordance with applicable law, and (B) the recording of intellectual property security agreements or other applicable intellectual property security documents in the appropriate U. S. intellectual property filing or registration

office, as applicable, with respect to after-acquired patent and trademark applications and registrations and copyrights.

(dd) Canadian Pension Plans. No Loan Party or any of its Subsidiaries sponsors, maintains, participates in, contributes to, or has otherwise incurred liability under, a Canadian Pension Plan nor has any liabilities or obligations in respect of a Canadian Pension Plan that has been terminated or wound up.

(ee) Sanctions; Anti-Corruption and Anti-Money Laundering Laws. None of any Loan Party, any Subsidiary thereof, any of their respective directors, officers, employees, nor, to the knowledge of any Loan Party, any of their respective shareholders, owners, agents or Affiliates, (i) is a Sanctioned Person or currently the subject or target of any Sanctions, (ii) has assets located in a Sanctioned Country, (iii) conducts any business with or for the benefit of any Sanctioned Person, (iv) directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons, (v) is a "Foreign Shell Bank" within the meaning of the USA PATRIOT Act, i.e., a foreign bank that does not have a physical presence in any country and that is not affiliated with a bank that has a physical presence and an acceptable level of regulation and supervision, or (vi) is a Person that resides in or is organized under the laws of a jurisdiction designated by the United States Secretary of the Treasury under Section 311 or 312 of the USA Patriot Act as warranting special measures due to money laundering concerns. Each Loan Party and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by each Loan Party and its Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Law. Each Loan Party and each Subsidiary is in compliance with all Sanctions, Anti-Money Laundering Laws and Anti-Corruption Laws in all material respects. Each Loan Party and each Affiliate, officer, employee or director acting on behalf of any Loan Party is (and is taking no action that would result in any such Person not being) in compliance with (A) all applicable OFAC rules and regulations, (B) all applicable United States of America, United Kingdom, United Nations, European Union, German, Canadian, Australian and all other internationally respected national autonomous sanctions, embargos and trade restrictions and (C) all applicable provisions of the USA PATRIOT Act. In addition, no Loan Party or any Subsidiary is engaged in any kind of activities or business of or with any Person or in any country or territory that is subject to any sanctions administered by OFAC, the United Kingdom, the European Union, Germany, Canada, Australia or the United Nations.

(ff) Anti-Bribery and Corruption.

(i) Neither any Loan Party nor, to the best knowledge of any Loan Party, any director, officer, employee or any other Person acting on behalf of any Loan Party, has offered, promised, paid, given or authorized the payment or giving of any money or other thing of value, directly or indirectly, to or for the benefit of any Person, including, without limitation, any employee, official or other Person acting on behalf of any Governmental Authority, or otherwise engaged in any activity that may violate any Anti-Corruption Law.

(ii) Neither any Loan Party nor, to the best knowledge of any Loan Party, any director, officer, employee or any other Person acting on behalf of any Loan Party, has engaged in any activity that would breach any Anti-Corruption Laws.

(iii) To the best of each Loan Party's knowledge and belief, there is no pending or, to the best knowledge of any Loan Party, threatened action, suit, proceeding or investigation before any court or other Governmental Authority against any Loan Party or any of its directors, officers, employees or other Person acting on its behalf that relates to a potential violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions.

(iv) The Loan Parties will not directly or indirectly, use, lend or contribute the proceeds of the Loans for any purpose that would breach the Anti-Corruption Laws.

(gg) Full Disclosure.

(i) Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished in writing by or on behalf of any Loan Party to the Agents (other than forward-looking information and projections and information of a general economic nature and general information about Borrower's industry) in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading.

(ii) Projections have been prepared on a reasonable basis and in good faith based on assumptions, estimates, methods and tests that are believed by the Loan Parties to be reasonable at the time such Projections were prepared and information believed by the Loan Parties to have been accurate based upon the information available to the Loan Parties at the time such Projections were furnished to the Lenders, and Borrower is not be aware of any facts or information that would lead it to believe that such Projections are incorrect or misleading in any material respect; it being understood that (A) Projections are by their nature subject to significant uncertainties and contingencies, many of which are beyond the Loan Parties' control, (B) actual results may differ materially from the Projections and such variations may be material and (C) the Projections are not a guarantee of performance.

## ARTICLE VII
## COVENANTS OF THE LOAN PARTIES AND OTHER COLLATERAL MATTERS

**Section 7.1. Affirmative Covenants**. So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party will, unless the Required Lenders shall otherwise consent in writing:

(a) Reporting Requirements. Furnish to each Agent and each Lender:

(i) as soon as available, and in any event within 30 days after the end of each fiscal month of the Borrower and its Subsidiaries commencing with the first fiscal month of the Borrower and its Subsidiaries ending after the Effective Date, internally prepared consolidated balance sheets, statements of operations and retained earnings and statements of cash

flows as at the end of such fiscal month, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year and (B) the Projections, all in reasonable detail and certified by an Authorized Officer of the Borrower as fairly presenting, in all material respects, the financial position of the Borrower and its Subsidiaries as at the end of such fiscal month and the results of operations, retained earnings and cash flows of the Borrower and its Subsidiaries for such fiscal month and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(ii) as soon as available and in any event within 45 days after the end of each fiscal quarter of the Borrower and its Subsidiaries commencing with the first fiscal quarter of the Borrower and its Subsidiaries ending after the Effective Date, consolidated balance sheets, statements of operations and retained earnings and statements of cash flows of the Borrower and its Subsidiaries as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year and (B) the Projections, all in reasonable detail and certified by an Authorized Officer of the Borrower as fairly presenting, in all material respects, the financial position of the Borrower and its Subsidiaries as of the end of such quarter and the results of operations, retained earnings and cash flows of the Borrower and its Subsidiaries for such quarter and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Borrower and its Subsidiaries furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments;

(iii) as soon as available, and in any event within 120 days after the end of each Fiscal Year of the Borrower and its Subsidiaries, consolidated balance sheets, statements of operations and retained earnings and statements of cash flows of the Borrower and its Subsidiaries as at the end of such Fiscal Year, setting forth in each case in comparative form the figures for the corresponding date or period set forth in (A) the financial statements for the immediately preceding Fiscal Year and (B) the Projections, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Borrower and satisfactory to the Agents (which report and opinion shall not include (1) any qualification, exception or explanatory paragraph expressing substantial doubt about the ability of the Borrower or any of its Subsidiaries to continue as a going concern or any qualification or exception as to the scope of such audit or (2) any qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such qualification, would require an adjustment to such item, the effect of which would be to cause any noncompliance with the provisions of Section 7.3);

(iv) simultaneously with the delivery of the financial statements of the Borrower and its Subsidiaries required by clauses (i), (ii) and (iii) of this Section 7.1(a), a Compliance Certificate:

(A) stating that such Authorized Officer has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Borrower and its Subsidiaries during the period covered by such financial statements with a view to determining whether the Borrower and its Subsidiaries were in compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no knowledge of, the occurrence and continuance during such period of an Event of Default or Default or, if an Event of Default or Default had occurred and continued or is continuing, describing the nature and period of existence thereof and the action which the Borrower and its Subsidiaries propose to take or have taken with respect thereto,

(B) in the case of the delivery of the quarterly financial statements of the Borrower and its Subsidiaries required by clause (ii) of this Section 7.1(a), (x) attaching a schedule showing the calculation of each of the applicable financial covenants specified in Section 7.3, (y) confirmation that there have been no changes to the information contained in the Information Certificate delivered on the Effective Date or the date of the most recently updated Information Certificate delivered to the Agents and/or attaching an updated Information Certificate identifying any such changes to the information contained therein, and (z) including a discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for the portion of the Fiscal Year then elapsed and discussing the reasons for any significant variations from the Projections for such period and the figures for the corresponding period in the previous Fiscal Year, as applicable, and

(C) in the case of the delivery of the annual audited financial statements of the Borrower and its Subsidiaries required by clause (iii) of this Section 7.1(a), attaching (1) a summary of all insurance coverage maintained as of the date thereof by any Loan Party or any of its Subsidiaries in accordance with the requirements set forth in Section 7.1, each Security Agreement and each Mortgage (if any), together with such other related documents and information as the Administrative Agent may reasonably require, (2) the calculation of the Excess Cash Flow in accordance with the terms of Section 2.5(c)(i) and (3) a discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such Fiscal Year and discussing the reasons for any significant variations from the Projections for such Fiscal Year and the figures for the previous Fiscal Year, as applicable;

(v) as soon as available and in any event within 10 days after the end of each fiscal quarter of the Borrower and its Subsidiaries commencing with the first fiscal quarter of the Borrower and its Subsidiaries ending after the Effective Date, reports in form and detail satisfactory to the Agents and certified by an Authorized Officer of the Borrower as being accurate

and complete (A) listing all Accounts of the Loan Parties as of such day, which shall include the amount and age of each such Account, showing separately those which are more than 30, 60, 90 and 120 days old and a description of all Liens, set-offs, defenses and counterclaims with respect thereto, and (B) listing all accounts payable of the Loan Parties as of each such day which shall include the amount and age of each such account payable and such other information as any Agent may request;

(vi) as soon as available and in any event not later than December 31 each Fiscal Year, a certificate of an Authorized Officer of the Borrower (A) attaching Projections for the Borrower and its Subsidiaries, supplementing and superseding the Projections previously required to be delivered pursuant to this Agreement, prepared on a monthly basis and otherwise in form and substance satisfactory to the Agents, for the immediately succeeding Fiscal Year for the Borrower and its Subsidiaries, and (B) certifying that the representations and warranties set forth in Section 6.1(gg)(ii) are true and correct with respect to the Projections;

(vii) promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Loan Party other than routine inquiries by such Governmental Authority;

(viii) as soon as possible, and in any event within three (3) days after the occurrence of an Event of Default or Default or the occurrence of any event or development that could reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(ix) as soon as possible and in any event (A) within three (3) Business days after the occurrence of any ERISA Event, a certificate of an Authorized Officer of the Borrower specifying the nature and period of existence of such ERISA Event and what action Borrower and its Subsidiaries have taken, are taking and proposes to take with respect thereto, (B) within three days after receipt thereof by any Loan Party or any of its ERISA Affiliates from the PBGC, copies of each notice received by any Loan Party or any of its ERISA Affiliates of the PBGC's intention to terminate any Pension Plan or to have a trustee appointed to administer any Pension Plan, (C) within ten days after the filing thereof with the Internal Revenue Service, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Pension Plan, (D) within three days after receipt thereof by any Loan Party or any of its ERISA Affiliates from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Loan Party or any of its ERISA Affiliates concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (E) within ten days after any Loan Party sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Loan Party;

(x) promptly after the commencement thereof but in any event not later than five days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(xi) as soon as possible and in any event within ten (10) days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with any Material Contract;

(xii) as soon as possible and in any event within ten (10) days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Equity Interests of, or all or substantially all of the assets of, any Loan Party;

(xiii) [reserved];

(xiv) (A) substantially concurrently with the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of its Indebtedness or its securities or files with the SEC or any national (domestic or foreign) securities exchange, and (B) promptly after the receipt thereof, a copy of any material notice received from any holder of its Indebtedness;

(xv) promptly upon receipt thereof, copies of all financial reports (including, without limitation, management letters), if any, submitted to the board of directors or equivalent governing body (or the audit committee of the board of directors or such equivalent governing body) of any Loan Party by its auditors in connection with any annual or interim audit of the books thereof;

(xvi) promptly upon request, any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming the Borrower's compliance with Section 7.2(r);

(xvii) simultaneously with the delivery of the financial statements of the Borrower and its Subsidiaries required by clauses (i), (ii) and (iii) of this Section 7.1(a), if, as a result of any change in accounting principles and policies from those used in the preparation of the Financial Statements that is permitted by Section 7.2(q), the consolidated financial statements of the Borrower and its Subsidiaries delivered pursuant to clauses (i), (ii) and (iii) of this Section 7.1(a) will differ from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to the Agents;

(xviii) promptly following any request therefor, provide information and documentation reasonably requested by the Agents for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable Anti-Money Laundering Laws, Anti-Corruption Laws, or Sanctions; and

(xix) promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as any Agent may from time to time may reasonably request.

(b) Additional Guarantors and Collateral Security. Cause:

(i) Hand MD Corp. (subject to Section 5.3) and each Subsidiary of any Loan Party not in existence on the Effective Date, to execute and deliver to the Collateral Agent promptly and in any event within three (3) days after the formation, acquisition or change in status thereof, (A) a Joinder Agreement, pursuant to which such Subsidiary shall be made a party to this Agreement as a Guarantor, (B) a supplement to the Security Agreement, together with (1) certificates evidencing all of the Equity Interests of any Person owned by such Subsidiary required to be pledged under the terms of the Security Agreement, (2) undated stock powers for such Equity Interests executed in blank with signature guaranteed, and (3) such opinions of counsel as the Agents may reasonably request, (C) to the extent required under the terms of this Agreement, one or more Mortgages creating on the owned real property of such Subsidiary a perfected, first priority Lien (in terms of priority, subject only to Permitted Specified Liens) on such real property and such other Real Property Deliverables as may be required by the Collateral Agent with respect to each such real property and (D) such other agreements, instruments, approvals or other documents reasonably requested by the Agents in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreement or Mortgage or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all applicable property and assets of such Subsidiary shall become Collateral for the Obligations;

(ii) each owner of the Equity Interests of any such Subsidiary to execute and deliver promptly and in any event within three (3) days after the formation or acquisition of such Subsidiary a Pledge Amendment (as defined in the Security Agreement), together with (A) certificates evidencing all of the Equity Interests of such Subsidiary required to be pledged under the terms of the Security Agreement, (B) undated stock powers or other appropriate instruments of assignment for such Equity Interests executed in blank with signature guaranteed, together with registration pages and executed irrevocable voting proxies for such Equity Interests, (C) such opinions of counsel as the Collateral Agent may reasonably request and (D) such other agreements, instruments, approvals or other documents requested by the Collateral Agent; and

(iii) with respect to any Subsidiary to become a Guarantor hereunder, within three (3) Business Days prior to becoming a Guarantor, all information and documentation reasonably requested by (and results satisfactory to the Agents and each Lender) for purposes of compliance with applicable "know your customer" requirements under the PATRIOT Act or other applicable Anti-Money Laundering Laws to the extent such information is requested by the Agents

or the Lenders reasonably promptly after written notice to the Agents of the proposed joinder of a Borrower or a Guarantor.

Notwithstanding the foregoing, no Excluded Subsidiary shall be required to become a Guarantor hereunder (and, as such, shall not be required to deliver the documents required by clause (i) above); provided, however, that (I) if the Equity Interests of a Foreign Subsidiary that is an Excluded Subsidiary are owned by a Loan Party, such Loan Party shall deliver all such documents, instruments, agreements (including, without limitation, at the reasonable request of the Collateral Agent, a pledge agreement governed by the laws of the jurisdiction of the organization of such Excluded Subsidiary) and certificates described in clause (ii) above to the Collateral Agent, and take all commercially reasonable actions reasonably requested by the Collateral Agent or otherwise necessary to grant and to perfect a first-priority Lien (subject to Permitted Specified Liens) in favor of the Collateral Agent, for the benefit of the Agents and the Lenders, in 65% of the voting Equity Interests of such Foreign Subsidiary and 100% of all other Equity Interests of such Foreign Subsidiary owned by such Loan Party, and (II) promptly and in any event within 20 days after the effectiveness of any amendment of the Internal Revenue Code to allow for 100% of the voting Equity Interests of such Foreign Subsidiary to be pledged to the Collateral Agent without material adverse tax consequences to the Borrower and its Subsidiaries, 100% of such voting Equity Interests shall be pledged pursuant to clause (ii) above.

(c) Compliance with Laws; Payment of Taxes.

(i) Comply, and cause each of its Subsidiaries to comply, in all material respects with all Requirements of Law, judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing).

(ii) Pay, and cause each of its Subsidiaries to pay, in full before delinquency or before the expiration of any extension period, all Taxes imposed upon any Loan Party or any of its Subsidiaries or any property of any Loan Party or any of its Subsidiaries, except (i) unpaid Taxes in an aggregate amount at any one time not in excess of $50,000, and (ii) Taxes contested in good faith by proper proceedings which stay the imposition of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP.

(d) Preservation of Existence, Etc. Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(e) Keeping of Records and Books of Account. Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f) Inspection Rights. Permit, and cause each of its Subsidiaries to permit, the agents and representatives of any Agent at any reasonable time following reasonable advance

written notice (but in no event less than two (2) Business Days unless an Event of Default has occurred and is continuing) and from time to time during normal business hours, at the expense of the Borrower as provided in Section 2.6(b), to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other assets, to conduct audits, physical counts, valuations, appraisals or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants (in the presence of Authorized Officers of such Loan Party as it may designate) or any of its other representatives. In furtherance of the foregoing, each Loan Party hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of any Agent in accordance with this Section 7.1(f).

(g) Maintenance of Properties, Etc. Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear and casualty excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except to the extent the failure to so maintain and preserve or so comply could not reasonably be expected to have a Material Adverse Effect.

(h) Maintenance of Insurance. Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, worker's compensation and business interruption insurance) with respect to the Collateral and its other properties (including all real property leased or owned by it) and business, in such amounts and covering such risks as is (i) carried generally in accordance with sound business practice by companies in similar businesses similarly situated, (ii) required by any Requirement of Law, (iii) required by any Material Contract and (iv) in any event in amount, adequacy and scope reasonably satisfactory to the Collateral Agent. All policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Agents and the Lenders, as their interests may appear, in case of loss, under a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies. If any portion of any real estate covered by a Mortgage is at any time located in a special flood hazard area in respect of which flood insurance has been made available under the Flood Insurance Laws, then the applicable Loan Party shall (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws, and (ii) deliver to the Collateral Agent evidence of such compliance in form and substance reasonably acceptable to the Collateral Agent. All certificates of insurance are to be delivered to the Collateral Agent and the policies are to be premium prepaid, with the loss payable and additional insured endorsement in favor of the Collateral Agent for the benefit of the Agents and the Lenders, as their respective interests may appear, and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than 30 days' (ten days' in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation. If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance,

but at the Borrower's expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Lenders, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i) Obtaining of Permits, Etc. Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations that are necessary or useful in the proper conduct of its business, in each case, except to the extent the failure to obtain, maintain, preserve or take such action could not reasonably be expected to have a Material Adverse Effect.

(j) Controlled Accounts; Control Agreements.

(i) Maintain, at all times, cash, Cash Equivalents or other amounts in deposit accounts, securities, commodities and other accounts that are Controlled Accounts, other than with respect to Excluded Accounts; provided, however, that with respect to any deposit account which is an Excluded Account pursuant to clause (c) of such defined term, if the balance in such account exceeds $50,000 as of the last Business Day of any calendar month, the Loan Parties shall, within five (5) Business Days after the end of such month, transfer or cause to be transferred the portion of such excess above $50,000 to a Controlled Account.

(ii) So long as no Default or Event of Default has occurred and is continuing, the Loan Parties may amend Schedule 6.1(u), to add or replace any deposit accounts, securities, commodities and other accounts maintained with any financial institution, securities intermediary or broker dealer and all other similar accounts; provided, however, that (A) such account shall be reasonably satisfactory to the Collateral Agent and the Collateral Agent shall have consented in writing in advance to the opening of such account, and (B) prior to the time of the opening of such account (other than an Excluded Account), each Loan Party and such financial institution, securities intermediary or broker dealer shall have executed and delivered to the Collateral Agent a Control Agreement. Each Loan Party shall close any of its Controlled Accounts (and establish replacement accounts in accordance with the foregoing sentence) promptly and in any event within 30 days after notice from the Collateral Agent that the creditworthiness of any financial institution, securities intermediary or broker dealer is no longer acceptable in the Collateral Agent's reasonable judgment, or that the operating performance, funds transfer, or availability procedures or performance of such financial institution, securities intermediary or broker dealer with respect to the Controlled Accounts or the Collateral Agent's liability under any Control Agreement with such financial institution, securities intermediary or broker dealer is no longer acceptable in the Collateral Agent's reasonable judgment.

(iii) The Loan Parties shall deposit or cause to be deposited promptly, and in any event no later than the next Business Day after the date of receipt thereof, all proceeds

in respect of any Collateral, all Collections (of a nature susceptible to a deposit in a bank account) and all other amounts received by any Loan Party (including payments made by Account Debtors directly to any Loan Party and remittances on credit card sales) into a deposit account that is a Controlled Account.

(iv) Upon the terms and subject to the conditions set forth in a Control Agreement with respect to each deposit account that is a Controlled Account, all amounts received in such deposit account shall, at the Administrative Agent's direction, be wired each Business Day into the Administrative Agent's Account, except that, so long as no Event of Default has occurred and is continuing, the Administrative Agent will not direct the depositary bank for each such deposit account to transfer funds in each such deposit account to the Administrative Agent's Account.

(k) Environmental.

(i) Keep the Collateral free of any Environmental Lien;

(ii) Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all Environmental Permits that are necessary in the proper conduct of its business, and comply, and cause each of its Subsidiaries to comply, with all Environmental Laws and Environmental Permits, except to the extent the failure to so obtain, maintain, preserve or comply could not reasonably be expected to have a Material Adverse Effect;

(iii) Take all commercially reasonable steps to prevent any Release of Hazardous Materials in violation of any Environmental Law or Environmental Permit at, on, under or from any property owned, leased or operated by any Loan Party or its Subsidiaries that could reasonably be expected to result in a Material Adverse Effect; and

(iv) Provide the Collateral Agent with written notice within ten (10) days of any of the following: (A) any Loan Party obtaining knowledge of any Release of a Hazardous Material or environmental condition at, on, under or from any property currently or formerly owned, leased or operated by any Loan Party, Subsidiary or predecessor in interest or any violation of Environmental Law or Environmental Permit that in any case could reasonably be expected to result in a Material Adverse Effect; (B) notice that an Environmental Lien has been filed against any Collateral; or (C) an Environmental Claim or Environmental Liabilities that could reasonably be expected to result in a Material Adverse Effect; and provide such reports, documents and information as the Collateral Agent may reasonably request from time to time with respect to any of the foregoing.

(l) Fiscal Year. Cause the Fiscal Year of the Borrower and its Subsidiaries to end on December 31 of each calendar year unless the Agents consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(m) Landlord Waivers; Collateral Access Agreements. At any time any Collateral, or any material books and records of the Loan Parties and their Subsidiaries is located on any real property of a Loan Party (whether such real property is now existing or acquired after the Effective Date) which is not owned by a Loan Party, or is stored on the premises of a bailee,

warehouseman, or similar party, use commercially reasonable efforts to obtain written subordinations or waivers or collateral access agreements, as the case may be, in form and substance satisfactory to the Collateral Agent.

(n) After-Acquired Real Property. Upon the acquisition by it or any of its Subsidiaries after the date hereof of any interest (whether fee or leasehold) in any real property (wherever located) (each such interest being a "**New Facility**") with a Current Value (as defined below) in excess of $500,000 in the case of a fee interest, immediately so notify the Collateral Agent, setting forth with specificity a description of the interest acquired, the location of the real property, and, in the case of a fee interest, any structures or improvements thereon and either an appraisal or such Loan Party's good faith estimate of the current value of such real property (for purposes of this Section, the "**Current Value**"). The Collateral Agent shall notify such Loan Party whether it intends to require a Mortgage (and any other Real Property Deliverables) in respect of any fee interest or landlord's waiver (pursuant to Section 7.1(m)) with respect to such New Facility. Upon receipt of such notice requesting a Mortgage (and any other Real Property Deliverables) or landlord's waiver, the Person that has acquired such New Facility shall promptly furnish the same to the Collateral Agent. The Borrower shall pay all fees and expenses, including, without limitation, reasonable attorneys' fees and expenses, and all title insurance charges and premiums, in connection with each Loan Party's obligations under this Section 7.1(n).

(o) Lender Meetings. Upon the request of any Agent or the Required Lenders (which request, so long as no Event of Default shall have occurred and be continuing, shall not be made more than once during each fiscal quarter), participate in a meeting with the Agents and the Lenders at the Borrower's corporate offices (or at such other location as may be agreed to by the Borrower and such Agent or the Required Lenders) or via teleconference at such time as may be agreed to by the Borrower and such Agent or the Required Lenders.

(p) Anti-Corruption Laws; Anti-Money Laundering Laws; Sanctions.

(i) Maintain, and cause each of its Subsidiaries to maintain, policies and procedures designed to promote compliance by each Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with all Anti-Corruption Laws and Anti-Money Laundering Laws.

(ii) Comply, and cause each of its Subsidiaries to comply with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(iii) No Loan Party nor, to the best knowledge of any Loan Party, any director, officer, employee or any Person acting on behalf of any Loan Party will engage in any activity that would breach any Anti-Corruption Law.

(iv) Promptly notify the Administrative Agent of any action, suit or investigations by any court or Governmental Authority in relation to an alleged breach of the Anti-Corruption Law.

(v) Not directly or indirectly, use, lend or contribute the proceeds of any Loan for any purpose that would breach any Anti-Corruption Law.

(vi) Each Loan Party and Affiliate, officer, employee or director, acting on behalf of the Loan Party is (and will take no action which would result in any such Person not being) in compliance, in all material respects, with (A) all applicable OFAC rules and regulations, (B) all applicable United States of America, United Kingdom, United Nations, European Union, German, Canadian, Australian and all other reasonable internationally respected national autonomous sanctions, embargos and trade restrictions and (C) all applicable provisions of the USA PATRIOT Act. In addition, none of the activities or business of any Loan Party includes any kind of activities or business of or with any Person or in any country or territory that is subject to any Sanctions.

(vii) In order to comply with the "know your customer/borrower" requirements of the Anti-Money Laundering Laws, promptly provide to the Administrative Agent upon its reasonable request from time to time (A) information relating to individuals and entities affiliated with any Loan Party that maintain a business relationship with the Administrative Agent and (B) such identifying information and documentation as may be available for such Loan Party in order to enable the Administrative Agent or any Lender to comply with Anti-Money Laundering Laws.

(q) Further Assurances. Take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as any Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of any Loan Party and its Subsidiaries, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Secured Party the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document. In furtherance of the foregoing, to the maximum extent permitted by applicable law, each Loan Party (i) authorizes each Agent to execute any such agreements, instruments or other documents in such Loan Party's name and to file such agreements, instruments or other documents in any appropriate filing office, (ii) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (iii) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.

**Section 7.2. Negative Covenants**. So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a) Liens, Etc. Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code or any Requirement of Law of any jurisdiction, a financing statement (or the equivalent thereof) that names it or any of its Subsidiaries as debtor; sign or suffer to exist any

security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof) other than, as to all of the above, Permitted Liens.

(b) Indebtedness. Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than Permitted Indebtedness.

(c) Fundamental Changes; Dispositions.

(i) Wind up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, including by means of a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, or permit any of its Subsidiaries to do (or agree to do) any of the foregoing; provided, however, that any wholly-owned Subsidiary of any Loan Party (other than a Borrower) may be merged into such Loan Party or another wholly-owned Subsidiary of such Loan Party, or may consolidate or amalgamate with another wholly-owned Subsidiary of such Loan Party, so long as:

(A) no other provision of this Agreement would be violated thereby;

(B) such Loan Party gives the Agents at least thirty (30) days (or such shorter period as the Agents may agree in their sole discretion) prior written notice of such merger, consolidation or amalgamation accompanied by true, correct and complete copies of all material agreements, documents and instruments relating to such merger, consolidation or amalgamation, including, without limitation, the certificate or certificates of merger or amalgamation to be filed with each appropriate Secretary of State (with a copy as filed promptly after such filing);

(C) no Default or Event of Default shall have occurred and be continuing either before or after giving effect to such transaction;

(D) the Lenders' rights in any Collateral, including, without limitation, the existence, perfection and priority of any Lien thereon, are not adversely affected by such merger, consolidation or amalgamation; and

(E) the surviving Subsidiary, if any, if not already a Loan Party, is joined as a Loan Party hereunder pursuant to a Joinder Agreement and is a party to a Security Agreement and the Equity Interests of such Subsidiary is the subject of a Security Agreement, in each case, which is in full force and effect on the date of and immediately after giving effect to such merger, consolidation or amalgamation (or such later date as consented to by the Collateral Agent).

(ii) Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; provided, however, that any Loan Party and its Subsidiaries may make Permitted Dispositions.

(d) Change in Nature of Business. Make, or permit any of its Subsidiaries to make, any change in the nature of its business as described in Section 6.1(l).

(e) Loans, Advances, Investments, Etc. Make or commit or agree to make, or permit any of its Subsidiaries make or commit or agree to make, any Investment in any other Person except for Permitted Investments.

(f) Sale and Leaseback Transactions. Enter into, or permit any of its Subsidiaries to enter into, any Sale and Leaseback Transaction.

(g) Limitation on Issuance of Equity Interests; Subsidiaries.

(i) Issue or sell or enter into any agreement or arrangement for the issuance and sale of, or permit any of its Subsidiaries to issue or sell or enter into any agreement or arrangement for the issuance and sale of, any Equity Interests, any securities convertible into or exchangeable for its Equity Interests or any warrants to acquire its Equity Interests; provided that the Loan Parties may issue Qualified Equity Interests so long as no Change of Control would result therefrom.

(ii) Form any Subsidiary after the Effective Date unless such Subsidiary (i) is a wholly-owned Subsidiary organized under the laws of the United States, and (ii) complies with the requirements under Section 7.1(b); provided that the formation of any non-wholly-owned Subsidiary shall require the prior written consent of the Agents.

(iii) Enter into, after the Effective Date, any partnership, joint venture or similar arrangement from and after the Effective Date without the prior written consent of the Agents.

(h) Restricted Payments. Make or permit any of its Subsidiaries to make any Restricted Payment other than Permitted Restricted Payments.

(i) Federal Reserve Regulations. Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan under the provisions of Regulation T, U or X of the Board of Governors.

(j) Transactions with Affiliates. Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except (i) transactions consummated in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof, and that are fully disclosed to the Agents prior to the consummation thereof, (ii) transactions with another Loan Party, (iii) transactions permitted by Sections 7.2(e), 7.2(g) and 7.2(h), (iv) sales of Qualified Equity Interests of the Borrower to Affiliates of the Borrower not otherwise prohibited by the Loan Documents and the granting of registration and other customary rights in connection therewith, (v) reasonable and customary director and officer compensation (including bonuses and

stock option programs), benefits and indemnification arrangements, in each case approved by the Board of Directors (or a committee thereof) of such Loan Party or such Subsidiary, and (vi) the transactions with Affiliates existing on the Effective Date and described on Schedule 7.2(j).

(k) Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries. Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Loan Party (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; provided, however, that nothing in any of clauses (i) through (iv) of this Section 7.2(k) shall prohibit or restrict compliance with:

(A) this Agreement and the other Loan Documents;

(B) [reserved];

(C) any agreement in effect on the date of this Agreement and described on Schedule 7.2(k) hereto, or any extension, replacement or continuation of any such agreement; provided that, any such encumbrance or restriction contained in such extended, replaced or continued agreement is no less favorable to the Agents and the Lenders than the encumbrance or restriction under or pursuant to the agreement so extended, replaced or continued;

(D) any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances);

(E) in the case of clause (iv), (1) customary restrictions on the subletting, assignment or transfer of any specified property or asset set forth in a lease, license, asset, sale agreement or similar contract for the conveyance of such property or asset and (2) instrument or other document evidencing a Permitted Lien (or the Indebtedness secured thereby) from restricting on customary terms the transfer of any property or assets subject thereto;

(F) customary restrictions on dispositions of real property interests in reciprocal easement agreements;

(G) customary restrictions in agreements for the sale of assets on the transfer or encumbrance of such assets during an interim period prior to the closing of the sale of such assets; or

(H) customary restrictions in contracts that prohibit the assignment of such contract.

(l) Limitations on Negative Pledges. Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed, lease or other arrangement that prohibits, restricts or imposes any condition upon

the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following: (i) this Agreement and the other Loan Documents, (ii) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.2(b) if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iii) any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets or of a Subsidiary pending such sale or other disposition, provided that such restrictions and conditions apply only to the assets or Subsidiary to be sold or disposed of and such sale or disposition is permitted hereunder, (iv) [reserved] and (v) customary provisions in leases restricting the assignment or sublet thereof.

(m) Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.

(i) Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Indebtedness or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Indebtedness if such amendment, modification or change (A) in respect of any Sanders Note or any other Subordinated Indebtedness, would violate the Sanders Subordination Agreement or other Subordination Agreement applicable thereto or (B) in respect of any other Indebtedness would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Indebtedness, would increase the interest rate applicable to such Indebtedness, would add any covenant or event of default, would change the subordination provision, if any, of such Indebtedness, or would otherwise be adverse to the Lenders or the issuer of such Indebtedness in any respect;

(ii) except for the Obligations:

(A) make any voluntary or optional payment (including, without limitation, any payment of interest in cash that, at the option of the issuer, may be paid in cash or in kind), prepayment, redemption, defeasance, sinking fund payment or other acquisition for value of any of its or its Subsidiaries' Indebtedness (including, without limitation, by way of depositing money or securities with the trustee therefor before the date required for the purpose of paying any portion of such Indebtedness when due);

(B) refund, refinance, replace or exchange any other Indebtedness for any such Indebtedness (other than with respect to Permitted Refinancing Indebtedness);

(C) make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase, including payments of interest, of any Subordinated Indebtedness (including any Sanders Note) in violation of the subordination provisions thereof or any Subordination Agreement (including any Sanders Subordination Agreement applicable thereto) with respect thereto other than (1) any payments of interest in respect of any Sanders Notes so long as, as of the date of any such interest payment and after giving effect thereto, the Sanders

Notes Interest Payment Conditions are satisfied and (2) prepayments of principal in respect of any Sanders Notes, so long as, as of the date of any such prepayment after giving effect thereto, the Sanders Notes Principal Payment Conditions are satisfied, and in each case with respect to the foregoing clauses (1) and (2), such prepayment would not otherwise be prohibited by any applicable Sanders Subordination Agreement with respect to such Sanders Note; or

(D) make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Indebtedness as a result of any asset sale, change of control, issuance and sale of debt or equity securities or similar event, or give any notice with respect to any of the foregoing;

(iii) amend, modify or otherwise change any of its Governing Documents (including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it) with respect to any of its Equity Interests (including any shareholders agreement), or enter into any new agreement with respect to any of its Equity Interests, except any such amendments, modifications or changes or any such new agreements or arrangements pursuant to this clause (iii) that either individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect, provided that no such amendment, modification or change or new agreement or arrangement shall provide for any plan of division pursuant to Section 18-217 of the Delaware Limited Liability Company Act (or any similar statute or provision under applicable law); or

(iv) agree to any amendment, modification or other change to or waiver of any of its rights under any Material Contract if such amendment, modification, change or waiver would be adverse in any material respect to any Loan Party or any of its Subsidiaries or the Agents and the Lenders.

(n) <u>Investment Company Act of 1940</u>. Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" or a company "controlled" by an "investment company" not entitled to an exemption within the meaning of such Act.

(o) <u>ERISA</u>.

(i) Cause or fail to prevent, or permit any of its ERISA Affiliates to cause or fail to prevent, an ERISA Event, or

(ii) adopt, or permit any of its ERISA Affiliates to adopt, any employee welfare benefit plan within the meaning of Section 3(1) of ERISA that provides benefits to employees after termination of employment other than as required by Section 601 of ERISA or other Requirements of Law.

(p) <u>Environmental</u>. Permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned, leased or operated by it or any of its Subsidiaries, except in compliance with Environmental Laws (other than any noncompliance that could not reasonably be expected to have a Material Adverse Effect).

(q) Accounting Methods. Modify or change, or permit any of its Subsidiaries to modify or change, its method of accounting or accounting principles from those utilized in the preparation of the Financial Statements (other than as may be required to conform to GAAP).

(r) [Reserved].

(s) Sanctioned Persons; Anti-Corruption Laws; Anti-Money Laundering Laws.

(i) Conduct, nor permit any of its Subsidiaries to conduct, any business or engage in any transaction or deal with or for the benefit of any Sanctioned Person, including the making or receiving of any contribution of funds, goods or services to, from or for the benefit of any Sanctioned Person; or

(ii) Use, nor permit any of its Subsidiaries to use, directly or indirectly, any of the proceeds of any Loan, (A) to fund any activities or business of or with any Sanctioned Person or in any other manner that would result in a violation of any Sanctions by any Person, or (B) for the purpose of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law.

(t) Foreign Exchange Availability. Fail to maintain in full force and effect and comply with the terms of all Requirements of Law required to enable it to pay solely and exclusively in Dollars all amounts which a Loan Party is or may be required to pay under the Loan Documents.

(u) Canadian Pension Plan. No Loan Party or any of its Subsidiaries shall establish, sponsor, maintain, participate in, contribute to, assume or have or otherwise incur liability under, a Canadian Pension Plan or amalgamate with any Person if such Person sponsors, maintains, contributes to, participates in or has liability under, any Canadian Pension Plan.

(v) Pari Passu. Fail to take all actions necessary to cause all Obligations to rank at all times at least pari passu in priority in right of payment and in all other respects with all other of unsecured and unsubordinated Indebtedness of any Loan Party.

**Section 7.3. Financial Covenants**. So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a) Consolidated Senior Net Leverage Ratio. Permit the Consolidated Senior Net Leverage Ratio of the Borrower and its Subsidiaries for any trailing four fiscal quarters of the Borrower and its Subsidiaries for which the last fiscal quarter for such period ends on a date set forth below to be greater than the ratio set forth opposite such date:

| **Fiscal Quarter End** | **Consolidated Senior Net Leverage Ratio** |
|---|---|
| September 30, 2025 | 3.25:1.00 |

| | |
|---|---|
| December 31, 2025 | 3.25:1.00 |
| March 31, 2026 | 3.00:1.00 |
| June 30, 2026 | 2.75:1.00 |
| September 30, 2026 | 2.75:1.00 |
| December 31, 2026 and each fiscal quarter ended thereafter | 2.50:1.00 |

(b) Fixed Charge Coverage Ratio. Permit the Fixed Charge Coverage Ratio of the Borrower and its Subsidiaries for any trailing four fiscal quarters of the Borrower and its Subsidiaries for which the last fiscal quarter for such period ends on a date set forth below to be less than the ratio set forth opposite such date:

| **Fiscal Quarter End** | **Fixed Charge Coverage Ratio** |
|---|---|
| September 30, 2025 and each fiscal quarter ended thereafter | 1.20 |

## ARTICLE VIII
## EVENTS OF DEFAULT

**Section 8.1. Events of Default**. Each of the following events shall constitute an event of default (each, an "**Event of Default**"):

(a) the Borrower shall fail to pay, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), (i) any interest on any Loan, any Agent Advance, or any fee, indemnity or other amount payable under this Agreement (other than any portion thereof constituting principal of the Loans) or any other Loan Document, and such failure continues for a period of three (3) Business Days or (ii) all or any portion of the principal of the Loans;

(b) any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any Loan Document shall have been incorrect in any material respect (or in any respect if such representation or warranty is qualified or modified as to materiality or "Material Adverse Effect" in the text thereof) when made or deemed made;

(c) any Loan Party shall fail to perform or comply with any covenant or agreement contained in Sections 7.1(a), 7.1(b), 7.1(c), 7.1(d), 7.1(f), 7.1(h), 7.1(j), 7.1(l) 7.1(n), 7.1(o), 7.2 or 7.3, or any Loan Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party or any Mortgage to which it is a party;

(d) any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this Section 8.1, such failure, if capable of being remedied, shall remain unremedied for 30 days after the earlier of the date a senior officer of any Loan Party has knowledge of such failure and the date written notice of such default shall have been given by any Agent to such Loan Party;

(e) the Borrower or any of its Subsidiaries shall fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of Material Indebtedness (excluding Indebtedness evidenced by this Agreement), and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f) the Borrower or any of its Subsidiaries (i) shall institute any proceeding or voluntary case seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding-up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);

(g) any proceeding shall be instituted against the Borrower or any of its Subsidiaries seeking to adjudicate it a bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of 45 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

(h) any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i) any Security Agreement, any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, first priority Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby subject only to Permitted Liens;

(j) one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $250,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified and has not denied coverage) shall be rendered against the Borrower or any of its Subsidiaries and remain unsatisfied and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (ii) there shall be a period of 10 consecutive days after entry thereof during which (A) a stay of enforcement thereof is not in effect or (B) the same is not vacated, discharged, stayed or bonded pending appeal within the applicable appeal period;

(k) [reserved];

(l) any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than 15 consecutive Business Days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party, if any such event or circumstance could reasonably be expected to have a Material Adverse Effect;

(m) the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by the Borrower or any of its Subsidiaries, if such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect;

(n) the indictment of the Loan Parties or any senior officer thereof under any criminal statute, or commencement of criminal or civil proceedings against the Borrower or any of its Subsidiaries or any senior officer thereof, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of the Loan Parties;

(o) (i) there shall occur one or more ERISA Events that individually or in the aggregate results in, or could reasonably be expected to result in liability of any Loan Party or any of its ERISA Affiliates in excess of $250,000, or (ii) there exists any fact or circumstance that could reasonably be expected to result in the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or Section 4068 of ERISA upon the property or rights to property of any Loan Party or any of its ERISA Affiliates;

(p) (i) there shall occur and be continuing any "Event of Default" (or any comparable term) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, including any Sanders Note, or any Subordination Agreement,

including any Sanders Subordination Agreement, (ii) any of the Obligations for any reason shall cease to be "Senior Indebtedness" or "Designated Senior Indebtedness" (or any comparable terms) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, including the Sanders Notes or any Subordination Agreement, including any Sanders Subordination Agreement, (iii) any Indebtedness other than the Obligations shall constitute "Senior Indebtedness" or "Designated Senior Indebtedness" (or any comparable term) under, and as defined in, the documents evidencing or governing any Subordinated Indebtedness, including any Sanders Note, or any Subordination Agreement, including any Sanders Subordination Agreement, (iv) any holder of Subordinated Indebtedness shall fail to perform or comply with any of the subordination provisions of the documents evidencing or governing such Subordinated Indebtedness, including any Sanders Note, or any Subordination Agreement, including any Sanders Subordination Agreement, or (v) the subordination provisions of the documents evidencing or governing any Subordinated Indebtedness, including any Sanders Note, or any Subordination Agreement, including any Sanders Subordination Agreement, shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness;

(q) a Change of Control shall have occurred;

(r) the Borrower or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting, or otherwise ceases to conduct for any reason whatsoever, all or any material part of its business for a period which materially and adversely affects the ability of such Person to continue its business on a profitable basis; or

(s) in the event the Pledged Promissory Note is not paid in full by January 1, 2026 and, on or before such date, Mr. Jack Ross has failed to deliver an equity pledge agreement in form and substance satisfactory to the Collateral Agent pledging such number of shares of the Borrower's stock with a market value equal to the amount of the outstanding obligations of the Pledged Promissory Note as of December 31, 2025, as security for the Obligations (which equity pledge shall, for the purpose of clarity, be released upon payment in full of the Pledged Promissory Note);

then, and in any such event, the Collateral Agent may, and shall at the request of the Required Lenders, by notice to the Borrower, (i) terminate or reduce all Commitments, whereupon all Commitments shall immediately be so terminated or reduced, (ii) declare all or any portion of the Loans then outstanding to be accelerated and due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, together with the payment of the Applicable Premium with respect to the Commitments so terminated and the Loans so repaid, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents; provided, however, that upon the occurrence of any Event of Default described in subsection (f) or (g) of this Section 8.1 with respect to any Loan Party, without any notice to any Loan Party or any other Person or any act by any Agent or any Lender, all Commitments shall automatically terminate and all Loans then outstanding, together with all

accrued and unpaid interest thereon, all fees and all other amounts due under this Agreement and the other Loan Documents, including, without limitation, the Applicable Premium, shall be accelerated and become due and payable automatically and immediately, without presentment, demand, protest or notice of any kind, all of which are expressly waived by each Loan Party.

## ARTICLE IX
## AGENTS

**Section 9.1. Appointment**. Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints, authorizes and empowers the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto, including: (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to Section 2.2, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices and agreements received by such Agent and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to make the Loans and Agent Advances, for such Agent or on behalf of the applicable Lenders as provided in this Agreement or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; (viii) subject to Section 9.3, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations); and (ix) to act with respect to all Collateral under the Loan Documents, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations. As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and such instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other

Loan Documents) shall be binding upon all Lenders and all makers of Loans; provided, however, the Agents shall not be required to take any action which, in the reasonable opinion of any Agent, exposes such Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

**Section 9.2. Nature of Duties; Delegation.**

(a) The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents. The duties of the Agents shall be mechanical and administrative in nature. The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender. Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein. Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral without reliance upon the Administrative Agent or any other Lender or any of their Related Parties, and neither the Agents nor any of their Related Parties shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided that upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document. If any Agent seeks the consent or approval of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender. Each Agent shall promptly notify each Lender any time that the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) have instructed such Agent to act or refrain from acting pursuant hereto.

(b) Each Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any of its Related Parties or any other trustee, co-agent or other Person (including any Lender). Any such Related Party, trustee, co-agent or other Person shall benefit from this Article IX to the extent provided by the applicable Agent.

**Section 9.3. Rights, Exculpation, Etc.** The Agents and their Related Parties shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction. Without limiting the generality of the foregoing, the Agents (i) may treat the payee of any Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 11.7, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including, without limitation, counsel to any Agent or

counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral. The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.3, and if any such apportionment or distribution is subsequently determined to have been made in error, and the sole recourse of any Lender to whom payment was due but not made shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled. The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders. Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents).

**Section 9.4.** **Reliance**. Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

**Section 9.5.** **Indemnification**. To the extent that any Agent or any Related Party of the foregoing is not reimbursed and indemnified by any Loan Party, and whether or not such Agent has made demand on any Loan Party for the same, the Lenders will, within five days of written demand by such Agent, reimburse such Agent and such Related Parties for and indemnify such Agent and such Related Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client

charges and expenses of counsel or any other consultant or advisor to such Agent and such Related Parties), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent and the Related Parties in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by such Agent and such Related Parties under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 9.8; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final non-appealable judicial determination that such liability resulted from such Agent's or such Related Party's gross negligence or willful misconduct. The obligations of the Lenders under this Section 9.5 shall survive the occurrence of the Termination Date and the termination of this Agreement.

**Section 9.6. Agents Individually**. With respect to its Pro Rata Share of the Total Commitment hereunder and the Loans made by it, each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan. The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders. Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with the Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

**Section 9.7. Successor Agent**.

(a) Any Agent may at any time give at least 30 days prior written notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right to appoint a successor Agent. If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent. Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b) With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by such Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above. Upon the acceptance of a successor's Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Sections 11.4 and

11.15 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

**Section 9.8. Collateral Matters**.

(a) Each Agent may from time to time make such disbursements and advances ("**Agent Advances**") which such Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrower of the Loans and other Obligations or to pay any other amount chargeable to the Borrower pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 11.4. The Agent Advances shall be repayable on demand and be secured by the Collateral and shall bear interest at a rate per annum equal to the rate then applicable to Term Loans that are Reference Rate Loans. The Agent Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with Section 4.1. The Collateral Agent shall notify each Lender and the Borrower in writing of each such Agent Advance, which notice shall include a description of the purpose of such Agent Advance. Without limitation to its obligations pursuant to Section 9.5, each Lender agrees that it shall make available to the Collateral Agent, upon such Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Agent Advance. If such funds are not made available to the Collateral Agent by such Lender, such Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to such Agent, at the Federal Funds Rate for three Business Days and thereafter at the Reference Rate.

(b) The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of the Total Commitment and payment and satisfaction of all Loans and all other Obligations (other than Contingent Indemnity Obligations) in accordance with the terms hereof; or constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders in accordance with Section 11.2. Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 9.8(b).

(c) Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in Section 9.8(b)), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under Section 9.8(b). Upon receipt by the Collateral Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral; provided, however, that (i) the

Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d) Notwithstanding anything contained in any of the Loan Documents to the contrary, the Loan Parties, each Agent and each Lender hereby agree that no Lender shall have any right individually to realize upon any of the Collateral under any Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Lenders in accordance with the terms thereof

(e) The Agents and the Lenders hereby irrevocably authorize the Collateral Agent, as agent for and representative of the Agents and the Lenders (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing), to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (i) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Section 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (ii) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Collateral Agent (whether by judicial action or otherwise) in accordance with any applicable law. In connection with any such credit bid and purchase, the Obligations owed to the Agents and the Lenders shall be entitled to be, and shall be, credit bid by the Collateral Agent (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase). In connection with any such bid (A) the Collateral Agent shall be authorized to form one or more acquisition vehicles and to assign any successful credit bid to such acquisition vehicle or vehicles, (B) each of the Agents' and the Lenders' ratable interests in the Obligations which were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (C) the Collateral Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Collateral Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Required Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 11.2), (D) the Collateral Agent, on behalf of such

acquisition vehicle or vehicles, shall be authorized to issue to each of the Agents and the Lenders, ratably on account of the relevant Obligations which were credit bid, interests, whether as equity, partnership interests, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Agent, any Lender or any acquisition vehicle to take any further action, and (E) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Agents and the Lenders pro rata with their original interest in such Obligations and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Agent, any Lender or any acquisition vehicle to take any further action. Notwithstanding that the ratable portion of the Obligations of each Agent and each Lender are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (B) above, each Agent and each Lender shall execute such documents and provide such information regarding such Person (and/or any designee of such Person that will receive interests in or debt instruments issued by such acquisition vehicle) as the Collateral Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

(f) The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 9.8 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

**Section 9.9. Agency for Perfection**. Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party. Should the Administrative Agent or any Lender obtain possession or control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions. In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan

Documents. Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

**Section 9.10. No Reliance on any Agent's Customer Identification Program**. Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly, 31 C.F.R. § 103.121), as hereafter amended or replaced ("**CIP Regulations**"), or any other Anti-Money Laundering Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act. Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

**Section 9.11. No Third-Party Beneficiaries**. The provisions of this Article are solely for the benefit of the Secured Parties, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.

**Section 9.12. No Fiduciary Relationship**. It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**Section 9.13. Reports; Confidentiality; Disclaimers**. By becoming a party to this Agreement, each Lender:

(a) is deemed to have requested that each Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report with respect to the Borrower or any of its Subsidiaries (each, a "**Report**") prepared by or at the request of such Agent, and each Agent shall so furnish each Lender with each such Report;

(b) expressly agrees and acknowledges that the Agents (i) do not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports;

(c) expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that any Agent or other party performing any audit or examination will inspect only specific information regarding the Borrower and its Subsidiaries and will rely significantly upon the Borrower's and its Subsidiaries' books and records, as well as on representations of their personnel;

(d) agrees to keep all Reports and other material, non-public information regarding the Borrower and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with Section 11.19; and

(e) without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold any Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of the Borrower, and (ii) to pay and protect, and indemnify, defend and hold any Agent and any other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys' fees and costs) incurred by any such Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

**Section 9.14. Collateral Custodian**. Upon the occurrence and during the continuance of any Default or Event of Default, the Collateral Agent or its designee may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent or its designee who shall have full authority to do all acts necessary to protect the Agents' and the Lenders' interests. Each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such custodian and to do whatever the Collateral Agent or its designee may reasonably request to preserve the Collateral. All costs and expenses incurred by the Collateral Agent or its designee by reason of the employment of the custodian shall be the responsibility of the Borrower and charged to the Loan Account.

**Section 9.15. Collateral Agent May File Proofs of Claim**. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Collateral Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the compensation, expenses, disbursements and advances of the Secured Parties and their respective agents and counsel and all other amounts due the Secured Parties hereunder and under the other Loan Documents) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments

to the Collateral Agent and, in the event that the Collateral Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Collateral Agent and its agents and counsel, and any other amounts due the Collateral Agent hereunder and under the other Loan Documents.

**Section 9.16. Erroneous Distribution**. If all or any part of any payment or other distribution by or on behalf of any Agent to the Borrower, any Lender, or any other Person is determined by such Agent in its sole discretion to have been made in error as determined by such Agent (any such payment or other distribution, an "**Erroneous Distribution**"), then the relevant Borrower, Lender, or other Person shall forthwith on written demand (accompanied by a reasonably detailed calculation of such Erroneous Distribution) repay to such Agent the amount of such Erroneous Distribution received by such Person. Any determination by any Agent, in its sole discretion, that all or a portion of any payment or other distribution to the Borrower, any Lender, or any other Person was an Erroneous Distribution shall be conclusive absent manifest error. The Borrower, each Lender, and each other potential recipient of an Erroneous Distribution hereunder waives any claim of discharge for value and any other claim of entitlement to, or in respect of, any Erroneous Distribution.

## ARTICLE X
## GUARANTY

**Section 10.1. Guaranty**. Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrower now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of the Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrower, being the "**Guaranteed Obligations**"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Secured Parties in enforcing any rights under the guaranty set forth in this Article X. Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrower to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving the Borrower. Notwithstanding any of the foregoing, Guaranteed Obligations shall not include any Excluded Swap Obligations.

**Section 10.2. Guaranty Absolute**. Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto. Each Guarantor agrees that this Article X constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral. The obligations of each Guarantor under this Article X are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against

any Loan Party or whether any Loan Party is joined in any such action or actions. The liability of each Guarantor under this Article X shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have (except for payment in full in cash of the Guaranteed Obligations) in any way relating to, any or all of the following:

(a) any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c) any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d) the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Secured Party;

(e) any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(f) any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Article X shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

**Section 10.3. Waiver**. Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article X and any requirement that the Secured Parties exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct any Secured Party to seek payment or recovery of any amounts owed under this Article X from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that any Secured Party protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) any other defense (except for payment in full in cash of the Guaranteed Obligations) available to any Guarantor. Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing

arrangements contemplated herein and that the waiver set forth in this Section 10.3 is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this Article X, and acknowledges that this Article X is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

**Section 10.4. Continuing Guaranty; Assignments**. This Article X is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article X and the Termination Date shall have occurred, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments or its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 11.7.

**Section 10.5. Subrogation**. No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article X, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article X shall have been paid in full in cash and the Termination Date shall have occurred. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article X and the occurrence of the Termination Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Article X, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article X thereafter arising. If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article X shall be paid in full in cash and (iii) the Termination Date shall have occurred, the Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

**Section 10.6. Contribution**. All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty. Accordingly, in the event

any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date. "**Fair Share**" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the Guaranteed Obligations. "**Fair Share Contribution Amount**" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this Section 10.6, any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor. "**Aggregate Payments**" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 10.6), minus (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this Section 10.6. The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor. The allocation among Guarantors of their obligations as set forth in this Section 10.6 shall not be construed in any way to limit the liability of any Guarantor hereunder. Each Guarantor is a third-party beneficiary to the contribution agreement set forth in this Section 10.6.

## ARTICLE XI
## MISCELLANEOUS

**Section 11.1. Notices, Etc.**

(a) Notices Generally. All notices and other communications provided for hereunder shall be in writing and shall be delivered by hand, sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or fax. In the case of notices or other communications to any Loan Party, Administrative Agent or the Collateral Agent, as the case may be, they shall be sent to the respective address set forth below (or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 11.1):

if to any Loan Party, to it at the following address:

Synergy CHC Corp.
P.O. Box 22
Sebago, ME 04029
Attention: Jack Ross

Email: jack@synergychc.com

with a copy to:

Nelson Mullins Riley & Scarborough LLP
One Financial Center, Suite 3500
Boston, MA 02111
Attention: James W. Bartling, Esq.
Telephone: (617) 217-4692
Email: jim.bartling@nelsonmullins.com

if to the Administrative Agent or the Collateral Agent, to it at the following address:

ACP Agency, LLC
c/o Acme Credit Partners, LLC
600 Lexington Ave, 14th Floor
New York, New York 10022
Attention: Peter Eschmann
Telephone: 646-357-8385
Email: peschmann@acmecreditpartners.com

in each case, with a copy to:

KTBS Law LLP
1801 Century Park East, 26th Floor
Los Angeles, CA 90067
Attention: David A. Fidler, Esq.
Telephone: 310-407-4000
Fax: 310-407-9090
Email: dfidler@ktbslaw.com

All notices or other communications sent in accordance with this Section 11.1, shall be deemed received on the earlier of the date of actual receipt or three (3) Business Days after the deposit thereof in the mail; provided that (i) notices sent by overnight courier service shall be deemed to have been given when received and (ii) notices by fax shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient), provided, further, that notices to any Agent pursuant to Article II shall not be effective until received by such Agent.

(b) Electronic Communications.

(i) Each Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular

notices or communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agents, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II, if such Lender has notified the Agents that it is incapable of receiving notices under such Article by electronic communication.

(ii) Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided that for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

**Section 11.2. Amendments, Etc.**

(a) No amendment or waiver of any provision of this Agreement or any other Loan Document (excluding the Fee Letter), and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (x) in the case of an amendment, consent or waiver to cure any ambiguity, omission, defect or inconsistency or granting a new Lien for the benefit of the Agents and the Lenders or extending an existing Lien over additional property, by the Agents and the Borrower, (y) in the case of any other waiver or consent, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and (z) in the case of any other amendment, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that no amendment, waiver or consent shall:

(i) increase the Commitment of any Lender, reduce the principal (but not any mandatory or voluntary prepayment) of, or reduce the interest on, the Loans payable to any Lender, reduce the amount of any fee payable for the account of any Lender (other than the Applicable Premium), or postpone or extend any scheduled date fixed for any payment of principal (but not mandatory or voluntary prepayment) of, or interest or fees (other than the Applicable Premium) on, the Loans payable to any Lender, in each case, without the written consent of each Lender directly and adversely affected thereby;

(ii) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender;

(iii) amend the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender;

(iv) release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Collateral Agent for the benefit of the Agents and the Lenders, or release the Borrower or any Guarantor, in each case, without the written consent of each Lender; or

(v) amend, modify or waive Section 4.2, Section 4.3 or this Section 11.2 without the written consent of each Lender directly and adversely affected thereby.

(b) Notwithstanding anything to the contrary in Section 11.2(a):

(i) no amendment, waiver or consent shall, unless in writing and signed by an Agent, affect the rights or duties of such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents;

(ii) any amendment, waiver or consent to any provision of this Agreement (including Sections 4.1 and 4.2) that permits any Loan Party or any of their respective Affiliates to purchase Loans on a non-pro rata basis, become an eligible assignee pursuant to Section 11.7 and/or make offers to make optional prepayments on a non-pro rata basis shall require the prior written consent of the Required Lenders rather than the prior written consent of each Lender directly affected thereby;

(iii) any Control Agreement, Guaranty, Mortgage, Security Agreement, Canadian Security Documents, collateral access agreement, landlord waiver, or other agreement or document purporting to create or perfect a security interest in any of the Collateral (a "**Collateral Document**") may be amended, waived or otherwise modified with the consent of the applicable Agent and the applicable Loan Party without the need to obtain the consent of any Lender or any other Person if such amendment, modification, supplement or waiver is delivered in order (A) to comply with local Requirements of Law (including foreign law or regulatory requirements) or advice of local counsel, (B) to cure any ambiguity, inconsistency, omission, mistake or defect, or (C) to cause such Collateral Document to be consistent with this Agreement and the other Loan Documents, and if the Administrative Agent and the Borrower shall have jointly identified an ambiguity, inconsistency, omission, mistake or defect, in each case, in any provision of any Loan Document (other than a Collateral Document), then the Administrative Agent and the Borrower shall be permitted to amend such provision; any amendment, waiver or modification pursuant to this paragraph shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof;

(iv) no consent of any Loan Party shall be required to change any order of priority set forth in Sections 2.5(d) and Section 4.3;

(v) the Administrative Agent will have the right to make Conforming Changes as set forth in Section 2.7(e) and/or Section 2.4(e) from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document;

(vi) the Administrative Agent, the Incremental Term Loan Lenders and the Loan Parties may enter into an Incremental Amendment as provided in Section 2.13;

(vii) no Defaulting Lender or Affiliate thereof shall have any right to approve or disapprove any amendment, waiver or consent under the Loan Documents, and any Loans held by such Person for purposes hereof shall be automatically deemed to be voted pro rata according to the Loans of all other Lenders in the aggregate (other than such Defaulting Lender or Affiliate thereof); and

(viii) the Agents and the Loan Parties may enter into an amendment to this Agreement in connection with the Loan Parties' entry of the ABL Facility in the sole discretion of the Agents.

(c) If any action to be taken by the Lenders hereunder requires the consent, authorization, or agreement of all of the Lenders or any Lender affected thereby, and a Lender other than the Collateral Agent and the Administrative Agent and their respective Affiliates and Related Funds (the "**Holdout Lender**") fails to give its consent, authorization, or agreement, then the Collateral Agent, upon at least five (5) Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute lenders (each, a "**Replacement Lender**"), and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than fifteen (15) Business Days after the date such notice is given. Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 11.7. Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make its Pro Rata Share of Loans.

**Section 11.3. No Waiver; Remedies, Etc.** No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

**Section 11.4. Expenses; Taxes; Attorneys' Fees.** The Borrower will pay on written demand, all reasonable and documented costs and expenses incurred by or on behalf of each Agent

(and, in the case of clauses (c) through (m) below, each Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable and documented fees, costs, client charges and expenses of counsel for the Agents, and, in the case of clauses (b) through (m) below, each Lender), accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, the rating of the Loans, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to: (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 7.1(b) or the review of any of the agreements, instruments and documents referred to in Section 7.1(f)), (b) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against any Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) any attempt to collect from any Loan Party, (j) any Environmental Claim, Environmental Liability or Remedial Action arising from or in connection with the past, present or future operations of, or any property currently, formerly or in the future owned, leased or operated by, any Loan Party, any of its Subsidiaries or any predecessor in interest, (k) any Environmental Lien, (l) the rating of the Loans by one or more rating agencies Lender's Securitization, or (m) the receipt by any Agent or any Lender of any advice from professionals with respect to any of the foregoing. Without limitation of the foregoing or any other provision of any Loan Document: (x) the Borrower agrees to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents, and (y) if the Borrower fails to perform any covenant or agreement contained herein or in any other Loan Document, any Agent is expressly permitted or authorized to perform or cause performance of such covenant or agreement pursuant to such Loan Document, and the expenses of such Agent incurred in connection therewith shall be reimbursed on written demand by such Agent to the Borrower. The obligations of the Borrower under this Section 11.4 shall survive after the occurrence of the Termination Date, the discharge of any Liens granted under the Loan Documents and the termination of this Agreement and the other Loan Documents.

**Section 11.5. Right of Set-off**. Upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender or any of their respective Affiliates to or for the

credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 4.4 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agents and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off. Each Agent and each Lender agrees to notify such Loan Party promptly after any such set-off and application made by such Agent or such Lender or any of their respective Affiliates provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Agents and the Lenders under this Section 11.5 are in addition to the other rights and remedies (including other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

**Section 11.6. Severability**. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

**Section 11.7. Assignments and Participations**.

(a) This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns; provided, however, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b) Subject to the conditions set forth in clause (c) below, each Lender may assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Commitments and any Loan made by it with the written consent of the Administrative Agent, and so long as no Event of Default has occurred and is continuing at the time of such assignment, the Borrower (such consent not to be unreasonably conditioned, withheld or delayed); provided, however, that no written consent of the Administrative Agent or the Borrower shall be required (i) in connection with any assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (ii) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender.

(c) Assignments shall be subject to the following additional conditions:

(i) Each such assignment shall be in an amount which is at least $1,000,000 or in increments of $500,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (A)

a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (B) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $1,000,000 or a multiple of $500,000 in excess thereof);

(ii) The parties to each such assignment shall execute and deliver to the Administrative Agent for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Administrative Agent, for the benefit of the Collateral Agent, a processing and recordation fee of $3,500 (except the payment of such fee shall not be required in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender); and

(iii) No such assignment shall be made to (A) any Loan Party or any of their respective Affiliates, (B) any natural Person, or (C) any Defaulting Lender or any of its Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (C). In the event any such assignment is made, such assignment shall be null and void *ab initio*.

(d) Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least three Business Days after the delivery thereof to the Administrative Agent (or such shorter period as shall be agreed to by the Administrative Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(e) By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not

taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(f) The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "**Register**") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Loans (and stated interest thereon) (the "**Registered Loans**") owing to each Lender from time to time. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(g) Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, and subject to any consent required from the Administrative Agent pursuant to Section 11.7(b) (which consent of the applicable Agent must be evidenced by such Agent's execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register (as adjusted to reflect any principal payments on or amounts capitalized and added to the principal balance of the Loans and/or Commitment reductions made subsequent to the effective date of the applicable assignment, as confirmed in writing by the corresponding assignor and assignee in conjunction with delivery of the assignment to the Administrative Agent) and provide to the Collateral Agent a copy of the fully executed Assignment and Acceptance.

(h) A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).

(i) If any Lender sells participations in a Registered Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrower, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "**Participant Register**"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall

expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(j) Any Foreign Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.9(d).

(k) Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Commitments and the Loans made by it); provided that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) action directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, (B) action directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 9.8 or any other Loan Document). The Loan Parties agree that each participant shall be entitled to the benefits of Sections 2.9 and 2.10 with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender; provided that such participant (x) agrees to be subject to the provisions of Section 2.12 as if it were an assignee under Section 11.7(b); and (y) shall not be entitled to receive any greater payment under Section 2.9 or 2.10, with respect to any participation, than its participating Lender would have been entitled to receive.

(l) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to, or other indebtedness issued by, such Lender pursuant to a securitization transaction (including any structured warehouse credit facility, collateralized loan obligation transaction or similar facility or transaction, and including any further securitization of the indebtedness or equity issued under such a transaction) (a "**Securitization**"); provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. The Loan Parties shall cooperate with such Lender and its Affiliates to effect a Securitization, including, without limitation, by providing such information as may be reasonably requested by such Lender in connection with the rating of its Loans or any Securitization.

(m) For the benefit of each assigning Lender and each assignee party to an Assignment and Acceptance in respect of an assignment of any portion of the Loans and/or Commitments hereunder, each assigning Lender and each assignee and party to such Assignment and Acceptance may expressly authorize and designate either the Collateral Agent or Administrative Agent party to such Assignment and Acceptance as the transfer agent (either Agent

acting in such capacity, the "**Transfer Agent**") and the Transfer Agent shall accept such designation upon its execution and acceptance of the Assignment and Acceptance (such designation and acceptance, the "**Transfer Agent Designation**"). Upon a Transfer Agent Designation, (i) (x) an assignee party to an Assignment and Acceptance may make payments to an assignor thereunder by transferring funds to the deposit account of the Transfer Agent (the deposit account of the Transfer Agent, the "**Transfer Agent Account**") in accordance with the wire instructions of the Transfer Agent Account as set forth in such Assignment and Acceptance and (y) upon receipt of such funds in its Transfer Agent Account, the Transfer Agent shall then disburse such funds from its Transfer Agent Account to the respective assigning Lender thereunder in accordance with the wire instructions of such assigning Lender on file with the Administrative Agent (each such assigning Lender's account, an "**Assignor Account**") and (ii) (x) an assigning Lender party to an Assignment and Acceptance may make payments to an assignee thereunder in respect of any closing or similar fees purchased by such assignee by transferring funds to the Transfer Agent Account and (y) upon receipt of such funds in its Transfer Agent Account, the Transfer Agent shall then disburse such funds from its Transfer Agent Account to the respective assignee thereunder in accordance with the wire instructions of such assignee as set forth in the Assignment and Acceptance (each such assignee's account, an "**Assignee Account**"). The Transfer Agent acknowledges and agrees that it shall disburse funds from its Transfer Agent Account to the respective Assignor Account and/or the Assignee Account, as applicable, promptly, and in any event within one (1) Business Day of receipt. By accepting its designation as a Transfer Agent, such Transfer Agent agrees that it will perform the duties of a Transfer Agent in accordance with the terms of this Agreement.

**Section 11.8. Counterparts**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by fax or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*. The words "execution," "signed," "signature," and words of similar import in any Loan Document or any notice, certificate, document, agreement or instrument in respect thereof shall be deemed to include electronic or digital signatures or the keeping of records in electronic form, each of which shall be of the same effect, validity and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000, the Electronic Signatures and Records Act of 1999, or any other similar state laws based on the Uniform Electronic Transactions Act.

**Section 11.9. Governing Law**. THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

**Section 11.10. Consent to Jurisdiction; Service of Process and Venue**.

(a) ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH LOAN PARTY HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY ANY MEANS PERMITTED BY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 11.1, SUCH SERVICE TO BECOME EFFECTIVE 10 DAYS AFTER SUCH MAILING. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(b) Each Loan Party irrevocably and unconditionally agrees that it will not commence any action or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against any Agent, any Lender or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof.

(c) Each Canadian Guarantor hereby irrevocably appoints Nelson Mullins Riley & Scarborough LLP (the "**Process Agent**"), with an office on the date hereof at 330 Madison Avenue, 27th Floor, New York, NY 10017 as its agent to receive on behalf of each Canadian Guarantor service of the summons and complaint and any other process which may be served in any action or proceeding described above. Such service may be made by mailing or delivering a copy of such process to each Canadian Guarantor, in care of the Process Agent at the address

specified above for such Process Agent, and such Canadian Guarantor hereby irrevocably authorizes and directs the Process Agent to accept such service on its behalf. Each Canadian Guarantor covenants and agrees that, for so long as it shall be bound under this Agreement or any other Loan Document, it shall maintain a duly appointed agent for the service of summons and other legal process in New York, New York, United States of America, for the purposes of any legal action, suit or proceeding brought by any party in respect of this Agreement or such other Loan Document and shall keep the Agents advised of the identity and location of such agent. If for any reason there is no authorized agent for service of process in New York, each Canadian Guarantor irrevocably consents to the service of process out of the said courts by mailing copies thereof by registered United States air mail postage prepaid to it at its address specified in Section 11.1. Nothing in this Section 11.10 shall affect the right of any Secured Party to (i) commence legal proceedings or otherwise sue any Canadian Guarantor in the country in which it is domiciled or in any other court having jurisdiction over such Canadian Guarantor or (ii) serve process upon any Canadian Guarantor in any manner authorized by the laws of any such jurisdiction.

**Section 11.11. Waiver of Jury Trial, Etc.** EACH LOAN PARTY, EACH AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENTS AND THE LENDERS ENTERING INTO THIS AGREEMENT.

**Section 11.12. Consent by the Agents and Lenders**. Except as otherwise expressly set forth herein to the contrary or in any other Loan Document, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "**Action**") of any Agent or any Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party and to which any Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by such Agent or such Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

**Section 11.13. No Party Deemed Drafter**. Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

**Section 11.14. Reinstatement; Certain Payments**. If any claim is ever made upon any Secured Party for repayment or recovery of any amount or amounts received by such Secured Party in payment or on account of any of the Obligations, such Secured Party shall give prompt

notice of such claim to each other Agent and Lender and the Borrower, and if such Secured Party repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Secured Party or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Secured Party with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Secured Party hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Secured Party.

**Section 11.15. Indemnification; Limitation of Liability for Certain Damages**.

(a) In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Secured Party and all of their respective Related Parties (collectively called the "**Indemnitees**") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable and documented costs and expenses (including, without limitation, reasonable and documented attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following: (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) any Agent's or any Lender's furnishing of funds to the Borrower under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans or the Borrower's use of the proceeds thereof, (iii) the Agents and the Lenders relying on any instructions of the Borrower or the handling of the Loan Account and Collateral of the Borrower as herein provided, (iv) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "**Indemnified Matters**"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.

(b) The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees set forth in this Section 11.15 are chargeable against the Loan Account. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 11.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c) No Loan Party shall assert, and each Loan Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on

contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Loan Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d) The indemnities and waivers set forth in this Section 11.15 shall survive after the occurrence of the Termination Date, any discharge of any Liens granted under the Loan Documents and the termination of this Agreement and the other Loan Documents.

**Section 11.16. Records**. The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.6 hereof, shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

**Section 11.17. Binding Effect**. This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 5.1 have been satisfied or waived in writing by the Agents, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each Agent and each Lender, and their respective successors and assigns, except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Agent and each Lender, and any assignment by any Lender shall be governed by Section 11.7.

**Section 11.18. Highest Lawful Rate**. It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it. Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows: (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrower); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall, subject to the last sentence of this Section

11.18, be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrower). All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law. If at any time and from time to time (x) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this Section 11.18 and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this Section 11.18.

For purposes of this Section 11.18, the term “applicable law” shall mean that law in effect from time to time and applicable to the loan transaction between the Borrower, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

**Section 11.19. Confidentiality**. Each Agent and each Lender agrees (on behalf of itself and its Related Parties) to use reasonable precautions to keep confidential, in accordance with its customary procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any non-public information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents which is identified in writing by the Loan Parties as being confidential at the time the same is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided that nothing herein shall limit the disclosure by any Agent or any Lender of any such information (i) to its Affiliates, its Related Parties or the Related Parties of any Person described in clause (ii) or (iii) below (it being understood that the Persons to whom such disclosure is made either will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 11.19 or is subject to other customary confidentiality obligations); (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization, so long as such assignee or participant (or

prospective assignee or participant) or party to a Securitization agrees, in writing, to be bound by or is otherwise subject to customary confidentiality obligations (including, without limitation, confidentiality provisions similar in substance to this Section 11.19); (iv) to any potential investors in such Lender or any of its Affiliates, so long as each such potential investor agrees, in writing, to be bound by or is otherwise subject to customary confidentiality obligations (including, without limitation, confidentiality provisions similar in substance to this Section 11.19; (v) to the extent required by any Requirement of Law or judicial process or as otherwise requested by any Governmental Authority; (vi) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor or accountant or any nationally recognized rating agency; (vii) in connection with any litigation to which any Agent or any Lender is a party; (viii) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (ix) to any other Person if such information is general portfolio information that does not identity the Loan Parties; or (x) with the consent of the Borrower. In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to any Agent or any Lender in connection with the administration of this Agreement, the other Loan Documents and the Commitments.

**Section 11.20. Public Disclosure**. Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing such press release or other public disclosure). Each Loan Party hereby authorizes each Agent and each Lender, after consultation with the Borrower, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such Agent or such Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such Agent or such Lender shall deem appropriate.

**Section 11.21. Integration**. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

**Section 11.22. USA PATRIOT Act**. Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrower, which information includes the name and address of each such entity and other information that will allow such Lender to identify the entities composing the Borrower in accordance with the USA PATRIOT Act. Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as

any Lender may reasonably require from time to time in order to enable such Lender to comply with the USA PATRIOT Act.

**Section 11.23.** **Judgment Currency**. This is an international financial transaction in which the specification of a currency and payment in New York is of the essence. Dollars shall be the currency of account in the case of all payments pursuant to or arising under this Agreement or under any other Loan Document, and all such payments shall be made to the Administrative Agent's Account in New York in immediately available funds. To the fullest extent permitted by applicable law, the obligations of each Loan Party to the Secured Parties under this Agreement and under the other Loan Documents shall not be discharged by any amount paid in any other currency or in a place other than to the Administrative Agent's Account in New York to the extent that the amount so paid after conversion under this Agreement and transfer to New York does not yield the amount of Dollars in New York due under this Agreement and under the other Loan Documents. If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "**Other Currency**"), to the fullest extent permitted by applicable law, the rate of exchange used shall be that at which the Administrative Agent could, in accordance with normal procedures, purchase Dollars with the Other Currency on the Business Day preceding that on which final judgment is given. The obligation of each Loan Party in respect of any such sum due from it to the Secured Parties hereunder shall, notwithstanding any judgment in such Other Currency, be discharged only to the extent that, on the Business Day immediately following the date on which the Administrative Agent receives any sum adjudged to be so due in the Other Currency, the Administrative Agent may, in accordance with normal banking procedures, purchase Dollars with the Other Currency. If the Dollars so purchased are less than the sum originally due to the Secured Parties in Dollars, each Loan Party agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Secured Parties against such loss, and if the Dollars so purchased exceed the sum originally due to the Secured Parties in Dollars, the Secured Parties agrees to remit to the Loan Parties such excess.

**Section 11.24.** **Waiver of Immunity**. To the extent that any Loan Party has or hereafter may acquire (or may be attributed, whether or not claimed) any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set-off or any legal process (whether service of process or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such Loan Party hereby irrevocably waives and agrees not to plead or claim, to the fullest extent permitted by law, such immunity in respect of (a) its obligations under the Loan Documents, (b) any legal proceedings to enforce such obligations and (c) any legal proceedings to enforce any judgment rendered in any proceedings to enforce such obligations. Each Loan Party hereby agrees that the waivers set forth in this Section 11.24 shall be to the fullest extent permitted under the Foreign Sovereign Immunities Act and are intended to be irrevocable for purposes of the Foreign Sovereign Immunities Act.

**Section 11.25.** **English Language**. This Agreement and each other Loan Document have been negotiated and executed in English. All certificates, reports, notices and other documents and communications given or delivered by any party hereto pursuant to this Agreement or any other Loan Document shall be in English or, if not in English, accompanied by a certified English translation thereof. The English version of any such document shall control the meaning of the matters set forth herein.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER:**

**SYNERGY CHC CORP.**

Signed by:

By: ______________________________

CAE4FF7E52AA41F...

Name: Jack Ross
Title: Chairman and Chief Executive Officer

**GUARANTORS:**

**SYNERGY CHC INC.**

Signed by:

By: ______________________________
CAE4FF7E52AA41F...
Name: Jack Ross
Title: Chairman and Chief Executive Officer

**<u>ADMINISTRATIVE AGENT AND COLLATERAL AGENT</u>:**

**ACP AGENCY, LLC**

By: ______________________________
Name: Peter Eschmann
Title: Authorized Person

**<u>LENDERS</u>:**

**ACME CREDIT PARTNERS FUND I, LP**

By: Acme Credit Investors LLC, its general partner

By: Acme Credit Partners LLC, its managing member

By: ______________________________
Name: Peter Eschmann
Title: Managing Partner

**SCHEDULE 1.1(A)**

**COMMITMENTS**

| Lender | Initial Term Loan Commitment | Delayed Draw Term Loan Commitment |
|---|---|---|
| **ACME CREDIT PARTNERS FUND I, LP** | **$15,000,000.00** | **$2,500,000.00** |
| **TOTAL** | **$15,000,000.00** | **$2,500,000.00** |

**SCHEDULE 1.1(B)**

**EFFECTIVE DATE PAYOFF DEBT**

| **Loan Party Obligor** | **Creditor/ Beneficiary** | **Amount of Debt to be Paid Off** | **Collateral** |
|---|---|---|---|
| Synergy CHC Corp. | Knight Therapeutics | $10,000,000 | All assets |
| Synergy CHC Corp. | Shopify | $147,589.41 | All assets |

**SCHEDULE 6.1(E)**

**CAPITALIZATION; SUBSIDIARIES**

**SHARES**

| Loan Party/ Subsidiary | Description of Equity Interest | Certificated Y/N | Name of Equity Holder | Number of Shares Held, if applicable | Percentage of Equity Held |
|---|---|---|---|---|---|
| Synergy CHC Corp. | Shares | Yes | Gowan Private Equity Inc. | 3,979,056 | 43.3% |
| | Shares | Yes | Knight Therapeutics International S.A. | 1,482,844 | 16.1% |
| | Shares | Yes | Jack Ross | 1,072,701 | 11.7% |
| | Shares | Yes | James Paul SoRelle | 108,963 | 1.2% |
| | Shares | Yes | Other Public Holders | 2,549,792 | 27.7% |
| NomadChoice Pty Limited | Shares | Yes | Synergy CHC Corp. | 1,200 | 100% |
| Synergy CHC Inc. | Shares | Yes | Synergy CHC Corp. | 100 | 100% |
| Hand MD Corp. | Shares | Yes | Synergy CHC Corp. | 2,000,000 | 100% |

**WARRANTS**

| Loan Party/ Subsidiary | Description | Name of Holder | Number of Warrants | Grant Date | Expiration Date |
|---|---|---|---|---|---|
| Synergy CHC Corp. | Warrant | Roth Capital Partners, LLC | 103,500 | October 24, 2024 | 25,875 expire 10/27/2027<br>25,875 expire 10/23/2028<br>51,750 expire 10/23/2029 |

**OPTIONS**

| Loan Party/ Subsidiary | Description | Name of Holder | Number of Warrants | Grant Date | Expiration Date |
|---|---|---|---|---|---|
| | Warrants | James Paul SoRelle | 84,034 | 12/14/2015 | 12/14/2025 |

| **Loan Party/ Subsidiary** | **Description** | **Name of Holder** | **Number of Warrants** | **Grant Date** | **Expiration Date** |
|---|---|---|---|---|---|
| Synergy CHC Corp. | Warrants | Jaime Fickett | 84,034 | 12/14/2015 | 12/14/2025 |
| | Warrants | Alfred Baumeler | 84,034 | 12/14/2015 | 12/14/2025 |

**SCHEDULE 6.1(F)**

**LITIGATION**

None.

## SCHEDULE 6.1(O)

## FACILITIES; REAL PROPERTY

| **Address** | **Loan Party** | **Owned/Leased** |
|---|---|---|
| 3175 Highway 2, Fall River, NS B2T 1J5, Canada | Synergy CHC Inc. | Leased |

# SCHEDULE 6.1(P)

## EMPLOYEE AND LABOR MATTERS

None.

# SCHEDULE 6.1(Q)

## ENVIRONMENTAL MATTERS

None.

**SCHEDULE 6.1(R)**

**INSURANCE**

| **Policy Type** | **Carrier** | **Policy Number** | **Policy Term** |
|---|---|---|---|
| Commercial General Liability | Scott Insurance | ZB6-D807931-06D25D8E250701 | 1/22/2025 - 1/22/2026 |
| Automobile Liability | Scott Insurance | ZB6-D807931-06 | 1/22/2025 - 1/22/2026 |
| Umbrella / Excess Liability | Scott Insurance | UH6-D807941-06 | 1/22/2025 - 1/22/2026 |
| Workers Compensation and Employers' Liability | Scott Insurance | WD6-J219854-02 | 1/22/2025 - 1/22/2026 |
| Products Liability | Scott Insurance | D25D8E250701 | 1/22/2025 - 1/22/2026 |
| Commercial Property | Scott Insurance | ZD6 D807931 06 | 1/22/2025 - 1/22/2026 |

**SCHEDULE 6.1(U)**

**DEPOSIT, SECURITIES AND COMMODITIES ACCOUNTS**

| Company | Bank | Address | Account Number | Excluded Account (Y/N) |
|---|---|---|---|---|
| Synergy CHC Corp. | Banc of California | PO Box 131207, Carlsbad, CA 92013-1207 | 3111852 | N |
| NomadChoice Pty Limited | Banc of California | PO Box 131207, Carlsbad, CA 92013-1207 | 3162940 | Y |
| Synergy CHC Inc. | Royal Bank | 200 Bay Street, Royal Bank Plaza, Toronto, ON, CA M5J 2J5 | 01793 102-418-1 | Y |
| Synergy CHC Inc. (Focus Factor) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8015992 | Y |
| Synergy CHC Corp. (Flat Tummy Tea) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8684416 | Y |
| Synergy CHC Corp. (Hand MD) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8016007 | Y |
| Synergy CHC Corp. (Think Fuel) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8489345 | Y |
| Synergy CHC Corp. (The Synergy Effect) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8214396 | Y |
| Synergy CHC Corp. (Perfekt Beauty) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8216061 | Y |
| Synergy CHC Corp. (Coco White) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8489270 | Y |
| Synergy CHC Corp. (Mane Game) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8489189 | Y |

## SCHEDULE 6.1(V)

## INTELLECTUAL PROPERTY

**Patents**

None.

**Copyrights**

None.

**Trademarks**

United States Registrations:

| Grantor | Mark | Registration No. | Registration Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | BLACKOTTER | 6289745 | 09-Mar-2021 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5074891 | 01-Nov-2016 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5142815 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5596520 | 30-Oct-2018 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY TEA | 5142816 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY TEA | 5142817 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FOCUS FACTOR | 2414522 | 19-Dec-2000 | United States of America |
| Synergy CHC Corp. | FOCUS FACTOR BRAIN HUB | 6840427 | 06-Sep-2022 | United States of America |
| Synergy CHC Corp. | SNEAKY VAUNT | 7552593 | 29-Oct-2024 | United States of America |
| Synergy CHC Corp. | SNEAKY VAUNT | 5572253 | 25-Sep-2018 | United States of America |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | SYNERGY A CONSUMER HEALTHCARE COMPANY | 6463755 | 24-Aug-2021 | United States of America |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 5365149 | 26-Dec-2017 | United States of America |
| Synergy CHC Corp. | WHY LOOK GOOD WHEN YOU CAN LOOK PER-FÉKT | 3436683 | 27-May-2008 | United States of America |
| Synergy CHC Corp. |  | 3383804 | 19-Feb-2008 | United States of America |
| Synergy CHC Corp. | PER-FÉKT | 3383803 | 19-Feb-2008 | United States of America |
| Hand MD Corp. | HAND MD | 6278206 | 23-Feb-2021 | United States of America |
| Neuragen Corp. (merged into Synergy CHC Corp.) | NEURAGEN | 3777747 | 20-Apr-2010 | United States of America |
| Neuragen Corp. (merged into Synergy CHC Corp.) | NEURAGEN PN | 3423772 | 06-May-2008 | United States of America |

<u>United States Applications</u>:

| Grantor | Mark | Application No. | Application Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | FACTOR NUTRITION | 90477772 | 20-Jan-2021 | United States of America |
| Synergy CHC Corp. | FACTOR NUTRITION | 98898853 | 12-Dec-2024 | United States of America |
| Synergy CHC Corp. | UrgentRX | 97026495 | 14-Sep-2021 | United States of America |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | PER-FÉKT | 98817880 | 24-Oct-2024 | United States of America |
| Synergy CHC Corp. | PER-FÉKT BEAUTY | 98817879 | 24-Oct-2024 | United States of America |

Foreign Registrations:

| Grantor | Mark | Registration No. | Registration Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | FLAT TUMMY | 1857065 | 31-Mar-2017 | Australia |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1715196 | 18-Aug-2015 | Australia |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1768380 | 03-May-2016 | Australia |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Australia |
| Hand MD Corp. | HAND MD | 1863325 | 12-Apr-2018 | Australia |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Australia |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | 1133555 | 16-Jul-2012 | Australia |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Austria |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Bahrain |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 29-Jun-2017 | Bahrain |
| Hand MD Corp. | HAND MD | 1358721 | 03-Aug-2017 | Bahrain |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Bahrain |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Benelux |
| Synergy CHC Corp. | BLACKOTTER | TMA1101411 | 03-Jun-2021 | Canada |
| Synergy CHC Corp. | FLAT TUMMY | TMA1028125 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | FOCUS FACTOR | TMA1101412 | 03-Jun-2021 | Canada |
| Hand MD Corp. | HAND MD | TMA1070387 | 21-Jan-2020 | Canada |
| Synergy CHC Corp. | SNEAKY VAUNT | TMA1028071 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | SYNERGY A CONSUMER HEALTHCARE COMPANY | TMA1046985 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | SYNERGY EFFECT | TMA1046990 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | SYNERGY EFFECT | TMA1046986 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1046991 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1047043 | 06-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1023459 | 04-Jun-2019 | Canada |
| Synergy CHC Corp. | FLAT TUMMY ABS | TMA1028111 | 18-Jun-2019 | Canada |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | URGENTRX | TMA926000 | 14-Jan-2016 | Canada |

| | | | | |
|---|---|---|---|---|
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | URGENTRX | TMA906488 | 17-Jun-2015 | Canada |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | RIGHT NOW RELIEF | 1096512 | 16-Nov-2015 | Chile |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | China (People's Republic) |
| Hand MD Corp. | HAND MD | 1358721 | 15-Nov-2018 | China (People's Republic) |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | 1133555 | 16-Jul-2012 | China (People's Republic) |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Denmark |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Egypt |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Egypt |
| Hand MD Corp. | HAND MD | 1358721 | 03-Aug-2017 | Egypt |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | European Union (Community) |
| Hand MD Corp. | HAND MD | 1358721 | 05-Jan-2018 | European Union (Community) |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | RIDICULOUSLY FAST RELIEF | 010627099 | 01-Oct-2012 | European Union (Community) |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | European Union (Community) |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | 010627248 | 10-Sep-2012 | European Union (Community) |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Finland |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Finland |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | France |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | France |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1306320 | 05-May-2016 | Germany |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | India |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | India |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 31-Jul-2020 | India |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1306320 | 25-Aug-2016 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Int'l Registration - Madrid Protocol Only |
| Hand MD Corp. | HAND MD | 1358721 | 15-Feb-2017 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | Int'l Registration - Madrid Protocol Only |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | UrgentRX | 1133555 | 16-Jul-2012 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Ireland |
| Synergy CHC Corp. | FOCUS FACTOR | 13531781 | 03-Jul-2018 | Israel |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Italy |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Italy |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | 5767403 | 29-May-2015 | Japan |
| Hand MD Corp. | HAND MD | 152797 | 10-Aug-2017 | Jordan |
| Synergy CHC Corp. | FLAT TUMMY | 160099 | 10-Aug-2017 | Kuwait |
| Synergy CHC Corp. | FOCUS FACTOR | 160098 | 10-Aug-2017 | Kuwait |
| Hand MD Corp. | HAND MD | 156127 | | Kuwait |
| Synergy CHC Corp. | FLAT TUMMY | 181214 | 28-Aug-2017 | Lebanon |
| Synergy CHC Corp. | FOCUS FACTOR | 181260 | 30-Aug-2017 | Lebanon |
| Hand MD Corp. | HAND MD | 181233 | 29-Aug-2017 | Lebanon |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 181671 | 05-Oct-2017 | Lebanon |
| Synergy CHC Corp. | FLAT TUMMY | 2826083 | 21-Feb-2025 | Mexico |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | FLAT TUMMY | 2826084 | 21-Feb-2025 | Mexico |
| Synergy CHC Corp. | FOCUS FACTOR | 2826082 | 21-Feb-2025 | Mexico |
| Synergy CHC Corp. | FLAT TUMMY | | | Nigeria |
| Synergy CHC Corp. | THE SYNERGY EFFECT | | | Nigeria |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Norway |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Norway |
| Hand MD Corp. | HAND MD | 1358721 | 08-Jun-2018 | Norway |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Oman |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Oman |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Oman |
| Synergy CHC Corp. | FLAT TUMMY | 117489 | 15-Oct-2018 | Qatar |
| Synergy CHC Corp. | FLAT TUMMY | 117411 | 14-Nov-2018 | Qatar |
| Synergy CHC Corp. | FOCUS FACTOR | 117410 | 25-Sep-2017 | Qatar |
| Hand MD Corp. | HAND MD | 117231 | 05-Jun-2018 | Qatar |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 117412 | 14-Nov-2018 | Qatar |
| Synergy CHC Corp. | FLAT TUMMY | 117229 | 03-Oct-2017 | Saudi Arabia |
| Synergy CHC Corp. | FOCUS FACTOR | 117228 | 03-Oct-2017 | Saudi Arabia |

| | | | | |
|---|---|---|---|---|
| Hand MD Corp. | HAND MD | 117843 | 11-Oct-2017 | Saudi Arabia |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 117224 | 03-Oct-2017 | Saudi Arabia |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Spain |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 12-Jul-2017 | Spain |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Sweden |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Switzerland |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Switzerland |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Switzerland |
| Hand MD Corp. | HAND MD | 1358721 | 13-Jul-2018 | Switzerland |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | Switzerland |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Syria |
| Hand MD Corp. | HAND MD | 1358721 | 07-May-2018 | Syria |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Syria |
| Synergy CHC Corp. | FLAT TUMMY | 279486 | 12-Sep-2017 | United Arab Emirates |
| Synergy CHC Corp. | FOCUS FACTOR | 279483 | 27-Sep-2017 | United Arab Emirates |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 279482 | 12-Sep-2017 | United Arab Emirates |
| Synergy CHC Corp. | FLAT TUMMY | WO0000001354339 | 14-Sep-2018 | United Kingdom |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | FLAT TUMMY TEA | 1306320 | 22-Dec-2016 | United Kingdom |
| Synergy CHC Corp. | FOCUS FACTOR | UK00801351781 | 01-Dec-2017 | United Kingdom |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | United Kingdom |
| Hand MD Corp. | HAND MD | UK00801358721 | 03-Aug-2017 | United Kingdom |
| Hand MD Corp. | HAND MD | WO0000001358721 | 08-Nov-2017 | United Kingdom |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | RIDICULOUSLY FAST RELIEF | UK00910627099 | 01-Oct-2012 | United Kingdom |
| Synergy CHC Corp. | SNEAKY VAUNT | UK00801335034 | 02-Dec-2016 | United Kingdom |
| Synergy CHC Corp. | SNEAKY VAUNT | WO0000001335034 | 27-Jul-2017 | United Kingdom |
| Synergy CHC Corp. | THE SYNERGY EFFECT | WO0000001377589 | 03-May-2018 | United Kingdom |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | UK00910627248 | 10-Sep-2012 | United Kingdom |
| Synergy CHC Corp. | FLAT TUMM (Int. Class 30) | 81303 | 24-Sep-2017 | Yemen, Republic of |
| Synergy CHC Corp. | FLAT TUMMY (Int. Class 5) | 81301 | 24-Sep-2017 | Yemen, Republic of |
| Synergy CHC Corp. | FOCUS FACTOR | 81298 | 24-Sep-2017 | Yemen, Republic of |
| Hand MD Corp. | HAND MD | 81478 | 04-Oct-2017 | Yemen, Republic of |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | THE SYNERGY EFFECT | 81300 | 24-Sep-2017 | Yemen, Republic of |

Foreign Applications:

| Grantor | Mark | Application No. | Application Date | Granting Jurisdiction |
|---|---|---|---|---|
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | FAST POWDERS | 1144360 | 08-Oct-2015 | Chile |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | FAST POWDERS | 1096513 | 23-Dec-2014 | Chile |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Austria |
| Synergy CHC Corp. | FLAT TUMMY TEA | | | Nigeria |
| Synergy CHC Corp. | FLAT TUMMY TEA | | | Nigeria |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Norway |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Sweden |
| Synergy CHC Corp. | FOCUS FACTOR | 2272869 | 08-Jul-2021 | Mexico |
| Synergy CHC Corp. | FOCUS FACTOR | | | Nigeria |
| Hand MD Corp. | HAND MD | 1358721 | 03-Aug-2017 | Iran (Islamic Republic of) |
| Hand MD Corp. | HAND MD | | | Nigeria |
| Hand MD Corp. | HAND MD | 1358721 | 03-Aug-2017 | Oman |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | SNEAKY VAUNT | | | Brazil |
| Synergy CHC Corp. | SNEAKY VAUNT | | | China (People's Republic) |
| Synergy CHC Corp. | SNEAKY VAUNT | | | Nigeria |
| Synergy CHC Corp. | SNEAKY VAUNT | | | Nigeria |

**Trade names**

Flat Tummy Tea

Focus Factor

Factor Nutrition Labs

## SCHEDULE 6.1(W)

## MATERIAL CONTRACTS

That certain Securities Purchase Agreement, dated March 8, 2022, by and among Sanders Morris Harris, LLC, in its capacity of representative for the Noteholders and Mr. Don A Sanders, and Synergy CHC Corp., a Nevada corporation, as amended by that certain Modification Agreement, dated June 14, 2023, as further modified by that certain Modification Agreement, dated March 31, 2024, and those certain consolidated promissory notes, dated March 8, 2022, issued by Synergy CHC Corp., a Nevada corporation, in connection therewith.

That certain Sales and Marketing Consultant and Distribution Agreement, dated as of April 2, 2014, between Kenek Brands Inc. and Synergy CHC Corp., a Nevada corporation.

**SCHEDULE 6.1(BB)**

**NAME; JURISDICTION OF ORGANIZATION; ORGANIZATIONAL ID NUMBER; CHIEF PLACE OF BUSINESS; CHIEF EXECUTIVE OFFICE; FEIN**

| **Loan Party** | **Jurisdiction of organization** | **Organizational Identification Number** | **Federal Employer Identification Number** | **Chief Executive Office** |
|---|---|---|---|---|
| Synergy CHC Corp. | Nevada | NV20101902811 | 99-0379440 | 3 Kimball Drive, Standish, ME 04084 |
| NomadChoice Pty Limited | Australia | ACN 160 729 939 / ABN 41 160 729 939 | N/A | 3 Kimball Drive, Standish, ME 04084 |
| Synergy CHC Inc. | Alberta, Canada | 78053 1125 RT0001 | N/A | 3175 Highway 2, Fall River, Nova Scotia, B2T 1J5, Canada |
| Hand MD Corp. | Delaware | 5799900 | 47-4803041 | 3 Kimball Drive, Standish, ME 04084 |

# SCHEDULE 7.2(A)

## EXISTING LIENS

None.

**SCHEDULE 7.2(B)**

**EXISTING INDEBTEDNESS**

| Loan Party | Creditor/ Beneficiary | Amount of Debt | Maturity Date | Collateral | Intercreditor Agreement (Y/N) |
|---|---|---|---|---|---|
| Synergy CHC Corp. | Sanders Morris Harris LLC | $9,794,445.00 | March 31, 2026 | N/A – Unsecured | Y |
| Synergy CHC Corp. | Atrium | $2,802,445.00 | N/A | N/A | N |
| Synergy CHC Corp. | VitaBest | $1,660,412.14 | N/A | N/A. | N |

**SCHEDULE 7.2(E)**

**EXISTING INVESTMENTS**

That certain Second Amended and Restated Promissory Note, dated May 29, 2025, issued by Boombod Ltd, a UK corporation, in favor of Synergy CHC Corp, a Nevada Corporation, in the original principal amount of $4,424,547.

## SCHEDULE 7.2(J)

## EXISTING TRANSACTIONS WITH AFFILIATES

That certain Sales and Marketing Consultant and Distribution Agreement, dated as of April 2, 2014, between Kenek Brands Inc. and Synergy CHC Corp., a Nevada corporation.

That certain Distribution, License and Supply Agreement, dated as of January 22, 2025, between Synergy CHC Corp., a Nevada corporation and Knight Therapeutics International S.A., a company registered under the laws of Uruguay (formerly known as Knight Therapeutics (Barbados) Inc.).

# SCHEDULE 7.2(K)

## LIMITATIONS ON DIVIDENDS AND OTHER PAYMENT RESTRICTIONS

None.

# EXHIBIT A

## [FORM OF] JOINDER AGREEMENT

**THIS JOINDER AGREEMENT**, dated as of ____________ (this "**Agreement**"), to the Credit Agreement referred to below is entered into by and among [NAME OF ADDITIONAL GUARANTOR], a _________________ ______________ (the "**Additional Guarantor**"), ACP AGENCY, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), and ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**" and together with the Collateral Agent, each an "**Agent**" and collectively, the "**Agents**").

**WHEREAS**, Synergy CHC Corp., a Nevada corporation (the "**Borrower**"), each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder or otherwise guaranties all or any part of the Obligations (as defined therein), each a "**Guarantor**" and collectively, the "**Guarantors**") (other than the Additional Guarantor), the lenders from time to time party thereto (each a "**Lender**" and, collectively, the "**Lenders**"), and the Agents have entered into that certain Term Loan Credit Agreement, dated as of May 30, 2025 (such agreement, as amended, restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "**Credit Agreement**"), pursuant to which the Lenders have agreed to make loans to the Borrower (each a "**Loan**" and collectively the "**Loans**") in an aggregate principal amount not to exceed the Total Commitment (as defined under the Credit Agreement);

**WHEREAS**, the Borrower's obligation to repay the Loans and all other Obligations are guaranteed, jointly and severally, by the Guarantors;

**WHEREAS**, pursuant to Section 7.1(b) of the Credit Agreement, the Additional Guarantor is required to become a Guarantor by, among other things, executing and delivering this Agreement to the Collateral Agent; and

**WHEREAS**, the Additional Guarantor has determined that the execution, delivery and performance of this Agreement directly benefit, and are within the corporate purposes and in the best interests of, the Additional Guarantor.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

**SECTION 1. <u>Definitions</u>**. Reference is hereby made to the Credit Agreement for a statement of the terms thereof. All terms used in this Agreement which are defined therein and not otherwise defined herein shall have the same meanings herein as set forth therein.

**SECTION 2. Joinder of Additional Guarantor.**

(a) Pursuant to Section 7.1(b) of the Credit Agreement, by its execution of this Agreement, the Additional Guarantor hereby (i) confirms that, as to the Additional Guarantor, the representations and warranties contained in Article VI of the Credit Agreement are true and correct in all material respects as of the effective date of this Agreement (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), and (ii) agrees that, from and after the effective date of this Agreement, the Additional Guarantor shall be a party to the Credit Agreement and shall be bound, as a Guarantor, by all the provisions thereof and shall comply with and be subject to all of the terms, conditions, covenants, agreements and obligations set forth therein and applicable to the Guarantors, including, without limitation, the guaranty of the Obligations made by the Guarantors, jointly and severally with the other Loan Parties, in favor of the Agents and the Lenders pursuant to Article X of the Credit Agreement. The Additional Guarantor hereby agrees that from and after the effective date of this Agreement, each reference to a "Guarantor" or a "Loan Party" and each reference to the "Guarantors" or the "Loan Parties" in the Credit Agreement shall include the Additional Guarantor. The Additional Guarantor acknowledges that it has received a copy of the Credit Agreement and each other Loan Document and that it has read and understands the terms thereof.

(b) Attached hereto are supplements to each Schedule to the Credit Agreement revised to include all information required to be provided therein with respect to, and only with respect to, the Additional Guarantor. The Schedules to the Credit Agreement shall, without further action, be amended to include the information contained in each such supplement.

**SECTION 3. Effectiveness**. This Agreement shall become effective upon its execution by the Additional Guarantor, and each Agent and receipt by the Agents of the following, in each case in form and substance reasonably satisfactory to the Agents:

(a) original counterparts to this Agreement, duly executed by, the Additional Guarantor and the Agents, together with the Schedules referred to in Section 2(b) hereof;

(b) a Supplement to the Security Agreement, substantially in the form of Exhibit C to the Security Agreement (the "**Security Agreement Supplement**"), duly executed by the Additional Guarantor, and any instruments of assignment or other documents required to be delivered to the Agents pursuant to the terms thereof;

(c) a Pledge Amendment to the Security Agreement to which the parent company of the Additional Guarantor is a party, in substantially the form of Exhibit A thereto, duly executed by such parent company and providing for all Equity Interests of the Additional Guarantor to be pledged to the Collateral Agent pursuant to the terms thereof;

(d) (i) certificates, if any, representing 100% of the issued and outstanding Equity Interests of the Additional Guarantor and each Subsidiary of the Additional Guarantor and (ii) all original promissory notes of such Additional Guarantor, if any, in each case, that are required to be delivered under the Loan Documents, in each case, accompanied by instruments of assignment and transfer in such form as the Collateral Agent may reasonably request;

(e) subject to Section 7.1(b) of the Credit Agreement, a Mortgage (the "**Additional Mortgage**"), duly executed by the Additional Guarantor, with respect to the real property owned by the Additional Guarantor, together with all other applicable Real Property Deliverables, agreements, instruments and documents as the Collateral Agent may reasonably require, whether comparable to the documents required under Section 7.1(n) of the Credit Agreement or otherwise;

(f) appropriate financing statements on Form UCC-1 duly filed in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by the Security Agreement Supplement and any Mortgage;

(g) a favorable written opinion of counsel to the Loan Parties as to such matters as the Agents may reasonably request; and

(h) such other agreements, instruments or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority (subject to Permitted Liens) of, or otherwise protect, any Lien purported to be covered by the Security Agreement Supplement [or any Additional Mortgage] or otherwise to effect the intent that the Additional Guarantor shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Additional Guarantor shall become Collateral for the Obligations free and clear of all Liens other than Permitted Liens.

**SECTION 4. Notices, Etc.** All notices and other communications provided for hereunder shall be in writing and shall be mailed (by certified mail, postage prepaid and return receipt requested), telecopied or delivered by hand, Federal Express or other reputable overnight courier, if to the Additional Guarantor, to it at its address set forth below its signature to this Agreement, and if to the Borrower, any Guarantor, any Lender or any Agent, to it at its address specified in the Credit Agreement or Joinder Agreement (as applicable); or as to any such Person at such other address as shall be designated by such Person in a written notice to such other Person, complying as to delivery with the terms of this Section 4. All such notices and other communications shall be effective in accordance with Section 11.1 of the Credit Agreement.

**SECTION 5. General Provisions.**

(a) The Additional Guarantor hereby confirms that each representation and warranty made by it under the Loan Documents is true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date as though made on and as of such date, except to the

extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), and that no Default or Event of Default has occurred or is continuing under the Credit Agreement. The Additional Guarantor hereby represents and warrants that as of the date hereof there are no claims or offsets against or defenses or counterclaims to its obligations under the Credit Agreement or any other Loan Document.

(b) Except as supplemented hereby, the Credit Agreement and each other Loan Document shall continue to be, and shall remain, in full force and effect. This Agreement shall not be deemed (i) to be a waiver of, or consent to, or a modification or amendment of, any other term or condition of the Credit Agreement or any other Loan Document or (ii) to prejudice any right or rights which the Agents or the Lenders may now have or may have in the future under or in connection with the Credit Agreement or the other Loan Documents or any of the instruments or agreements referred to therein, as the same may be amended, restated, supplemented or otherwise modified from time to time, including any replacement instrument or agreement therefor.

(c) The Additional Guarantor hereby expressly authorizes the Collateral Agent to file appropriate financing statements or continuation statements, and amendments thereto, (including without limitation, any such financing statements that indicate the Collateral as “all assets” or words of similar import) in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the Liens to be created by the Security Agreement Supplement and each of the other Loan Documents.

(d) To the extent required pursuant to Section 11.4 of the Credit Agreement, the Borrower agrees to pay on written demand all reasonable and documented costs and expenses incurred by or on behalf of each Agent in connection with the negotiation, preparation, execution, delivery and performance of this Agreement, including, without limitation, the reasonable and documented fees, costs, client charges and expenses and disbursements of counsel for the Agents.

(e) This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier or electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. The words “execution,” “signed,” “signature,” and words of similar import in this Agreement or any notice, certificate, document, agreement or instrument in respect thereof shall be deemed to include electronic or digital signatures or the keeping of records in electronic form, each of which shall be of the same effect, validity and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000, the Electronic Signatures and Records Act of 1999, or any other similar state laws based on the Uniform Electronic Transactions Act.

(f) Section headings in this Agreement are included herein for the convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(g) Each of the parties hereto hereby agrees that Sections 11.9, 11.10 and 11.11 of the Credit Agreement are incorporated by reference herein, *mutatis mutandis*, and shall have the same force and effect with respect to this Agreement as if originally set forth herein.

(h) This Agreement, together with the Credit Agreement and the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and thereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:

SYNERGY CHC CORP.

By: ______________________________
Name: _______________________
Title: ________________________

GUARANTORS:

SYNERGY CHC INC.

By: ______________________________
Name: _______________________
Title: ________________________

COLLATERAL AGENT:

ACP AGENCY, LLC

By: ______________________________
Name:
Title:

ADDITIONAL GUARANTOR:

[_____________________________]

By: ________________________________________________
Name:
Title:

Address:
________________________________________
________________________________________
________________________________________

# EXHIBIT B

# PLEDGE AND SECURITY AGREEMENT

**PLEDGE AND SECURITY AGREEMENT** (this "**Agreement**"), dated as of May 30, 2025, made by each of the Grantors referred to below, in favor of **ACP AGENCY, LLC** ("**ACP**"), in its capacity as collateral agent for the Secured Parties referred to below (in such capacity, together with its successors and assigns in such capacity, if any, the "**Collateral Agent**").

## RECITALS:

**WHEREAS**, **SYNERGY CHC CORP.,** a Nevada Corporation (the "**Borrower**"), and each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person (as defined in the Credit Agreement) that guarantees all or any portion of the Obligations (as defined in the Credit Agreement) from time to time, each a "**Guarantor**" and collectively, the "**Guarantors**", and together with the Borrower and each other Person that becomes an "**Additional Grantor**" hereunder, each a "**Grantor**" and collectively, the "**Grantors**"), the lenders from time to time party thereto (each a "**Lender**" and collectively, the "**Lenders**"), and ACP, in its capacities as the administrative agent (in such capacity, together with its successor and assigns, the "**Administrative Agent**") and as the Collateral Agent are parties to that certain Term Loan Credit Agreement, dated as of the date hereof (such agreement, as amended, restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor, being hereinafter referred to as the "**Credit Agreement**");

**WHEREAS**, pursuant to the Credit Agreement, the Lenders have agreed to make certain term loans and delayed draw term loans to the Borrower;

**WHEREAS**, it is a condition precedent to the Administrative Agent, the Collateral Agent and the Lenders making any Loan and providing any other financial accommodations to the Borrower pursuant to the Credit Agreement that each Grantor shall have executed and delivered this Agreement to the Collateral Agent for the benefit of the Secured Parties;

**WHEREAS**, the Grantors are mutually dependent on each other in the conduct of their respective businesses as an integrated operation, with credit needed from time to time by each Grantor often being provided through financing obtained by the other Grantors and the ability to obtain such financing being dependent on the successful operations of all of the Grantors as a whole; and

**WHEREAS,** each Grantor has determined that the execution, delivery and performance of this Agreement directly benefit, and are in the best interest of, such Grantor.

**NOW, THEREFORE**, in consideration of the premises and the agreements herein and in order to induce the Collateral Agent, the Administrative Agent and the Lenders to make and maintain the Loans and to provide other financial accommodations to the Borrower pursuant to the Credit Agreement, the Grantors hereby jointly and severally agree with the Collateral Agent, for the benefit of the Secured Parties, as follows:

**SECTION 1. Definitions.**

(a) Reference is hereby made to the Credit Agreement for a statement of the terms thereof. All capitalized terms used in this Agreement that are defined in the Credit Agreement or in Article 8 or 9 of the UCC and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided that terms used herein which are defined in the UCC on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Collateral Agent may otherwise determine.

(b) The following terms shall have the respective meanings provided for in the UCC: "Accounts", "Account Debtor", "Cash Proceeds", "Certificate of Title", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Security Account", "Software", "Supporting Obligations" and "Tangible Chattel Paper".

(c) As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"**Additional Collateral**" has the meaning specified therefor in Section 4(a)(i) hereof.

"**Additional Grantor**" has the meaning specified therefor in the Recitals hereto.

"**Administrative Agent**" has the meaning specified therefor in the Recitals hereto.

"**Agreement**" has the meaning specified therefor in the preamble hereto.

"**Borrower**" has the meaning specified therefor in the Recitals hereto.

"**Certificated Entities**" has the meaning specified therefor in Section 5(m) hereof.

"**Collateral**" has the meaning specified therefor in Section 2 hereof.

"**Collateral Agent**" has the meaning specified therefor in the preamble hereto.

"**Copyright Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to use or sell any works covered by any Copyright.

"**Copyrights**" means all domestic and foreign copyrights, whether registered or unregistered, including, without limitation, all copyright rights (whether now or hereafter arising) in any and all media (whether known as of the date hereof or hereafter developed), in and to all original works of authorship fixed in any tangible medium of expression (including computer software and internet website content) now or hereafter owned, acquired or used by any Grantor,

including all applications, registrations and recordations thereof (including, without limitation, applications, registrations and recordations in the United States Copyright Office or in any similar office or agency of the United States or any other country or any political subdivision thereof), and all extensions or renewals thereof.

"**Credit Agreement**" has the meaning specified therefor in the Recitals hereto.

"**Excluded Accounts**" has the meaning specified therefor in Section 1.01 of the Credit Agreement.

"**Governing Documents**" has the meaning specified therefor in Section 1.01 of the Credit Agreement.

"**Grantor**" and "**Grantors**" have the respective meanings specified therefor in the Recitals hereto.

"**Guarantor**" and "**Guarantors**" have the respective meanings specified therefor in the Recitals hereto.

"**Insolvency Proceeding**" has the meaning specified therefor in Section 1.01 of the Credit Agreement.

"**Intellectual Property**" means all Copyrights, Patents, Trademarks and Other Intellectual Property.

"**Intellectual Property Security Agreement**" has the meaning specified therefor in Section 6(f)(i) hereof.

"**Irrevocable Proxy**" has the meaning specified therefor in Section 4(a)(i) hereof.

"**Lender**" and "**Lenders**" have the respective meanings specified therefor in the Recitals hereto.

"**Licenses**" means the Copyright Licenses, the Patent Licenses and the Trademark Licenses.

"**Other Intellectual Property**" means any trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and privacy and other general intangibles of like nature, now or hereafter acquired, owned, developed or used by any Grantor.

"**Patent Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to manufacture, use or sell any invention covered by any Patent.

"**Patents**" means all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and other

general intangibles of like nature, now existing or hereafter acquired, all applications, registrations and recordings thereof, and all reissues, divisions, continuations, continuations in part and extensions or renewals thereof.

"**Perfection Requirement**" and "**Perfection Requirements**" have the respective meanings specified therefor in Section 5(j) hereof.

"**Pledge Amendment**" has the meaning specified therefor in Section 4(a)(ii) hereof.

"**Pledged Debt**" means the indebtedness described in Schedule VII hereto and all other indebtedness from time to time owned or acquired by a Grantor, Promissory Notes and other Instruments evidencing any or all of such indebtedness, and all interest, cash, Instruments, Investment Property, financial assets, securities, Equity Interests, stock options and Commodity Contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness.

"**Pledged Interests**" means, collectively, (a) the Pledged Debt, (b) the Pledged Shares and (c) all security entitlements in any and all of the foregoing.

"**Pledged Issuers**" means, collectively, (a) the issuers of the shares of Equity Interests described in Schedule VIII hereto and (b) any other issuer of Equity Interests at any time and from time to time owned or acquired by a Grantor whose shares of Equity Interests are required to be pledged as Collateral under this Agreement.

"**Pledged Partnership/LLC Agreement**" means each limited liability agreement, operating agreement, membership agreement, partnership agreement or similar agreement to which a Grantor is a party and relating to any Pledged Interests (as amended, restated, supplemented or otherwise modified from time to time).

"**Pledged Shares**" means (a) the shares of Equity Interests of the Pledged Issuers, whether or not evidenced or represented by any stock certificate, certificated security or other Instrument, (b) all additional Equity Interests issued to or held by any Grantor from time to time in any manner, (c) the certificates representing such shares of Equity Interests, all options and other rights, contractual or otherwise, in respect thereof and all dividends, distributions, cash, Instruments, Investment Property, financial assets, securities, Equity Interests, stock options and Commodity Contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property (including, without limitation, any stock dividend and any distribution in connection with a stock split) from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Equity Interests and (d) without affecting the obligations of any Grantor under any provision prohibiting such action under this Agreement, the Credit Agreement or any other Loan Document, in the event of any consolidation or merger involving any Pledged Issuer and in which such Pledged Issuer is not the surviving entity, all Equity Interests of the successor entity formed by or resulting from such consolidation or merger.

"**Registration Page**" has the meaning specified therefor in Section 4(a)(i) hereof.

"**Secured Obligations**" has the meaning specified therefor in Section 3 hereof.

"**Security Agreement Supplement**" has the meaning specified therefor in Section 13(f) hereof.

"**Titled Collateral**" means all Collateral for which the title to such Collateral is governed by a Certificate of Title or certificate of ownership, including, without limitation, all motor vehicles (including, without limitation, all trucks, trailers, tractors, service vehicles, automobiles and other mobile equipment) for which the title to such motor vehicles is governed by a Certificate of Title or certificate of ownership.

"**Trademark Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensor or licensee and providing for the grant of any right concerning any Trademark, together with any goodwill connected with and symbolized by any such trademark licenses, contracts or agreements and the right to prepare for sale or lease and sell or lease any and all Inventory now or hereafter owned by any Grantor and now or hereafter covered by such licenses.

"**Trademarks**" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, acquired or used by any Grantor, all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by such marks and all customer lists, formulae and other Records of any Grantor relating to the distribution of products and services in connection with which any of such marks are used.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

**SECTION 2. Grant of Security Interest**. As collateral security for the payment, performance and observance of all of the Secured Obligations, each Grantor hereby pledges and assigns to the Collateral Agent (and its agents and designees), and grants to the Collateral Agent (and its agents and designees), for the benefit of the Secured Parties, a continuing security interest in, all personal property and Fixtures of such Grantor, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including, without limitation, the following (all being collectively referred to herein as the "**Collateral**"):

(a) all Accounts;

(b) all Chattel Paper (whether tangible or electronic);

(c) all Commercial Tort Claims;

(d) all Deposit Accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of the Collateral Agent, the Administrative Agent or any Lender or any affiliate, representative, agent or participant of the Collateral Agent, the Administrative Agent or any Lender;

(e) all Documents;

(f) all General Intangibles (including, without limitation, all Payment Intangibles, Intellectual Property and Licenses);

(g) all Goods, including, without limitation, all Equipment, Fixtures and Inventory;

(h) all Instruments (including, without limitation, Promissory Notes);

(i) all Investment Property (including any Securities Account or Commodity Account);

(j) all Letter-of-Credit Rights;

(k) all Pledged Interests;

(l) all Supporting Obligations;

(m) all Additional Collateral;

(n) all other tangible and intangible personal property and Fixtures of such Grantor (whether or not subject to the UCC), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses of this Section 2 hereof (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Grantor or any other Person from time to time acting for such Grantor that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 2 hereof or are otherwise necessary or helpful in the collection or realization thereof; and

(o) all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral;

in each case, howsoever such Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

Notwithstanding anything herein to the contrary, the term "Collateral" shall not include, and no Grantor is pledging, nor granting a security interest hereunder in any of such Grantor's right, title

or interest in any of the following: (i) any general intangible, contract, license, permit or authorization to the extent, but only to the extent, that such general intangible, contract, license, permit or authorization, by its terms or by law, prohibits (other than to the extent such term (A) has been waived or (B) would be rendered ineffective pursuant to Sections 9-406, 9-408, 9-409 of the UCC or other applicable provisions of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity) the assignment of, or the granting of a lien over the rights of a Grantor thereunder or which would be invalid or unenforceable upon such assignment or grant; provided, that (x) immediately upon the ineffectiveness, lapse, termination or waiver of any such provision, the Collateral shall include, and such Grantor shall be deemed to have granted a security interest in, any such right, title and interest as if such provision had never been in effect and (y) the foregoing exclusion shall in no way be construed so as to limit, impair or otherwise affect the Collateral Agent's unconditional continuing security interest in and liens upon any rights or interests of a Grantor in or to the proceeds of, or any monies due or to become due under, any such general intangible, contract, license, permit or authorization, or (ii) any intent-to-use United States trademark applications for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a) or examined and accepted, respectively, by the United States Patent and Trademark Office, provided that upon such filing and acceptance, such intent-to-use applications shall be included in the definition of Collateral.

Notwithstanding anything herein to the contrary, the term "Collateral" shall not include in the case of a Foreign Subsidiary of such Grantor, more than 65% (or such greater percentage that, due to a change in applicable law after the date hereof, (i) would not reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent and (ii) would not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding shares of Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) (it being understood and agreed that the Collateral shall include 100% of the issued and outstanding shares of Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) or other equity interest of such Foreign Subsidiary).

The Grantors agree that the pledge of the shares of Equity Interests of any Pledged Issuer who is a Foreign Subsidiary may be supplemented by one or more separate pledge agreements, deeds of pledge, share charges, or other similar agreements or instruments, executed and delivered by the relevant Grantors in favor of the Collateral Agent, which pledge agreements will provide for the pledge of such shares of Equity Interests in accordance with the laws of the applicable foreign jurisdiction. With respect to such shares of Equity Interests, the Collateral Agent may, at any time and from time to time, in its sole discretion, take actions in such foreign jurisdictions that will result in the perfection of the Lien created in such shares of Equity Interests.

**SECTION 3. Security for Secured Obligations**. The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (the "**Secured Obligations**"):

(a) the prompt payment by each Grantor, as and when due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), of all

amounts from time to time owing by the Borrower in respect of the Credit Agreement and/or the other Loan Documents, including, without limitation, (i) all Obligations, (ii) in the case of a Guarantor, all amounts from time to time owing by such Grantor in respect of its guaranty made pursuant to Article X of the Credit Agreement or under any other Guaranty to which it is a party, including, without limitation, all obligations guaranteed by such Grantor and (iii) all interest, fees, commissions, charges, expense reimbursements, indemnifications and all other amounts due or to become due under any Loan Document (including, without limitation, all interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts that accrue after the commencement of any Insolvency Proceeding of any Loan Party, whether or not the payment of such interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts are unenforceable or are not allowable, in whole or in part, due to the existence of such Insolvency Proceeding); and

(b) the prompt payment and due performance and observance by each Grantor of all of its other obligations from time to time existing in respect of this Agreement and any other Loan Document.

**SECTION 4. Delivery of the Pledged Interests**.

(a) (i) All Promissory Notes evidencing the Pledged Debt as of the Effective Date and all certificates representing the Pledged Shares as of the Effective Date, in each case to the extent constituting Collateral and to the extent not previously delivered to the Collateral Agent (or its agent or designated custodian), shall be delivered to the Collateral Agent on or prior to the Effective Date (or within such period thereafter as the Collateral Agent agrees in its sole discretion). All other Promissory Notes, certificates and Instruments constituting Pledged Interests from time to time required to be pledged to the Collateral Agent pursuant to the terms of this Agreement or the Credit Agreement (the "**Additional Collateral**") shall be delivered to the Collateral Agent (or its agent or designated custodian) promptly upon, but in any event within one (1) Business Day (or such longer period as agreed by the Collateral Agent in its sole discretion) after, receipt thereof by or on behalf of any of the Grantors. All such Promissory Notes, certificates and Instruments shall be (A) held by or on behalf of the Collateral Agent pursuant hereto, (B) delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment executed in blank and (C) with respect to certificates representing any Pledged Shares, accompanied by (1) a duly executed irrevocable proxy coupled with an interest, in substantially the form of Exhibit D hereto (an "**Irrevocable Proxy**"), and (2) a duly acknowledged Equity Interest registration page, in blank, from each Pledged Issuer, substantially in the form of Exhibit E hereto, or otherwise in form and substance satisfactory to the Collateral Agent (a "**Registration Page**"), all in form and substance satisfactory to the Collateral Agent. If any Pledged Interests consist of uncertificated securities, unless the immediately following sentence is applicable thereto, such Grantor shall cause (x) the Collateral Agent (or its designated custodian or nominee) to become the registered holder thereof, or (y) cause each issuer of such securities to agree that it will comply with instructions originated by the Collateral Agent with respect to such securities without further consent by such Grantor. If any Pledged Interests consist of security entitlements, such Grantor shall (x) transfer such Pledged Interests or security entitlements to the Collateral Agent (or its custodian, nominee or other designee), or (y) cause the applicable issuer thereof or securities intermediary to agree that it will

comply with entitlement orders by the Collateral Agent without further consent by such Grantor.

(ii) Within three (3) days of the receipt by a Grantor of any Additional Collateral, a pledge amendment duly executed by such Grantor, in substantially the form of Exhibit A hereto (a "**Pledge Amendment**"), shall be delivered to the Collateral Agent, in respect of the Additional Collateral that must be pledged pursuant to this Agreement or the Credit Agreement. The Pledge Amendment shall from and after delivery thereof constitute part of Schedules VII and VIII hereto. Each Grantor hereby authorizes the Collateral Agent to attach each Pledge Amendment to this Agreement and agrees that all Promissory Notes, certificates or Instruments constituting Pledged Interests listed on any Pledge Amendment delivered to the Collateral Agent shall for all purposes hereunder constitute Pledged Interests and such Grantor shall be deemed upon delivery thereof to have made the representations and warranties set forth in Section 5 hereof with respect to such Additional Collateral.

(b) If any Grantor shall receive, by virtue of such Grantor being or having been an owner of any Pledged Interests, any Additional Collateral consisting of any (i) Equity Interest certificate (including, without limitation, any certificate representing an Equity Interest dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, combination of shares, stock split, spin-off or split-off), Promissory Note or other Instrument, (ii) certificated option or right, whether as an addition to, substitution for, or in exchange for, any Pledged Interests, or otherwise, (iii) dividends or distributions payable in cash (except such dividends and/or distributions permitted to be retained by any such Grantor pursuant to Section 7 hereof) or in securities or other property or (iv) dividends, distributions, cash, Instruments, Investment Property and other property in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, such Grantor shall receive such Equity Interest certificate, Promissory Note, Instrument, option, right, payment or distribution in trust for the benefit of the Collateral Agent, shall segregate it from such Grantor's other property and shall promptly, but in any event within five (5) Business Days (or such longer period as agreed to in writing by the Collateral Agent in its sole discretion) deliver it to the Collateral Agent (or its agent or designated custodian), in the exact form received, with any necessary indorsement and/or instrument of transfer or assignment executed in blank (and, in the case of any Additional Collateral described in clause (b)(i) above, with an Irrevocable Proxy and Registration Page with respect to any such Additional Collateral), all in form and substance reasonably satisfactory to the Collateral Agent, to be held by the Collateral Agent as Pledged Interests.

**SECTION 5. <u>Representations and Warranties</u>.** Each Grantor jointly and severally represents and warrants on the date hereof, and on the date any Loan is made pursuant to the Credit Agreement, as follows:

(a) Schedule I hereto sets forth a complete and accurate list as of the date hereof of (i) the exact legal name of each Grantor, (ii) the jurisdiction of organization of each Grantor, (iii) the type of organization of each Grantor and (iv) the organizational identification number of each Grantor (or states that no such organizational identification number exists). The Information Certificate, dated as of the Effective Date, a copy of which has been previously delivered to the Collateral Agent, or the most recently delivered Information Certificate as provided in Section 7.1(a)(iv)(B) of the Credit Agreement, is true, complete and correct in all

respects.

(b) All Equipment, Fixtures, Inventory and other Goods now existing or hereafter existing are, and will be, located at the addresses specified therefor in Schedule III hereto (as amended, supplemented or otherwise modified from time to time in accordance with Section 6(b)). Schedule III hereto contains a true, correct and complete list, as of the Effective Date, of the legal names and addresses of each warehouse, if any, at which Collateral is stored. Each Grantor's chief place of business and chief executive office, the place where such Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper are located at the addresses specified therefor in Schedule III hereto (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof). None of the Accounts is evidenced by Promissory Notes or other Instruments. Set forth in Schedule IV hereto is a complete and accurate list, as of the date of this Agreement, of each Deposit Account, Securities Account and Commodities Account of each Grantor, together with the name and address of each institution at which each such Account is maintained, the account number for each such Deposit Account, Securities Account and Commodities Account and a description of the purpose of each such Deposit Account, Securities Account and Commodities Account. Set forth in Schedule II hereto as of the Effective Date is (i) a complete and correct list of each trade name used by each Grantor and (ii) the name of, and each trade name used by, each Person from which such Grantor has acquired any substantial part of the Collateral within five years of the date hereof.

(c) Each Grantor has delivered to the Collateral Agent true, complete and correct copies, in case, in all material respects, of each License described in Schedule II hereto, including all schedules and exhibits thereto, which represents all of the Licenses existing on the date of this Agreement. Each such License sets forth the entire agreement and understanding of the parties thereto relating to the subject matter thereof, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby or the rights of any Grantor or any of its Affiliates in respect thereof. Each License now existing is, and each other License will be, the legal, valid and binding obligation of the parties thereto, enforceable against such parties in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally. No default under any License by any such party has occurred, nor does any defense, offset, deduction or counterclaim exist thereunder in favor of any such party, in each case, that could reasonably be expected to result in a Material Adverse Effect. No party to any License has given any Grantor notice of its intention to cancel, terminate or fail to renew any License, in each case, that could reasonably be expected to result in a Material Adverse Effect.

(d) Schedule II hereto sets forth a complete and accurate list of all registered or applied-for Intellectual Property owned by each Grantor as of the date hereof and all Licenses of Intellectual Property to each Grantor. All such Intellectual Property is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, is valid and enforceable and has not been abandoned in whole or in part. No such Intellectual Property is the subject of any licensing or franchising agreement. No Intellectual Property owned or used by any Grantor conflicts with the rights of others to any Intellectual Property and no Grantor is now infringing or in conflict with any such rights of others, and to the best knowledge of each Grantor, no other Person is now infringing or in conflict with any such properties, assets and rights owned or used by any Grantor, except for infringements and conflicts that could not reasonably be expected to

have, individually or in the aggregate, a Material Adverse Effect. No Grantor has received any notice that it is violating or has violated the Intellectual Property rights of any third party.

(e) To such Grantor's knowledge, none of the Other Intellectual Property of any Grantor has been used, divulged, disclosed or appropriated to the detriment of such Grantor for the benefit of any other Person other than such Grantor; no employee, independent contractor or agent of any Grantor has misappropriated any Other Intellectual Property of any other Person in the course of the performance of his or her duties as an employee, independent contractor or agent of such Grantor; and no employee, independent contractor or agent of any Grantor is in default or breach of any term of any employment agreement, non-disclosure agreement, assignment of inventions agreement or similar agreement, or contract relating in any way to the protection, ownership, development, use or transfer of such Grantor's Intellectual Property.

(f) The Pledged Issuers set forth in Schedule VIII that are Subsidiaries of a Grantor are such Grantor's only Subsidiaries as of the date of the most recent update to Schedule VIII in accordance with the terms hereof. The Pledged Shares have been duly authorized and validly issued, and to the extent such concepts are applicable thereto, fully paid and nonassessable and, except as set forth on Schedule VIII, the holders thereof are not entitled to any preemptive, first refusal or other similar rights. Except as noted in Schedule VIII hereto, the Pledged Shares constitute 100% of the issued shares of Equity Interests of the Pledged Issuers as of the date hereof. All other shares of Equity Interests constituting Pledged Interests will be duly authorized and validly issued, and to the extent such concepts are applicable thereto, fully paid and nonassessable.

(g) The Promissory Notes evidencing the Pledged Debt in existence on the Effective Date have been, and all other Promissory Notes from time to time evidencing Pledged Debt, when executed and delivered, will have been, duly authorized, executed and delivered by the respective makers thereof, and all such Promissory Notes are or will be, as the case may be, legal, valid and binding obligations of such makers, enforceable against such makers in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally or equitable principles.

(h) The Grantors are and will be at all times the sole and exclusive owners of, or otherwise have and will have adequate rights in, the Collateral free and clear of any Liens except for the Permitted Liens. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office except such as may have been filed to perfect or protect any Permitted Lien.

(i) The exercise by the Collateral Agent of any of its rights and remedies hereunder will not contravene any applicable law or Contractual Obligation binding on or otherwise affecting any Grantor or any of its properties and will not result in, or require the creation of, any Lien upon or with respect to any of its properties (in each case, other than as set forth in this Agreement).

(j) Other than those obtained or already made, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any

other Person, is required for (i) the due execution, delivery and performance by any Grantor of this Agreement, (ii) the grant by any Grantor of the security interest purported to be created hereby in the Collateral or (iii) the exercise by the Collateral Agent of any of its rights and remedies hereunder, except, in the case of this clause (iii), as may be required in connection with any sale of any Pledged Interests by laws affecting the offering and sale of securities generally. No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other Person, is required for the perfection of the security interest purported to be created hereby in the Collateral, except (A) for the filing under the Uniform Commercial Code as in effect in the applicable jurisdiction of the financing statements described in Schedule V hereto, all of which financing statements have been duly filed and are in full force and effect, (B) with respect to the perfection of any security interest created hereby in any United States Intellectual Property and Licenses, for the recording of the appropriate Intellectual Property Security Agreement in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, (C) with respect to the perfection of the security interest created hereby in foreign Intellectual Property and Licenses, for registrations and filings in jurisdictions located outside of the United States and covering rights in such jurisdictions relating to such foreign Intellectual Property and Licenses, (D) with respect to the perfection of the security interest created hereby in Titled Collateral with a value in excess of, individually, $100,000 and, in the aggregate, $250,000, for the submission of an appropriate application requesting that the Lien of the Collateral Agent be noted on the Certificate of Title or certificate of ownership, completed and authenticated by the applicable Grantor, together with the Certificate of Title or certificate of ownership, with respect to such Titled Collateral, to the appropriate Governmental Authority, (E) with respect to any action that may be necessary to obtain control of Collateral constituting Deposit Accounts (excluding the Excluded Accounts), Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights, the taking of such actions, (F) the Collateral Agent's having possession of all Documents, tangible Chattel Paper, Instruments and cash constituting Collateral, (G) in the case of commercial tort claims arising after the date hereof in which any Grantor acquires an interest, the actions required under Section 6(a) with respect to commercial tort claims with a value, individually, in excess of $250,000, to the extent required thereby, (H) in the case of all Pledged Shares which are certificated securities, and Pledged Debt, the delivery thereof to the Collateral Agent (or its agent or designated custodian) of such Pledged Shares and Pledged Debt consisting of instruments and certificates, in each case properly endorsed for transfer to the Collateral Agent or in blank and (I) in the case of all Pledged Shares which are uncertificated securities, the actions that may be necessary to obtain control with respect to such Investment Property (subclauses (A) - (I), each a "**Perfection Requirement**" and collectively, the "**Perfection Requirements**").

(k) This Agreement creates a legal, valid and enforceable security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, in the Collateral, as security for the Secured Obligations. The Perfection Requirements result in the perfection of such security interests. Such security interests are, or in the case of Collateral in which any Grantor obtains rights after the date hereof, will be, perfected, first priority security interests, subject in priority only to the Permitted Liens, and the recording of such instruments of assignment described above. Such Perfection Requirements and all other action necessary or desirable to perfect and protect such security interest have been duly made or taken, except for (i) the Collateral Agent's having possession of all Instruments, Documents, Chattel Paper and cash constituting Collateral after the date hereof, (ii) the Collateral Agent's having control of all Deposit Accounts, Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights constituting Collateral after the date

hereof, and (iii) the other filings and recordations and actions described in Section 5(j) hereof.

(l) As of the date hereof, no Grantor holds any Commercial Tort Claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant, except for such claims described in Schedule VI.

(m) Each Grantor and any of its Subsidiaries that is a partnership or a limited liability company with certificated Equity Interests, has irrevocably opted into (and has caused each of its Subsidiaries that is a partnership or a limited liability company with certificated Equity Interests, and a Pledged Issuer to opt into) Article 8 of the relevant Uniform Commercial Code (collectively, the "**Certificated Entities**"). Such interests are securities for purposes of Article 8 of the relevant Uniform Commercial Code. With respect to each Grantor and its Subsidiaries that is a partnership or a limited liability company and is not a Certificated Entity, the partnership interests or membership interests of each such Person are not (i) dealt in or traded on securities exchanges or in securities markets, (ii) securities for purposes of Article 8 of any relevant Uniform Commercial Code, (iii) investment company securities within the meaning of Section 8-103 of any relevant Uniform Commercial Code or (iv) evidenced by a certificate.

**SECTION 6. Covenants as to the Collateral**. In accordance with Section 7.1 of the Credit Agreement, during the period from the Effective Date until the Termination Date, unless the Collateral Agent shall otherwise consent in writing:

(a) Further Assurances. Each Grantor will take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as the Collateral Agent may require from time to time in order (i) to perfect and protect, or maintain the perfection of, the security interest and Lien purported to be created hereby; (ii) to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) otherwise to effect the purposes of this Agreement, including, without limitation: (A) at the request of the Collateral Agent, marking conspicuously all Chattel Paper, Instruments, Licenses and all of its Records pertaining to the Collateral with a legend, in form and substance satisfactory to the Collateral Agent, indicating that such Chattel Paper, Instrument, License or Records is subject to the security interest created hereby, (B) if any Account shall be evidenced by a Promissory Note or other Instrument or Chattel Paper, delivering and pledging to the Collateral Agent (or its agent or designated custodian) such Promissory Note, other Instrument or Chattel Paper, duly endorsed and accompanied by executed instruments of transfer or assignment, all in form and substance satisfactory to the Collateral Agent, (C) executing and filing (to the extent, if any, that such Grantor's signature is required thereon) or authenticating the filing of, such financing or continuation statements, or amendments thereto, (D) with respect to Intellectual Property hereafter existing and not covered by an appropriate security interest grant, the executing and recording in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, appropriate instruments granting a security interest, as may be necessary or desirable or that the Collateral Agent may request in order to perfect and preserve the security interest purported to be created hereby, (E) delivering to the Collateral Agent the appropriate instruments of transfer or assignment executed in blank, Irrevocable Proxies and Registration Pages in respect of the Pledged Interests, (F) furnishing to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all

in reasonable detail, (G) if at any time after the date hereof, any Grantor acquires or holds any Commercial Tort Claim with a value, individually, in excess of $250,000, promptly, but in any event within three (3) Business Days after such acquisition, notifying the Collateral Agent in a writing signed by such Grantor setting forth a brief description of such Commercial Tort Claim and granting to the Collateral Agent a security interest therein and in the proceeds thereof, which writing shall incorporate the provisions hereof and shall be in form and substance satisfactory to the Collateral Agent, (H) upon the acquisition after the date hereof by any Grantor of any Titled Collateral with a value in excess of, individually, $100,000 and, in the aggregate, $250,000 (other than Equipment that is subject to a purchase money security interest that constitutes a Permitted Lien under the Credit Agreement), promptly, and in any event within five (5) days after such acquisition, notifying the Collateral Agent of such acquisition, setting forth a description of such Titled Collateral acquired and a good faith estimate of the current value of such Titled Collateral, and if so requested by the Collateral Agent, promptly causing the Collateral Agent to be listed as the lienholder on such Certificate of Title or certificate of ownership and delivering evidence of the same to the Collateral Agent, and (I) taking all actions required by law in any relevant Uniform Commercial Code jurisdiction with respect to any Collateral. No Grantor shall take or fail to take any action which could in any manner impair the validity or enforceability of the Collateral Agent's security interest in and Lien on any Collateral.

(b) Location of Equipment and Inventory. Each Grantor will keep the Equipment and Inventory at the locations specified in Schedule III hereto or, upon not less than 30 days' prior written notice to the Collateral Agent accompanied by a new Schedule III hereto indicating each new location of the Equipment and Inventory, at such other locations in the continental United States as the Grantors may elect, provided that (i) all action has been taken to grant to the Collateral Agent a perfected, first priority security interest in such Equipment and Inventory (subject only to Permitted Liens) in favor of the Collateral Agent, for the benefit of the Secured Parties, and (ii) the Collateral Agent's rights in such Equipment and Inventory, including, without limitation, the existence, perfection and priority of the security interest created hereby in such Equipment and Inventory, are not adversely affected thereby.

(c) Condition of Equipment. Each Grantor will promptly furnish to the Collateral Agent a statement describing in reasonable detail any loss or damage in excess of $100,000, in the aggregate, to any Equipment.

(d) Provisions Concerning the Accounts and the Licenses.

(i) Each Grantor will, except as otherwise provided in this subsection (d), continue to collect, at its own expense, all amounts due or to become due under the Accounts. In connection with such collections, each Grantor may (and, at the Collateral Agent's direction, will) take such action as such Grantor (or, if applicable, the Collateral Agent) may deem necessary or advisable to enforce collection or performance of the Accounts; provided, however, that the Collateral Agent shall have the right at any time, upon the occurrence and during the continuance of an Event of Default, to notify the Account Debtors or obligors under any Accounts of the assignment of such Accounts to the Collateral Agent and to direct such Account Debtors or obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Collateral Agent or its designated agent and, upon such notification and at the expense of such Grantor and to the extent permitted by applicable law, to enforce collection of any such

Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done. After receipt by any Grantor of a notice from the Collateral Agent that the Collateral Agent has notified, intends to notify, or has enforced or intends to enforce a Grantor's rights against the Account Debtors or obligors under any Accounts as referred to in the proviso to the immediately preceding sentence, (A) all amounts and proceeds (including Instruments) received by such Grantor in respect of the Accounts shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Collateral Agent or its designated agent in the same form as so received (with any necessary endorsement) to be held as cash collateral and applied as specified in the Credit Agreement unless otherwise directed by the Collateral Agent. In addition, upon the occurrence and during the continuance of an Event of Default, such Grantor will not (A) grant any extension of the time for payment of any Account, (B) compromise or settle any Account receivable for less than the full amount thereof, (C) release, wholly or partially any Person liable for the payment of any Account or (D) allow any credit or discount thereon. Any such securities, cash, investments and other items so received by the Collateral Agent or its designated agent shall (in the sole and absolute discretion of the Collateral Agent) be held as additional Collateral for the Secured Obligations or distributed in accordance with Section 9 hereof.

(ii) Upon the occurrence and during the continuance of any breach or default under any License by any party thereto other than a Grantor, (A) the relevant Grantor will, promptly after obtaining knowledge thereof, give the Collateral Agent written notice of the nature and duration thereof, specifying what action, if any, it has taken and proposes to take with respect thereto, (B) no Grantor will, without the prior written consent of the Collateral Agent, declare or waive any such breach or default or affirmatively consent to the cure thereof or exercise any of its remedies in respect thereof, and (C) each Grantor will, upon written instructions from the Collateral Agent and at such Grantor's expense, take such action as the Collateral Agent may deem necessary or advisable in respect thereof.

(iii) Each Grantor will, at its expense, promptly deliver to the Collateral Agent a copy of each notice or other communication received by it by which any other party to any License (A) declares a breach or default by a Grantor of any material term thereunder, (B) terminates such License or (C) purports to exercise any of its rights or affect any of its obligations thereunder, together with a copy of any reply by such Grantor thereto.

(iv) Each Grantor will exercise promptly and diligently each and every right which it may have under each License (other than any right of termination) and will duly perform and observe in all respects all of its obligations under each License and will take all action necessary to maintain the Licenses in full force and effect. No Grantor will, without the prior written consent of the Collateral Agent, cancel, terminate, amend or otherwise modify in any respect, or waive any provision of, any License.

(e) Notices and Communications; Defense of Title; Amendments; Equity Issuances. Each Grantor will:

(i) at the Grantors' joint and several expense, promptly deliver to the Collateral Agent a copy of each notice or other communication received by it in respect of

the Pledged Interests;

(ii) at the Grantors' joint and several expense, defend the Collateral Agent's right, title and security interest in and to the Pledged Interests against the claims of any Person (subject to Permitted Liens), keep the Pledged Interests free from all Liens (except Permitted Liens), and not sell, exchange, transfer, assign, lease or otherwise dispose of the Pledged Interests or any interest therein, except as permitted under the Credit Agreement and the other Loan Documents;

(iii) not make or consent to any amendment or other modification or waiver with respect to any Pledged Interests or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests other than as expressly permitted under the Credit Agreement; and

(iv) not permit the issuance of (A) any additional shares of any class of Equity Interests of any Pledged Issuer, (B) any securities convertible voluntarily by the holder thereof or automatically upon the occurrence or non-occurrence of any event or condition into, or exchangeable for, any such shares of Equity Interests or (C) any warrants, options, contracts or other commitments entitling any Person to purchase or otherwise acquire any such shares of Equity Interests, in each case, unless pledged to the Collateral Agent pursuant to a Pledge Amendment in accordance with Section 4(a)(ii) hereof or as otherwise permitted under the Credit Agreement.

(f) Intellectual Property.

(i) If applicable, each Grantor has duly executed and delivered the applicable short form Security Agreement (in the form attached hereto as Exhibit B, the "**Intellectual Property Security Agreement**"). Except as provided in subsection (ii) below, each Grantor (either itself or through licensees) will, and will cause each licensee thereof to, take all action necessary to maintain all of the Intellectual Property in full force and effect, including, without limitation, using the proper statutory notices and markings and using the Trademarks on each applicable trademark class of goods in order to so maintain the Trademarks in full force, free from any claim of abandonment for non-use, and no Grantor will (nor permit any licensee thereof to) do any act or knowingly omit to do any act whereby any Intellectual Property may become invalidated.

(ii) Notwithstanding the foregoing, so long as no Event of Default has occurred and is continuing, no Grantor shall have an obligation to use or to maintain any Intellectual Property (A) that relates solely to any product or work, that has been, or is in the process of being, discontinued, abandoned or terminated, (B) that is being replaced with Intellectual Property substantially similar to the Intellectual Property that may be abandoned or otherwise become invalid, so long as the failure to use or maintain such Intellectual Property does not materially adversely affect the validity of such replacement Intellectual Property and so long as such replacement Intellectual Property is subject to the Lien created by this Agreement or (C) that is substantially the same as any other Intellectual Property that is in full force, so long as the failure to use or maintain such Intellectual Property does not materially adversely affect the validity of such replacement Intellectual Property and so long as such other Intellectual Property is subject to the Lien and security interest created by this Agreement.

(iii) Each Grantor will cause to be taken all necessary steps in any proceeding before the United States Patent and Trademark Office and the United States Copyright Office or any similar office or agency in any other country or political subdivision thereof to maintain each registration of the Intellectual Property (other than the Intellectual Property described in Section 6(f)(ii)), including, without limitation, filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings and payment of maintenance fees, filing fees, taxes or other governmental fees. If any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors shall (A) upon obtaining knowledge of such infringement, misappropriation, dilution or other violation, promptly notify the Collateral Agent and (B) to the extent the Grantors shall deem appropriate under the circumstances, promptly sue for infringement, misappropriation, dilution or other violation, seek injunctive relief where appropriate and recover any and all damages for such infringement, misappropriation, dilution or other violation, or take such other actions as the Grantors shall deem appropriate under the circumstances to protect such Intellectual Property.

(iv) Each Grantor shall furnish to the Collateral Agent statements and schedules further identifying and describing the Intellectual Property and Licenses and such other reports in connection with the Intellectual Property and Licenses as the Collateral Agent may reasonably request, all in reasonable detail and promptly upon request of the Collateral Agent, following receipt by the Collateral Agent of any such statements, schedules or reports, the Grantors shall modify this Agreement by amending Schedule II hereto to include any Intellectual Property and Licenses, as the case may be, which become part of the Collateral under this Agreement, and shall execute and authenticate such documents and do such acts as shall be necessary or, in the judgment of the Collateral Agent, desirable to subject such Intellectual Property and Licenses to the Lien and security interest created by this Agreement.

(v) Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default, no Grantor may abandon or otherwise permit any Intellectual Property to become invalid without the prior written consent of the Collateral Agent, and if any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors will take such action as the Collateral Agent shall deem appropriate under the circumstances to protect such Intellectual Property.

(vi) In the event that any Grantor shall (A) obtain rights to any new Trademarks necessary for the operation of its business, or any reissue, renewal or extension of any existing Trademark necessary for the operation of its business, (B) obtain rights to or develop any new patentable inventions, or become entitled to the benefit of any Patent, or any reissue, division, continuation, renewal, extension or continuation-in-part of any existing Patent or any improvement thereof (whether pursuant to any license or otherwise), (C) obtain rights to or develop any new works protectable by Copyright, or become entitled to the benefit of any rights with respect to any Copyright or any registration or application therefor, or any renewal or extension of any existing Copyright or any registration or application therefor, or (D) obtain rights to or develop new Other Intellectual Property, the provisions of Section 2 hereof shall automatically apply thereto and such Grantor shall give to the Collateral Agent prompt notice thereof in accordance with the terms of this Agreement and the Credit Agreement. Except as otherwise provided herein or in the Credit Agreement each Grantor, either itself or through any agent, employee, licensee or designee, shall give the Collateral Agent written notice of each

application submitted by it for the registration of any Trademark or Copyright or the issuance of any Patent with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, or in any similar office or agency of the United States or any country or any political subdivision thereof.

(vii) Each Grantor shall execute, authenticate and deliver any and all grants, assignments, agreements, instruments, documents and papers as the Collateral Agent may reasonably request to evidence the Collateral Agent's security interest hereunder in any Intellectual Property and the General Intangibles of such Grantor relating thereto or represented thereby, and each Grantor hereby appoints the Collateral Agent its attorney-in-fact to execute and/or authenticate and file all such writings for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed, and such power (being coupled with an interest) shall be irrevocable until the Termination Date.

(g) Deposit, Commodities and Securities Accounts. Each Grantor shall cause each bank and other financial institution with an account referred to in Schedule IV hereto (other than any Excluded Account) to execute and deliver to the Collateral Agent (or its designee) a Control Agreement, in form and substance satisfactory to the Collateral Agent, duly executed by such Grantor and such bank or financial institution, or enter into other arrangements in form and substance satisfactory to the Collateral Agent, pursuant to which such institution shall irrevocably agree (unless otherwise agreed to by the Collateral Agent), among other things, that (i) it will comply at any time with the instructions originated by the Collateral Agent (or its designee) to such bank or financial institution directing the disposition of cash, Commodity Contracts, securities, Investment Property and other items from time to time credited to such account, without further consent of such Grantor, (ii) all cash, Commodity Contracts, securities, Investment Property and other items of such Grantor deposited with such institution shall be subject to a perfected, first priority security interest (subject only to Permitted Liens) in favor of the Collateral Agent (or its designee), and (iii) any right of set off, banker's Lien or other similar Lien, security interest or encumbrance shall be fully waived or subordinated as against the Collateral Agent (or its designee). The provisions of this Section 6(g) shall not apply to any Excluded Accounts.

(h) Titled Collateral.

(i) Each Grantor shall (a) cause all Collateral, now owned or hereafter acquired by any Grantor, which under applicable law are required to be registered, to be properly registered in the name of such Grantor, (b) cause all Titled Collateral, to be properly titled in the name of such Grantor, and if requested by the Collateral Agent in accordance with the terms hereof, with the Collateral Agent's Lien noted thereon and (c) if requested by the Collateral Agent in accordance with the terms hereof, promptly deliver to the Collateral Agent (or its custodian) originals of all such Certificates of Title or certificates of ownership for such Titled Collateral, with the Collateral Agent's Lien noted thereon.

(ii) Upon the acquisition after the date hereof by any Grantor of any Titled Collateral with a value in excess of, individually, $100,000 and, in the aggregate, $250,000 (other than Equipment to be acquired that is subject to a purchase money security interest that constitutes a Permitted Lien under the Credit Agreement), such Grantor shall immediately notify the Collateral Agent of such acquisition, set forth a description of such Titled Collateral

acquired and a good faith estimate of the current value of such Titled Collateral, and if so requested by the Collateral Agent, immediately deliver to the Collateral Agent (or its custodian) originals of the Certificates of Title or certificates of ownership for such Titled Collateral, together with the manufacturer's statement of origin, and an application duly executed by the appropriate Grantor to evidence the Collateral Agent's Lien thereon.

(iii) Each Grantor hereby appoints the Collateral Agent as its attorney-in-fact, effective the date hereof and terminating upon the Termination Date, for the purpose of (A) executing on behalf of such Grantor title or ownership applications for filing with appropriate Governmental Authority to enable Titled Collateral now owned or hereafter acquired by such Grantor to be amended to reflect the Collateral Agent listed as lienholder thereof, (B) filing such applications with such Governmental Authority, and (C) executing such other documents and instruments on behalf of, and taking such other action in the name of, such Grantor as the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Section 6(h) (including, without limitation, for the purpose of creating in favor of the Collateral Agent a perfected Lien on such Titled Collateral and exercising the rights and remedies of the Collateral Agent hereunder). This appointment as attorney-in-fact is coupled with an interest and is irrevocable until the Termination Date.

(iv) With respect to motor vehicles, any Certificates of Title or ownership delivered pursuant to the terms hereof shall be accompanied by odometer statements for each motor vehicle covered thereby.

(v) So long as no Event of Default shall have occurred and be continuing, upon the request of any Grantor, the Collateral Agent shall execute and deliver to such Grantor such instruments as such Grantor shall reasonably request to remove the notation of the Collateral Agent as lienholder on any Certificate of Title or certificate of ownership for any Titled Collateral; provided that any such instruments shall be delivered, and the release shall be effective, only upon receipt by the Collateral Agent of a certificate from such Grantor, stating that the Titled Collateral, the Lien on which is to be released, is to be sold in accordance with the terms of the Credit Agreement or has suffered a casualty loss (with title thereto passing to the casualty insurance company therefor in settlement of the claim for such loss), the amount that such Grantor will receive as sale proceeds or insurance proceeds and whether or not such sale proceeds or insurance proceeds are required by the Credit Agreement to be paid to the Collateral Agent to be applied to the Secured Obligations and, to the extent required by the Credit Agreement, any proceeds of such sale or casualty loss shall be paid to the Collateral Agent hereunder to be applied to the Secured Obligations in accordance with the terms of the Credit Agreement.

(i) Control. Each Grantor hereby agrees to take any or all action that may be necessary or desirable or that the Collateral Agent may request in order for the Collateral Agent to obtain control in accordance with Sections 9-104, 9-105, 9-106, and 9-107 of the UCC with respect to the following Collateral: (i) Deposit Accounts (other than Excluded Accounts), (ii) Securities Accounts; (iii) Electronic Chattel Paper, (iv) Investment Property and (v) Letter-of-Credit Rights. Each Grantor hereby acknowledges and agrees that any agent or designee of the Collateral Agent shall be deemed to be a "secured party" with respect to the Collateral under the control of such agent or designee for all purposes.

(j) Records; Inspection and Reporting.

(i) Each Grantor shall keep adequate records concerning its Accounts, Chattel Paper and Pledged Interests.

(ii) No Grantor shall (A) change its legal name, (B) change its form of legal entity (e.g., converting from a corporation to a limited liability company or vice versa), (C) change its jurisdiction of organization as set forth in Schedule I or become (or attempt or purport to become) organized in more than one jurisdiction, or (D) otherwise amend, modify or waive any term or material provision of its Governing Documents in a manner materially adverse to any Secured Party, in any such case without (x) giving at least fifteen (15) days prior written notice of such intended change to the Collateral Agent, (y) having received from the Collateral Agent confirmation that the Collateral Agent has taken all steps necessary for the Collateral Agent to continue the perfection of and protect the enforceability and priority of its Liens in the Collateral belonging to such Grantor and in the Equity Interests of such Grantor and (z) in any case under clause (D), having received the prior written consent of the Collateral Agent to such amendment, modification or waiver.

(iii) Each Grantor shall promptly notify (and in any event within five (5) Business Days after the occurrence thereof) the Collateral Agent of any amendment, modification or other change to (A) its organizational identification number or FEIN, or (B) its chief executive office as set forth in Schedule III hereto. Each Grantor shall immediately notify the Collateral Agent upon obtaining an organizational identification number, if on the date hereof, such Grantor did not have such identification number.

(k) Partnership and Limited Liability Company Interests.

(i) Except with respect to partnership interests and limited liability company interests evidenced by a certificate, which certificate has been pledged and delivered to the Collateral Agent pursuant to Section 4 hereof, no Grantor that is a partnership or a limited liability company shall, nor shall any Grantor with any Subsidiary that is a partnership or a limited liability company, permit such Subsidiary's partnership interests or membership interests to (A) be dealt in or traded on securities exchanges or in securities markets, (B) become a security for purposes of Article 8 of any relevant Uniform Commercial Code, (C) become an investment company security within the meaning of Section 8-103 of any relevant Uniform Commercial Code or (D) be evidenced by a certificate. Each Grantor agrees that such uncertificated partnership interests or membership interests shall constitute General Intangibles.

(ii) Each Pledged Partnership/LLC Agreement is hereby amended or otherwise modified by this Section 6(k) (A) to permit each member, manager and partner that is a Grantor (1) to pledge all of the Pledged Interests in which such Grantor has rights, (2) to grant and collaterally assign to the Collateral Agent, for the benefit of each Secured Party, a lien on and security interest in such Pledged Interests and (3) to, upon any foreclosure by the Collateral Agent on such Pledged Interests (or any other sale or transfer of such Pledged Interests in lieu of such foreclosure), transfer to the Collateral Agent (or to the purchaser or other transferee of such Pledged Interests in lieu of such foreclosure) its rights and powers to manage and control the affairs of the applicable Pledged Issuer, in each case, without any further consent, approval or

action by any other party, including, without limitation, any other party to any Pledged Partnership/LLC Agreement or otherwise and (B) to provide that (1) the bankruptcy or insolvency of such Grantor shall not cause such Grantor to cease to be a holder of such Pledged Interests, (2) upon the occurrence of such an event, the applicable Pledged Issuer shall continue without dissolution and (3) such Grantor waives any right it might have to agree in writing to dissolve the applicable Pledged Issuer upon the bankruptcy or insolvency of such Grantor, or the occurrence of an event that causes such Grantor to cease to be a be a holder of such Pledged Interests.

(iii) Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent or its designee shall have the right (but not the obligation) to be substituted for the applicable Grantor as a member, manager or partner under the applicable Pledged Partnership/LLC Agreement, and the Collateral Agent or its designee shall have all rights, powers and benefits of such Grantor as a member, manager or partner, as applicable, under such Pledged Partnership/LLC Agreement in accordance with the terms of this Section 6(k). For avoidance of doubt, such rights, powers and benefits of a substituted member, manager or partner shall include all voting and other rights and not merely the rights of an economic interest holder.

(iv) During the period from the Effective Date until the Termination Date, no further consent, approval or action by any other party, including, without limitation, any other party to the applicable Pledged Partnership/LLC Agreement or otherwise shall be necessary to permit the Collateral Agent or its designee to be substituted as a member, manager or partner pursuant to this Section 6(k). The rights, powers and benefits granted pursuant to this paragraph shall inure to the benefit of the Collateral Agent, on its own behalf and on behalf of each other Secured Party, and each of their respective successors, assigns and designees, as intended third party beneficiaries.

(v) Each Grantor and each applicable Pledged Issuer agrees that during the period from the Effective Date until the Termination Date, no Pledged Partnership/LLC Agreement shall be amended to be inconsistent with the provisions of this Section 6(k) without the prior written consent of the Collateral Agent.

**SECTION 7. <u>Voting Rights, Dividends, Etc. in Respect of the Pledged Interests</u>.**

(a) So long as no Event of Default shall have occurred and be continuing:

(i) each Grantor may exercise any and all voting and other consensual rights pertaining to any Pledged Interests for any purpose not inconsistent with the terms of this Agreement, the Credit Agreement or the other Loan Documents; <u>provided</u>, <u>however</u>, that (A) no Grantor will exercise or refrain from exercising any such right, as the case may be, if the Collateral Agent gives such Grantor notice that, in the Collateral Agent's judgment, such action (or inaction) could reasonably be expected to violate the terms of any Loan Document or have a Material Adverse Effect and (B) each Grantor will give the Collateral Agent at least 5 Business Days' notice of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right which could reasonably be expected to adversely affect the value, liquidity or marketability of any Collateral or the creation, perfection and priority of the Collateral

Agent's Lien thereon; and

(ii) each Grantor may receive and retain any and all dividends, interest or other distributions paid in respect of the Pledged Interests to the extent permitted by the Credit Agreement; provided, however, that any and all (A) dividends and interest paid or payable other than in cash in respect of, and Instruments and other property received, receivable or otherwise distributed in respect of or in exchange for, any Pledged Interests, (B) dividends and other distributions paid or payable in cash in respect of any Pledged Interests in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, and (C) cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Interests, together with any dividend, interest or other distribution or payment which at the time of such payment was not permitted by the Credit Agreement, shall be, and shall forthwith be delivered to the Collateral Agent, to hold as, Pledged Interests and shall, if received by any of the Grantors, be received in trust for the benefit of the Collateral Agent, shall be segregated from the other property or funds of the Grantors, and shall be forthwith delivered to the Collateral Agent in the exact form received with any necessary indorsement and/or appropriate instruments of transfer or assignment or undated stock powers duly executed in blank, to be held by the Collateral Agent as Pledged Interests and as further collateral security for the Secured Obligations.

(b) Upon the occurrence and during the continuance of an Event of Default:

(i) all rights of each Grantor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 7(a)(i) hereof, and to receive the dividends, distributions, interest and other payments that it would otherwise be authorized to receive and retain pursuant to Section 7(a)(ii) hereof, shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Interests such dividends, distributions and interest payments, and the Collateral Agent (personally or through an agent) shall thereupon be solely authorized and empowered to transfer and register in the Collateral Agent's name, or in the name of the Collateral Agent's nominee, the whole or any part of the Pledged Interests, it being acknowledged by each Grantor that such transfer and registration may be effected by the Collateral Agent by the delivery of a Registration Page to the Grantor or to the Pledged Issuer, as applicable, reflecting the Collateral Agent or its designee as the holder of such Pledged Interests, or otherwise by the Collateral Agent through its irrevocable appointment as attorney-in-fact pursuant to Section 8 hereof;

(ii) the Collateral Agent is authorized to notify each debtor with respect to the Pledged Debt to make payment directly to the Collateral Agent (or its designee) and may collect any and all moneys due or to become due to any Grantor in respect of the Pledged Debt, and each of the Grantors hereby authorizes each such debtor to make such payment directly to the Collateral Agent (or its designee) without any duty of inquiry;

(iii) without limiting the generality of the foregoing, the Collateral Agent may, at its option, exercise any and all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to any of the Pledged Interests as

if it were the absolute owner thereof, including, without limitation, the right to exchange, in its discretion, any and all of the Pledged Interests upon the merger, consolidation, reorganization, recapitalization or other adjustment of any Pledged Issuer, or upon the exercise by any Pledged Issuer of any right, privilege or option pertaining to any Pledged Interests, and, in connection therewith, to deposit and deliver any and all of the Pledged Interests with any committee, depository, transfer agent, registrar or other designated agent upon such terms and conditions as it may determine; and

(iv) all dividends, distributions, interest and other payments that are received by any of the Grantors contrary to the provisions of Section 7(b)(i) hereof shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other funds of the Grantors, and shall be forthwith paid over to the Collateral Agent as Pledged Interests in the exact form received with any necessary indorsement and/or appropriate instruments of transfer or assignment or undated Equity Interest powers duly executed in blank, to be held by the Collateral Agent as Pledged Interests and as further collateral security for the Secured Obligations.

**SECTION 8. Additional Provisions Concerning the Collateral.**

(a) Without limiting Section 7.1(q) of the Credit Agreement, to the maximum extent permitted by applicable law, and for the purpose of taking any action that the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, each Grantor hereby (i) authorizes the Collateral Agent at any time and from time to time to execute any such agreements, instruments or other documents in such Grantor's name and to file such agreements, instruments or other documents in such Grantor's name and in any appropriate filing office, (ii) authorizes the Collateral Agent at any time and from time to time to file, one or more financing or continuation statements and amendments thereto, relating to the Collateral (including, without limitation, any such financing statements that (A) describe the Collateral as "all assets" or "all personal property" (or words of similar effect) or that describe or identify the Collateral by type or in any other manner as the Collateral Agent may determine, regardless of whether any particular asset of such Grantor falls within the scope of Article 9 of the Uniform Commercial Code or whether any particular asset of such Grantor constitutes part of the Collateral, and (B) contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including, without limitation, whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor) and (iii) ratifies such authorization to the extent that the Collateral Agent has filed any such financing statements, continuation statements, or amendments thereto, prior to the date hereof. A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by applicable law.

(b) Each Grantor hereby irrevocably appoints the Collateral Agent as its attorney-in-fact and proxy, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time until the Termination Date and in the Collateral Agent's discretion, to take any action and to execute any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement (subject to the rights of a Grantor under Section 6 hereof and Section 7(a) hereof), including, without limitation, (i) to obtain and adjust insurance required to be paid to the Collateral Agent pursuant

to the Credit Agreement, (ii) following an Event of Default, to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any Collateral, (iii) to receive, endorse, and collect any drafts or other Instruments, Documents and Chattel Paper in connection with clause (i) or (ii) above, (iv) following an Event of Default, to receive, indorse and collect all Instruments made payable to such Grantor representing any dividend, interest payment or other distribution in respect of any Pledged Interests and to give full discharge for the same, (v) following an Event of Default, to file any claims or take any action or institute any proceedings which the Collateral Agent may deem necessary or desirable for the collection of any Collateral or otherwise to enforce the rights of each Secured Party with respect to any Collateral, (vi) following an Event of Default, to execute assignments, licenses and other documents to enforce the rights of each Secured Party with respect to any Collateral, (vii) to pay or discharge taxes or Liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Collateral Agent (in its sole discretion), and such payments made by the Collateral Agent shall constitute additional Secured Obligations of such Grantor to the Collateral Agent, be due and payable immediately without demand, and shall bear interest at the Post-Default Rate from the earlier of (A) the date payment of said amount is demanded in writing by the Collateral Agent to such Grantor and (B) the date that the Post-Default Rate is otherwise imposed pursuant to Section 2.4(c) of the Credit Agreement, and (viii) following an Event of Default, to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, assignments, verifications and notices in connection with Accounts, Chattel Paper and other documents relating to the Collateral. This power is coupled with an interest and is irrevocable until the Termination Date.

(c) For the purpose of enabling the Collateral Agent to exercise rights and remedies hereunder in addition to any rights of the Collateral Agent under Section 9 of the Credit Agreement, at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby (i) grants to the Collateral Agent an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to any Grantor) to use, assign, license or sublicense any Intellectual Property now or hereafter owned by any Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof; and (ii) assigns to the Collateral Agent, to the extent assignable, all of its rights to any Intellectual Property now or hereafter licensed or used by any Grantor. Each Grantor hereby releases the Collateral Agent from, and indemnifies the Collateral Agent against, any claims, causes of action and demands at any time arising out of or with respect to any actions taken or omitted to be taken by the Collateral Agent under the powers of attorney, proxy or license, granted herein other than actions taken or omitted to be taken through the Collateral Agent's gross negligence or willful misconduct, as determined by a final determination of a court of competent jurisdiction.

(d) If any Grantor fails to perform any agreement or obligation contained herein, the Collateral Agent may itself perform, or cause performance of, such agreement or obligation, in the name of such Grantor or the Collateral Agent, and the fees and expenses of the Collateral Agent incurred in connection therewith shall be jointly and severally payable by the Grantors pursuant to Section 10 hereof constitute additional Secured Obligations of the Grantor to the Collateral Agent, be due and payable immediately without demand and bear

interest at the Post-Default Rate from the earlier of (A) the date payment of said amount is demanded in writing by the Collateral Agent to such Grantor and (B) the date that the Post-Default Rate is otherwise imposed pursuant to Section 2.4(c) of the Credit Agreement.

(e) The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Other than the exercise of reasonable care to assure the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against other parties or any other rights pertaining to any Collateral and shall be relieved of all responsibility for any Collateral in its possession upon surrendering it or tendering surrender of it to any of the Grantors (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct). The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property, it being understood that the Collateral Agent shall not have responsibility for ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Collateral Agent has or is deemed to have knowledge of such matters. The Collateral Agent shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Collateral Agent in good faith.

(f) Anything herein to the contrary notwithstanding (i) each Grantor shall remain liable under the Licenses and otherwise in respect of the Collateral to the extent set forth therein to perform all of its obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Collateral Agent of any of its rights hereunder shall not release any Grantor from any of its obligations under the Licenses or otherwise in respect of the Collateral, and (iii) the Collateral Agent shall not have any obligation or liability by reason of this Agreement under the Licenses or otherwise in respect of the Collateral, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(g) The Collateral Agent may at any time, following the occurrence and during the continuance of an Event of Default, in its discretion (i) without notice to any Grantor, transfer or register in the name of the Collateral Agent or any of its nominees any or all of the Pledged Interests, subject only to the revocable rights of such Grantor under Section 7(a) hereof, and (ii) exchange certificates or Instruments constituting Pledged Interests for certificates or Instruments of smaller or larger denominations.

**SECTION 9.** **Remedies Upon Default**. If any Event of Default shall have occurred and be continuing:

(a) The Collateral Agent may exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral), and also may (i) take absolute control of the Collateral,

including, without limitation, transfer into the Collateral Agent's name or into the name of its nominee or nominees (to the extent the Collateral Agent has not theretofore done so) and thereafter receive, for the benefit of each Secured Party, all payments made thereon, give all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof, (ii) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place or places to be designated by the Collateral Agent that is reasonably convenient to both parties, and the Collateral Agent may enter into and occupy any premises owned or leased by any Grantor where the Collateral or any part thereof is located or assembled for a reasonable period in order to effectuate the Collateral Agent's rights and remedies hereunder or under law, without obligation to any Grantor in respect of such occupation, and (iii) without notice except as specified below and without any obligation to prepare or process the Collateral for sale, (A) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's offices, at any exchange or broker's board or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable and/or (B) lease, license or otherwise dispose of the Collateral or any part thereof upon such terms as the Collateral Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notice of sale or any other disposition of the Collateral shall be required by law, at least ten (10) days' prior notice to the applicable Grantor of the time and place of any public sale or the time after which any private sale or other disposition of the Collateral is to be made shall constitute reasonable notification. If the Collateral Agent sells any of the Collateral upon credit, the Grantors will be credited only with payments actually received by the Collateral Agent from the purchaser thereof, and if such purchaser fails to pay for the Collateral, the Collateral Agent may resell the Collateral and the Grantors shall be credited with proceeds of the sale. The Collateral Agent shall not be obligated to make any sale or other disposition of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor hereby waives any claims against each Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree, and waives all rights that such Grantor may have to require that all or any part of the Collateral be marshaled upon any sale (public or private) thereof. Each Grantor hereby acknowledges that (A) any such sale of the Collateral by the Collateral Agent shall be made without warranty, (B) the Collateral Agent may specifically disclaim any warranties of title, possession, quiet enjoyment or the like, (C) the Collateral Agent may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness), if permitted by law, for the purchase, lease, license or other disposition of the Collateral or any portion thereof for the account of the Collateral Agent (on behalf of itself and each Secured Party) and (D) such actions set forth in clauses (A), (B) and (C) above shall not adversely affect the commercial reasonableness of any such sale of the Collateral. In addition to the foregoing, (1) upon written notice to any Grantor from the Collateral Agent, each Grantor shall cease any use of the Intellectual Property or any trademark, patent or copyright similar thereto for any purpose described in such notice; (2) the Collateral Agent may, at any time and from time to time, upon prior notice to any Grantor, license,

whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any of the Intellectual Property, throughout the universe for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine; and (3) the Collateral Agent may, at any time, execute and deliver on behalf of a Grantor, one or more instruments of assignment of the Intellectual Property (or any application or registration thereof), in form suitable for filing, recording or registration in any country.

(b) In the event that the Collateral Agent determines to exercise its right to sell all or any part of the Pledged Interests pursuant to Section 9(a) hereof, each Grantor will, at such Grantor's expense and upon request by the Collateral Agent: (i) execute and deliver, and cause each issuer of such Pledged Interests and the directors and officers thereof to execute and deliver, all such instruments and documents, and do or cause to be done all such other acts and things, as may be necessary or, in the opinion of the Collateral Agent, advisable to register such Pledged Interests under the provisions of the Securities Act, and to cause the registration statement relating thereto to become effective and to remain effective for such period as prospectuses are required by law to be furnished, and to make all amendments and supplements thereto and to the related prospectus which, in the opinion of the Collateral Agent, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the SEC applicable thereto, (ii) cause each issuer of such Pledged Interests to qualify such Pledged Interests under the state securities or "Blue Sky" laws of each jurisdiction, and to obtain all necessary governmental approvals for the sale of the Pledged Interests, as requested by the Collateral Agent, (iii) cause each Pledged Issuer to make available to its security holders, as soon as practicable, an earnings statement which will satisfy the provisions of Section 11(a) of the Securities Act, and (iv) do or cause to be done all such other acts and things as may be necessary to make such sale of such Pledged Interests valid and binding and in compliance with applicable law. Each Grantor acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Collateral Agent by reason of the failure by any Grantor to perform any of the covenants contained in this Section 9(b) and, consequently, agrees that, if any Grantor fails to perform any of such covenants, it shall pay, as liquidated damages and not as a penalty, an amount equal to the value of the Pledged Interests on the date the Collateral Agent demands compliance with this Section 9(b); provided, however, that the payment of such amount shall not release any Grantor from any of its obligations under any of the other Loan Documents.

(c) Notwithstanding the provisions of Section 9(b) hereof, each Grantor recognizes that the Collateral Agent may deem it impracticable to effect a public sale of all or any part of the Pledged Shares or any other securities constituting Pledged Interests and that the Collateral Agent may, therefore, determine to make one or more private sales of any such securities to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms which might have been obtained at a public sale and, notwithstanding the foregoing, agrees that such private sales shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to delay the sale of any such securities for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the Securities Act. Each Grantor further acknowledges and agrees that any offer to sell such securities which has been (i) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation

in the financial community of New York, New York (to the extent that such an offer may be so advertised without prior registration under the Securities Act) or (ii) made privately in the manner described above to not less than fifteen bona fide offerees shall be deemed to involve a "public disposition" for the purposes of Section 9-610(c) of the UCC (or any successor or similar, applicable statutory provision) as then in effect in the State of New York, notwithstanding that such sale may not constitute a "public offering" under the Securities Act, and that the Collateral Agent may, in such event, bid for the purchase of such securities.

(d) Any cash held by the Collateral Agent (or its agent or designee) as Collateral and all Cash Proceeds received by the Collateral Agent (or its agent or designee) in respect of any sale of or collection from, or other realization upon, all or any part of the Collateral, the Collateral Agent may, in the discretion of the Collateral Agent, be held by the Collateral Agent (or its agent or designee) as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Collateral Agent pursuant to Section 10 hereof) in whole or in part by the Collateral Agent against, all or any part of the Secured Obligations in such order as the Collateral Agent shall elect, consistent with the provisions of the Credit Agreement. Any surplus of such cash or Cash Proceeds held by the Collateral Agent (or its agent or designee) and remaining after the Termination Date shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

(e) In the event that the proceeds of any such sale, collection or realization are insufficient to pay all amounts to which each Secured Party is legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon at the highest rate specified in any applicable Loan Document for interest on overdue principal thereof or such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees, costs, expenses and other client charges of any attorneys employed by the Collateral Agent to collect such deficiency.

(f) Each Grantor hereby acknowledges that if the Collateral Agent complies with any applicable requirements of law in connection with a disposition of the Collateral, such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

(g) The Collateral Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Collateral Agent's rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that any Grantor lawfully may, such Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

**SECTION 10. Indemnity and Expenses.**

(a) Each Grantor jointly and severally agrees to defend, protect, indemnify and hold harmless the Collateral Agent and each other Indemnitee in accordance with Section 11.15 of the Credit Agreement.

(b) Each Grantor jointly and severally agrees to pay to the Collateral Agent's costs and expenses in accordance with Section 11.4 of the Credit Agreement.

**SECTION 11. Notices, Etc.** All notices and other communications provided for hereunder shall be given in accordance with the notice provision of the Credit Agreement.

**SECTION 12. Security Interest Absolute; Joint and Several Obligations.**

(a) All rights of the Secured Parties, all Liens and all obligations of each of the Grantors hereunder shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of the Credit Agreement or any other Loan Document, (ii) any change in the time, manner or place of payment of, or in any other term in respect of, all or any of the Secured Obligations, or any other amendment or waiver of or consent to any departure from the Credit Agreement or any other Loan Document, (iii) any exchange or release of, or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Secured Obligations, or (iv) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any of the Grantors in respect of the Secured Obligations. All authorizations and agencies contained herein with respect to any of the Collateral are irrevocable and powers coupled with an interest.

(b) Each Grantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and notice of the incurrence of any Secured Obligation by any Borrower, (iii) notice of any actions taken by any Agent, any Lender, any Guarantor or any other Person under any Loan Document or any other agreement, document or instrument relating thereto, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Secured Obligations, the omission of or delay in which, but for the provisions of this subsection (b), might constitute grounds for relieving such Grantor of any such Grantor's obligations hereunder and (v) any requirement that any Agent or any Lender protect, secure, perfect or insure any security interest or other lien on any Collateral or exhaust any right or take any action against any Grantor or any other Person or any Collateral.

(c) All of the obligations of the Grantors hereunder are joint and several. The Collateral Agent may, in its sole and absolute discretion, enforce the provisions hereof against any of the Grantors and shall not be required to proceed against all Grantors jointly or seek payment from the Grantors ratably. In addition, the Collateral Agent may, in its sole and absolute discretion, select the Collateral of any one or more of the Grantors for sale or application to the Secured Obligations, without regard to the ownership of such Collateral, and shall not be required to make such selection ratably from the Collateral owned by all of the Grantors. The release or discharge of any Grantor by the Collateral Agent shall not release or discharge any other Grantor from the obligations of such Person hereunder.

**SECTION 13. Miscellaneous.**

(a) No amendment of any provision of this Agreement (including any Schedule attached hereto) shall be effective unless it is in writing and signed by each Grantor affected thereby and the Collateral Agent, and no waiver of any provision of this Agreement, and no consent to any departure by any Grantor therefrom, shall be effective unless it is in writing and signed by the Collateral Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b) No failure on the part of the Secured Parties to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Secured Parties provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Secured Parties under any Loan Document against any party thereto are not conditional or contingent on any attempt by such Person to exercise any of its rights under any other Loan Document against such party or against any other Person, including but not limited to, any Grantor.

(c) This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to paragraph (e) below, until the Termination Date and (ii) be binding on each Grantor and all other Persons who become bound as debtor to this Agreement in accordance with Section 9-203(d) of the UCC, and shall inure, together with all rights and remedies of the Secured Parties hereunder, to the benefit of the Secured Parties and their respective successors, transferees and assigns. Without limiting the generality of clause (ii) of the immediately preceding sentence, each Secured Party may assign or otherwise transfer its respective rights and obligations under this Agreement and any other Loan Document to any other Person to the terms and conditions of the Credit Agreement, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Secured Parties herein or otherwise. Upon any such assignment or transfer, all references in this Agreement to any Secured Party shall mean the assignee of any such Secured Party. None of the rights or obligations of any Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Collateral Agent, and any such assignment or transfer shall be null and void.

(d) After the occurrence of the Termination Date, (i) subject to paragraph (e) below, this Agreement and the security interests and licenses created hereby shall automatically terminate, all Liens shall automatically be released and all rights to the Collateral shall revert to the Grantors, (ii) the Collateral Agent agrees to file or authorize the Grantors to file UCC amendments on or promptly after the Termination Date to evidence the termination of the Liens so released and (iii) the Collateral Agent will, upon the Grantors' request and at the Grantors' cost and expense, (A) promptly return to the Grantors (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct) such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof, and (B) promptly execute and deliver to the Grantors such documents and make such other filings as the Grantors shall reasonably request to evidence such termination, without representation, warranty or recourse of any kind. In addition, upon any sale or disposition of any item of Collateral in a transaction expressly permitted under the Credit Agreement, the Collateral Agent agrees to execute

a release of its security interest in such item of Collateral, and the Collateral Agent shall, upon the reasonable request of the Grantors and at the Grantors' cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence such release, without representation, warranty or recourse of any kind.

(e) This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(f) Upon the execution and delivery, or authentication, by any Person of a security agreement supplement in substantially the form of Exhibit C hereto (each a "**Security Agreement Supplement**"), (i) such Person shall be referred to as an "Additional Grantor" and shall be and become a Grantor, and each reference in this Agreement to "Grantor" shall also mean and be a reference to such Additional Grantor, and each reference in this Agreement and the other Loan Documents to "Collateral" shall also mean and be a reference to the Collateral of such Additional Grantor, and (ii) the supplemental Schedules I-VIII attached to each Security Agreement Supplement shall be incorporated into and become a part of and supplement Schedules I-VIII, respectively, hereto, and the Collateral Agent may attach such Schedules as supplements to such Schedules, and each reference to such Schedules shall mean and be a reference to such Schedules, as amended, supplemented or otherwise modified pursuant hereto from time to time.

(g) **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE, WITH THE LAW OF THE STATE OF NEW YORK, EXCEPT (I) AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND (II) TO THE EXTENT THAT THE VALIDITY AND PERFECTION OR THE PERFECTION AND THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTEREST CREATED HEREBY, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

(h) In addition to and without limitation of any of the foregoing, this Agreement shall be deemed to be a Loan Document and shall otherwise be subject to all of terms and conditions contained in Sections 11.10 and 11.11 of the Credit Agreement, *mutatis mutandi*.

(i) Each Grantor irrevocably and unconditionally waives any right it may have to claim or recover in any legal action, suit or proceeding with respect to this Agreement any special, exemplary, punitive or consequential damages.

(j) Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(k) Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(l) This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterparty shall not affect the validity, enforceability, and binding effect of this Agreement.

(m) For purposes of this Agreement, all references to Schedules I-VIII attached hereto shall be deemed to refer to each such Schedule as updated from time to time in accordance with the terms of this Agreement.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, each Grantor has caused this Agreement to be executed and delivered by its officer thereunto duly authorized, as of the date first above written.

**GRANTORS:**

**SYNERGY CHC CORP.**

By: ________________________________
Name: Jack Ross
Title: Chairman and Chief Executive Officer

**SYNERGY CHC INC.**

By: ________________________________
Name: Jack Ross
Title: Chairman and Chief Executive Officer

Acknowledged and Agreed:

**ACP AGENCY, LLC,**
as Collateral Agent

By: ________________________________
Name: Peter Eschmann
Title: Authorized Person

# SCHEDULE I

## LEGAL NAME; JURISDICTION OF ORGANIZATION; TYPE OF ORGANIZATION; ORGANIZATIONAL IDENTIFICATION NUMBER

| Legal Name | Jurisdiction of Organization | Type of Organization | Organizational Identification Number |
|---|---|---|---|
| Synergy CHC Corp. | Nevada | Corporation | NV20101902811 |
| Synergy CHC Inc. | Alberta, Canada | Corporation | 78053 1125 RT0001<br><br>Corporate Access Number: 2019531597 |

## SCHEDULE II

## INTELLECTUAL PROPERTY AND LICENSES; TRADE NAMES

**A. Patents -** None.

**B. Copyrights -** None.

**C. Trademarks**

United States Registrations:

| Grantor | Mark | Registration No. | Registration Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | BLACKOTTER | 6289745 | 09-Mar-2021 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5074891 | 01-Nov-2016 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5142815 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5596520 | 30-Oct-2018 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY TEA | 5142816 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY TEA | 5142817 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FOCUS FACTOR | 2414522 | 19-Dec-2000 | United States of America |
| Synergy CHC Corp. | FOCUS FACTOR BRAIN HUB | 6840427 | 06-Sep-2022 | United States of America |
| Synergy CHC Corp. | SNEAKY VAUNT | 7552593 | 29-Oct-2024 | United States of America |
| Synergy CHC Corp. | SNEAKY VAUNT | 5572253 | 25-Sep-2018 | United States of America |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | SYNERGY A CONSUMER HEALTHCARE COMPANY | 6463755 | 24-Aug-2021 | United States of America |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 5365149 | 26-Dec-2017 | United States of America |
| Synergy CHC Corp. | WHY LOOK GOOD WHEN YOU CAN LOOK PER-FÉKT | 3436683 | 27-May-2008 | United States of America |
| Synergy CHC Corp. |  | 3383804 | 19-Feb-2008 | United States of America |
| Synergy CHC Corp. | PER-FÉKT | 3383803 | 19-Feb-2008 | United States of America |
| Neuragen Corp. (merged into Synergy CHC Corp.) | NEURAGEN | 3777747 | 20-Apr-2010 | United States of America |
| Neuragen Corp. (merged into Synergy CHC Corp.) | NEURAGEN PN | 3423772 | 06-May-2008 | United States of America |

<u>United States Applications</u>:

| Grantor | Mark | Application No. | Application Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | FACTOR NUTRITION | 90477772 | 20-Jan-2021 | United States of America |
| Synergy CHC Corp. | FACTOR NUTRITION | 98898853 | 12-Dec-2024 | United States of America |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | UrgentRX | 97026495 | 14-Sep-2021 | United States of America |
| Synergy CHC Corp. | PER-FÉKT | 98817880 | 24-Oct-2024 | United States of America |
| Synergy CHC Corp. | PER-FÉKT BEAUTY | 98817879 | 24-Oct-2024 | United States of America |

<u>Foreign Registrations:</u>

| Grantor | Mark | Registration No. | Registration Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | FLAT TUMMY | 1857065 | 31-Mar-2017 | Australia |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1715196 | 18-Aug-2015 | Australia |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1768380 | 03-May-2016 | Australia |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Australia |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Australia |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | 1133555 | 16-Jul-2012 | Australia |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Austria |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Bahrain |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 29-Jun-2017 | Bahrain |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Bahrain |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Benelux |
| Synergy CHC Corp. | BLACKOTTER | TMA1101411 | 03-Jun-2021 | Canada |
| Synergy CHC Corp. | FLAT TUMMY | TMA1028125 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | FLAT TUMMY ABS | TMA1028111 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | FOCUS FACTOR | TMA1101412 | 03-Jun-2021 | Canada |
| Synergy CHC Corp. | SNEAKY VAUNT | TMA1028071 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | SYNERGY A CONSUMER HEALTHCARE COMPANY | TMA1046985 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | SYNERGY EFFECT | TMA1046990 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | SYNERGY EFFECT | TMA1046986 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1046991 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1047043 | 06-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1023459 | 04-Jun-2019 | Canada |
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | UrgentRX | TMA926000 | 14-Jan-2016 | Canada |

| | | | | |
|---|---|---|---|---|
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | UrgentRX | TMA906488 | 17-Jun-2015 | Canada |
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | RIGHT NOW RELIEF | 1096512 | 16-Nov-2015 | Chile |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | China (People's Republic) |
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | UrgentRX | 1133555 | 16-Jul-2012 | China (People's Republic) |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Denmark |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Egypt |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Egypt |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | European Union (Community) |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | RIDICULOUSL Y FAST RELIEF | 010627099 | 01-Oct-2012 | European Union (Community) |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | European Union (Community) |
| Breakthrough Products, Inc. (merged into | UrgentRX | 010627248 | 10-Sep-2012 | European Union (Community) |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp.) | | | | |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Finland |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Finland |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | France |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | France |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1306320 | 05-May-2016 | Germany |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | India |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | India |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 31-Jul-2020 | India |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1306320 | 25-Aug-2016 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | Int'l Registration - Madrid Protocol Only |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | UrgentRX | 1133555 | 16-Jul-2012 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Ireland |
| Synergy CHC Corp. | FOCUS FACTOR | 13531781 | 03-Jul-2018 | Israel |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Italy |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Italy |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | 5767403 | 29-May-2015 | Japan |
| Synergy CHC Corp. | FLAT TUMMY | 160099 | 10-Aug-2017 | Kuwait |
| Synergy CHC Corp. | FOCUS FACTOR | 160098 | 10-Aug-2017 | Kuwait |
| Synergy CHC Corp. | FLAT TUMMY | 181214 | 28-Aug-2017 | Lebanon |
| Synergy CHC Corp. | FOCUS FACTOR | 181260 | 30-Aug-2017 | Lebanon |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 181671 | 05-Oct-2017 | Lebanon |
| Synergy CHC Corp. | FLAT TUMMY | 2826083 | 21-Feb-2025 | Mexico |
| Synergy CHC Corp. | FLAT TUMMY | 2826084 | 21-Feb-2025 | Mexico |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | FOCUS FACTOR | 2826082 | 21-Feb-2025 | Mexico |
| Synergy CHC Corp. | FLAT TUMMY | | | Nigeria |
| Synergy CHC Corp. | THE SYNERGY EFFECT | | | Nigeria |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Norway |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Norway |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Oman |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Oman |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Oman |
| Synergy CHC Corp. | FLAT TUMMY | 117489 | 15-Oct-2018 | Qatar |
| Synergy CHC Corp. | FLAT TUMMY | 117411 | 14-Nov-2018 | Qatar |
| Synergy CHC Corp. | FOCUS FACTOR | 117410 | 25-Sep-2017 | Qatar |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 117412 | 14-Nov-2018 | Qatar |
| Synergy CHC Corp. | FLAT TUMMY | 117229 | 03-Oct-2017 | Saudi Arabia |
| Synergy CHC Corp. | FOCUS FACTOR | 117228 | 03-Oct-2017 | Saudi Arabia |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 117224 | 03-Oct-2017 | Saudi Arabia |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Spain |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 12-Jul-2017 | Spain |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Sweden |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Switzerland |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Switzerland |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Switzerland |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | Switzerland |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Syria |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Syria |
| Synergy CHC Corp. | FLAT TUMMY | 279486 | 12-Sep-2017 | United Arab Emirates |
| Synergy CHC Corp. | FOCUS FACTOR | 279483 | 27-Sep-2017 | United Arab Emirates |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 279482 | 12-Sep-2017 | United Arab Emirates |
| Synergy CHC Corp. | FLAT TUMMY | WO0000001354339 | 14-Sep-2018 | United Kingdom |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1306320 | 22-Dec-2016 | United Kingdom |
| Synergy CHC Corp. | FOCUS FACTOR | UK00801351781 | 01-Dec-2017 | United Kingdom |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | United Kingdom |

| | | | | |
|---|---|---|---|---|
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | RIDICULOUSLY FAST RELIEF | UK00910627099 | 01-Oct-2012 | United Kingdom |
| Synergy CHC Corp. | SNEAKY VAUNT | UK00801335034 | 02-Dec-2016 | United Kingdom |
| Synergy CHC Corp. | SNEAKY VAUNT | WO0000001335034 | 27-Jul-2017 | United Kingdom |
| Synergy CHC Corp. | THE SYNERGY EFFECT | WO0000001377589 | 03-May-2018 | United Kingdom |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | UK00910627248 | 10-Sep-2012 | United Kingdom |
| Synergy CHC Corp. | FLAT TUMM (Int. Class 30) | 81303 | 24-Sep-2017 | Yemen, Republic of |
| Synergy CHC Corp. | FLAT TUMMY (Int. Class 5) | 81301 | 24-Sep-2017 | Yemen, Republic of |
| Synergy CHC Corp. | FOCUS FACTOR | 81298 | 24-Sep-2017 | Yemen, Republic of |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 81300 | 24-Sep-2017 | Yemen, Republic of |

<u>Foreign Applications:</u>

| Grantor | Mark | Application No. | Application Date | Granting Jurisdiction |
|---|---|---|---|---|
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | FAST POWDERS | 1144360 | 08-Oct-2015 | Chile |

| | | | | |
|---|---|---|---|---|
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | FAST POWDERS | 1096513 | 23-Dec-2014 | Chile |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Austria |
| Synergy CHC Corp. | FLAT TUMMY TEA | | | Nigeria |
| Synergy CHC Corp. | FLAT TUMMY TEA | | | Nigeria |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Norway |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Sweden |
| Synergy CHC Corp. | FOCUS FACTOR | 2272869 | 08-Jul-2021 | Mexico |
| Synergy CHC Corp. | FOCUS FACTOR | | | Nigeria |
| Synergy CHC Corp. | SNEAKY VAUNT | | | Brazil |
| Synergy CHC Corp. | SNEAKY VAUNT | | | China (People's Republic) |
| Synergy CHC Corp. | SNEAKY VAUNT | | | Nigeria |
| Synergy CHC Corp. | SNEAKY VAUNT | | | Nigeria |

D. OTHER INTELLECTUAL PROPERTY

Domain Names:

synergychc.com
flattummytea.com
sneakyvaunt.com
focusfactor.com

E. TRADENAMES

Flat Tummy Tea
Focus Factor
Factor Nutrition Labs

F. THE LEGAL NAME OF, AND EACH TRADE NAME USED BY, EACH PERSON FROM WHICH A GRANTOR HAS ACQUIRED ANY SUBSTANTIAL PART OF THE COLLATERAL WITHIN THE PRECEDING FIVE YEARS

| Grantor/Subsidiary | Other names |
|---|---|
| Synergy CHC Corp. | Focus Factor, Factor Nutrition Labs |
| Synergy CHC Inc. | None. |

# SCHEDULE III

## LOCATIONS OF GRANTORS

| Grantor | Location | Description |
|---|---|---|
| Synergy CHC Corp. | 3 Kimball Drive, Standish, ME 04084 | Chief Executive Office |
| Synergy CHC Inc. | 3175 Highway 2, Fall River, Nova Scotia, B2T 1J5, Canada | Chief Executive Office |
| Synergy CHC Inc. | 12 Cleve Court<br>Halton Hills, ON L7G 0L7 | Inventory |
| Synergy CHC Corp. | 200 Docks Corner Road, Dayton, NJ 08810 | Inventory |
| Synergy CHC Corp. | 9565 N. Virginia St, Suite 100, Reno, NV 89506 | Inventory |

## SCHEDULE IV

## DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS AND COMMODITIES ACCOUNTS

| Grantor | Name and Address of Institution Maintaining Account | Account Number | Purpose of Account |
|---|---|---|---|
| Synergy CHC Corp. | Banc of California, PO Box 131207, Carlsbad, CA 92013-1207 | 3111852 | Operating Account |
| Synergy CHC Inc. | Royal Bank, 200 Bay Street, Royal Bank Plaza, Toronto, ON, Canada | 01793 102-418-1 | Operating Account |
| Synergy CHC Inc. (Focus Factor) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8015992 | Online Sweep Accounts |
| Synergy CHC Corp. (Flat Tummy) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8684416 | Online Sweep Accounts |
| Synergy CHC Corp. (Hand MD) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8016007 | Online Sweep Accounts |
| Synergy CHC Corp. (Think Fuel) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8489345 | Online Sweep Accounts |
| Synergy CHC Corp. (Synergy Effect) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8214396 | Online Sweep Accounts |
| Synergy CHC Corp. (Perfekt Beauty) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8216061 | Online Sweep Accounts |
| Synergy CHC Corp. (Coco White) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8489270 | Online Sweep Accounts |
| Synergy CHC Corp. (Mane Game) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8489189 | Online Sweep Accounts |

# SCHEDULE V

## UCC FINANCING STATEMENTS

UCC Financing Statements have been filed in the jurisdictions below against the Grantors:

| Name of Grantor | Secretary of State |
|---|---|
| Synergy CHC Corp. | Nevada |
| Synergy CHC Inc. | Alberta, Canada |

## SCHEDULE VI

## COMMERCIAL TORT CLAIMS

None.

# SCHEDULE VII

# PLEDGED DEBT

| Grantor | Name of Maker | Description | Original Principal Amount |
|---|---|---|---|
| Boombod Ltd. | Synergy CHC Corp. | Second Amended and Restated Promissory Note dated May 29, 2025 | $4,425,547.00 |

# SCHEDULE VIII

## PLEDGED SHARES

| Grantor | Pledged Issuer | Number of Shares | Percentage of Outstanding Shares | Class | Certificate Number |
|---|---|---|---|---|---|
| Synergy CHC Corp. | NomadChoice Pty Limited | 1,200 | 100% | Ordinary | N/A[1] |
| Synergy CHC Corp. | Synergy CHC Inc. | 100 | 100% | Class A | A-1 |
| Synergy CHC Corp. | Hand MD Corp. | 2,000,000 | 100% | Common Stock | N/A[2] |

[1] New share certificates will be issued and delivered to the Collateral Agent pursuant to the requirements of Section 5.3 of the Credit Agreement.

[2] New share certificates will be issued and delivered to the Collateral Agent pursuant to the requirements of Section 5.3 of the Credit Agreement.

# EXHIBIT A

## PLEDGE AMENDMENT

This Pledge Amendment, dated _________ __, 20__, is delivered pursuant to Section 4 of the Security Agreement referred to below. The undersigned hereby agrees that this Pledge Amendment may be attached to the Pledge and Security Agreement, dated May 30, 2025, as it may heretofore have been or hereafter may be amended, restated, supplemented, modified or otherwise changed from time to time (the "**Security Agreement**") and that the Promissory Notes, Instruments or shares listed on this Pledge Amendment shall be hereby pledged and assigned to the Collateral Agent and become part of the Pledged Interests referred to in such Security Agreement and shall secure all of the Secured Obligations referred to in such Security Agreement.

| **Pledged Debt** | | | |
|---|---|---|---|
| **Grantor** | **Name of Maker** | **Description** | **Original Principal Amount** |
| __________ | __________ | __________ | __________ |
| __________ | __________ | __________ | __________ |

| **Pledged Shares** | | | | | |
|---|---|---|---|---|---|
| **Grantor** | **Name of Pledged Issuer** | **Number of Shares** | **Percentage of Outstanding Shares** | **Class** | **Certificate Number** |
| __________ | __________ | __________ | __________ | __________ | __________ |
| __________ | __________ | __________ | __________ | __________ | __________ |

[GRANTOR]

By: ______________________________
Name:
Title:

**ACP AGENCY, LLC**,
as the Collateral Agent

By:______________________________
Name:
Title:

# EXHIBIT B

## [TRADEMARK] [PATENT] [COPYRIGHT] SECURITY AGREEMENT

This **[Trademark][Copyright][Patent] Security Agreement** (this **"[Trademark][Patent][Copyright] Security Agreement**") is made as of __________ __, 202_, by _______________ (the "**Grantor**"), in favor of ACP AGENCY, LLC, in its capacity as Collateral Agent (together with its successors and assigns in such capacity, the "**Grantee**").

**WHEREAS**, the Grantor [has adopted, used and is using, and holds all right, title and interest in and to, the trademarks and service marks listed on the attached Schedule A, which trademarks and service marks are registered or applied for in the United States Patent and Trademark Office (the "**Trademarks**")] [holds all right, title and interest in the letter patents, design patents and utility patents listed on the attached Schedule A, which patents are issued or applied for in the United States Patent and Trademark Office (the "**Patents**")] [holds all right, title and interest in the copyrights listed on the attached Schedule A, which copyrights are registered or applied for in the United States Copyright Office (the "**Copyrights**")];

**WHEREAS**, the Grantor has entered into a Pledge and Security Agreement, dated May 30, 2025 (as amended, restated, supplemented, modified or otherwise changed from time to time, the "**Security Agreement**"), in favor of the Grantee; and

**WHEREAS**, pursuant to the Security Agreement, the Grantor has granted to the Grantee for the benefit of the Secured Parties (as defined in the Security Agreement) a continuing security interest in all right, title and interest of the Grantor in, to and under the [Trademarks, together with, among other things, the good-will of the business symbolized by the Trademarks] [Patents] [Copyrights] and the applications and registrations thereof, and all proceeds thereof, including, without limitation, any and all causes of action which may exist by reason of infringement thereof and any and all damages arising from past, present and future violations thereof (the "**Collateral**"), to secure the payment, performance and observance of the Secured Obligations (as defined in the Security Agreement).

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor does hereby pledge, convey, sell, assign, transfer and set over unto the Grantee and grants to the Grantee for the benefit of the Grantee and the Secured Parties a continuing security interest in the Collateral to secure the prompt payment, performance and observance of the Secured Obligations.

The Grantor does hereby further acknowledge and affirm that the rights and remedies of the Grantee with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.

**IN WITNESS WHEREOF**, the Grantor has caused this [Trademark][Copyright][Patent] Security Agreement to be duly executed by its officer thereunto duly authorized as of _____________ __, 202_.

[GRANTOR]

By:________________________________________
Name:
Title:

Acknowledged and Agreed:

**ACP AGENCY, LLC**,
as Collateral Agent

By: ______________________________
Name:
Title:

# SCHEDULE A TO [TRADEMARK] [PATENT] [COPYRIGHT] SECURITY AGREEMENT

[Trademarks and Trademark Applications]
[Patent and Patent Applications]
[Copyright and Copyright Applications]
Owned by ______________________________

# EXHIBIT C

## FORM OF SECURITY AGREEMENT SUPPLEMENT

[Date of Security Agreement Supplement]

ACP Agency, LLC, as Collateral Agent
600 Lexington Ave, 14th Floor
New York, New York 10022
Attention: Peter Eschmann
Telephone: 646-357-8385
Email: peschmann@acmecreditpartners.com

Ladies and Gentlemen:

Reference hereby is made to (a) the Term Loan Credit Agreement, dated as of May 30, 2025 (such agreement, as amended, restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor, being hereinafter referred to as the "**Credit Agreement**") by and among SYNERGY CHC CORP., a Nevada corporation (the "**Borrower**"), and each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person (as defined therein) that guarantees all or any portion of the Obligations (as defined therein) from time to time, each a "**Guarantor**" and collectively, the "**Guarantors**", and together with the Borrower and each other Person that becomes an "**Additional Grantor**" under the Security Agreement (as defined below), each a "**Grantor**" and collectively, the "**Grantors**"), the lenders from time to time party thereto (each a "**Lender**" and collectively, the "**Lenders**"), and ACP Agency, LLC, in its capacity as Collateral Agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, if any, the "**Collateral Agent**") and (b) the Pledge and Security Agreement, dated as of May 30, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), made by the Grantors from time to time party thereto in favor of the Collateral Agent. Capitalized terms defined in the Credit Agreement or the Security Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement or the Security Agreement.

**SECTION 1. Grant of Security**. The undersigned hereby grants to the Collateral Agent, for the ratable benefit of each Secured Party, a security interest in, all of its right, title and interest in and to all of the Collateral (as defined in the Security Agreement) of the undersigned, whether now owned or hereafter acquired by the undersigned, wherever located and whether now or hereafter existing or arising, including, without limitation, the property and assets of the undersigned set forth on the attached supplemental schedules to the Schedules to the Security Agreement.

**SECTION 2. Security for Obligations**. The grant of a security interest in the Collateral by the undersigned under this Security Agreement Supplement and the Security Agreement secures the payment of all Secured Obligations of the undersigned now or hereafter

existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, premiums, penalties, fees, indemnifications, contract causes of action, costs, expenses or otherwise. Without limiting the generality of the foregoing, each of this Security Agreement Supplement and the Security Agreement secures the payment of all amounts that constitute part of the Secured Obligations and that would be owed by the undersigned to the Collateral Agent or any Secured Party under the Loan Documents but for the fact that such Secured Obligations are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving a Grantor.

**SECTION 3. Supplements to Security Agreement Schedules.** The undersigned has attached hereto supplemental Schedules I through VIII to Schedules I through VIII, respectively, to the Security Agreement, and the undersigned hereby certifies, as of the date first above written, that such supplemental Schedules have been prepared by the undersigned in substantially the form of the equivalent Schedules to the Security Agreement, and such supplemental Schedules include all of the information required to be scheduled to the Security Agreement and do not omit to state any information material thereto.

**SECTION 4. Representations and Warranties**. The undersigned hereby makes each representation and warranty set forth in Section 5 of the Security Agreement (as supplemented by the attached supplemental Schedules) to the same extent as each other Grantor.

**SECTION 5. Obligations Under the Security Agreement**. The undersigned hereby agrees, as of the date first above written, to be bound as a Grantor by all of the terms and provisions of the Security Agreement to the same extent as each of the other Grantors. The undersigned further agrees, as of the date first above written, that each reference in the Security Agreement to an "Additional Grantor" or a "Grantor" shall also mean and be a reference to the undersigned.

**SECTION 6. Governing Law**. This Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

**SECTION 7. Loan Document**. In addition to and without limitation of any of the foregoing, this Security Agreement Supplement shall be deemed to be a Loan Document and shall otherwise be subject to all of terms and conditions contained in Sections 11.10 and 11.11 of the Credit Agreement, *mutatis mutandi*.

Very truly yours,

[NAME OF ADDITIONAL LOAN PARTY]

By: ______________________________
Name:
Title:

Acknowledged and Agreed:

**ACP AGENCY, LLC**,
as Collateral Agent

By: ______________________________
Name:
Title:

# EXHIBIT D

## FORM OF IRREVOCABLE PROXY

(Interests of [_______] (the "**Issuer**"))

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [_____________] a [_______________] (the "**Grantor**"), hereby irrevocably (to the fullest extent permitted by law) appoints and constitutes _____________, a ______________, in its capacity as Collateral Agent for the Secured Parties (in such capacity, the "**Proxy Holder**") under the Term Loan Credit Agreement, dated as of May 30, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), to which the Proxy Holder, the Grantor, certain affiliates of the Grantor and the Lenders are a party, the attorney and proxy of the Grantor with full power of substitution and resubstitution, to the full extent of the Grantor's rights with respect to all of the Pledged Interests (as defined in the Security Agreement, defined below) which constitute the Equity Interests of the Issuer (the "**Interests**") owned by the Grantor. Upon the execution hereof, all prior proxies given by the Grantor with respect to any of the Interests are hereby revoked, and no subsequent proxies will be given with respect to any of the Interests.

This proxy is irrevocable, is coupled with an interest, and is granted pursuant to that certain Pledge and Security Agreement, dated as of May 30, 2025, by and among the Grantor, certain affiliates of the Grantor and Proxy Holder (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**") for the benefit of Proxy Holder in consideration of the credit extended pursuant to the Credit Agreement. Capitalized terms used herein but not otherwise defined in this Irrevocable Proxy have the meanings ascribed to such terms in the Security Agreement.

The Proxy Holder named above will be empowered and may exercise this Irrevocable Proxy to vote the Interests at any and all times after the occurrence and during the continuance of an Event of Default, including, but not limited to, at any meeting of the [members/board] of the Issuer, however called, and at any adjournment thereof, or in any written action by consent of the [members/board] of the Issuer. This Irrevocable Proxy shall remain in effect with respect to the Interests until the Termination Date and will continue to be effective or automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by Proxy Holder as a preference, fraudulent conveyance, or otherwise under any bankruptcy, insolvency, or similar law, all as though such payment had not been made (provided, that in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Proxy Holder in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations), notwithstanding any time limitations set forth in the [operating agreement/by-laws] and other organization documents of the Issuer or the [Limited Liability Company Act/Corporations Act] of the State of [__________].

Any obligation of the Grantor hereunder shall be binding upon the heirs, successors, and assigns of the Grantor (including, without limitation, any transferee of any of the Interests).

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the Grantor has executed this Irrevocable Proxy as of this [__] day of [________ __], 202[_].

[_________________________________]

By _____________________________
Print Name _______________________
Title_____________________________

**EXHIBIT E**

**FORM OF REGISTRATION PAGE**

[Issuer]

[Stock/Membership/Partnership] Ledger as of ________, ___*

| **Name** | **Certificate No.** | **Number of Interests** |
|---|---|---|
| | | |

Acknowledged By:

[Issuer]

By ________________________________
Print Name ________________________
Title______________________________

*To Remain Blank - Not Completed at Closing

# EXHIBIT C

## [FORM OF] INFORMATION CERTIFICATE

Reference is made to that certain Pledge and Security Agreement (the "**Security Agreement**"), dated as of May 30, 2025, by and among Synergy CHC Corp., a Nevada corporation ("**Synergy**"), each subsidiary of Synergy listed as a "Grantor" on the signature pages thereto, and each Person joined thereto as a Grantor from time to time (collectively, the "**Grantors**", and each a "**Grantor**"), and ACME Credit Partners, LLC, in its capacity as Collateral Agent. Capitalized terms used but not defined herein have the meanings assigned to them in the Security Agreement.

Each of the undersigned, hereby certifies as follows on behalf of the Grantors, solely in an official capacity and not any individual capacity, that as of the date hereof:

**1.** **Names**. (a) The exact legal name of each Grantor, as such name appears on its certificate of formation or any other formation or organizational document, is as follows:

Source: UCC §9-503(a)(i)

(b) The following is a list of all other names (including trade names or similar appellations) used by each Grantor, or any other business or organization to which any Grantor became the successor by merger, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, now or at any time during the past five years:

Source: UCC §9-507

(c) Each Grantor is the type of entity described next to its name below:

(d) Each Grantor is a registered organization except to the extent disclosed below:

(e) The jurisdiction of organization or formation of each Grantor is as follows:

(f) Except as set forth below, no Grantor has changed its jurisdiction of organization or formation at any time during the past four months:

(g) The federal employer identification number, if any, of each Grantor appears next to its name below:

(h) The organizational identification number or other applicable formation identification number of each Grantor appears next to its name below.

Source: UCC §9-516(b)(5)

**2.** **Current Locations**. (a) The chief executive office and principal mailing address of each Grantor is:

Source: UCC §§9-516(b)(5), 9-301

(b) The following are all other locations where each Grantor maintains any books or records relating to any of the Collateral consisting of accounts, contract rights, instruments, chattel paper, general intangibles or goods:

Source: UCC §§9-516(b)(5), 9-301

(c) The following are all other places of business of each Grantor:

Source: UCC §9-301, 9-501

(d) The following are all other locations where any of the Collateral is located:

Source: UCC §9-301, 9-501

(e) The following is a list of all owned and leased real property held by each Grantor:

(f) Except as described below, no Grantor has entered into any leases, subleases, tenancies, franchise agreements, licenses or other occupancy arrangements, as owner, lessor, sublessor, licensor, franchisor or grantor with respect to any of the real property described above, and no Grantor has any leases which require the consent of the landlord, tenant or other party thereto to the transactions contemplated in the Loan Documents:

(g) The following are the names and addresses of all persons or entities other than the Grantors, such as lessees, consignees, warehousemen or purchasers of chattel paper, which have possession or are intended to have possession of any of the Collateral consisting of chattel paper, inventory or equipment:

Source: UCC §§9-301 and 9-312; see also UCC §§2-326(3), 9-306, 9-330 and 9-505

**3.** **Prior Locations**. Set forth below is the information required by subparagraphs (a)-(d) and (g) of §2 with respect to each location at which, or other person or entity with which, any of the Collateral has been previously held or any place of business previously maintained by each Grantor, in each case, at any time during the past twelve months:

Source: UCC §9-316

**4. <u>Fixtures</u>.** Set forth below is the information required by UCC §9-502(b) of each state in which any of the Collateral consisting of fixtures are or are to be located and the name and address of each real estate recording office where a mortgage on the real estate on which such fixtures are or are to be located would be recorded:

Source: UCC §§9-501 (a) and 9-502

**5. <u>Intellectual Property</u>**. The following is a complete list of all of each Grantor's patents, patent licenses, copyrights, copyright licenses, trademarks, trademark licenses, trade names and service marks registered or for which applications are pending in the name of any Grantor, including the name of the registered owner and the registration number of each:

**6. <u>Equity Interests</u>**. The following is a list of all of the authorized, and the issued and outstanding, stock, partnership interests, limited liability company membership interests or other equity interests of each Grantor, the record and beneficial owners of such stock, partnership interests, membership interests or other equity interests and whether such interests are certificated or non-certificated.

**7. <u>Investment Property: Instruments</u>**. The following is a complete list of all instruments (other than checks to be deposited in the ordinary course of business), stock (or other equity interests), bonds, debentures, notes (including all intercompany notes between each Grantor and any other Grantor), commodity contracts and other securities owned by each Grantor (provide name of issuer and a description of security and if an equity interest, the total outstanding amount thereof and the number and percentage thereof held by each Grantor) and all securities accounts and commodity accounts owned by each Grantor (provide name of intermediary):

**8. <u>Letter-of-Credit Rights</u>**. The following a list of all Letters of Credit issued in favor of each Grantor as beneficiary thereunder:

**9. <u>Motor Vehicles</u>.** The following is a complete list of all motor vehicles owned by any Grantor (describe each vehicle by make, model, and year and indicate for each the state in which registered and the state in which based and include the approximate value of each vehicle):

**10. <u>Other Titled Collateral</u>.** The following is a complete list of all aircraft vessels and all other inventory, equipment and other goods of any Grantor which are subject to any certificate of title or other registration statute of the United States, any state or any other jurisdiction (provide description of covered goods and indicate registration system and jurisdiction):

**11.** **Deposit Accounts.** The following is a complete list of all deposit accounts maintained by each Grantor (provide name and address of depository bank, where such account is held, type of account and account number):

**12.** **Commercial Tort Claims**. The following is a complete list of claims arising in tort with respect to which a Grantor is claimant and which arose in the course of any of the Grantor's business; together with case file numbers or other identification of such claim and a brief description thereof:

Source: UCC §§9-102(a)(13), 9-108, 9-504

**13.** **Unusual Transactions**. All of the Collateral has been originated by each Grantor in the ordinary course of any Grantor's, as applicable, business or consists of goods which have been acquired by each Grantor in the ordinary course from a person in the business of selling goods of that kind, except for the following Collateral which was obtained outside the ordinary course of business, including, but not limited to, transactions involving bulk transfers:

Source: UCC §1-201(9)

**14.** **Timber**. The following are all of the locations in which any Grantor possesses any timber to be cut:

Source: UCC §9-301 (3)(B) and Official Comment 5(c) to 9-301.

**15.** **Extracted Collateral**. The following are all of the locations in which any Grantor possesses any wellhead or minehead used in the extraction of minerals:

Source: UCC §9-301(4) and Official Comment 5(d) to 9-301.

**16.** **Farm Products.** The following are all of the locations in which any Grantor possesses any farm products as defined in UCC §9-102(34):

Source: UCC §9-302.

[*The remainder of this page is intentionally left blank.*]

**IN WITNESS WHEREOF**, each of the undersigned has executed this Information Certificate as of _____ __, 202_

**GRANTORS:**

**[__________]**

By:________________________________
Name:
Title:

# EXHIBIT D

## [FORM OF] ASSIGNMENT AND ACCEPTANCE AGREEMENT

This **ASSIGNMENT AND ACCEPTANCE AGREEMENT** ("**Assignment Agreement**") is entered into as of _____ __, 20__ between ___________ ("**Assignor**") and ______________ ("**Assignee**"). Reference is made to the agreement described in Item 2 of Annex I annexed hereto (as amended, restated, modified or otherwise supplemented from time to time, the "**Credit Agreement**"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Credit Agreement.

1. In accordance with the terms and conditions of Section 11.7 of the Credit Agreement, the Assignor hereby irrevocably sells, transfers, conveys and assigns without recourse, representation or warranty (except as expressly set forth herein) to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, that interest in and to the Assignor's rights and obligations under the Loan Documents with respect to the Obligations owing to the Assignor, and the Assignor's portion of the Commitments and the Loans as specified on Annex I.

2. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the interest being assigned by it hereunder and that such interest is free and clear of any adverse claim, and (ii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment Agreement and to consummate the transactions contemplated hereby; (b) makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with the Loan Documents or the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any other instrument or document furnished pursuant thereto; and (c) makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or the performance or observance by any Loan Party of any of its obligations under the Loan Documents or any other instrument or document furnished pursuant thereto.

3. The Assignee (a) confirms that it has received copies of the Credit Agreement and the other Loan Documents, together with copies of the financial statements referred to therein and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment Agreement; (b) agrees that it will, independently and without reliance upon the Administrative Agent, the Collateral Agent, the Assignor, or any other Lender, based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents; (c) confirms that it is eligible as an assignee under the terms of the Credit Agreement; (d) appoints and authorizes each of the Administrative Agent and the Collateral Agent to take such action as the Administrative Agent or the Collateral Agent (as the case may be) on its behalf and to exercise such powers under the Loan Documents as are delegated to the Administrative Agent or the Collateral Agent (as the case may be) by the terms thereof, together with such powers as are reasonably incidental thereto; (e) agrees that it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender; and (f) attaches the forms prescribed by the Internal Revenue Service of the United States certifying as to the Assignee's status for purposes of determining exemption from United States withholding taxes with respect to all payments to be made to the Assignee under the Credit Agreement or such other documents as are necessary to indicate that all such payments are subject to such rates at a rate reduced by an applicable tax treaty.

4. Following the execution of this Assignment Agreement by the Assignor and the Assignee, it will be delivered by the Assignor to the Agents for recording by the Administrative Agent. The effective date of this Assignment Agreement (the "**Settlement Date**") shall be the latest of (a) the date of the execution hereof by the Assignor and the Assignee, (b) the date this Assignment Agreement has been accepted by the Collateral Agent (and the Administrative Agent if required by the Credit Agreement) and recorded in the Register by the Administrative Agent, (c) the date of receipt by the Collateral Agent of a processing and recordation fee in the amount of $5,000[1], (d) the settlement date specified on Annex I, and (e) the receipt by Assignor of the Purchase Price specified in Annex I.

5. As of the Settlement Date (a) the Assignee shall be a party to the Credit Agreement and, to the extent of the interest assigned pursuant to this Assignment Agreement, have the rights and obligations of a Lender thereunder and under the other Loan Documents, and (b) the Assignor shall, to the extent of the interest assigned pursuant to this Assignment Agreement, relinquish its rights and be released from its obligations under the Credit Agreement and the other Loan Documents.

6. Upon recording by the Administrative Agent, from and after the Settlement Date, the Administrative Agent shall make all payments under the Credit Agreement and the other Loan Documents in respect of the interest assigned hereby (including, without limitation, all payments of principal, interest and commitment fees (if applicable) with respect thereto) to the Assignee. The Assignor and the Assignee shall make all appropriate adjustments in payments under the Credit Agreement and the other Loan Documents for periods prior to the Settlement Date directly between themselves on the Settlement Date.

7. THIS ASSIGNMENT AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

8. EACH PARTY HERETO HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BASED UPON OR ARISING OUT OF THIS ASSIGNMENT AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, AND AGREES THAT ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

9. This Assignment Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Assignment Agreement by facsimile or electronic mail shall be equally effective as delivery of an original executed counterpart.

[Remainder of page left intentionally blank.]

[1] The payment of such fee shall not be required in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized, as of the date first above written.

[ASSIGNOR]

By:________________________________________

Name:
Title:
Date:

[ASSIGNEE]

By:________________________________________

Name:
Title:
Date:

ACCEPTED AND CONSENTED TO this ___ day
of ________, 20__

**ACP AGENCY, LLC,**
**as Collateral Agent and Administrative Agent**

By:____________________
Name:
Title:

ANNEX FOR ASSIGNMENT AND ACCEPTANCE

ANNEX I

1. Borrower: Synergy CHC Corp.

2. Name and Date of Credit Agreement:

Term Loan Credit Agreement, dated as of May 30, 2025 (as the same may be amended, restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "**Credit Agreement**"), by and among Synergy CHC Corp. (the "**Borrower**"), each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder or otherwise guaranties all or any part of the Obligations (as thereinafter defined), each a "**Guarantor**" and collectively, the "**Guarantors**"), the lenders from time to time party thereto (each a "**Lender**" and collectively, the "**Lenders**"), ACP Agency, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), and ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**" and together with the Collateral Agent, each an "**Agent**" and collectively, the "**Agents**").

3. Date of Assignment Agreement: __________

4. Amount of Initial Term Loan Assigned: $ __________

5. Amount of Delayed Draw Term Loan Commitment Assigned: $ __________

6. Amount of Delayed Draw Term Loan Assigned: $ __________

7. Purchase Price: $__________

8. Settlement Date: __________

9. Notice and Payment Instructions, etc.

| Assignee: | Assignor: |
| --- | --- |
| ______________________________ | ______________________________ |
| ______________________________ | ______________________________ |
| ______________________________ | ______________________________ |
| Attn: ________________________ | Attn: ________________________ |
| Fax No.: _____________________ | Fax No.: _____________________ |

Assignee:

Bank Name:
ABA Number:
Account Name:
Account Number:
Sub-Account Name:
Sub-Account Number:
Reference:
Attn:

Assignor:

Bank Name:
ABA Number:
Account Name:
Account Number:
Sub-Account Name:
Sub-Account Number:
Reference:
Attn:

# EXHIBIT E

## [FORM OF] NOTICE OF BORROWING

[LETTERHEAD OF THE BORROWER]

___________ __, 202_

ACP AGENCY, LLC,
as Administrative Agent for the Lenders
party to the Credit Agreement referred to below
c/o Acme Credit Partners, LLC
600 Lexington Ave., 14th Floor
New York, New York 10022
Attention: Peter Eschmann

Ladies and Gentlemen:

The undersigned, Synergy CHC Corp. (the "**Borrower**"), (i) refers to the Term Loan Credit Agreement, dated as of May 30, 2025 (as the same may be amended, restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "**Credit Agreement**"), by and among the Borrower, each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto, the lenders from time to time party thereto (collectively, the "**Lenders**"), ACP Agency, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns, the "**Collateral Agent**"), and ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns, the "**Administrative Agent**" and together with the Collateral Agent, each an "**Agent**" and, collectively, the "**Agents**") and (ii) hereby gives you notice pursuant to Section 2.2 of the Credit Agreement that the undersigned hereby requests a Loan under the Credit Agreement (the "**Proposed Loan**"), and in connection therewith sets forth below the information relating to such Proposed Loan as required by Section 2.2 of the Credit Agreement. All capitalized terms used but not defined herein have the same meanings herein as set forth in the Credit Agreement.

a. The aggregate principal amount of the Proposed Loan is $_________.

b. The Proposed Loan is [an Initial Term Loan][Delayed Draw Term Loan].

c. The Proposed Loan shall be a [Reference Rate Loan][Term SOFR Rate Loan with an Interest Period of [1][3] month(s)].

d. The borrowing date of the Proposed Loan is _________.

e. The proceeds of the Proposed Loan are to be disbursed pursuant to the instructions set forth on Exhibit A attached hereto.

The undersigned certifies as of the date of this notice and as of the date the Proposed Loan is made that (i) the representations and warranties contained in the Article VI of the Credit Agreement and in each other Loan Document are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), (ii) no Default or Event of Default shall have occurred and be continuing on the Effective Date or would result from the Credit Agreement or any other Loan Documents becoming effective in accordance with its or their respective terms or the making of the Proposed Loan [and (iii) all applicable conditions set forth in Section 5.2 of the Credit Agreement shall have been satisfied or waived in writing by the applicable Lenders as of the date of the Proposed Loan.][1]

[SIGNATURE PAGES FOLLOW]

[1] To be included solely in the Notices of Borrowing delivered after the Effective Date.

Very truly yours,

**SYNERGY CHC CORP.**,
as Borrower

By: ______________________________
Name:
Title:

# EXHIBIT A

# WIRING INSTRUCTIONS

| Payee | Wiring Instructions |
|---|---|
| ____________________ | **Bank:**<br>**[City/State]**<br>**ABA #**<br>**Account #**<br>**Ref:** |

**EXHIBIT F**

**[FORM OF] TERM SOFR RATE NOTICE**

[LETTERHEAD OF BORROWER]

ACP Agency, LLC
as Administrative Agent for the Lenders
party to the Credit Agreement referred to below
c/o Acme Credit Partners, LLC
600 Lexington Ave, 14th Floor
New York, New York 10022
Attention: Peter Eschmann
Email: peschmann@acmecreditpartners.com

Ladies and Gentlemen:

Reference is made to the Term Loan Credit Agreement, dated as of May 30, 2025 (as the same may be amended, restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "**Credit Agreement**"), by and among Synergy CHC Corp. (the "**Borrower**"), each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto, the lenders from time to time party thereto (each a "**Lender**" and, collectively, the "**Lenders**"), ACP Agency, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), and ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**" and together with the Collateral Agent, each an "**Agent**" and, collectively, the "**Agents**"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement.

This Term SOFR Rate Notice represents the Borrower's request to [convert into] [continue as] [Term SOFR Rate Loans] [Reference Rate Loans] $[________] of the outstanding principal amount of the [Initial Term Loan][Delayed Draw Term Loan] (the "**Requested Term SOFR Rate Loan**")[, and is a written confirmation of the telephonic notice of such election previously given to the Administrative Agent].

[Such Requested Term SOFR Rate Loan will have an Interest Period of [1] [3] month(s), commencing on ____________.]

[This Term SOFR Rate Notice further confirms the Borrower's acceptance, for purposes of determining the rate of interest based on the Term SOFR Rate under the Credit Agreement, of the Term SOFR Rate as determined pursuant to the Credit Agreement.]

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

The undersigned certifies that (i) the representations and warranties contained in Article VI of the Credit Agreement and in each other Loan Document, certificate or other writing delivered to any Agent or any Lender pursuant thereto on or prior to the date of the [conversion] [continuation] of the Requested Term SOFR Rate Loan are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to "materiality" or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date) and (ii) no Default or Event of Default has occurred and is continuing or would result from the [conversion] [continuation] of the Requested Term SOFR Rate Loan.

Dated: ___________________

_________________________________

By: ____________________________
Name:
Title:

# EXHIBIT G

# [FORM OF] COMPLIANCE CERTIFICATE

# SYNERGY CHC CORP.

ACP Agency, LLC
c/o Acme Credit Partners, LLC
600 Lexington Ave, 14th Floor
New York, New York 10022
Attention: Peter Eschmann
Email: peschmann@acmecreditpartners.com

Re: Compliance Certificate dated [_________] [__], 20[__]
Ladies and Gentlemen:

Reference is made to that certain Term Loan Credit Agreement, dated as of May 30, 2025 (such agreement, as amended, restated, supplemented or otherwise modified from time to time, being hereinafter referred to as the "**Credit Agreement**"), by and among Synergy CHC Corp., a Nevada corporation (the "**Borrower**"), each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder or otherwise guaranties all or any part of the Obligations, each, a "**Guarantor**" and, collectively, the "**Guarantors**", and the Guarantors, together with the Borrower, each, a "**Loan Party**" and, collectively, the "**Loan Parties**"), the lenders from time to time party thereto (together with its successors and permitted assigns, individually, the "**Lender**" and, collectively, the "**Lenders**"), ACP Agency, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), and, ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**" and, together with the Collateral Agent, each, an "**Agent**" and, collectively, the "**Agents**"). Capitalized terms used in this Compliance Certificate have the meanings set forth in the Credit Agreement unless specifically defined herein.

Pursuant to the terms of the Credit Agreement, the undersigned Authorized Officer of the Borrower hereby certifies that:

1. [The financial statements of the Borrower and its Subsidiaries furnished in Schedule 1 hereto pursuant to [Section 7.1(a)(i)][Section 7.1(a)(ii)] of the Credit Agreement fairly present, in all material respects, the financial position of the Borrower and its Subsidiaries as of the end of the period covered by such financial statements and the results of operations, retained earnings and cash flows of the Borrower and its Subsidiaries for such period and such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the

most recent audited financial statements of the Borrower and its Subsidiaries furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments.][1]

2. I have reviewed the provisions of the Credit Agreement and the other Loan Documents and have made, or caused to be made under my supervision, a review of the condition and operations of the Borrower and its Subsidiaries during the period covered by the financial statements delivered pursuant to Section 7.1(a) of the Credit Agreement with a view to determining whether the Borrower and its Subsidiaries were in compliance with all of the provisions of the Credit Agreement and the other Loan Documents during such period at the times such compliance is required thereby.

3. Such review has not disclosed the existence during such period, and I have no knowledge of the occurrence and continuance during such period, of a Default or an Event of Default[, except as listed on [Schedule 2] hereto, describing the nature and period of existence thereof and the action the Borrower and its Subsidiaries have taken, are taking, or propose to take with respect thereto].[2]

4. [The Borrower and its Subsidiaries are in compliance with the applicable covenants contained in Section 7.3 of the Credit Agreement as demonstrated on [Schedule 3] hereto.][3]

5. [Set forth on [Schedule 4] hereto, is a discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for the portion of the Fiscal Year elapsed as of the date of the financial statements delivered in connection herewith and includes the reasons for any significant variations from the Projections for such period and the figures for the [corresponding period in] the previous Fiscal Year.][4]

6. [Set forth on [Schedule 5] hereto, is a summary of all material coverage maintained as of the date thereof by any Loan Party or any of its Subsidiaries in accordance with the requirements set forth in Section 7.1 of the Credit Agreement, as well as in each Security Agreement and each Mortgage (if any).][5]

---

[1] Only to be included in certificates accompanying quarterly and monthly financials delivered pursuant to Sections 7.01(a)(i) and 7.01(a)(ii).

[2] [Schedule 2] to describe the nature and period of existence of such Default or Event of Default and the actions taken or proposed to be taken by the Borrower and its Subsidiaries with respect thereto.

[3] To be included in certificates accompanying quarterly financial statements delivered pursuant to Section 7.01(a)(ii).

[4] To be included in certificates accompanying quarterly and annual audited financial statements delivered pursuant to Sections 7.01(a)(ii) and 7.01(a)(iii).

[5] To be included in certificates accompanying annual audited financial statements delivered pursuant to Section 7.01(a)(iii).

7. [Set forth on [Schedule 6] hereto, is a calculation of the Excess Cash Flow in accordance with the terms of Section 2.5(c)(i) of the Credit Agreement.][6]

8. [I confirm that there have been no changes to the information contained in the Information Certificate delivered on the [Effective Date] [date of the most recently updated Information Certificate delivered pursuant to Section 7.1(a)(iv)(B) of the Credit Agreement].] [Attached hereto as Exhibit A is an updated Information Certificate identifying all changes to the information contained therein from the Information Certificate delivered on the [Effective Date] [date of the most recently updated Information Certificate delivered pursuant to Section 7.1(a)(iv)(B) of the Credit Agreement].][7]

[6] To be included in certificates accompanying annual audited financial statements delivered pursuant to Section 7.01(a)(iii).

[7] To be included in certificates delivered pursuant to Section 7.01(a)(ii) and 7.01(a)(iii).

IN WITNESS WHEREOF, this Compliance Certificate is executed by the undersigned as of the date first written above.

**SYNERGY CHC CORP.**

By: ______________________________
Name: __________________________
Title: __________________________

# SCHEDULE 1

## Financial Statements

[See Attached]

**[SCHEDULE 2]**

**Default or Event of Default**

[See Attached]

**[SCHEDULE 3]**

**Financial Covenants**

**Compliance status is indicated by circling Yes/No under "Complies" column.**

| Financial Covenant | Required | Actual | Complies |
|---|---|---|---|
| Section 7.3(a) – Consolidated Leverage Ratio | [_____] or less | [______] | Yes No |
| Section 7.3(b) – Fixed Charge Coverage Ratio | [_____] or greater | [______] | Yes No |

**Comments Regarding Exceptions:** ________________________________________

**[[SCHEDULE 4]**

**Discussion and Analysis**

[See Attached]]

**[[SCHEDULE 5]**

**Insurance Coverage**

[See Attached]]

**[[SCHEDULE 6]**

**Excess Cash Flow**

[See Attached]]

**[[EXHIBIT A**

**Updated Information Certificate**

[See Attached]]

# EXHIBIT H-1

# U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Term Loan Credit Agreement dated as of May 30, 2025 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Synergy CHC Corp., a Nevada corporation ("**Borrower**"), each subsidiary of Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder or otherwise guaranties all or any part of the Obligations, each, a "**Guarantor**" and, collectively, the "**Guarantors**", and the Guarantors, together with the Borrower, each, a "**Loan Party**" and, collectively, the "**Loan Parties**"), the lenders from time to time party thereto (together with its successors and permitted assigns, individually, the "**Lender**" and, collectively, the "**Lenders**"), ACP Agency, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), and, ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**" and, together with the Collateral Agent, each, an "**Agent**" and, collectively, the "**Agents**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.9(d) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan or Loans (as well as any note evidencing any such Loan) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: ___________________________________
Name:
Title:

Date: ________ __, 20[ ]

# EXHIBIT H-2

## U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Term Loan Credit Agreement dated as of May 30, 2025 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Synergy CHC Corp., a Nevada corporation ("**Borrower**"), each subsidiary of Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder or otherwise guaranties all or any part of the Obligations, each, a "**Guarantor**" and, collectively, the "**Guarantors**", and the Guarantors, together with the Borrower, each, a "**Loan Party**" and, collectively, the "**Loan Parties**"), the lenders from time to time party thereto (together with its successors and permitted assigns, individually, the "**Lender**" and, collectively, the "**Lenders**"), ACP Agency, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), and, ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**" and, together with the Collateral Agent, each, an "**Agent**" and, collectively, the "**Agents**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.9(d) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: ___________________________________

Name:
Title:

Date: ________ __, 20[ ]

# EXHIBIT H-3

## U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Term Loan Credit Agreement dated as of May 30, 2025 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Synergy CHC Corp., a Nevada corporation ("**Borrower**"), each subsidiary of Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder or otherwise guaranties all or any part of the Obligations, each, a "**Guarantor**" and, collectively, the "**Guarantors**", and the Guarantors, together with the Borrower, each, a "**Loan Party**" and, collectively, the "**Loan Parties**"), the lenders from time to time party thereto (together with its successors and permitted assigns, individually, the "**Lender**" and, collectively, the "**Lenders**"), ACP Agency, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), and, ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**" and, together with the Collateral Agent, each, an "**Agent**" and, collectively, the "**Agents**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.9(d) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners or members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners or members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners or members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code and (v) none of its direct or indirect partners or members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: ________________________________
Name:
Title:

Date: ________ __, 20[ ]

# EXHIBIT H-4

# U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Term Loan Credit Agreement dated as of May 30, 2025 (as amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), by and among Synergy CHC Corp., a Nevada corporation ("**Borrower**"), each subsidiary of Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder or otherwise guaranties all or any part of the Obligations, each, a "**Guarantor**" and, collectively, the "**Guarantors**", and the Guarantors, together with the Borrower, each, a "**Loan Party**" and, collectively, the "**Loan Parties**"), the lenders from time to time party thereto (together with its successors and permitted assigns, individually, the "**Lender**" and, collectively, the "**Lenders**"), ACP Agency, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), and, ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**" and, together with the Collateral Agent, each, an "**Agent**" and, collectively, the "**Agents**"). Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

Pursuant to the provisions of Section 2.9(d) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan or Loans (as well as any note evidencing any such Loan) in respect of which it is providing this certificate, (ii) its direct or indirect partners or members are the sole beneficial owners of such Loan or Loans (as well as any note evidencing such Loan), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners or members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners or members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Internal Revenue Code and (v) none of its direct or indirect partners or members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or IRS Form W-8BEN-E, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By: ___________________________________
Name:
Title:

Date: ________ __, 20[ ]

# EXHIBIT 2

**EXECUTION VERSION**

# JOINDER AGREEMENT

**THIS JOINDER AGREEMENT**, dated as of June 9, 2025 (this "**Agreement**"), to the Credit Agreement referred to below is entered into by and among Hand MD Corp., a Delaware corporation (the "**Additional Guarantor**"), ACP AGENCY, LLC ("**ACP**"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"), and ACP, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "**Administrative Agent**" and together with the Collateral Agent, each an "**Agent**" and collectively, the "**Agents**").

**WHEREAS**, Synergy CHC Corp., a Nevada corporation (the "**Borrower**"), each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" thereunder or otherwise guaranties all or any part of the Obligations (as defined therein), each a "**Guarantor**" and collectively, the "**Guarantors**") (other than the Additional Guarantor), the lenders from time to time party thereto (each a "**Lender**" and, collectively, the "**Lenders**"), and the Agents have entered into that certain Term Loan Credit Agreement, dated as of May 30, 2025 (such agreement, as amended, restated, supplemented or otherwise modified from time to time, including any replacement agreement therefor, the "**Credit Agreement**"), pursuant to which the Lenders have agreed to make loans to the Borrower (each a "**Loan**" and collectively the "**Loans**") in an aggregate principal amount not to exceed the Total Commitment (as defined under the Credit Agreement);

**WHEREAS**, the Borrower's obligation to repay the Loans and all other Obligations are guaranteed, jointly and severally, by the Guarantors;

**WHEREAS**, pursuant to Section 7.1(b) of the Credit Agreement, the Additional Guarantor is required to become a Guarantor by, among other things, executing and delivering this Agreement to the Collateral Agent; and

**WHEREAS**, the Additional Guarantor has determined that the execution, delivery and performance of this Agreement directly benefit, and are within the corporate purposes and in the best interests of, the Additional Guarantor.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby agree as follows:

**SECTION 1. <u>Definitions</u>**. Reference is hereby made to the Credit Agreement for a statement of the terms thereof. All terms used in this Agreement which are defined therein and not otherwise defined herein shall have the same meanings herein as set forth therein.

**SECTION 2. <u>Joinder of Additional Guarantor</u>.**

(a) Pursuant to Section 7.1(b) of the Credit Agreement, by its execution of this Agreement, the Additional Guarantor hereby (i) confirms that, as to the Additional Guarantor, the representations and warranties contained in Article VI of the Credit Agreement are true and correct in all material respects as of the effective date of this Agreement (except that

such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), and (ii) agrees that, from and after the effective date of this Agreement, the Additional Guarantor shall be a party to the Credit Agreement and shall be bound, as a Guarantor, by all the provisions thereof and shall comply with and be subject to all of the terms, conditions, covenants, agreements and obligations set forth therein and applicable to the Guarantors, including, without limitation, the guaranty of the Obligations made by the Guarantors, jointly and severally with the other Loan Parties, in favor of the Agents and the Lenders pursuant to Article X of the Credit Agreement. The Additional Guarantor hereby agrees that from and after the effective date of this Agreement, each reference to a "Guarantor" or a "Loan Party" and each reference to the "Guarantors" or the "Loan Parties" in the Credit Agreement shall include the Additional Guarantor. The Additional Guarantor acknowledges that it has received a copy of the Credit Agreement and each other Loan Document and that it has read and understands the terms thereof.

(b) Each existing Schedule to the Credit Agreement reflects all information required to be provided therein with respect to the Additional Guarantor as of the date hereof.

**SECTION 3. Effectiveness**. This Agreement shall become effective upon its execution by the Additional Guarantor, and each Agent and receipt by the Agents of the following, in each case in form and substance reasonably satisfactory to the Agents:

(a) original counterparts to this Agreement, duly executed by, the Additional Guarantor and the Agents;

(b) a Supplement to the Security Agreement, substantially in the form of Exhibit C to the Security Agreement (the "**Security Agreement Supplement**"), duly executed by the Additional Guarantor, and any instruments of assignment or other documents required to be delivered to the Agents pursuant to the terms thereof;

(c) (i) certificates, if any, representing 100% of the issued and outstanding Equity Interests of the Additional Guarantor and each Subsidiary of the Additional Guarantor and (ii) all original promissory notes of such Additional Guarantor, if any, in each case, that are required to be delivered under the Loan Documents, in each case, accompanied by instruments of assignment and transfer in such form as the Collateral Agent may reasonably request;

(d) appropriate financing statements on Form UCC-1 duly filed in such office or offices as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the security interests purported to be created by the Security Agreement Supplement;

(e) a favorable written opinion of counsel to the Loan Parties as to such matters as the Agents may reasonably request; and

(f) such other agreements, instruments or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority (subject to Permitted Liens) of, or otherwise protect, any Lien purported to be covered by the Security Agreement Supplement or otherwise to effect the intent that the Additional Guarantor shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Additional Guarantor shall become Collateral for the Obligations free and clear of all Liens other than Permitted Liens.

**SECTION 4. Notices, Etc.** All notices and other communications provided for hereunder shall be in writing and shall be mailed (by certified mail, postage prepaid and return receipt requested), telecopied or delivered by hand, Federal Express or other reputable overnight courier, if to the Additional Guarantor, to it at its address set forth below its signature to this Agreement, and if to the Borrower, any Guarantor, any Lender or any Agent, to it at its address specified in the Credit Agreement or Joinder Agreement (as applicable); or as to any such Person at such other address as shall be designated by such Person in a written notice to such other Person, complying as to delivery with the terms of this Section 4. All such notices and other communications shall be effective in accordance with Section 11.1 of the Credit Agreement.

**SECTION 5. General Provisions.**

(a) The Additional Guarantor hereby confirms that each representation and warranty made by it under the Loan Documents is true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that already are qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct on and as of such earlier date), and that no Default or Event of Default has occurred or is continuing under the Credit Agreement. The Additional Guarantor hereby represents and warrants that as of the date hereof there are no claims or offsets against or defenses or counterclaims to its obligations under the Credit Agreement or any other Loan Document.

(b) Except as supplemented hereby, the Credit Agreement and each other Loan Document shall continue to be, and shall remain, in full force and effect. This Agreement shall not be deemed (i) to be a waiver of, or consent to, or a modification or amendment of, any other term or condition of the Credit Agreement or any other Loan Document or (ii) to prejudice any right or rights which the Agents or the Lenders may now have or may have in the future under or in connection with the Credit Agreement or the other Loan Documents or any of the instruments or agreements referred to therein, as the same may be amended, restated, supplemented or otherwise modified from time to time, including any replacement instrument or agreement therefor.

(c) The Additional Guarantor hereby expressly authorizes the Collateral Agent to file appropriate financing statements or continuation statements, and amendments thereto, (including without limitation, any such financing statements that indicate the Collateral as "all assets" or words of similar import) in such office or offices as may be necessary or, in the

opinion of the Collateral Agent, desirable to perfect the Liens to be created by the Security Agreement Supplement and each of the other Loan Documents.

(d) To the extent required pursuant to Section 11.4 of the Credit Agreement, the Borrower agrees to pay on written demand all reasonable and documented costs and expenses incurred by or on behalf of each Agent in connection with the negotiation, preparation, execution, delivery and performance of this Agreement, including, without limitation, the reasonable and documented fees, costs, client charges and expenses and disbursements of counsel for the Agents.

(e) This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telecopier or electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. The words "execution," "signed," "signature," and words of similar import in this Agreement or any notice, certificate, document, agreement or instrument in respect thereof shall be deemed to include electronic or digital signatures or the keeping of records in electronic form, each of which shall be of the same effect, validity and enforceability as manually executed signatures or a paper-based recordkeeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000, the Electronic Signatures and Records Act of 1999, or any other similar state laws based on the Uniform Electronic Transactions Act.

(f) Section headings in this Agreement are included herein for the convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(g) Each of the parties hereto hereby agrees that Sections 11.9, 11.10 and 11.11 of the Credit Agreement are incorporated by reference herein, *mutatis mutandis*, and shall have the same force and effect with respect to this Agreement as if originally set forth herein.

(h) This Agreement, together with the Credit Agreement and the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and thereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

[*Remainder of Page Intentionally Left Blank*]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

**BORROWER**:

**SYNERGY CHC CORP.**

Signed by:
By: ______________________
6CE49F4FB1D846C...
Name: Jack Ross
Title: Chairman and Chief Executive Officer

**GUARANTORS**:

**SYNERGY CHC INC.**

Signed by:
By: ______________________
6CE49F4FB1D846C...
Name: Jack Ross
Title: Chairman and Chief Executive Officer

**COLLATERAL AGENT**:

**ACP AGENCY, LLC**

By: ______________________________
Name: Peter Eschmann
Title: Authorized Person

**ADDITIONAL GUARANTOR**:

**HAND MD CORP.**

By: Signed by:
6CE49F4FB1D846C...
Name: Jack Ross
Title: Chairman and Chief Executive Officer

Address:
P.O. Box 22
Sebago, ME 04029
Attention: Jack Ross
jack@synergychc.com

# EXHIBIT 3

**EXECUTION VERSION**

# PLEDGE AND SECURITY AGREEMENT

**PLEDGE AND SECURITY AGREEMENT** (this "**Agreement**"), dated as of May 30, 2025, made by each of the Grantors referred to below, in favor of **ACP AGENCY, LLC** ("**ACP**"), in its capacity as collateral agent for the Secured Parties referred to below (in such capacity, together with its successors and assigns in such capacity, if any, the "**Collateral Agent**").

## RECITALS:

**WHEREAS**, **SYNERGY CHC CORP.,** a Nevada Corporation (the "**Borrower**"), and each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person (as defined in the Credit Agreement) that guarantees all or any portion of the Obligations (as defined in the Credit Agreement) from time to time, each a "**Guarantor**" and collectively, the "**Guarantors**", and together with the Borrower and each other Person that becomes an "**Additional Grantor**" hereunder, each a "**Grantor**" and collectively, the "**Grantors**"), the lenders from time to time party thereto (each a "**Lender**" and collectively, the "**Lenders**"), and ACP, in its capacities as the administrative agent (in such capacity, together with its successor and assigns, the "**Administrative Agent**") and as the Collateral Agent are parties to that certain Term Loan Credit Agreement, dated as of the date hereof (such agreement, as amended, restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor, being hereinafter referred to as the "**Credit Agreement**");

**WHEREAS**, pursuant to the Credit Agreement, the Lenders have agreed to make certain term loans and delayed draw term loans to the Borrower;

**WHEREAS**, it is a condition precedent to the Administrative Agent, the Collateral Agent and the Lenders making any Loan and providing any other financial accommodations to the Borrower pursuant to the Credit Agreement that each Grantor shall have executed and delivered this Agreement to the Collateral Agent for the benefit of the Secured Parties;

**WHEREAS**, the Grantors are mutually dependent on each other in the conduct of their respective businesses as an integrated operation, with credit needed from time to time by each Grantor often being provided through financing obtained by the other Grantors and the ability to obtain such financing being dependent on the successful operations of all of the Grantors as a whole; and

**WHEREAS,** each Grantor has determined that the execution, delivery and performance of this Agreement directly benefit, and are in the best interest of, such Grantor.

**NOW, THEREFORE**, in consideration of the premises and the agreements herein and in order to induce the Collateral Agent, the Administrative Agent and the Lenders to make and maintain the Loans and to provide other financial accommodations to the Borrower pursuant to the Credit Agreement, the Grantors hereby jointly and severally agree with the Collateral Agent, for the benefit of the Secured Parties, as follows:

**SECTION 1. Definitions.**

(a) Reference is hereby made to the Credit Agreement for a statement of the terms thereof. All capitalized terms used in this Agreement that are defined in the Credit Agreement or in Article 8 or 9 of the UCC and which are not otherwise defined herein shall have the same meanings herein as set forth therein; provided that terms used herein which are defined in the UCC on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Collateral Agent may otherwise determine.

(b) The following terms shall have the respective meanings provided for in the UCC: "Accounts", "Account Debtor", "Cash Proceeds", "Certificate of Title", "Chattel Paper", "Commercial Tort Claim", "Commodity Account", "Commodity Contracts", "Deposit Account", "Documents", "Electronic Chattel Paper", "Equipment", "Fixtures", "General Intangibles", "Goods", "Instruments", "Inventory", "Investment Property", "Letter-of-Credit Rights", "Noncash Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Security Account", "Software", "Supporting Obligations" and "Tangible Chattel Paper".

(c) As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"**Additional Collateral**" has the meaning specified therefor in Section 4(a)(i) hereof.

"**Additional Grantor**" has the meaning specified therefor in the Recitals hereto.

"**Administrative Agent**" has the meaning specified therefor in the Recitals hereto.

"**Agreement**" has the meaning specified therefor in the preamble hereto.

"**Borrower**" has the meaning specified therefor in the Recitals hereto.

"**Certificated Entities**" has the meaning specified therefor in Section 5(m) hereof.

"**Collateral**" has the meaning specified therefor in Section 2 hereof.

"**Collateral Agent**" has the meaning specified therefor in the preamble hereto.

"**Copyright Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to use or sell any works covered by any Copyright.

"**Copyrights**" means all domestic and foreign copyrights, whether registered or unregistered, including, without limitation, all copyright rights (whether now or hereafter arising) in any and all media (whether known as of the date hereof or hereafter developed), in and to all original works of authorship fixed in any tangible medium of expression (including computer software and internet website content) now or hereafter owned, acquired or used by any Grantor,

including all applications, registrations and recordations thereof (including, without limitation, applications, registrations and recordations in the United States Copyright Office or in any similar office or agency of the United States or any other country or any political subdivision thereof), and all extensions or renewals thereof.

"**Credit Agreement**" has the meaning specified therefor in the Recitals hereto.

"**Excluded Accounts**" has the meaning specified therefor in Section 1.01 of the Credit Agreement.

"**Governing Documents**" has the meaning specified therefor in Section 1.01 of the Credit Agreement.

"**Grantor**" and "**Grantors**" have the respective meanings specified therefor in the Recitals hereto.

"**Guarantor**" and "**Guarantors**" have the respective meanings specified therefor in the Recitals hereto.

"**Insolvency Proceeding**" has the meaning specified therefor in Section 1.01 of the Credit Agreement.

"**Intellectual Property**" means all Copyrights, Patents, Trademarks and Other Intellectual Property.

"**Intellectual Property Security Agreement**" has the meaning specified therefor in Section 6(f)(i) hereof.

"**Irrevocable Proxy**" has the meaning specified therefor in Section 4(a)(i) hereof.

"**Lender**" and "**Lenders**" have the respective meanings specified therefor in the Recitals hereto.

"**Licenses**" means the Copyright Licenses, the Patent Licenses and the Trademark Licenses.

"**Other Intellectual Property**" means any trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and privacy and other general intangibles of like nature, now or hereafter acquired, owned, developed or used by any Grantor.

"**Patent Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensee or licensor and providing for the grant of any right to manufacture, use or sell any invention covered by any Patent.

"**Patents**" means all domestic and foreign letters patent, design patents, utility patents, industrial designs, inventions, trade secrets, ideas, concepts, methods, techniques, processes, proprietary information, technology, know-how, formulae, rights of publicity and other

general intangibles of like nature, now existing or hereafter acquired, all applications, registrations and recordings thereof, and all reissues, divisions, continuations, continuations in part and extensions or renewals thereof.

“**Perfection Requirement**” and “**Perfection Requirements**” have the respective meanings specified therefor in Section 5(j) hereof.

“**Pledge Amendment**” has the meaning specified therefor in Section 4(a)(ii) hereof.

“**Pledged Debt**” means the indebtedness described in Schedule VII hereto and all other indebtedness from time to time owned or acquired by a Grantor, Promissory Notes and other Instruments evidencing any or all of such indebtedness, and all interest, cash, Instruments, Investment Property, financial assets, securities, Equity Interests, stock options and Commodity Contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness.

“**Pledged Interests**” means, collectively, (a) the Pledged Debt, (b) the Pledged Shares and (c) all security entitlements in any and all of the foregoing.

“**Pledged Issuers**” means, collectively, (a) the issuers of the shares of Equity Interests described in Schedule VIII hereto and (b) any other issuer of Equity Interests at any time and from time to time owned or acquired by a Grantor whose shares of Equity Interests are required to be pledged as Collateral under this Agreement.

“**Pledged Partnership/LLC Agreement**” means each limited liability agreement, operating agreement, membership agreement, partnership agreement or similar agreement to which a Grantor is a party and relating to any Pledged Interests (as amended, restated, supplemented or otherwise modified from time to time).

“**Pledged Shares**” means (a) the shares of Equity Interests of the Pledged Issuers, whether or not evidenced or represented by any stock certificate, certificated security or other Instrument, (b) all additional Equity Interests issued to or held by any Grantor from time to time in any manner, (c) the certificates representing such shares of Equity Interests, all options and other rights, contractual or otherwise, in respect thereof and all dividends, distributions, cash, Instruments, Investment Property, financial assets, securities, Equity Interests, stock options and Commodity Contracts, notes, debentures, bonds, Promissory Notes or other evidences of indebtedness and all other property (including, without limitation, any stock dividend and any distribution in connection with a stock split) from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Equity Interests and (d) without affecting the obligations of any Grantor under any provision prohibiting such action under this Agreement, the Credit Agreement or any other Loan Document, in the event of any consolidation or merger involving any Pledged Issuer and in which such Pledged Issuer is not the surviving entity, all Equity Interests of the successor entity formed by or resulting from such consolidation or merger.

“**Registration Page**” has the meaning specified therefor in Section 4(a)(i) hereof.

"**Secured Obligations**" has the meaning specified therefor in Section 3 hereof.

"**Security Agreement Supplement**" has the meaning specified therefor in Section 13(f) hereof.

"**Titled Collateral**" means all Collateral for which the title to such Collateral is governed by a Certificate of Title or certificate of ownership, including, without limitation, all motor vehicles (including, without limitation, all trucks, trailers, tractors, service vehicles, automobiles and other mobile equipment) for which the title to such motor vehicles is governed by a Certificate of Title or certificate of ownership.

"**Trademark Licenses**" means all licenses, contracts or other agreements, whether written or oral, naming any Grantor as licensor or licensee and providing for the grant of any right concerning any Trademark, together with any goodwill connected with and symbolized by any such trademark licenses, contracts or agreements and the right to prepare for sale or lease and sell or lease any and all Inventory now or hereafter owned by any Grantor and now or hereafter covered by such licenses.

"**Trademarks**" means all domestic and foreign trademarks, service marks, collective marks, certification marks, trade names, business names, d/b/a's, Internet domain names, trade styles, designs, logos and other source or business identifiers and all general intangibles of like nature, now or hereafter owned, adopted, acquired or used by any Grantor, all applications, registrations and recordings thereof (including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any state thereof or any other country or any political subdivision thereof), and all reissues, extensions or renewals thereof, together with all goodwill of the business symbolized by such marks and all customer lists, formulae and other Records of any Grantor relating to the distribution of products and services in connection with which any of such marks are used.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

**SECTION 2. Grant of Security Interest**. As collateral security for the payment, performance and observance of all of the Secured Obligations, each Grantor hereby pledges and assigns to the Collateral Agent (and its agents and designees), and grants to the Collateral Agent (and its agents and designees), for the benefit of the Secured Parties, a continuing security interest in, all personal property and Fixtures of such Grantor, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, of every kind and description, tangible or intangible, including, without limitation, the following (all being collectively referred to herein as the "**Collateral**"):

(a) all Accounts;

(b) all Chattel Paper (whether tangible or electronic);

(c) all Commercial Tort Claims;

(d) all Deposit Accounts, all cash, and all other property from time to time deposited therein or otherwise credited thereto and the monies and property in the possession or under the control of the Collateral Agent, the Administrative Agent or any Lender or any affiliate, representative, agent or participant of the Collateral Agent, the Administrative Agent or any Lender;

(e) all Documents;

(f) all General Intangibles (including, without limitation, all Payment Intangibles, Intellectual Property and Licenses);

(g) all Goods, including, without limitation, all Equipment, Fixtures and Inventory;

(h) all Instruments (including, without limitation, Promissory Notes);

(i) all Investment Property (including any Securities Account or Commodity Account);

(j) all Letter-of-Credit Rights;

(k) all Pledged Interests;

(l) all Supporting Obligations;

(m) all Additional Collateral;

(n) all other tangible and intangible personal property and Fixtures of such Grantor (whether or not subject to the UCC), including, without limitation, all bank and other accounts and all cash and all investments therein, all proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any of the property of such Grantor described in the preceding clauses of this Section 2 hereof (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by such Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, Software, data and computer programs in the possession or under the control of such Grantor or any other Person from time to time acting for such Grantor that at any time evidence or contain information relating to any of the property described in the preceding clauses of this Section 2 hereof or are otherwise necessary or helpful in the collection or realization thereof; and

(o) all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral;

in each case, howsoever such Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

Notwithstanding anything herein to the contrary, the term "Collateral" shall not include, and no Grantor is pledging, nor granting a security interest hereunder in any of such Grantor's right, title

or interest in any of the following: (i) any general intangible, contract, license, permit or authorization to the extent, but only to the extent, that such general intangible, contract, license, permit or authorization, by its terms or by law, prohibits (other than to the extent such term (A) has been waived or (B) would be rendered ineffective pursuant to Sections 9-406, 9-408, 9-409 of the UCC or other applicable provisions of the Uniform Commercial Code of any relevant jurisdiction or any other applicable law (including the Bankruptcy Code) or principles of equity) the assignment of, or the granting of a lien over the rights of a Grantor thereunder or which would be invalid or unenforceable upon such assignment or grant; provided, that (x) immediately upon the ineffectiveness, lapse, termination or waiver of any such provision, the Collateral shall include, and such Grantor shall be deemed to have granted a security interest in, any such right, title and interest as if such provision had never been in effect and (y) the foregoing exclusion shall in no way be construed so as to limit, impair or otherwise affect the Collateral Agent's unconditional continuing security interest in and liens upon any rights or interests of a Grantor in or to the proceeds of, or any monies due or to become due under, any such general intangible, contract, license, permit or authorization, or (ii) any intent-to-use United States trademark applications for which an amendment to allege use or statement of use has not been filed under 15 U.S.C. § 1051(c) or 15 U.S.C. § 1051(d), respectively, or if filed, has not been deemed in conformance with 15 U.S.C. § 1051(a) or examined and accepted, respectively, by the United States Patent and Trademark Office, provided that upon such filing and acceptance, such intent-to-use applications shall be included in the definition of Collateral.

Notwithstanding anything herein to the contrary, the term "Collateral" shall not include in the case of a Foreign Subsidiary of such Grantor, more than 65% (or such greater percentage that, due to a change in applicable law after the date hereof, (i) would not reasonably be expected to cause the undistributed earnings of such Foreign Subsidiary as determined for United States federal income tax purposes to be treated as a deemed dividend to such Foreign Subsidiary's United States parent and (ii) would not reasonably be expected to cause any material adverse tax consequences) of the issued and outstanding shares of Equity Interests entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) (it being understood and agreed that the Collateral shall include 100% of the issued and outstanding shares of Equity Interests not entitled to vote (within the meaning of Treas. Reg. Section 1.956-2(c)(2)) or other equity interest of such Foreign Subsidiary).

The Grantors agree that the pledge of the shares of Equity Interests of any Pledged Issuer who is a Foreign Subsidiary may be supplemented by one or more separate pledge agreements, deeds of pledge, share charges, or other similar agreements or instruments, executed and delivered by the relevant Grantors in favor of the Collateral Agent, which pledge agreements will provide for the pledge of such shares of Equity Interests in accordance with the laws of the applicable foreign jurisdiction. With respect to such shares of Equity Interests, the Collateral Agent may, at any time and from time to time, in its sole discretion, take actions in such foreign jurisdictions that will result in the perfection of the Lien created in such shares of Equity Interests.

**SECTION 3. Security for Secured Obligations**. The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (the "**Secured Obligations**"):

(a) the prompt payment by each Grantor, as and when due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), of all

amounts from time to time owing by the Borrower in respect of the Credit Agreement and/or the other Loan Documents, including, without limitation, (i) all Obligations, (ii) in the case of a Guarantor, all amounts from time to time owing by such Grantor in respect of its guaranty made pursuant to Article X of the Credit Agreement or under any other Guaranty to which it is a party, including, without limitation, all obligations guaranteed by such Grantor and (iii) all interest, fees, commissions, charges, expense reimbursements, indemnifications and all other amounts due or to become due under any Loan Document (including, without limitation, all interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts that accrue after the commencement of any Insolvency Proceeding of any Loan Party, whether or not the payment of such interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts are unenforceable or are not allowable, in whole or in part, due to the existence of such Insolvency Proceeding); and

(b) the prompt payment and due performance and observance by each Grantor of all of its other obligations from time to time existing in respect of this Agreement and any other Loan Document.

**SECTION 4. Delivery of the Pledged Interests.**

(a) (i) All Promissory Notes evidencing the Pledged Debt as of the Effective Date and all certificates representing the Pledged Shares as of the Effective Date, in each case to the extent constituting Collateral and to the extent not previously delivered to the Collateral Agent (or its agent or designated custodian), shall be delivered to the Collateral Agent on or prior to the Effective Date (or within such period thereafter as the Collateral Agent agrees in its sole discretion). All other Promissory Notes, certificates and Instruments constituting Pledged Interests from time to time required to be pledged to the Collateral Agent pursuant to the terms of this Agreement or the Credit Agreement (the "**Additional Collateral**") shall be delivered to the Collateral Agent (or its agent or designated custodian) promptly upon, but in any event within one (1) Business Day (or such longer period as agreed by the Collateral Agent in its sole discretion) after, receipt thereof by or on behalf of any of the Grantors. All such Promissory Notes, certificates and Instruments shall be (A) held by or on behalf of the Collateral Agent pursuant hereto, (B) delivered in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment executed in blank and (C) with respect to certificates representing any Pledged Shares, accompanied by (1) a duly executed irrevocable proxy coupled with an interest, in substantially the form of Exhibit D hereto (an "**Irrevocable Proxy**"), and (2) a duly acknowledged Equity Interest registration page, in blank, from each Pledged Issuer, substantially in the form of Exhibit E hereto, or otherwise in form and substance satisfactory to the Collateral Agent (a "**Registration Page**"), all in form and substance satisfactory to the Collateral Agent. If any Pledged Interests consist of uncertificated securities, unless the immediately following sentence is applicable thereto, such Grantor shall cause (x) the Collateral Agent (or its designated custodian or nominee) to become the registered holder thereof, or (y) cause each issuer of such securities to agree that it will comply with instructions originated by the Collateral Agent with respect to such securities without further consent by such Grantor. If any Pledged Interests consist of security entitlements, such Grantor shall (x) transfer such Pledged Interests or security entitlements to the Collateral Agent (or its custodian, nominee or other designee), or (y) cause the applicable issuer thereof or securities intermediary to agree that it will

comply with entitlement orders by the Collateral Agent without further consent by such Grantor.

(ii) Within three (3) days of the receipt by a Grantor of any Additional Collateral, a pledge amendment duly executed by such Grantor, in substantially the form of Exhibit A hereto (a "**Pledge Amendment**"), shall be delivered to the Collateral Agent, in respect of the Additional Collateral that must be pledged pursuant to this Agreement or the Credit Agreement. The Pledge Amendment shall from and after delivery thereof constitute part of Schedules VII and VIII hereto. Each Grantor hereby authorizes the Collateral Agent to attach each Pledge Amendment to this Agreement and agrees that all Promissory Notes, certificates or Instruments constituting Pledged Interests listed on any Pledge Amendment delivered to the Collateral Agent shall for all purposes hereunder constitute Pledged Interests and such Grantor shall be deemed upon delivery thereof to have made the representations and warranties set forth in Section 5 hereof with respect to such Additional Collateral.

(b) If any Grantor shall receive, by virtue of such Grantor being or having been an owner of any Pledged Interests, any Additional Collateral consisting of any (i) Equity Interest certificate (including, without limitation, any certificate representing an Equity Interest dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, combination of shares, stock split, spin-off or split-off), Promissory Note or other Instrument, (ii) certificated option or right, whether as an addition to, substitution for, or in exchange for, any Pledged Interests, or otherwise, (iii) dividends or distributions payable in cash (except such dividends and/or distributions permitted to be retained by any such Grantor pursuant to Section 7 hereof) or in securities or other property or (iv) dividends, distributions, cash, Instruments, Investment Property and other property in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, such Grantor shall receive such Equity Interest certificate, Promissory Note, Instrument, option, right, payment or distribution in trust for the benefit of the Collateral Agent, shall segregate it from such Grantor's other property and shall promptly, but in any event within five (5) Business Days (or such longer period as agreed to in writing by the Collateral Agent in its sole discretion) deliver it to the Collateral Agent (or its agent or designated custodian), in the exact form received, with any necessary indorsement and/or instrument of transfer or assignment executed in blank (and, in the case of any Additional Collateral described in clause (b)(i) above, with an Irrevocable Proxy and Registration Page with respect to any such Additional Collateral), all in form and substance reasonably satisfactory to the Collateral Agent, to be held by the Collateral Agent as Pledged Interests.

**SECTION 5.** **Representations and Warranties**. Each Grantor jointly and severally represents and warrants on the date hereof, and on the date any Loan is made pursuant to the Credit Agreement, as follows:

(a) Schedule I hereto sets forth a complete and accurate list as of the date hereof of (i) the exact legal name of each Grantor, (ii) the jurisdiction of organization of each Grantor, (iii) the type of organization of each Grantor and (iv) the organizational identification number of each Grantor (or states that no such organizational identification number exists). The Information Certificate, dated as of the Effective Date, a copy of which has been previously delivered to the Collateral Agent, or the most recently delivered Information Certificate as provided in Section 7.1(a)(iv)(B) of the Credit Agreement, is true, complete and correct in all

respects.

(b) All Equipment, Fixtures, Inventory and other Goods now existing or hereafter existing are, and will be, located at the addresses specified therefor in Schedule III hereto (as amended, supplemented or otherwise modified from time to time in accordance with Section 6(b)). Schedule III hereto contains a true, correct and complete list, as of the Effective Date, of the legal names and addresses of each warehouse, if any, at which Collateral is stored. Each Grantor's chief place of business and chief executive office, the place where such Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper are located at the addresses specified therefor in Schedule III hereto (as amended, supplemented or otherwise modified from time to time in accordance with the terms hereof). None of the Accounts is evidenced by Promissory Notes or other Instruments. Set forth in Schedule IV hereto is a complete and accurate list, as of the date of this Agreement, of each Deposit Account, Securities Account and Commodities Account of each Grantor, together with the name and address of each institution at which each such Account is maintained, the account number for each such Deposit Account, Securities Account and Commodities Account and a description of the purpose of each such Deposit Account, Securities Account and Commodities Account. Set forth in Schedule II hereto as of the Effective Date is (i) a complete and correct list of each trade name used by each Grantor and (ii) the name of, and each trade name used by, each Person from which such Grantor has acquired any substantial part of the Collateral within five years of the date hereof.

(c) Each Grantor has delivered to the Collateral Agent true, complete and correct copies, in case, in all material respects, of each License described in Schedule II hereto, including all schedules and exhibits thereto, which represents all of the Licenses existing on the date of this Agreement. Each such License sets forth the entire agreement and understanding of the parties thereto relating to the subject matter thereof, and there are no other agreements, arrangements or understandings, written or oral, relating to the matters covered thereby or the rights of any Grantor or any of its Affiliates in respect thereof. Each License now existing is, and each other License will be, the legal, valid and binding obligation of the parties thereto, enforceable against such parties in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally. No default under any License by any such party has occurred, nor does any defense, offset, deduction or counterclaim exist thereunder in favor of any such party, in each case, that could reasonably be expected to result in a Material Adverse Effect. No party to any License has given any Grantor notice of its intention to cancel, terminate or fail to renew any License, in each case, that could reasonably be expected to result in a Material Adverse Effect.

(d) Schedule II hereto sets forth a complete and accurate list of all registered or applied-for Intellectual Property owned by each Grantor as of the date hereof and all Licenses of Intellectual Property to each Grantor. All such Intellectual Property is subsisting and in full force and effect, has not been adjudged invalid or unenforceable, is valid and enforceable and has not been abandoned in whole or in part. No such Intellectual Property is the subject of any licensing or franchising agreement. No Intellectual Property owned or used by any Grantor conflicts with the rights of others to any Intellectual Property and no Grantor is now infringing or in conflict with any such rights of others, and to the best knowledge of each Grantor, no other Person is now infringing or in conflict with any such properties, assets and rights owned or used by any Grantor, except for infringements and conflicts that could not reasonably be expected to

have, individually or in the aggregate, a Material Adverse Effect. No Grantor has received any notice that it is violating or has violated the Intellectual Property rights of any third party.

(e) To such Grantor's knowledge, none of the Other Intellectual Property of any Grantor has been used, divulged, disclosed or appropriated to the detriment of such Grantor for the benefit of any other Person other than such Grantor; no employee, independent contractor or agent of any Grantor has misappropriated any Other Intellectual Property of any other Person in the course of the performance of his or her duties as an employee, independent contractor or agent of such Grantor; and no employee, independent contractor or agent of any Grantor is in default or breach of any term of any employment agreement, non-disclosure agreement, assignment of inventions agreement or similar agreement, or contract relating in any way to the protection, ownership, development, use or transfer of such Grantor's Intellectual Property.

(f) The Pledged Issuers set forth in Schedule VIII that are Subsidiaries of a Grantor are such Grantor's only Subsidiaries as of the date of the most recent update to Schedule VIII in accordance with the terms hereof. The Pledged Shares have been duly authorized and validly issued, and to the extent such concepts are applicable thereto, fully paid and nonassessable and, except as set forth on Schedule VIII, the holders thereof are not entitled to any preemptive, first refusal or other similar rights. Except as noted in Schedule VIII hereto, the Pledged Shares constitute 100% of the issued shares of Equity Interests of the Pledged Issuers as of the date hereof. All other shares of Equity Interests constituting Pledged Interests will be duly authorized and validly issued, and to the extent such concepts are applicable thereto, fully paid and nonassessable.

(g) The Promissory Notes evidencing the Pledged Debt in existence on the Effective Date have been, and all other Promissory Notes from time to time evidencing Pledged Debt, when executed and delivered, will have been, duly authorized, executed and delivered by the respective makers thereof, and all such Promissory Notes are or will be, as the case may be, legal, valid and binding obligations of such makers, enforceable against such makers in accordance with their respective terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally or equitable principles.

(h) The Grantors are and will be at all times the sole and exclusive owners of, or otherwise have and will have adequate rights in, the Collateral free and clear of any Liens except for the Permitted Liens. No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office except such as may have been filed to perfect or protect any Permitted Lien.

(i) The exercise by the Collateral Agent of any of its rights and remedies hereunder will not contravene any applicable law or Contractual Obligation binding on or otherwise affecting any Grantor or any of its properties and will not result in, or require the creation of, any Lien upon or with respect to any of its properties (in each case, other than as set forth in this Agreement).

(j) Other than those obtained or already made, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any

other Person, is required for (i) the due execution, delivery and performance by any Grantor of this Agreement, (ii) the grant by any Grantor of the security interest purported to be created hereby in the Collateral or (iii) the exercise by the Collateral Agent of any of its rights and remedies hereunder, except, in the case of this clause (iii), as may be required in connection with any sale of any Pledged Interests by laws affecting the offering and sale of securities generally. No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other Person, is required for the perfection of the security interest purported to be created hereby in the Collateral, except (A) for the filing under the Uniform Commercial Code as in effect in the applicable jurisdiction of the financing statements described in Schedule V hereto, all of which financing statements have been duly filed and are in full force and effect, (B) with respect to the perfection of any security interest created hereby in any United States Intellectual Property and Licenses, for the recording of the appropriate Intellectual Property Security Agreement in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, (C) with respect to the perfection of the security interest created hereby in foreign Intellectual Property and Licenses, for registrations and filings in jurisdictions located outside of the United States and covering rights in such jurisdictions relating to such foreign Intellectual Property and Licenses, (D) with respect to the perfection of the security interest created hereby in Titled Collateral with a value in excess of, individually, $100,000 and, in the aggregate, $250,000, for the submission of an appropriate application requesting that the Lien of the Collateral Agent be noted on the Certificate of Title or certificate of ownership, completed and authenticated by the applicable Grantor, together with the Certificate of Title or certificate of ownership, with respect to such Titled Collateral, to the appropriate Governmental Authority, (E) with respect to any action that may be necessary to obtain control of Collateral constituting Deposit Accounts (excluding the Excluded Accounts), Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights, the taking of such actions, (F) the Collateral Agent's having possession of all Documents, tangible Chattel Paper, Instruments and cash constituting Collateral, (G) in the case of commercial tort claims arising after the date hereof in which any Grantor acquires an interest, the actions required under Section 6(a) with respect to commercial tort claims with a value, individually, in excess of $250,000, to the extent required thereby, (H) in the case of all Pledged Shares which are certificated securities, and Pledged Debt, the delivery thereof to the Collateral Agent (or its agent or designated custodian) of such Pledged Shares and Pledged Debt consisting of instruments and certificates, in each case properly endorsed for transfer to the Collateral Agent or in blank and (I) in the case of all Pledged Shares which are uncertificated securities, the actions that may be necessary to obtain control with respect to such Investment Property (subclauses (A) - (I), each a "**Perfection Requirement**" and collectively, the "**Perfection Requirements**").

(k) This Agreement creates a legal, valid and enforceable security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, in the Collateral, as security for the Secured Obligations. The Perfection Requirements result in the perfection of such security interests. Such security interests are, or in the case of Collateral in which any Grantor obtains rights after the date hereof, will be, perfected, first priority security interests, subject in priority only to the Permitted Liens, and the recording of such instruments of assignment described above. Such Perfection Requirements and all other action necessary or desirable to perfect and protect such security interest have been duly made or taken, except for (i) the Collateral Agent's having possession of all Instruments, Documents, Chattel Paper and cash constituting Collateral after the date hereof, (ii) the Collateral Agent's having control of all Deposit Accounts, Electronic Chattel Paper, Investment Property or Letter-of-Credit Rights constituting Collateral after the date

hereof, and (iii) the other filings and recordations and actions described in Section 5(j) hereof.

(l) As of the date hereof, no Grantor holds any Commercial Tort Claims in respect of which a claim has been filed in a court of law or a written notice by an attorney has been given to a potential defendant, except for such claims described in Schedule VI.

(m) Each Grantor and any of its Subsidiaries that is a partnership or a limited liability company with certificated Equity Interests, has irrevocably opted into (and has caused each of its Subsidiaries that is a partnership or a limited liability company with certificated Equity Interests, and a Pledged Issuer to opt into) Article 8 of the relevant Uniform Commercial Code (collectively, the "**Certificated Entities**"). Such interests are securities for purposes of Article 8 of the relevant Uniform Commercial Code. With respect to each Grantor and its Subsidiaries that is a partnership or a limited liability company and is not a Certificated Entity, the partnership interests or membership interests of each such Person are not (i) dealt in or traded on securities exchanges or in securities markets, (ii) securities for purposes of Article 8 of any relevant Uniform Commercial Code, (iii) investment company securities within the meaning of Section 8-103 of any relevant Uniform Commercial Code or (iv) evidenced by a certificate.

**SECTION 6. Covenants as to the Collateral**. In accordance with Section 7.1 of the Credit Agreement, during the period from the Effective Date until the Termination Date, unless the Collateral Agent shall otherwise consent in writing:

(a) Further Assurances. Each Grantor will take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as the Collateral Agent may require from time to time in order (i) to perfect and protect, or maintain the perfection of, the security interest and Lien purported to be created hereby; (ii) to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) otherwise to effect the purposes of this Agreement, including, without limitation: (A) at the request of the Collateral Agent, marking conspicuously all Chattel Paper, Instruments, Licenses and all of its Records pertaining to the Collateral with a legend, in form and substance satisfactory to the Collateral Agent, indicating that such Chattel Paper, Instrument, License or Records is subject to the security interest created hereby, (B) if any Account shall be evidenced by a Promissory Note or other Instrument or Chattel Paper, delivering and pledging to the Collateral Agent (or its agent or designated custodian) such Promissory Note, other Instrument or Chattel Paper, duly endorsed and accompanied by executed instruments of transfer or assignment, all in form and substance satisfactory to the Collateral Agent, (C) executing and filing (to the extent, if any, that such Grantor's signature is required thereon) or authenticating the filing of, such financing or continuation statements, or amendments thereto, (D) with respect to Intellectual Property hereafter existing and not covered by an appropriate security interest grant, the executing and recording in the United States Patent and Trademark Office or the United States Copyright Office, as applicable, appropriate instruments granting a security interest, as may be necessary or desirable or that the Collateral Agent may request in order to perfect and preserve the security interest purported to be created hereby, (E) delivering to the Collateral Agent the appropriate instruments of transfer or assignment executed in blank, Irrevocable Proxies and Registration Pages in respect of the Pledged Interests, (F) furnishing to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all

in reasonable detail, (G) if at any time after the date hereof, any Grantor acquires or holds any Commercial Tort Claim with a value, individually, in excess of $250,000, promptly, but in any event within three (3) Business Days after such acquisition, notifying the Collateral Agent in a writing signed by such Grantor setting forth a brief description of such Commercial Tort Claim and granting to the Collateral Agent a security interest therein and in the proceeds thereof, which writing shall incorporate the provisions hereof and shall be in form and substance satisfactory to the Collateral Agent, (H) upon the acquisition after the date hereof by any Grantor of any Titled Collateral with a value in excess of, individually, $100,000 and, in the aggregate, $250,000 (other than Equipment that is subject to a purchase money security interest that constitutes a Permitted Lien under the Credit Agreement), promptly, and in any event within five (5) days after such acquisition, notifying the Collateral Agent of such acquisition, setting forth a description of such Titled Collateral acquired and a good faith estimate of the current value of such Titled Collateral, and if so requested by the Collateral Agent, promptly causing the Collateral Agent to be listed as the lienholder on such Certificate of Title or certificate of ownership and delivering evidence of the same to the Collateral Agent, and (I) taking all actions required by law in any relevant Uniform Commercial Code jurisdiction with respect to any Collateral. No Grantor shall take or fail to take any action which could in any manner impair the validity or enforceability of the Collateral Agent's security interest in and Lien on any Collateral.

(b) Location of Equipment and Inventory. Each Grantor will keep the Equipment and Inventory at the locations specified in Schedule III hereto or, upon not less than 30 days' prior written notice to the Collateral Agent accompanied by a new Schedule III hereto indicating each new location of the Equipment and Inventory, at such other locations in the continental United States as the Grantors may elect, provided that (i) all action has been taken to grant to the Collateral Agent a perfected, first priority security interest in such Equipment and Inventory (subject only to Permitted Liens) in favor of the Collateral Agent, for the benefit of the Secured Parties, and (ii) the Collateral Agent's rights in such Equipment and Inventory, including, without limitation, the existence, perfection and priority of the security interest created hereby in such Equipment and Inventory, are not adversely affected thereby.

(c) Condition of Equipment. Each Grantor will promptly furnish to the Collateral Agent a statement describing in reasonable detail any loss or damage in excess of $100,000, in the aggregate, to any Equipment.

(d) Provisions Concerning the Accounts and the Licenses.

(i) Each Grantor will, except as otherwise provided in this subsection (d), continue to collect, at its own expense, all amounts due or to become due under the Accounts. In connection with such collections, each Grantor may (and, at the Collateral Agent's direction, will) take such action as such Grantor (or, if applicable, the Collateral Agent) may deem necessary or advisable to enforce collection or performance of the Accounts; provided, however, that the Collateral Agent shall have the right at any time, upon the occurrence and during the continuance of an Event of Default, to notify the Account Debtors or obligors under any Accounts of the assignment of such Accounts to the Collateral Agent and to direct such Account Debtors or obligors to make payment of all amounts due or to become due to such Grantor thereunder directly to the Collateral Agent or its designated agent and, upon such notification and at the expense of such Grantor and to the extent permitted by applicable law, to enforce collection of any such

Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as such Grantor might have done. After receipt by any Grantor of a notice from the Collateral Agent that the Collateral Agent has notified, intends to notify, or has enforced or intends to enforce a Grantor's rights against the Account Debtors or obligors under any Accounts as referred to in the proviso to the immediately preceding sentence, (A) all amounts and proceeds (including Instruments) received by such Grantor in respect of the Accounts shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from other funds of such Grantor and shall be forthwith paid over to the Collateral Agent or its designated agent in the same form as so received (with any necessary endorsement) to be held as cash collateral and applied as specified in the Credit Agreement unless otherwise directed by the Collateral Agent. In addition, upon the occurrence and during the continuance of an Event of Default, such Grantor will not (A) grant any extension of the time for payment of any Account, (B) compromise or settle any Account receivable for less than the full amount thereof, (C) release, wholly or partially any Person liable for the payment of any Account or (D) allow any credit or discount thereon. Any such securities, cash, investments and other items so received by the Collateral Agent or its designated agent shall (in the sole and absolute discretion of the Collateral Agent) be held as additional Collateral for the Secured Obligations or distributed in accordance with Section 9 hereof.

(ii) Upon the occurrence and during the continuance of any breach or default under any License by any party thereto other than a Grantor, (A) the relevant Grantor will, promptly after obtaining knowledge thereof, give the Collateral Agent written notice of the nature and duration thereof, specifying what action, if any, it has taken and proposes to take with respect thereto, (B) no Grantor will, without the prior written consent of the Collateral Agent, declare or waive any such breach or default or affirmatively consent to the cure thereof or exercise any of its remedies in respect thereof, and (C) each Grantor will, upon written instructions from the Collateral Agent and at such Grantor's expense, take such action as the Collateral Agent may deem necessary or advisable in respect thereof.

(iii) Each Grantor will, at its expense, promptly deliver to the Collateral Agent a copy of each notice or other communication received by it by which any other party to any License (A) declares a breach or default by a Grantor of any material term thereunder, (B) terminates such License or (C) purports to exercise any of its rights or affect any of its obligations thereunder, together with a copy of any reply by such Grantor thereto.

(iv) Each Grantor will exercise promptly and diligently each and every right which it may have under each License (other than any right of termination) and will duly perform and observe in all respects all of its obligations under each License and will take all action necessary to maintain the Licenses in full force and effect. No Grantor will, without the prior written consent of the Collateral Agent, cancel, terminate, amend or otherwise modify in any respect, or waive any provision of, any License.

(e) Notices and Communications; Defense of Title; Amendments; Equity Issuances. Each Grantor will:

(i) at the Grantors' joint and several expense, promptly deliver to the Collateral Agent a copy of each notice or other communication received by it in respect of

the Pledged Interests;

(ii) at the Grantors' joint and several expense, defend the Collateral Agent's right, title and security interest in and to the Pledged Interests against the claims of any Person (subject to Permitted Liens), keep the Pledged Interests free from all Liens (except Permitted Liens), and not sell, exchange, transfer, assign, lease or otherwise dispose of the Pledged Interests or any interest therein, except as permitted under the Credit Agreement and the other Loan Documents;

(iii) not make or consent to any amendment or other modification or waiver with respect to any Pledged Interests or enter into any agreement or permit to exist any restriction with respect to any Pledged Interests other than as expressly permitted under the Credit Agreement; and

(iv) not permit the issuance of (A) any additional shares of any class of Equity Interests of any Pledged Issuer, (B) any securities convertible voluntarily by the holder thereof or automatically upon the occurrence or non-occurrence of any event or condition into, or exchangeable for, any such shares of Equity Interests or (C) any warrants, options, contracts or other commitments entitling any Person to purchase or otherwise acquire any such shares of Equity Interests, in each case, unless pledged to the Collateral Agent pursuant to a Pledge Amendment in accordance with Section 4(a)(ii) hereof or as otherwise permitted under the Credit Agreement.

(f) Intellectual Property.

(i) If applicable, each Grantor has duly executed and delivered the applicable short form Security Agreement (in the form attached hereto as Exhibit B, the "**Intellectual Property Security Agreement**"). Except as provided in subsection (ii) below, each Grantor (either itself or through licensees) will, and will cause each licensee thereof to, take all action necessary to maintain all of the Intellectual Property in full force and effect, including, without limitation, using the proper statutory notices and markings and using the Trademarks on each applicable trademark class of goods in order to so maintain the Trademarks in full force, free from any claim of abandonment for non-use, and no Grantor will (nor permit any licensee thereof to) do any act or knowingly omit to do any act whereby any Intellectual Property may become invalidated.

(ii) Notwithstanding the foregoing, so long as no Event of Default has occurred and is continuing, no Grantor shall have an obligation to use or to maintain any Intellectual Property (A) that relates solely to any product or work, that has been, or is in the process of being, discontinued, abandoned or terminated, (B) that is being replaced with Intellectual Property substantially similar to the Intellectual Property that may be abandoned or otherwise become invalid, so long as the failure to use or maintain such Intellectual Property does not materially adversely affect the validity of such replacement Intellectual Property and so long as such replacement Intellectual Property is subject to the Lien created by this Agreement or (C) that is substantially the same as any other Intellectual Property that is in full force, so long as the failure to use or maintain such Intellectual Property does not materially adversely affect the validity of such replacement Intellectual Property and so long as such other Intellectual Property is subject to the Lien and security interest created by this Agreement.

(iii) Each Grantor will cause to be taken all necessary steps in any proceeding before the United States Patent and Trademark Office and the United States Copyright Office or any similar office or agency in any other country or political subdivision thereof to maintain each registration of the Intellectual Property (other than the Intellectual Property described in Section 6(f)(ii)), including, without limitation, filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference and cancellation proceedings and payment of maintenance fees, filing fees, taxes or other governmental fees. If any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors shall (A) upon obtaining knowledge of such infringement, misappropriation, dilution or other violation, promptly notify the Collateral Agent and (B) to the extent the Grantors shall deem appropriate under the circumstances, promptly sue for infringement, misappropriation, dilution or other violation, seek injunctive relief where appropriate and recover any and all damages for such infringement, misappropriation, dilution or other violation, or take such other actions as the Grantors shall deem appropriate under the circumstances to protect such Intellectual Property.

(iv) Each Grantor shall furnish to the Collateral Agent statements and schedules further identifying and describing the Intellectual Property and Licenses and such other reports in connection with the Intellectual Property and Licenses as the Collateral Agent may reasonably request, all in reasonable detail and promptly upon request of the Collateral Agent, following receipt by the Collateral Agent of any such statements, schedules or reports, the Grantors shall modify this Agreement by amending Schedule II hereto to include any Intellectual Property and Licenses, as the case may be, which become part of the Collateral under this Agreement, and shall execute and authenticate such documents and do such acts as shall be necessary or, in the judgment of the Collateral Agent, desirable to subject such Intellectual Property and Licenses to the Lien and security interest created by this Agreement.

(v) Notwithstanding anything herein to the contrary, upon the occurrence and during the continuance of an Event of Default, no Grantor may abandon or otherwise permit any Intellectual Property to become invalid without the prior written consent of the Collateral Agent, and if any Intellectual Property is infringed, misappropriated, diluted or otherwise violated in any material respect by a third party, the Grantors will take such action as the Collateral Agent shall deem appropriate under the circumstances to protect such Intellectual Property.

(vi) In the event that any Grantor shall (A) obtain rights to any new Trademarks necessary for the operation of its business, or any reissue, renewal or extension of any existing Trademark necessary for the operation of its business, (B) obtain rights to or develop any new patentable inventions, or become entitled to the benefit of any Patent, or any reissue, division, continuation, renewal, extension or continuation-in-part of any existing Patent or any improvement thereof (whether pursuant to any license or otherwise), (C) obtain rights to or develop any new works protectable by Copyright, or become entitled to the benefit of any rights with respect to any Copyright or any registration or application therefor, or any renewal or extension of any existing Copyright or any registration or application therefor, or (D) obtain rights to or develop new Other Intellectual Property, the provisions of Section 2 hereof shall automatically apply thereto and such Grantor shall give to the Collateral Agent prompt notice thereof in accordance with the terms of this Agreement and the Credit Agreement. Except as otherwise provided herein or in the Credit Agreement each Grantor, either itself or through any agent, employee, licensee or designee, shall give the Collateral Agent written notice of each

application submitted by it for the registration of any Trademark or Copyright or the issuance of any Patent with the United States Patent and Trademark Office or the United States Copyright Office, as applicable, or in any similar office or agency of the United States or any country or any political subdivision thereof.

(vii) Each Grantor shall execute, authenticate and deliver any and all grants, assignments, agreements, instruments, documents and papers as the Collateral Agent may reasonably request to evidence the Collateral Agent's security interest hereunder in any Intellectual Property and the General Intangibles of such Grantor relating thereto or represented thereby, and each Grantor hereby appoints the Collateral Agent its attorney-in-fact to execute and/or authenticate and file all such writings for the foregoing purposes, all acts of such attorney being hereby ratified and confirmed, and such power (being coupled with an interest) shall be irrevocable until the Termination Date.

(g) Deposit, Commodities and Securities Accounts. Each Grantor shall cause each bank and other financial institution with an account referred to in Schedule IV hereto (other than any Excluded Account) to execute and deliver to the Collateral Agent (or its designee) a Control Agreement, in form and substance satisfactory to the Collateral Agent, duly executed by such Grantor and such bank or financial institution, or enter into other arrangements in form and substance satisfactory to the Collateral Agent, pursuant to which such institution shall irrevocably agree (unless otherwise agreed to by the Collateral Agent), among other things, that (i) it will comply at any time with the instructions originated by the Collateral Agent (or its designee) to such bank or financial institution directing the disposition of cash, Commodity Contracts, securities, Investment Property and other items from time to time credited to such account, without further consent of such Grantor, (ii) all cash, Commodity Contracts, securities, Investment Property and other items of such Grantor deposited with such institution shall be subject to a perfected, first priority security interest (subject only to Permitted Liens) in favor of the Collateral Agent (or its designee), and (iii) any right of set off, banker's Lien or other similar Lien, security interest or encumbrance shall be fully waived or subordinated as against the Collateral Agent (or its designee). The provisions of this Section 6(g) shall not apply to any Excluded Accounts.

(h) Titled Collateral.

(i) Each Grantor shall (a) cause all Collateral, now owned or hereafter acquired by any Grantor, which under applicable law are required to be registered, to be properly registered in the name of such Grantor, (b) cause all Titled Collateral, to be properly titled in the name of such Grantor, and if requested by the Collateral Agent in accordance with the terms hereof, with the Collateral Agent's Lien noted thereon and (c) if requested by the Collateral Agent in accordance with the terms hereof, promptly deliver to the Collateral Agent (or its custodian) originals of all such Certificates of Title or certificates of ownership for such Titled Collateral, with the Collateral Agent's Lien noted thereon.

(ii) Upon the acquisition after the date hereof by any Grantor of any Titled Collateral with a value in excess of, individually, $100,000 and, in the aggregate, $250,000 (other than Equipment to be acquired that is subject to a purchase money security interest that constitutes a Permitted Lien under the Credit Agreement), such Grantor shall immediately notify the Collateral Agent of such acquisition, set forth a description of such Titled Collateral

acquired and a good faith estimate of the current value of such Titled Collateral, and if so requested by the Collateral Agent, immediately deliver to the Collateral Agent (or its custodian) originals of the Certificates of Title or certificates of ownership for such Titled Collateral, together with the manufacturer's statement of origin, and an application duly executed by the appropriate Grantor to evidence the Collateral Agent's Lien thereon.

(iii) Each Grantor hereby appoints the Collateral Agent as its attorney-in-fact, effective the date hereof and terminating upon the Termination Date, for the purpose of (A) executing on behalf of such Grantor title or ownership applications for filing with appropriate Governmental Authority to enable Titled Collateral now owned or hereafter acquired by such Grantor to be amended to reflect the Collateral Agent listed as lienholder thereof, (B) filing such applications with such Governmental Authority, and (C) executing such other documents and instruments on behalf of, and taking such other action in the name of, such Grantor as the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Section 6(h) (including, without limitation, for the purpose of creating in favor of the Collateral Agent a perfected Lien on such Titled Collateral and exercising the rights and remedies of the Collateral Agent hereunder). This appointment as attorney-in-fact is coupled with an interest and is irrevocable until the Termination Date.

(iv) With respect to motor vehicles, any Certificates of Title or ownership delivered pursuant to the terms hereof shall be accompanied by odometer statements for each motor vehicle covered thereby.

(v) So long as no Event of Default shall have occurred and be continuing, upon the request of any Grantor, the Collateral Agent shall execute and deliver to such Grantor such instruments as such Grantor shall reasonably request to remove the notation of the Collateral Agent as lienholder on any Certificate of Title or certificate of ownership for any Titled Collateral; provided that any such instruments shall be delivered, and the release shall be effective, only upon receipt by the Collateral Agent of a certificate from such Grantor, stating that the Titled Collateral, the Lien on which is to be released, is to be sold in accordance with the terms of the Credit Agreement or has suffered a casualty loss (with title thereto passing to the casualty insurance company therefor in settlement of the claim for such loss), the amount that such Grantor will receive as sale proceeds or insurance proceeds and whether or not such sale proceeds or insurance proceeds are required by the Credit Agreement to be paid to the Collateral Agent to be applied to the Secured Obligations and, to the extent required by the Credit Agreement, any proceeds of such sale or casualty loss shall be paid to the Collateral Agent hereunder to be applied to the Secured Obligations in accordance with the terms of the Credit Agreement.

(i) Control. Each Grantor hereby agrees to take any or all action that may be necessary or desirable or that the Collateral Agent may request in order for the Collateral Agent to obtain control in accordance with Sections 9-104, 9-105, 9-106, and 9-107 of the UCC with respect to the following Collateral: (i) Deposit Accounts (other than Excluded Accounts), (ii) Securities Accounts; (iii) Electronic Chattel Paper, (iv) Investment Property and (v) Letter-of-Credit Rights. Each Grantor hereby acknowledges and agrees that any agent or designee of the Collateral Agent shall be deemed to be a "secured party" with respect to the Collateral under the control of such agent or designee for all purposes.

(j) Records; Inspection and Reporting.

(i) Each Grantor shall keep adequate records concerning its Accounts, Chattel Paper and Pledged Interests.

(ii) No Grantor shall (A) change its legal name, (B) change its form of legal entity (e.g., converting from a corporation to a limited liability company or vice versa), (C) change its jurisdiction of organization as set forth in Schedule I or become (or attempt or purport to become) organized in more than one jurisdiction, or (D) otherwise amend, modify or waive any term or material provision of its Governing Documents in a manner materially adverse to any Secured Party, in any such case without (x) giving at least fifteen (15) days prior written notice of such intended change to the Collateral Agent, (y) having received from the Collateral Agent confirmation that the Collateral Agent has taken all steps necessary for the Collateral Agent to continue the perfection of and protect the enforceability and priority of its Liens in the Collateral belonging to such Grantor and in the Equity Interests of such Grantor and (z) in any case under clause (D), having received the prior written consent of the Collateral Agent to such amendment, modification or waiver.

(iii) Each Grantor shall promptly notify (and in any event within five (5) Business Days after the occurrence thereof) the Collateral Agent of any amendment, modification or other change to (A) its organizational identification number or FEIN, or (B) its chief executive office as set forth in Schedule III hereto. Each Grantor shall immediately notify the Collateral Agent upon obtaining an organizational identification number, if on the date hereof, such Grantor did not have such identification number.

(k) Partnership and Limited Liability Company Interests.

(i) Except with respect to partnership interests and limited liability company interests evidenced by a certificate, which certificate has been pledged and delivered to the Collateral Agent pursuant to Section 4 hereof, no Grantor that is a partnership or a limited liability company shall, nor shall any Grantor with any Subsidiary that is a partnership or a limited liability company, permit such Subsidiary's partnership interests or membership interests to (A) be dealt in or traded on securities exchanges or in securities markets, (B) become a security for purposes of Article 8 of any relevant Uniform Commercial Code, (C) become an investment company security within the meaning of Section 8-103 of any relevant Uniform Commercial Code or (D) be evidenced by a certificate. Each Grantor agrees that such uncertificated partnership interests or membership interests shall constitute General Intangibles.

(ii) Each Pledged Partnership/LLC Agreement is hereby amended or otherwise modified by this Section 6(k) (A) to permit each member, manager and partner that is a Grantor (1) to pledge all of the Pledged Interests in which such Grantor has rights, (2) to grant and collaterally assign to the Collateral Agent, for the benefit of each Secured Party, a lien on and security interest in such Pledged Interests and (3) to, upon any foreclosure by the Collateral Agent on such Pledged Interests (or any other sale or transfer of such Pledged Interests in lieu of such foreclosure), transfer to the Collateral Agent (or to the purchaser or other transferee of such Pledged Interests in lieu of such foreclosure) its rights and powers to manage and control the affairs of the applicable Pledged Issuer, in each case, without any further consent, approval or

action by any other party, including, without limitation, any other party to any Pledged Partnership/LLC Agreement or otherwise and (B) to provide that (1) the bankruptcy or insolvency of such Grantor shall not cause such Grantor to cease to be a holder of such Pledged Interests, (2) upon the occurrence of such an event, the applicable Pledged Issuer shall continue without dissolution and (3) such Grantor waives any right it might have to agree in writing to dissolve the applicable Pledged Issuer upon the bankruptcy or insolvency of such Grantor, or the occurrence of an event that causes such Grantor to cease to be a be a holder of such Pledged Interests.

(iii) Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent or its designee shall have the right (but not the obligation) to be substituted for the applicable Grantor as a member, manager or partner under the applicable Pledged Partnership/LLC Agreement, and the Collateral Agent or its designee shall have all rights, powers and benefits of such Grantor as a member, manager or partner, as applicable, under such Pledged Partnership/LLC Agreement in accordance with the terms of this Section 6(k). For avoidance of doubt, such rights, powers and benefits of a substituted member, manager or partner shall include all voting and other rights and not merely the rights of an economic interest holder.

(iv) During the period from the Effective Date until the Termination Date, no further consent, approval or action by any other party, including, without limitation, any other party to the applicable Pledged Partnership/LLC Agreement or otherwise shall be necessary to permit the Collateral Agent or its designee to be substituted as a member, manager or partner pursuant to this Section 6(k). The rights, powers and benefits granted pursuant to this paragraph shall inure to the benefit of the Collateral Agent, on its own behalf and on behalf of each other Secured Party, and each of their respective successors, assigns and designees, as intended third party beneficiaries.

(v) Each Grantor and each applicable Pledged Issuer agrees that during the period from the Effective Date until the Termination Date, no Pledged Partnership/LLC Agreement shall be amended to be inconsistent with the provisions of this Section 6(k) without the prior written consent of the Collateral Agent.

**SECTION 7. <u>Voting Rights, Dividends, Etc. in Respect of the Pledged Interests</u>.**

(a) So long as no Event of Default shall have occurred and be continuing:

(i) each Grantor may exercise any and all voting and other consensual rights pertaining to any Pledged Interests for any purpose not inconsistent with the terms of this Agreement, the Credit Agreement or the other Loan Documents; <u>provided</u>, <u>however</u>, that (A) no Grantor will exercise or refrain from exercising any such right, as the case may be, if the Collateral Agent gives such Grantor notice that, in the Collateral Agent's judgment, such action (or inaction) could reasonably be expected to violate the terms of any Loan Document or have a Material Adverse Effect and (B) each Grantor will give the Collateral Agent at least 5 Business Days' notice of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right which could reasonably be expected to adversely affect the value, liquidity or marketability of any Collateral or the creation, perfection and priority of the Collateral

Agent's Lien thereon; and

(ii) each Grantor may receive and retain any and all dividends, interest or other distributions paid in respect of the Pledged Interests to the extent permitted by the Credit Agreement; provided, however, that any and all (A) dividends and interest paid or payable other than in cash in respect of, and Instruments and other property received, receivable or otherwise distributed in respect of or in exchange for, any Pledged Interests, (B) dividends and other distributions paid or payable in cash in respect of any Pledged Interests in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in surplus, and (C) cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Interests, together with any dividend, interest or other distribution or payment which at the time of such payment was not permitted by the Credit Agreement, shall be, and shall forthwith be delivered to the Collateral Agent, to hold as, Pledged Interests and shall, if received by any of the Grantors, be received in trust for the benefit of the Collateral Agent, shall be segregated from the other property or funds of the Grantors, and shall be forthwith delivered to the Collateral Agent in the exact form received with any necessary indorsement and/or appropriate instruments of transfer or assignment or undated stock powers duly executed in blank, to be held by the Collateral Agent as Pledged Interests and as further collateral security for the Secured Obligations.

(b) Upon the occurrence and during the continuance of an Event of Default:

(i) all rights of each Grantor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 7(a)(i) hereof, and to receive the dividends, distributions, interest and other payments that it would otherwise be authorized to receive and retain pursuant to Section 7(a)(ii) hereof, shall cease, and all such rights shall thereupon become vested in the Collateral Agent, which shall thereupon have the sole right to exercise such voting and other consensual rights and to receive and hold as Pledged Interests such dividends, distributions and interest payments, and the Collateral Agent (personally or through an agent) shall thereupon be solely authorized and empowered to transfer and register in the Collateral Agent's name, or in the name of the Collateral Agent's nominee, the whole or any part of the Pledged Interests, it being acknowledged by each Grantor that such transfer and registration may be effected by the Collateral Agent by the delivery of a Registration Page to the Grantor or to the Pledged Issuer, as applicable, reflecting the Collateral Agent or its designee as the holder of such Pledged Interests, or otherwise by the Collateral Agent through its irrevocable appointment as attorney-in-fact pursuant to Section 8 hereof;

(ii) the Collateral Agent is authorized to notify each debtor with respect to the Pledged Debt to make payment directly to the Collateral Agent (or its designee) and may collect any and all moneys due or to become due to any Grantor in respect of the Pledged Debt, and each of the Grantors hereby authorizes each such debtor to make such payment directly to the Collateral Agent (or its designee) without any duty of inquiry;

(iii) without limiting the generality of the foregoing, the Collateral Agent may, at its option, exercise any and all rights of conversion, exchange, subscription or any other rights, privileges or options pertaining to any of the Pledged Interests as

if it were the absolute owner thereof, including, without limitation, the right to exchange, in its discretion, any and all of the Pledged Interests upon the merger, consolidation, reorganization, recapitalization or other adjustment of any Pledged Issuer, or upon the exercise by any Pledged Issuer of any right, privilege or option pertaining to any Pledged Interests, and, in connection therewith, to deposit and deliver any and all of the Pledged Interests with any committee, depository, transfer agent, registrar or other designated agent upon such terms and conditions as it may determine; and

(iv) all dividends, distributions, interest and other payments that are received by any of the Grantors contrary to the provisions of Section 7(b)(i) hereof shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other funds of the Grantors, and shall be forthwith paid over to the Collateral Agent as Pledged Interests in the exact form received with any necessary indorsement and/or appropriate instruments of transfer or assignment or undated Equity Interest powers duly executed in blank, to be held by the Collateral Agent as Pledged Interests and as further collateral security for the Secured Obligations.

**SECTION 8. Additional Provisions Concerning the Collateral.**

(a) Without limiting Section 7.1(q) of the Credit Agreement, to the maximum extent permitted by applicable law, and for the purpose of taking any action that the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, each Grantor hereby (i) authorizes the Collateral Agent at any time and from time to time to execute any such agreements, instruments or other documents in such Grantor's name and to file such agreements, instruments or other documents in such Grantor's name and in any appropriate filing office, (ii) authorizes the Collateral Agent at any time and from time to time to file, one or more financing or continuation statements and amendments thereto, relating to the Collateral (including, without limitation, any such financing statements that (A) describe the Collateral as "all assets" or "all personal property" (or words of similar effect) or that describe or identify the Collateral by type or in any other manner as the Collateral Agent may determine, regardless of whether any particular asset of such Grantor falls within the scope of Article 9 of the Uniform Commercial Code or whether any particular asset of such Grantor constitutes part of the Collateral, and (B) contain any other information required by Part 5 of Article 9 of the UCC for the sufficiency or filing office acceptance of any financing statement, continuation statement or amendment, including, without limitation, whether such Grantor is an organization, the type of organization and any organizational identification number issued to such Grantor) and (iii) ratifies such authorization to the extent that the Collateral Agent has filed any such financing statements, continuation statements, or amendments thereto, prior to the date hereof. A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by applicable law.

(b) Each Grantor hereby irrevocably appoints the Collateral Agent as its attorney-in-fact and proxy, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, from time to time until the Termination Date and in the Collateral Agent's discretion, to take any action and to execute any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement (subject to the rights of a Grantor under Section 6 hereof and Section 7(a) hereof), including, without limitation, (i) to obtain and adjust insurance required to be paid to the Collateral Agent pursuant

to the Credit Agreement, (ii) following an Event of Default, to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any Collateral, (iii) to receive, endorse, and collect any drafts or other Instruments, Documents and Chattel Paper in connection with clause (i) or (ii) above, (iv) following an Event of Default, to receive, indorse and collect all Instruments made payable to such Grantor representing any dividend, interest payment or other distribution in respect of any Pledged Interests and to give full discharge for the same, (v) following an Event of Default, to file any claims or take any action or institute any proceedings which the Collateral Agent may deem necessary or desirable for the collection of any Collateral or otherwise to enforce the rights of each Secured Party with respect to any Collateral, (vi) following an Event of Default, to execute assignments, licenses and other documents to enforce the rights of each Secured Party with respect to any Collateral, (vii) to pay or discharge taxes or Liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Collateral Agent (in its sole discretion), and such payments made by the Collateral Agent shall constitute additional Secured Obligations of such Grantor to the Collateral Agent, be due and payable immediately without demand, and shall bear interest at the Post-Default Rate from the earlier of (A) the date payment of said amount is demanded in writing by the Collateral Agent to such Grantor and (B) the date that the Post-Default Rate is otherwise imposed pursuant to Section 2.4(c) of the Credit Agreement, and (viii) following an Event of Default, to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, assignments, verifications and notices in connection with Accounts, Chattel Paper and other documents relating to the Collateral. This power is coupled with an interest and is irrevocable until the Termination Date.

(c) For the purpose of enabling the Collateral Agent to exercise rights and remedies hereunder in addition to any rights of the Collateral Agent under Section 9 of the Credit Agreement, at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Grantor hereby (i) grants to the Collateral Agent an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to any Grantor) to use, assign, license or sublicense any Intellectual Property now or hereafter owned by any Grantor, wherever the same may be located, including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout thereof; and (ii) assigns to the Collateral Agent, to the extent assignable, all of its rights to any Intellectual Property now or hereafter licensed or used by any Grantor. Each Grantor hereby releases the Collateral Agent from, and indemnifies the Collateral Agent against, any claims, causes of action and demands at any time arising out of or with respect to any actions taken or omitted to be taken by the Collateral Agent under the powers of attorney, proxy or license, granted herein other than actions taken or omitted to be taken through the Collateral Agent's gross negligence or willful misconduct, as determined by a final determination of a court of competent jurisdiction.

(d) If any Grantor fails to perform any agreement or obligation contained herein, the Collateral Agent may itself perform, or cause performance of, such agreement or obligation, in the name of such Grantor or the Collateral Agent, and the fees and expenses of the Collateral Agent incurred in connection therewith shall be jointly and severally payable by the Grantors pursuant to Section 10 hereof constitute additional Secured Obligations of the Grantor to the Collateral Agent, be due and payable immediately without demand and bear

interest at the Post-Default Rate from the earlier of (A) the date payment of said amount is demanded in writing by the Collateral Agent to such Grantor and (B) the date that the Post-Default Rate is otherwise imposed pursuant to Section 2.4(c) of the Credit Agreement.

(e) The powers conferred on the Collateral Agent hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. Other than the exercise of reasonable care to assure the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against other parties or any other rights pertaining to any Collateral and shall be relieved of all responsibility for any Collateral in its possession upon surrendering it or tendering surrender of it to any of the Grantors (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct). The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property, it being understood that the Collateral Agent shall not have responsibility for ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Collateral Agent has or is deemed to have knowledge of such matters. The Collateral Agent shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Collateral Agent in good faith.

(f) Anything herein to the contrary notwithstanding (i) each Grantor shall remain liable under the Licenses and otherwise in respect of the Collateral to the extent set forth therein to perform all of its obligations thereunder to the same extent as if this Agreement had not been executed, (ii) the exercise by the Collateral Agent of any of its rights hereunder shall not release any Grantor from any of its obligations under the Licenses or otherwise in respect of the Collateral, and (iii) the Collateral Agent shall not have any obligation or liability by reason of this Agreement under the Licenses or otherwise in respect of the Collateral, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

(g) The Collateral Agent may at any time, following the occurrence and during the continuance of an Event of Default, in its discretion (i) without notice to any Grantor, transfer or register in the name of the Collateral Agent or any of its nominees any or all of the Pledged Interests, subject only to the revocable rights of such Grantor under Section 7(a) hereof, and (ii) exchange certificates or Instruments constituting Pledged Interests for certificates or Instruments of smaller or larger denominations.

**SECTION 9. <u>Remedies Upon Default</u>.** If any Event of Default shall have occurred and be continuing:

(a) The Collateral Agent may exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral), and also may (i) take absolute control of the Collateral,

including, without limitation, transfer into the Collateral Agent's name or into the name of its nominee or nominees (to the extent the Collateral Agent has not theretofore done so) and thereafter receive, for the benefit of each Secured Party, all payments made thereon, give all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof, (ii) require each Grantor to, and each Grantor hereby agrees that it will at its expense and upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place or places to be designated by the Collateral Agent that is reasonably convenient to both parties, and the Collateral Agent may enter into and occupy any premises owned or leased by any Grantor where the Collateral or any part thereof is located or assembled for a reasonable period in order to effectuate the Collateral Agent's rights and remedies hereunder or under law, without obligation to any Grantor in respect of such occupation, and (iii) without notice except as specified below and without any obligation to prepare or process the Collateral for sale, (A) sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's offices, at any exchange or broker's board or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable and/or (B) lease, license or otherwise dispose of the Collateral or any part thereof upon such terms as the Collateral Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notice of sale or any other disposition of the Collateral shall be required by law, at least ten (10) days' prior notice to the applicable Grantor of the time and place of any public sale or the time after which any private sale or other disposition of the Collateral is to be made shall constitute reasonable notification. If the Collateral Agent sells any of the Collateral upon credit, the Grantors will be credited only with payments actually received by the Collateral Agent from the purchaser thereof, and if such purchaser fails to pay for the Collateral, the Collateral Agent may resell the Collateral and the Grantors shall be credited with proceeds of the sale. The Collateral Agent shall not be obligated to make any sale or other disposition of Collateral regardless of notice of sale having been given. The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor hereby waives any claims against each Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree, and waives all rights that such Grantor may have to require that all or any part of the Collateral be marshaled upon any sale (public or private) thereof. Each Grantor hereby acknowledges that (A) any such sale of the Collateral by the Collateral Agent shall be made without warranty, (B) the Collateral Agent may specifically disclaim any warranties of title, possession, quiet enjoyment or the like, (C) the Collateral Agent may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness), if permitted by law, for the purchase, lease, license or other disposition of the Collateral or any portion thereof for the account of the Collateral Agent (on behalf of itself and each Secured Party) and (D) such actions set forth in clauses (A), (B) and (C) above shall not adversely affect the commercial reasonableness of any such sale of the Collateral. In addition to the foregoing, (1) upon written notice to any Grantor from the Collateral Agent, each Grantor shall cease any use of the Intellectual Property or any trademark, patent or copyright similar thereto for any purpose described in such notice; (2) the Collateral Agent may, at any time and from time to time, upon prior notice to any Grantor, license,

whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any of the Intellectual Property, throughout the universe for such term or terms, on such conditions, and in such manner, as the Collateral Agent shall in its sole discretion determine; and (3) the Collateral Agent may, at any time, execute and deliver on behalf of a Grantor, one or more instruments of assignment of the Intellectual Property (or any application or registration thereof), in form suitable for filing, recording or registration in any country.

(b) In the event that the Collateral Agent determines to exercise its right to sell all or any part of the Pledged Interests pursuant to Section 9(a) hereof, each Grantor will, at such Grantor's expense and upon request by the Collateral Agent: (i) execute and deliver, and cause each issuer of such Pledged Interests and the directors and officers thereof to execute and deliver, all such instruments and documents, and do or cause to be done all such other acts and things, as may be necessary or, in the opinion of the Collateral Agent, advisable to register such Pledged Interests under the provisions of the Securities Act, and to cause the registration statement relating thereto to become effective and to remain effective for such period as prospectuses are required by law to be furnished, and to make all amendments and supplements thereto and to the related prospectus which, in the opinion of the Collateral Agent, are necessary or advisable, all in conformity with the requirements of the Securities Act and the rules and regulations of the SEC applicable thereto, (ii) cause each issuer of such Pledged Interests to qualify such Pledged Interests under the state securities or "Blue Sky" laws of each jurisdiction, and to obtain all necessary governmental approvals for the sale of the Pledged Interests, as requested by the Collateral Agent, (iii) cause each Pledged Issuer to make available to its security holders, as soon as practicable, an earnings statement which will satisfy the provisions of Section 11(a) of the Securities Act, and (iv) do or cause to be done all such other acts and things as may be necessary to make such sale of such Pledged Interests valid and binding and in compliance with applicable law. Each Grantor acknowledges the impossibility of ascertaining the amount of damages which would be suffered by the Collateral Agent by reason of the failure by any Grantor to perform any of the covenants contained in this Section 9(b) and, consequently, agrees that, if any Grantor fails to perform any of such covenants, it shall pay, as liquidated damages and not as a penalty, an amount equal to the value of the Pledged Interests on the date the Collateral Agent demands compliance with this Section 9(b); provided, however, that the payment of such amount shall not release any Grantor from any of its obligations under any of the other Loan Documents.

(c) Notwithstanding the provisions of Section 9(b) hereof, each Grantor recognizes that the Collateral Agent may deem it impracticable to effect a public sale of all or any part of the Pledged Shares or any other securities constituting Pledged Interests and that the Collateral Agent may, therefore, determine to make one or more private sales of any such securities to a restricted group of purchasers who will be obligated to agree, among other things, to acquire such securities for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges that any such private sale may be at prices and on terms less favorable to the seller than the prices and other terms which might have been obtained at a public sale and, notwithstanding the foregoing, agrees that such private sales shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to delay the sale of any such securities for the period of time necessary to permit the issuer of such securities to register such securities for public sale under the Securities Act. Each Grantor further acknowledges and agrees that any offer to sell such securities which has been (i) publicly advertised on a bona fide basis in a newspaper or other publication of general circulation

in the financial community of New York, New York (to the extent that such an offer may be so advertised without prior registration under the Securities Act) or (ii) made privately in the manner described above to not less than fifteen bona fide offerees shall be deemed to involve a "public disposition" for the purposes of Section 9-610(c) of the UCC (or any successor or similar, applicable statutory provision) as then in effect in the State of New York, notwithstanding that such sale may not constitute a "public offering" under the Securities Act, and that the Collateral Agent may, in such event, bid for the purchase of such securities.

(d) Any cash held by the Collateral Agent (or its agent or designee) as Collateral and all Cash Proceeds received by the Collateral Agent (or its agent or designee) in respect of any sale of or collection from, or other realization upon, all or any part of the Collateral, the Collateral Agent may, in the discretion of the Collateral Agent, be held by the Collateral Agent (or its agent or designee) as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Collateral Agent pursuant to Section 10 hereof) in whole or in part by the Collateral Agent against, all or any part of the Secured Obligations in such order as the Collateral Agent shall elect, consistent with the provisions of the Credit Agreement. Any surplus of such cash or Cash Proceeds held by the Collateral Agent (or its agent or designee) and remaining after the Termination Date shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

(e) In the event that the proceeds of any such sale, collection or realization are insufficient to pay all amounts to which each Secured Party is legally entitled, the Grantors shall be jointly and severally liable for the deficiency, together with interest thereon at the highest rate specified in any applicable Loan Document for interest on overdue principal thereof or such other rate as shall be fixed by applicable law, together with the costs of collection and the reasonable fees, costs, expenses and other client charges of any attorneys employed by the Collateral Agent to collect such deficiency.

(f) Each Grantor hereby acknowledges that if the Collateral Agent complies with any applicable requirements of law in connection with a disposition of the Collateral, such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

(g) The Collateral Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Collateral Agent's rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that any Grantor lawfully may, such Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

**SECTION 10. Indemnity and Expenses.**

(a) Each Grantor jointly and severally agrees to defend, protect, indemnify and hold harmless the Collateral Agent and each other Indemnitee in accordance with Section 11.15 of the Credit Agreement.

(b) Each Grantor jointly and severally agrees to pay to the Collateral Agent's costs and expenses in accordance with Section 11.4 of the Credit Agreement.

**SECTION 11. Notices, Etc.** All notices and other communications provided for hereunder shall be given in accordance with the notice provision of the Credit Agreement.

**SECTION 12. Security Interest Absolute; Joint and Several Obligations.**

(a) All rights of the Secured Parties, all Liens and all obligations of each of the Grantors hereunder shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of the Credit Agreement or any other Loan Document, (ii) any change in the time, manner or place of payment of, or in any other term in respect of, all or any of the Secured Obligations, or any other amendment or waiver of or consent to any departure from the Credit Agreement or any other Loan Document, (iii) any exchange or release of, or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Secured Obligations, or (iv) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any of the Grantors in respect of the Secured Obligations. All authorizations and agencies contained herein with respect to any of the Collateral are irrevocable and powers coupled with an interest.

(b) Each Grantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and notice of the incurrence of any Secured Obligation by any Borrower, (iii) notice of any actions taken by any Agent, any Lender, any Guarantor or any other Person under any Loan Document or any other agreement, document or instrument relating thereto, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Secured Obligations, the omission of or delay in which, but for the provisions of this subsection (b), might constitute grounds for relieving such Grantor of any such Grantor's obligations hereunder and (v) any requirement that any Agent or any Lender protect, secure, perfect or insure any security interest or other lien on any Collateral or exhaust any right or take any action against any Grantor or any other Person or any Collateral.

(c) All of the obligations of the Grantors hereunder are joint and several. The Collateral Agent may, in its sole and absolute discretion, enforce the provisions hereof against any of the Grantors and shall not be required to proceed against all Grantors jointly or seek payment from the Grantors ratably. In addition, the Collateral Agent may, in its sole and absolute discretion, select the Collateral of any one or more of the Grantors for sale or application to the Secured Obligations, without regard to the ownership of such Collateral, and shall not be required to make such selection ratably from the Collateral owned by all of the Grantors. The release or discharge of any Grantor by the Collateral Agent shall not release or discharge any other Grantor from the obligations of such Person hereunder.

**SECTION 13. Miscellaneous.**

(a) No amendment of any provision of this Agreement (including any Schedule attached hereto) shall be effective unless it is in writing and signed by each Grantor affected thereby and the Collateral Agent, and no waiver of any provision of this Agreement, and no consent to any departure by any Grantor therefrom, shall be effective unless it is in writing and signed by the Collateral Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b) No failure on the part of the Secured Parties to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Secured Parties provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Secured Parties under any Loan Document against any party thereto are not conditional or contingent on any attempt by such Person to exercise any of its rights under any other Loan Document against such party or against any other Person, including but not limited to, any Grantor.

(c) This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to paragraph (e) below, until the Termination Date and (ii) be binding on each Grantor and all other Persons who become bound as debtor to this Agreement in accordance with Section 9-203(d) of the UCC, and shall inure, together with all rights and remedies of the Secured Parties hereunder, to the benefit of the Secured Parties and their respective successors, transferees and assigns. Without limiting the generality of clause (ii) of the immediately preceding sentence, each Secured Party may assign or otherwise transfer its respective rights and obligations under this Agreement and any other Loan Document to any other Person to the terms and conditions of the Credit Agreement, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Secured Parties herein or otherwise. Upon any such assignment or transfer, all references in this Agreement to any Secured Party shall mean the assignee of any such Secured Party. None of the rights or obligations of any Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Collateral Agent, and any such assignment or transfer shall be null and void.

(d) After the occurrence of the Termination Date, (i) subject to paragraph (e) below, this Agreement and the security interests and licenses created hereby shall automatically terminate, all Liens shall automatically be released and all rights to the Collateral shall revert to the Grantors, (ii) the Collateral Agent agrees to file or authorize the Grantors to file UCC amendments on or promptly after the Termination Date to evidence the termination of the Liens so released and (iii) the Collateral Agent will, upon the Grantors' request and at the Grantors' cost and expense, (A) promptly return to the Grantors (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct) such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof, and (B) promptly execute and deliver to the Grantors such documents and make such other filings as the Grantors shall reasonably request to evidence such termination, without representation, warranty or recourse of any kind. In addition, upon any sale or disposition of any item of Collateral in a transaction expressly permitted under the Credit Agreement, the Collateral Agent agrees to execute

a release of its security interest in such item of Collateral, and the Collateral Agent shall, upon the reasonable request of the Grantors and at the Grantors' cost and expense, execute and deliver to the Grantors such documents as the Grantors shall reasonably request to evidence such release, without representation, warranty or recourse of any kind.

(e) This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against any Grantor for liquidation or reorganization, should any Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of any Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made. In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(f) Upon the execution and delivery, or authentication, by any Person of a security agreement supplement in substantially the form of <u>Exhibit C</u> hereto (each a "**Security Agreement Supplement**"), (i) such Person shall be referred to as an "Additional Grantor" and shall be and become a Grantor, and each reference in this Agreement to "Grantor" shall also mean and be a reference to such Additional Grantor, and each reference in this Agreement and the other Loan Documents to "Collateral" shall also mean and be a reference to the Collateral of such Additional Grantor, and (ii) the supplemental <u>Schedules I-VIII</u> attached to each Security Agreement Supplement shall be incorporated into and become a part of and supplement <u>Schedules I-VIII</u>, respectively, hereto, and the Collateral Agent may attach such Schedules as supplements to such Schedules, and each reference to such Schedules shall mean and be a reference to such Schedules, as amended, supplemented or otherwise modified pursuant hereto from time to time.

(g) **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE, WITH THE LAW OF THE STATE OF NEW YORK, EXCEPT (I) AS REQUIRED BY MANDATORY PROVISIONS OF LAW AND (II) TO THE EXTENT THAT THE VALIDITY AND PERFECTION OR THE PERFECTION AND THE EFFECT OF PERFECTION OR NON-PERFECTION OF THE SECURITY INTEREST CREATED HEREBY, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE GOVERNED BY THE LAW OF A JURISDICTION OTHER THAN THE STATE OF NEW YORK.**

(h) In addition to and without limitation of any of the foregoing, this Agreement shall be deemed to be a Loan Document and shall otherwise be subject to all of terms and conditions contained in Sections 11.10 and 11.11 of the Credit Agreement, *mutatis mutandi*.

(i) Each Grantor irrevocably and unconditionally waives any right it may have to claim or recover in any legal action, suit or proceeding with respect to this Agreement any special, exemplary, punitive or consequential damages.

(j) Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(k) Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(l) This Agreement may be executed in any number of counterparts and by different parties hereto on separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterparty shall not affect the validity, enforceability, and binding effect of this Agreement.

(m) For purposes of this Agreement, all references to Schedules I-VIII attached hereto shall be deemed to refer to each such Schedule as updated from time to time in accordance with the terms of this Agreement.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**IN WITNESS WHEREOF**, each Grantor has caused this Agreement to be executed and delivered by its officer thereunto duly authorized, as of the date first above written.

**<u>GRANTORS</u>:**

**SYNERGY CHC CORP.**




By: ______________________________
Name: Jack Ross
Title: Chairman and Chief Executive Officer

**SYNERGY CHC INC.**




By: ______________________________
Name: Jack Ross
Title: Chairman and Chief Executive Officer

Acknowledged and Agreed:

**ACP AGENCY, LLC**,
as Collateral Agent

By: ______________________________
Name: Peter Eschmann
Title: Authorized Person

## SCHEDULE I

## LEGAL NAME; JURISDICTION OF ORGANIZATION; TYPE OF ORGANIZATION; ORGANIZATIONAL IDENTIFICATION NUMBER

| Legal Name | Jurisdiction of Organization | Type of Organization | Organizational Identification Number |
|---|---|---|---|
| Synergy CHC Corp. | Nevada | Corporation | NV20101902811 |
| Synergy CHC Inc. | Alberta, Canada | Corporation | 78053 1125 RT0001<br><br>Corporate Access Number: 2019531597 |

**SCHEDULE II**

**INTELLECTUAL PROPERTY AND LICENSES; TRADE NAMES**

**A. Patents -** None.

**B. Copyrights -** None.

**C. Trademarks**

United States Registrations:

| Grantor | Mark | Registration No. | Registration Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | BLACKOTTER | 6289745 | 09-Mar-2021 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5074891 | 01-Nov-2016 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5142815 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5596520 | 30-Oct-2018 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY TEA | 5142816 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY TEA | 5142817 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FOCUS FACTOR | 2414522 | 19-Dec-2000 | United States of America |
| Synergy CHC Corp. | FOCUS FACTOR BRAIN HUB | 6840427 | 06-Sep-2022 | United States of America |
| Synergy CHC Corp. | SNEAKY VAUNT | 7552593 | 29-Oct-2024 | United States of America |
| Synergy CHC Corp. | SNEAKY VAUNT | 5572253 | 25-Sep-2018 | United States of America |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | SYNERGY A CONSUMER HEALTHCARE COMPANY | 6463755 | 24-Aug-2021 | United States of America |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 5365149 | 26-Dec-2017 | United States of America |
| Synergy CHC Corp. | WHY LOOK GOOD WHEN YOU CAN LOOK PER-FÉKT | 3436683 | 27-May-2008 | United States of America |
| Synergy CHC Corp. |  | 3383804 | 19-Feb-2008 | United States of America |
| Synergy CHC Corp. | PER-FÉKT | 3383803 | 19-Feb-2008 | United States of America |
| Neuragen Corp. (merged into Synergy CHC Corp.) | NEURAGEN | 3777747 | 20-Apr-2010 | United States of America |
| Neuragen Corp. (merged into Synergy CHC Corp.) | NEURAGEN PN | 3423772 | 06-May-2008 | United States of America |

<u>United States Applications</u>:

| Grantor | Mark | Application No. | Application Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | FACTOR NUTRITION | 90477772 | 20-Jan-2021 | United States of America |
| Synergy CHC Corp. | FACTOR NUTRITION | 98898853 | 12-Dec-2024 | United States of America |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | UrgentRX | 97026495 | 14-Sep-2021 | United States of America |
| Synergy CHC Corp. | PER-FÉKT | 98817880 | 24-Oct-2024 | United States of America |
| Synergy CHC Corp. | PER-FÉKT BEAUTY | 98817879 | 24-Oct-2024 | United States of America |

Foreign Registrations:

| Grantor | Mark | Registration No. | Registration Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | FLAT TUMMY | 1857065 | 31-Mar-2017 | Australia |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1715196 | 18-Aug-2015 | Australia |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1768380 | 03-May-2016 | Australia |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Australia |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Australia |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | 1133555 | 16-Jul-2012 | Australia |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Austria |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Bahrain |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 29-Jun-2017 | Bahrain |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Bahrain |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Benelux |
| Synergy CHC Corp. | BLACKOTTER | TMA1101411 | 03-Jun-2021 | Canada |
| Synergy CHC Corp. | FLAT TUMMY | TMA1028125 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | FLAT TUMMY ABS | TMA1028111 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | FOCUS FACTOR | TMA1101412 | 03-Jun-2021 | Canada |
| Synergy CHC Corp. | SNEAKY VAUNT | TMA1028071 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | SYNERGY A CONSUMER HEALTHCARE COMPANY | TMA1046985 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | SYNERGY EFFECT | TMA1046990 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | SYNERGY EFFECT | TMA1046986 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1046991 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1047043 | 06-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1023459 | 04-Jun-2019 | Canada |
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | UrgentRX | TMA926000 | 14-Jan-2016 | Canada |

| | | | | |
|---|---|---|---|---|
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | UrgentRX | TMA906488 | 17-Jun-2015 | Canada |
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | RIGHT NOW RELIEF | 1096512 | 16-Nov-2015 | Chile |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | China (People's Republic) |
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | UrgentRX | 1133555 | 16-Jul-2012 | China (People's Republic) |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Denmark |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Egypt |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Egypt |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | European Union (Community) |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | RIDICULOUSLY FAST RELIEF | 010627099 | 01-Oct-2012 | European Union (Community) |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | European Union (Community) |
| Breakthrough Products, Inc. (merged into | UrgentRX | 010627248 | 10-Sep-2012 | European Union (Community) |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp.) | | | | |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Finland |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Finland |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | France |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | France |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1306320 | 05-May-2016 | Germany |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | India |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | India |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 31-Jul-2020 | India |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1306320 | 25-Aug-2016 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | Int'l Registration - Madrid Protocol Only |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | UrgentRX | 1133555 | 16-Jul-2012 | Int'l Registration - Madrid Protocol Only |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Ireland |
| Synergy CHC Corp. | FOCUS FACTOR | 13531781 | 03-Jul-2018 | Israel |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Italy |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Italy |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | 5767403 | 29-May-2015 | Japan |
| Synergy CHC Corp. | FLAT TUMMY | 160099 | 10-Aug-2017 | Kuwait |
| Synergy CHC Corp. | FOCUS FACTOR | 160098 | 10-Aug-2017 | Kuwait |
| Synergy CHC Corp. | FLAT TUMMY | 181214 | 28-Aug-2017 | Lebanon |
| Synergy CHC Corp. | FOCUS FACTOR | 181260 | 30-Aug-2017 | Lebanon |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 181671 | 05-Oct-2017 | Lebanon |
| Synergy CHC Corp. | FLAT TUMMY | 2826083 | 21-Feb-2025 | Mexico |
| Synergy CHC Corp. | FLAT TUMMY | 2826084 | 21-Feb-2025 | Mexico |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | FOCUS FACTOR | 2826082 | 21-Feb-2025 | Mexico |
| Synergy CHC Corp. | FLAT TUMMY | | | Nigeria |
| Synergy CHC Corp. | THE SYNERGY EFFECT | | | Nigeria |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Norway |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Norway |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Oman |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Oman |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Oman |
| Synergy CHC Corp. | FLAT TUMMY | 117489 | 15-Oct-2018 | Qatar |
| Synergy CHC Corp. | FLAT TUMMY | 117411 | 14-Nov-2018 | Qatar |
| Synergy CHC Corp. | FOCUS FACTOR | 117410 | 25-Sep-2017 | Qatar |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 117412 | 14-Nov-2018 | Qatar |
| Synergy CHC Corp. | FLAT TUMMY | 117229 | 03-Oct-2017 | Saudi Arabia |
| Synergy CHC Corp. | FOCUS FACTOR | 117228 | 03-Oct-2017 | Saudi Arabia |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 117224 | 03-Oct-2017 | Saudi Arabia |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Spain |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 12-Jul-2017 | Spain |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Sweden |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Switzerland |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Switzerland |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | Switzerland |
| Synergy CHC Corp. | SNEAKY VAUNT | 1335034 | 02-Dec-2016 | Switzerland |
| Synergy CHC Corp. | FLAT TUMMY | 1354339 | 06-Jul-2017 | Syria |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1377589 | 26-Jul-2017 | Syria |
| Synergy CHC Corp. | FLAT TUMMY | 279486 | 12-Sep-2017 | United Arab Emirates |
| Synergy CHC Corp. | FOCUS FACTOR | 279483 | 27-Sep-2017 | United Arab Emirates |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 279482 | 12-Sep-2017 | United Arab Emirates |
| Synergy CHC Corp. | FLAT TUMMY | WO0000001354339 | 14-Sep-2018 | United Kingdom |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1306320 | 22-Dec-2016 | United Kingdom |
| Synergy CHC Corp. | FOCUS FACTOR | UK00801351781 | 01-Dec-2017 | United Kingdom |
| Synergy CHC Corp. | FOCUS FACTOR | 1351781 | 06-Apr-2017 | United Kingdom |

| | | | | |
|---|---|---|---|---|
| Breakthrough Products, Inc.(merged into Synergy CHC Corp.) | RIDICULOUSLY FAST RELIEF | UK00910627099 | 01-Oct-2012 | United Kingdom |
| Synergy CHC Corp. | SNEAKY VAUNT | UK00801335034 | 02-Dec-2016 | United Kingdom |
| Synergy CHC Corp. | SNEAKY VAUNT | WO0000001335034 | 27-Jul-2017 | United Kingdom |
| Synergy CHC Corp. | THE SYNERGY EFFECT | WO0000001377589 | 03-May-2018 | United Kingdom |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | UrgentRX | UK00910627248 | 10-Sep-2012 | United Kingdom |
| Synergy CHC Corp. | FLAT TUMM (Int. Class 30) | 81303 | 24-Sep-2017 | Yemen, Republic of |
| Synergy CHC Corp. | FLAT TUMMY (Int. Class 5) | 81301 | 24-Sep-2017 | Yemen, Republic of |
| Synergy CHC Corp. | FOCUS FACTOR | 81298 | 24-Sep-2017 | Yemen, Republic of |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 81300 | 24-Sep-2017 | Yemen, Republic of |

Foreign Applications:

| Grantor | Mark | Application No. | Application Date | Granting Jurisdiction |
|---|---|---|---|---|
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | FAST POWDERS | 1144360 | 08-Oct-2015 | Chile |

| | | | | |
|---|---|---|---|---|
| Breakthroug h Products, Inc.(merged into Synergy CHC Corp.) | FAST POWDERS | 1096513 | 23-Dec-2014 | Chile |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Austria |
| Synergy CHC Corp. | FLAT TUMMY TEA | | | Nigeria |
| Synergy CHC Corp. | FLAT TUMMY TEA | | | Nigeria |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Norway |
| Synergy CHC Corp. | FLAT TUMMY TEA | 1302395 | 18-May-2016 | Sweden |
| Synergy CHC Corp. | FOCUS FACTOR | 2272869 | 08-Jul-2021 | Mexico |
| Synergy CHC Corp. | FOCUS FACTOR | | | Nigeria |
| Synergy CHC Corp. | SNEAKY VAUNT | | | Brazil |
| Synergy CHC Corp. | SNEAKY VAUNT | | | China (People's Republic) |
| Synergy CHC Corp. | SNEAKY VAUNT | | | Nigeria |
| Synergy CHC Corp. | SNEAKY VAUNT | | | Nigeria |

D. OTHER INTELLECTUAL PROPERTY

Domain Names:

synergychc.com
flattummytea.com
sneakyvaunt.com
focusfactor.com

E. TRADENAMES

Flat Tummy Tea
Focus Factor
Factor Nutrition Labs

F. THE LEGAL NAME OF, AND EACH TRADE NAME USED BY, EACH PERSON FROM WHICH A GRANTOR HAS ACQUIRED ANY SUBSTANTIAL PART OF THE COLLATERAL WITHIN THE PRECEDING FIVE YEARS

| Grantor/Subsidiary | Other names |
|---|---|
| Synergy CHC Corp. | Focus Factor, Factor Nutrition Labs |
| Synergy CHC Inc. | None. |

## SCHEDULE III

## LOCATIONS OF GRANTORS

| Grantor | Location | Description |
|---|---|---|
| Synergy CHC Corp. | 3 Kimball Drive, Standish, ME 04084 | Chief Executive Office |
| Synergy CHC Inc. | 3175 Highway 2, Fall River, Nova Scotia, B2T 1J5, Canada | Chief Executive Office |
| Synergy CHC Inc. | 12 Cleve Court<br>Halton Hills, ON L7G 0L7 | Inventory |
| Synergy CHC Corp. | 200 Docks Corner Road, Dayton, NJ 08810 | Inventory |
| Synergy CHC Corp. | 9565 N. Virginia St, Suite 100, Reno, NV 89506 | Inventory |

**SCHEDULE IV**

**DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS AND COMMODITIES ACCOUNTS**

| Grantor | Name and Address of Institution Maintaining Account | Account Number | Purpose of Account |
|---|---|---|---|
| Synergy CHC Corp. | Banc of California, PO Box 131207, Carlsbad, CA 92013-1207 | 3111852 | Operating Account |
| Synergy CHC Inc. | Royal Bank, 200 Bay Street, Royal Bank Plaza, Toronto, ON, Canada | 01793 102-418-1 | Operating Account |
| Synergy CHC Inc. (Focus Factor) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8015992 | Online Sweep Accounts |
| Synergy CHC Corp. (Flat Tummy) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8684416 | Online Sweep Accounts |
| Synergy CHC Corp. (Hand MD) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8016007 | Online Sweep Accounts |
| Synergy CHC Corp. (Think Fuel) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8489345 | Online Sweep Accounts |
| Synergy CHC Corp. (Synergy Effect) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8214396 | Online Sweep Accounts |
| Synergy CHC Corp. (Perfekt Beauty) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8216061 | Online Sweep Accounts |
| Synergy CHC Corp. (Coco White) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8489270 | Online Sweep Accounts |
| Synergy CHC Corp. (Mane Game) | TD Bank, 835 Main St., Westbrook, ME 04092 | 242-8489189 | Online Sweep Accounts |

# SCHEDULE V

## UCC FINANCING STATEMENTS

UCC Financing Statements have been filed in the jurisdictions below against the Grantors:

| Name of Grantor | Secretary of State |
|---|---|
| Synergy CHC Corp. | Nevada |
| Synergy CHC Inc. | Alberta, Canada |

# SCHEDULE VI

## COMMERCIAL TORT CLAIMS

None.

# SCHEDULE VII

# PLEDGED DEBT

| Grantor | Name of Maker | Description | Original Principal Amount |
|---|---|---|---|
| Boombod Ltd. | Synergy CHC Corp. | Second Amended and Restated Promissory Note dated May 29, 2025 | $4,425,547.00 |

# SCHEDULE VIII

## PLEDGED SHARES

| Grantor | Pledged Issuer | Number of Shares | Percentage of Outstanding Shares | Class | Certificate Number |
|---|---|---|---|---|---|
| Synergy CHC Corp. | NomadChoice Pty Limited | 1,200 | 100% | Ordinary | N/A[1] |
| Synergy CHC Corp. | Synergy CHC Inc. | 100 | 100% | Class A | A-1 |
| Synergy CHC Corp. | Hand MD Corp. | 2,000,000 | 100% | Common Stock | N/A[2] |

[1] New share certificates will be issued and delivered to the Collateral Agent pursuant to the requirements of Section 5.3 of the Credit Agreement.

[2] New share certificates will be issued and delivered to the Collateral Agent pursuant to the requirements of Section 5.3 of the Credit Agreement.

# EXHIBIT A

## PLEDGE AMENDMENT

This Pledge Amendment, dated __________ __, 20__, is delivered pursuant to Section 4 of the Security Agreement referred to below. The undersigned hereby agrees that this Pledge Amendment may be attached to the Pledge and Security Agreement, dated May 30, 2025, as it may heretofore have been or hereafter may be amended, restated, supplemented, modified or otherwise changed from time to time (the "**Security Agreement**") and that the Promissory Notes, Instruments or shares listed on this Pledge Amendment shall be hereby pledged and assigned to the Collateral Agent and become part of the Pledged Interests referred to in such Security Agreement and shall secure all of the Secured Obligations referred to in such Security Agreement.

| **Pledged Debt** | | | |
|---|---|---|---|
| **Grantor** | **Name of Maker** | **Description** | **Original Principal Amount** |
| __________ | __________ | __________ | __________ |
| __________ | __________ | __________ | __________ |

| **Pledged Shares** | | | | | |
|---|---|---|---|---|---|
| **Grantor** | **Name of Pledged Issuer** | **Number of Shares** | **Percentage of Outstanding Shares** | **Class** | **Certificate Number** |
| __________ | __________ | __________ | __________ | __________ | __________ |
| __________ | __________ | __________ | __________ | __________ | __________ |

[GRANTOR]

By: ______________________________
Name:
Title:

**ACP AGENCY, LLC**,
as the Collateral Agent

By:______________________________
Name:
Title:

**EXHIBIT B**

**[TRADEMARK] [PATENT] [COPYRIGHT] SECURITY AGREEMENT**

This **[Trademark][Copyright][Patent] Security Agreement** (this **"[Trademark][Patent][Copyright] Security Agreement"**) is made as of __________ __, 202_, by _______________ (the "**Grantor**"), in favor of ACP AGENCY, LLC, in its capacity as Collateral Agent (together with its successors and assigns in such capacity, the "**Grantee**").

**WHEREAS**, the Grantor [has adopted, used and is using, and holds all right, title and interest in and to, the trademarks and service marks listed on the attached Schedule A, which trademarks and service marks are registered or applied for in the United States Patent and Trademark Office (the "**Trademarks**")] [holds all right, title and interest in the letter patents, design patents and utility patents listed on the attached Schedule A, which patents are issued or applied for in the United States Patent and Trademark Office (the "**Patents**")] [holds all right, title and interest in the copyrights listed on the attached Schedule A, which copyrights are registered or applied for in the United States Copyright Office (the "**Copyrights**")];

**WHEREAS**, the Grantor has entered into a Pledge and Security Agreement, dated May 30, 2025 (as amended, restated, supplemented, modified or otherwise changed from time to time, the "**Security Agreement**"), in favor of the Grantee; and

**WHEREAS**, pursuant to the Security Agreement, the Grantor has granted to the Grantee for the benefit of the Secured Parties (as defined in the Security Agreement) a continuing security interest in all right, title and interest of the Grantor in, to and under the [Trademarks, together with, among other things, the good-will of the business symbolized by the Trademarks] [Patents] [Copyrights] and the applications and registrations thereof, and all proceeds thereof, including, without limitation, any and all causes of action which may exist by reason of infringement thereof and any and all damages arising from past, present and future violations thereof (the "**Collateral**"), to secure the payment, performance and observance of the Secured Obligations (as defined in the Security Agreement).

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor does hereby pledge, convey, sell, assign, transfer and set over unto the Grantee and grants to the Grantee for the benefit of the Grantee and the Secured Parties a continuing security interest in the Collateral to secure the prompt payment, performance and observance of the Secured Obligations.

The Grantor does hereby further acknowledge and affirm that the rights and remedies of the Grantee with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.

**IN WITNESS WHEREOF**, the Grantor has caused this [Trademark][Copyright][Patent] Security Agreement to be duly executed by its officer thereunto duly authorized as of _____________ __, 202_.

[GRANTOR]

By:________________________________________
Name:
Title:

Acknowledged and Agreed:

**ACP AGENCY, LLC**,
as Collateral Agent

By: ______________________________
Name:
Title:

**SCHEDULE A TO [TRADEMARK] [PATENT] [COPYRIGHT] SECURITY AGREEMENT**

[Trademarks and Trademark Applications]
[Patent and Patent Applications]
[Copyright and Copyright Applications]
Owned by ______________________________

# EXHIBIT C

## FORM OF SECURITY AGREEMENT SUPPLEMENT

[Date of Security Agreement Supplement]

ACP Agency, LLC, as Collateral Agent
600 Lexington Ave, 14th Floor
New York, New York 10022
Attention: Peter Eschmann
Telephone: 646-357-8385
Email: peschmann@acmecreditpartners.com

Ladies and Gentlemen:

Reference hereby is made to (a) the Term Loan Credit Agreement, dated as of May 30, 2025 (such agreement, as amended, restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor, being hereinafter referred to as the "**Credit Agreement**") by and among SYNERGY CHC CORP., a Nevada corporation (the "**Borrower**"), and each subsidiary of the Borrower listed as a "Guarantor" on the signature pages thereto (together with each other Person (as defined therein) that guarantees all or any portion of the Obligations (as defined therein) from time to time, each a "**Guarantor**" and collectively, the "**Guarantors**", and together with the Borrower and each other Person that becomes an "**Additional Grantor**" under the Security Agreement (as defined below), each a "**Grantor**" and collectively, the "**Grantors**"), the lenders from time to time party thereto (each a "**Lender**" and collectively, the "**Lenders**"), and ACP Agency, LLC, in its capacity as Collateral Agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, if any, the "**Collateral Agent**") and (b) the Pledge and Security Agreement, dated as of May 30, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**"), made by the Grantors from time to time party thereto in favor of the Collateral Agent. Capitalized terms defined in the Credit Agreement or the Security Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement or the Security Agreement.

**SECTION 1. Grant of Security**. The undersigned hereby grants to the Collateral Agent, for the ratable benefit of each Secured Party, a security interest in, all of its right, title and interest in and to all of the Collateral (as defined in the Security Agreement) of the undersigned, whether now owned or hereafter acquired by the undersigned, wherever located and whether now or hereafter existing or arising, including, without limitation, the property and assets of the undersigned set forth on the attached supplemental schedules to the Schedules to the Security Agreement.

**SECTION 2. Security for Obligations**. The grant of a security interest in the Collateral by the undersigned under this Security Agreement Supplement and the Security Agreement secures the payment of all Secured Obligations of the undersigned now or hereafter

existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, premiums, penalties, fees, indemnifications, contract causes of action, costs, expenses or otherwise. Without limiting the generality of the foregoing, each of this Security Agreement Supplement and the Security Agreement secures the payment of all amounts that constitute part of the Secured Obligations and that would be owed by the undersigned to the Collateral Agent or any Secured Party under the Loan Documents but for the fact that such Secured Obligations are unenforceable or not allowable due to the existence of a bankruptcy, reorganization or similar proceeding involving a Grantor.

**SECTION 3. Supplements to Security Agreement Schedules.** The undersigned has attached hereto supplemental Schedules I through VIII to Schedules I through VIII, respectively, to the Security Agreement, and the undersigned hereby certifies, as of the date first above written, that such supplemental Schedules have been prepared by the undersigned in substantially the form of the equivalent Schedules to the Security Agreement, and such supplemental Schedules include all of the information required to be scheduled to the Security Agreement and do not omit to state any information material thereto.

**SECTION 4. Representations and Warranties**. The undersigned hereby makes each representation and warranty set forth in Section 5 of the Security Agreement (as supplemented by the attached supplemental Schedules) to the same extent as each other Grantor.

**SECTION 5. Obligations Under the Security Agreement**. The undersigned hereby agrees, as of the date first above written, to be bound as a Grantor by all of the terms and provisions of the Security Agreement to the same extent as each of the other Grantors. The undersigned further agrees, as of the date first above written, that each reference in the Security Agreement to an “Additional Grantor” or a “Grantor” shall also mean and be a reference to the undersigned.

**SECTION 6. Governing Law**. This Security Agreement Supplement shall be governed by, and construed in accordance with, the laws of the State of New York.

**SECTION 7. Loan Document**. In addition to and without limitation of any of the foregoing, this Security Agreement Supplement shall be deemed to be a Loan Document and shall otherwise be subject to all of terms and conditions contained in Sections 11.10 and 11.11 of the Credit Agreement, *mutatis mutandi*.

Very truly yours,

[NAME OF ADDITIONAL LOAN PARTY]

By: ________________________________
Name:
Title:

Acknowledged and Agreed:

**ACP AGENCY, LLC**,
as Collateral Agent

By: ______________________________
Name:
Title:

# EXHIBIT D

# FORM OF IRREVOCABLE PROXY

(Interests of [_______] (the "**Issuer**"))

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, [_____________] a [_______________] (the "**Grantor**"), hereby irrevocably (to the fullest extent permitted by law) appoints and constitutes _____________, a ______________, in its capacity as Collateral Agent for the Secured Parties (in such capacity, the "**Proxy Holder**") under the Term Loan Credit Agreement, dated as of May 30, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), to which the Proxy Holder, the Grantor, certain affiliates of the Grantor and the Lenders are a party, the attorney and proxy of the Grantor with full power of substitution and resubstitution, to the full extent of the Grantor's rights with respect to all of the Pledged Interests (as defined in the Security Agreement, defined below) which constitute the Equity Interests of the Issuer (the "**Interests**") owned by the Grantor. Upon the execution hereof, all prior proxies given by the Grantor with respect to any of the Interests are hereby revoked, and no subsequent proxies will be given with respect to any of the Interests.

This proxy is irrevocable, is coupled with an interest, and is granted pursuant to that certain Pledge and Security Agreement, dated as of May 30, 2025, by and among the Grantor, certain affiliates of the Grantor and Proxy Holder (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**") for the benefit of Proxy Holder in consideration of the credit extended pursuant to the Credit Agreement. Capitalized terms used herein but not otherwise defined in this Irrevocable Proxy have the meanings ascribed to such terms in the Security Agreement.

The Proxy Holder named above will be empowered and may exercise this Irrevocable Proxy to vote the Interests at any and all times after the occurrence and during the continuance of an Event of Default, including, but not limited to, at any meeting of the [members/board] of the Issuer, however called, and at any adjournment thereof, or in any written action by consent of the [members/board] of the Issuer. This Irrevocable Proxy shall remain in effect with respect to the Interests until the Termination Date and will continue to be effective or automatically reinstated, as the case may be, if at any time payment, in whole or in part, of any of the Secured Obligations is rescinded or must otherwise be restored or returned by Proxy Holder as a preference, fraudulent conveyance, or otherwise under any bankruptcy, insolvency, or similar law, all as though such payment had not been made (provided, that in the event payment of all or any part of the Secured Obligations is rescinded or must be restored or returned, all reasonable out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Proxy Holder in defending and enforcing such reinstatement shall be deemed to be included as a part of the Secured Obligations), notwithstanding any time limitations set forth in the [operating agreement/by-laws] and other organization documents of the Issuer or the [Limited Liability Company Act/Corporations Act] of the State of [__________].

Any obligation of the Grantor hereunder shall be binding upon the heirs, successors, and assigns of the Grantor (including, without limitation, any transferee of any of the Interests).

[*Signature Page Follows*]

**IN WITNESS WHEREOF**, the Grantor has executed this Irrevocable Proxy as of this [__] day of [________ __], 202[_].

[_____________________________________]

By ________________________________
Print Name _________________________
Title_______________________________

# EXHIBIT E

## FORM OF REGISTRATION PAGE

[Issuer]

[Stock/Membership/Partnership] Ledger as of ________, ___*

| Name | Certificate No. | Number of Interests |
|---|---|---|
| | | |

Acknowledged By:

[Issuer]

By ________________________________
Print Name ________________________
Title________________________________

*To Remain Blank - Not Completed at Closing

# EXHIBIT 4

**UNITED STATES PATENT AND TRADEMARK OFFICE**

UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND
DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

JUNE 3, 2025

PTAS

MS. MICHELLE BANAYAN
1801 CENTURY PARK EAST, 26TH FLOOR
LOS ANGELES, CA 90067

**900944721**

UNITED STATES PATENT AND TRADEMARK OFFICE
NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT RECORDATION BRANCH OF THE U.S. PATENT AND TRADEMARK OFFICE. A COMPLETE COPY IS AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE. THE INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM. IF YOU SHOULD FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY CONTACT THE ASSIGNMENT RECORDATION BRANCH AT 571-272-3350. PLEASE SEND REQUEST FOR CORRECTION TO: U.S. PATENT AND TRADEMARK OFFICE, MAIL STOP: ASSIGNMENT RECORDATION BRANCH, P.O. BOX 1450, ALEXANDRIA, VA 22313.

RECORDATION DATE: 05/30/2025
REEL/FRAME: 8883/0576
NUMBER OF PAGES: 7

BRIEF: SECURITY INTEREST

ASSIGNOR:
SYNERGY CHC CORP.
DOC DATE: 05/30/2025
CITIZENSHIP: NEVADA
ENTITY: CORPORATION

ASSIGNEE:
ACP AGENCY, LLC
CITIZENSHIP: DELAWARE
ENTITY: LIMITED LIABILITY COMPANY

C/O ACME CREDIT PARTNERS, LLC
600 LEXINGTON AVE, 14TH FLOOR
NEW YORK, NEW YORK 10022

SERIAL NUMBER: 75581818
FILING DATE: 11/16/1998
REGISTRATION NUMBER: 2414522
REGISTRATION DATE: 12/19/2000
MARK: FOCUS FACTOR
DRAWING TYPE: TYPESET WORD(S) /LETTER(S) /NUMBER(S)

SERIAL NUMBER: 76679299
FILING DATE: 07/09/2007
REGISTRATION NUMBER: 3436683
REGISTRATION DATE: 05/27/2008
MARK: WHY LOOK GOOD WHEN YOU CAN LOOK PER-FÉKT
DRAWING TYPE: AN ILLUSTRATION DRAWING WITH WORD(S)/LETTER(S)/NUMBER(S) IN STYLIZED FORM

SERIAL NUMBER: 76680155 FILING DATE: 08/01/2007
REGISTRATION NUMBER: 3383803 REGISTRATION DATE: 02/19/2008
MARK: PER-FÉKT
DRAWING TYPE: AN ILLUSTRATION DRAWING WITH WORD(S)/LETTER(S)/NUMBER(S) IN STYLIZED FORM

SERIAL NUMBER: 76680156 FILING DATE: 08/01/2007
REGISTRATION NUMBER: 3383804 REGISTRATION DATE: 02/19/2008
MARK:
DRAWING TYPE: AN ILLUSTRATION DRAWING WITHOUT ANY WORDS(S)/ LETTER(S) /NUMBER(S)

SERIAL NUMBER: 86799569 FILING DATE: 10/26/2015
REGISTRATION NUMBER: 5074891 REGISTRATION DATE: 11/01/2016
MARK: FLAT TUMMY
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 86799573 FILING DATE: 10/26/2015
REGISTRATION NUMBER: 5142815 REGISTRATION DATE: 02/14/2017
MARK: FLAT TUMMY
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 86799577 FILING DATE: 10/26/2015
REGISTRATION NUMBER: 5142816 REGISTRATION DATE: 02/14/2017
MARK: FLAT TUMMY TEA
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 86799582 FILING DATE: 10/26/2015
REGISTRATION NUMBER: 5142817 REGISTRATION DATE: 02/14/2017
MARK: FLAT TUMMY TEA
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 87345246 FILING DATE: 02/22/2017
REGISTRATION NUMBER: 6463755 REGISTRATION DATE: 08/24/2021
MARK: SYNERGY A CONSUMER HEALTHCARE COMPANY
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 87369114 FILING DATE: 03/13/2017
REGISTRATION NUMBER: 5596520 REGISTRATION DATE: 10/30/2018
MARK: FLAT TUMMY
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 87528722 FILING DATE: 07/14/2017
REGISTRATION NUMBER: 5365149 REGISTRATION DATE: 12/26/2017
MARK: THE SYNERGY EFFECT
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 87756927 FILING DATE: 01/16/2018
REGISTRATION NUMBER: 6289745 REGISTRATION DATE: 03/09/2021
MARK: BLACKOTTER
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 87977726 FILING DATE: 11/22/2016
REGISTRATION NUMBER: 5572253 REGISTRATION DATE: 09/25/2018
MARK: SNEAKY VAUNT
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 90097074 FILING DATE: 08/06/2020
REGISTRATION NUMBER: 7552593 REGISTRATION DATE: 10/29/2024
MARK: SNEAKY VAUNT
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 90477772 FILING DATE: 01/20/2021
REGISTRATION NUMBER: REGISTRATION DATE:
MARK: FACTOR NUTRITION
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 90519699 FILING DATE: 02/09/2021
REGISTRATION NUMBER: 6840427 REGISTRATION DATE: 09/06/2022
MARK: FOCUS FACTOR BRAIN HUB
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 97026495 FILING DATE: 09/14/2021
REGISTRATION NUMBER: REGISTRATION DATE:
MARK: URGENTRX
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 98817879 FILING DATE: 10/24/2024
REGISTRATION NUMBER: REGISTRATION DATE:
MARK: PER-FÉKT BEAUTY
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 98817880 FILING DATE: 10/24/2024
REGISTRATION NUMBER: REGISTRATION DATE:
MARK: PER-FÉKT
DRAWING TYPE: STANDARD CHARACTER MARK

SERIAL NUMBER: 98898853 FILING DATE: 12/12/2024
REGISTRATION NUMBER: REGISTRATION DATE:
MARK: FACTOR NUTRITION
DRAWING TYPE: STANDARD CHARACTER MARK

ASSIGNMENT RECORDATION BRANCH
PUBLIC RECORDS DIVISION

**EXECUTION VERSION**

# TRADEMARK SECURITY AGREEMENT

This Trademark Security Agreement (this "**Trademark Security Agreement**") is made as of May 30, 2025, by Synergy CHC Corp. (the "**Grantor**"), in favor of ACP AGENCY, LLC, in its capacity as Collateral Agent (together with its successors and assigns in such capacity, the "**Grantee**").

**WHEREAS**, the Grantor has adopted, used and is using, and holds all right, title and interest in and to, the trademarks and service marks listed on the attached Schedule A, which trademarks and service marks are registered or applied for in the United States Patent and Trademark Office (the "**Trademarks**");

**WHEREAS**, the Grantor has entered into a Pledge and Security Agreement, dated May 30, 2025 (as amended, restated, supplemented, modified or otherwise changed from time to time, the "**Security Agreement**"), in favor of the Grantee; and

**WHEREAS**, pursuant to the Security Agreement, the Grantor has granted to the Grantee for the benefit of the Secured Parties (as defined in the Security Agreement) a continuing security interest in all right, title and interest of the Grantor in, to and under the Trademarks, together with, among other things, the good-will of the business symbolized by the Trademarks and the applications and registrations thereof, and all proceeds thereof, including, without limitation, any and all causes of action which may exist by reason of infringement thereof and any and all damages arising from past, present and future violations thereof (the "**Collateral**"), to secure the payment, performance and observance of the Secured Obligations (as defined in the Security Agreement).

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Grantor does hereby pledge, convey, sell, assign, transfer and set over unto the Grantee and grants to the Grantee for the benefit of the Grantee and the Secured Parties a continuing security interest in the Collateral to secure the prompt payment, performance and observance of the Secured Obligations.

The Grantor hereby further acknowledges and affirms that the rights and remedies of the Grantee with respect to the Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein.

This Trademark Security Agreement may be executed in any number of counterparts and by different parties in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart by facsimile or electronic mail shall be equally effective as delivery of an original executed counterpart.

[*Remainder of page intentionally left blank*]

**IN WITNESS WHEREOF**, each Grantor has caused this Trademark Security Agreement to be duly executed by its officer thereunto duly authorized as of the date first set forth above.

**SYNERGY CHC CORP.**

Signed by:

By: ______________________________
CAE4FF7E52AA41F...
Name: Jack Ross
Title: Chairman and Chief Executive Officer

Acknowledged and Agreed:

**ACP AGENCY, LLC**,
as Collateral Agent

By: ______________________________
Name: Peter Eschmann
Title: Authorized Person

# SCHEDULE A TO TRADEMARK SECURITY AGREEMENT

**Trademarks and Trademark Applications**

United States Registrations:

| Grantor | Mark | Registration No. | Registration Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | BLACKOTTER | 6289745 | 09-Mar-2021 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5074891 | 01-Nov-2016 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5142815 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY | 5596520 | 30-Oct-2018 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY TEA | 5142816 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FLAT TUMMY TEA | 5142817 | 14-Feb-2017 | United States of America |
| Synergy CHC Corp. | FOCUS FACTOR | 2414522 | 19-Dec-2000 | United States of America |
| Synergy CHC Corp. | FOCUS FACTOR BRAIN HUB | 6840427 | 06-Sep-2022 | United States of America |
| Synergy CHC Corp. | SNEAKY VAUNT | 7552593 | 29-Oct-2024 | United States of America |
| Synergy CHC Corp. | SNEAKY VAUNT | 5572253 | 25-Sep-2018 | United States of America |
| Synergy CHC Corp. | SYNERGY A CONSUMER HEALTHCARE COMPANY | 6463755 | 24-Aug-2021 | United States of America |

| | | | | |
|---|---|---|---|---|
| Synergy CHC Corp. | THE SYNERGY EFFECT | 5365149 | 26-Dec-2017 | United States of America |
| Synergy CHC Corp. | WHY LOOK GOOD WHEN YOU CAN LOOK PER-FÉKT | 3436683 | 27-May-2008 | United States of America |
| Synergy CHC Corp. | | 3383804 | 19-Feb-2008 | United States of America |
| Synergy CHC Corp. | PER-FÉKT | 3383803 | 19-Feb-2008 | United States of America |

United States Applications:

| Grantor | Mark | Application No. | Application Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | FACTOR NUTRITION | 90477772 | 20-Jan-2021 | United States of America |
| Synergy CHC Corp. | FACTOR NUTRITION | 98898853 | 12-Dec-2024 | United States of America |
| Synergy CHC Corp. | UrgentRX | 97026495 | 14-Sep-2021 | United States of America |
| Synergy CHC Corp. | PER-FÉKT | 98817880 | 24-Oct-2024 | United States of America |
| Synergy CHC Corp. | PER-FÉKT BEAUTY | 98817879 | 24-Oct-2024 | United States of America |

# EXHIBIT 5

**EXECUTION VERSION**

CANADIAN SECURITY AGREEMENT

by and among

ACP AGENCY, LLC
as Collateral Agent for the Lender

and

SYNERGY CHC CORP. and SYNERGY CHC INC.
as Grantors

# Table of Contents


Page

1. Definitions and Construction ..... 1
   1.1. Definitions ..... 1
   1.2. Construction ..... 5
   1.3. Schedules ..... 5
   1.4. Relation to Other Loan Documents ..... 5
2. Grant of Security and Secured Obligations. ..... 5
   2.1. Grant of Security Interest ..... 5
   2.2. Grantors Remain Liable ..... 6
   2.3. Attachment ..... 6
3. Representations and Warranties. ..... 6
   3.1. Chief Executive Office; Name; Jurisdiction of Organization, Etc ..... 7
   3.2. [Reserved] ..... 7
   3.3. Deposit Accounts; Securities Accounts ..... 7
   3.4. Real Property ..... 7
   3.5. Intellectual Property ..... 7
   3.6. Valid and Perfected Security Interest ..... 8
   3.7. Pledged Interests. ..... 8
   3.8. Locations of Inventory and Equipment ..... 8
   3.9. No Conflicts; Consents ..... 8
4. Covenants. ..... 9
   4.1. Possession of Collateral ..... 9
   4.2. Chattel Paper ..... 9
   4.3. Control Agreements ..... 9
   4.4. Letter-of-Credit Rights ..... 9
   4.5. Titled Collateral ..... 9
   4.6. Intellectual Property ..... 10
   4.7. Investment Property. ..... 11
   4.8. Real Property; Fixtures ..... 11
   4.9. Name, Etc. ..... 12
   4.10. Account Verification ..... 12
   4.11. Insurance ..... 12
   4.12. Locations of Inventory and Equipment ..... 12
5. Further Assurances. ..... 13
   5.1. General ..... 13
   5.2. Authorization to File Financing Statements, Etc. ..... 13
   5.3. The Collateral Agent May Perform; The Collateral Agent's Duties ..... 13
6. Remedies. ..... 13
   6.1. General ..... 13
   6.2. License for Intellectual Property ..... 14
   6.3. Deposit Accounts and Securities Accounts ..... 14
   6.4. Investment Property ..... 14
   6.5. Deficiency ..... 14

6.6. Possession; Receiver ..... 15
6.7. The Collateral Agent's Right to Perform Contracts, Exercise Rights, Etc ..... 15
6.8. The Collateral Agent Appointed Attorney-in-Fact. ..... 15
6.9. Voting and Other Rights in Respect of Pledged Interests. ..... 16
6.10. Disposition of Pledged Interests by the Collateral Agent ..... 16
6.11. Collection of Accounts, General Intangibles and Negotiable Collateral ..... 16
6.12. Remedies Cumulative ..... 17
6.13. Marshaling ..... 17
6.14. Expenses ..... 17

7. Continuing Security Interest: Assignments under Credit Agreement. ..... 17

7.1. Continuing Security Interest; No Waiver ..... 17
7.2. Reinstatement ..... 17

8. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER, ETC. ..... 18

8.1. GOVERNING LAW ..... 18
8.2. FORUM NON CONVENIENS ..... 18
8.3. WAIVER OF JURY TRIAL ..... 18
8.4. SUBMISSION TO JURISDICTION ..... 18
8.5. WAIVER OF CLAIMS ..... 19

9. Miscellaneous. ..... 19

9.1. Survival ..... 19
9.2. Merger, Amendments; Etc ..... 19
9.3. Addresses for Notices ..... 19
9.4. Counterparts ..... 19
9.5. Effectiveness; Severability; Section Headings ..... 20

Schedules

Schedule 1 Chief Executive Office, Jurisdiction of Organization, Etc.
Schedule 2 [Reserved]
Schedule 3 Deposit Accounts; Securities Accounts
Schedule 4 Real Property
Schedule 5 Copyrights, Patents, Trademarks and Intellectual Property Licenses
Schedule 6 Pledged Interests
Schedule 7 Locations of Inventory and Equipment

# CANADIAN SECURITY AGREEMENT

This **CANADIAN SECURITY AGREEMENT** (this "Agreement") is entered into as of **May 30, 2025**, by and among the Grantors listed on the signature pages hereof (collectively, jointly and severally, "Grantors" and each individually "Grantor"), and **ACP AGENCY, LLC** ("ACP"), in its capacity as collateral agent for the lenders (collectively, the "Lender") party to the Credit Agreement (as hereinafter defined) (in such capacity, together with its successors and assigns in such capacity, if any, the "Collateral Agent")

W I T N E S S E T H:

WHEREAS, ACP, in its capacities as the administrative agent for the Lender (in such capacity, together with its successors and assigns in such capacity, if any, the "Administrative Agent") and as the Collateral Agent and the Lender have agreed to make certain financial accommodations available to the Grantors from time to time pursuant to the terms and conditions of the Credit Agreement, dated of even date herewith, by and among the Administrative Agent, the Collateral Agent, the Lender, the Grantors and the other loan parties party thereto (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement");

WHEREAS, in order to induce the Administrative Agent, the Collateral Agent and the Lender to enter into the Credit Agreement and to provide financial accommodations to *inter alios* the Grantors as set forth in the Loan Documents, each Grantor has agreed to (i) guarantee the loan (except that Grantor which is a borrower under the Credit Agreement ) and (ii) grant to the Collateral Agent, for the benefit of the Secured Parties, *inter alia* a continuing security interest in and to the Collateral in order to secure the prompt and complete payment, observance and performance of the Secured Obligations;

WHEREAS, as a result of its relationship with the other Grantors, each Grantor will receive substantial benefits from the financial accommodations provided by the Administrative Agent, the Collateral Agent and the Lender to the Grantors.

NOW, THEREFORE, for and in consideration of the recitals made above and other good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

## 1. **Definitions and Construction**

**1.1. Definitions**. As used in this Agreement, the following terms shall have the following definitions:

"Agreement" means this Security Agreement.

"Canadian Copyright Security Agreement" means each Copyright Security Agreement between any Grantor and the Collateral Agent.

"Canadian Patent Security Agreement" means each Patent Security Agreement between any Grantor and the Collateral Agent.

"Canadian Trademark Security Agreement" means each Trademark Security Agreement between any Grantor and the Collateral Agent.

"Certificate of Title" means a title document with respect to which the PPSA provides for the security interest to be indicated on the certificate as a condition or result of the security interest's obtaining priority over the rights of a secured party with respect to the Collateral.

"Collateral" has the meaning set forth in Section 2.

"Collateral Agent" has the meaning set forth in the preamble to this Agreement

"Copyrights" means any and all rights in any works of authorship, including (a) copyrights and moral rights, (b) copyright registrations and recordings thereof and all applications in connection therewith including those listed on Schedule 5, (c) income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (d) the right to sue for past, present, and future infringements thereof, and (e) all of each Grantor's rights corresponding thereto throughout the world.

"Credit Agreement" has the meaning set forth in the recitals to this Agreement.

"Excluded Accounts" has the meaning set forth in the Credit Agreement.

"Excluded Property" means:

(a) any rights or interest in any contract, permit, license, or license agreement covering real or personal property of any Grantor to the extent, but only to the extent, that under the terms of such contract, permit, license, or license agreement, or applicable law with respect thereto, the grant of a security interest therein is prohibited as a matter of law or under the terms of such contract, permit, license, or license agreement and such prohibition or restriction has not been waived or the consent of the other party to such contract, permit, license, or license agreement has not been obtained, provided, that, (i) the foregoing exclusions of this clause (a) shall in no way be construed (A) to apply to the extent that any such prohibition or restriction is ineffective under the PPSA or other applicable law, or (B) to apply to the extent that any consent or waiver has been obtained that would permit the Collateral Agent's security interest to attach notwithstanding the prohibition or restriction on the pledge of such contract, permit, license, or license agreement, (ii) the exclusions in this clause (a) shall in no way be construed to limit, impair, or otherwise affect the continuing security interests of the Collateral Agent upon any rights or interests of any Grantor in or to (1) monies due or to become due under or in connection with any described contract, permit, license, license agreement, or Equity Interests (including any accounts or Equity Interests), or (2) any proceeds from the sale, license, or other dispositions of any such contract, lease, permit, license, license agreement, or Equity Interests and (iii) immediately upon the ineffectiveness, lapse, termination or waiver of any such provision, the Collateral shall include, and such Grantor shall be deemed to have granted a security interest in, any such right, title and interest as if such provision had never been in effect; and

(b) any applicable Canadian intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable law; provided, that, upon submission and acceptance by the Canadian Intellectual Property Office, such intent-to-use trademark application shall cease to be Excluded Property and shall be considered Collateral.

"Futures Intermediary" shall mean "futures intermediary" as defined in the PPSA.

"Governmental Authority" has the meaning set forth in the Credit Agreement.

"Grantor" and "Grantors" have the respective meanings set forth in the preamble to this Agreement.

"Industrial Designs" means all of the following now owned or hereafter acquired by any Grantor: (a) all industrial designs arising under the laws of Canada or any other country in or to which any Grantor now or hereafter has any right, title or interest therein, all registrations and recordings thereof, and all

applications for industrial designs under the laws of Canada or any other country, including registrations, recordings and pending applications in the Canadian Intellectual Property Office, and (b) all reissues, continuations, divisions, continuations-in-part, renewals, improvements or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein.

"Intellectual Property" means any and all Patents, Copyrights, Trademarks, Industrial Designs, trade names, trade secrets, know-how, inventions (whether or not patentable), algorithms, software programs (including source code and object code), processes, product designs, industrial designs, blueprints, drawings, data, customer lists, URLs and domain names, specifications, documentations, reports, catalogs, literature, advertising matter, and any other forms of technology or proprietary information of any kind, including all rights therein and all applications for registration or registrations thereof.

"Intellectual Property Licenses" means, with respect to any Person (as used in this definition, the "Specified Party"), (a) any licenses or other similar rights provided to the Specified Party in or with respect to Intellectual Property owned or controlled by any other Person, and (b) any licenses or other similar rights provided to any other Person in or with respect to Intellectual Property owned or controlled by the Specified Party, in each case, including (i) any software license agreements (other than license agreements for commercially available off-the-shelf software that is generally available to the public which have been licensed to a Grantor pursuant to end-user licenses), (ii) the license agreements listed on Schedule 5, and (iii) the right to use any of the licenses or other similar rights described in this definition in connection with the enforcement of the Collateral Agent's rights under the Loan Documents.

"Investment Property" means (a) any and all investment property (as that term is defined in the PPSA), and (b) any and all of Pledged Interests and rights under Pledged Operating Agreements (regardless of whether classified as investment property under the PPSA).

"Lender" has the meaning set forth in the preamble to this Agreement.

"Negotiable Collateral" means letters of credit, letter-of-credit rights, Instruments, promissory notes, drafts and documents.

"Patents" means patents and patent applications, including (a) the patents and patent applications listed on Schedule 5, (b) all continuations, divisionals, continuations-in-part, re-examinations, reissues, and renewals thereof and improvements thereon, (c) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, (d) the right to sue for past, present, and future infringements thereof, and (e) all of each Grantor's rights corresponding thereto throughout the world.

"Permitted Liens" has the meaning set forth in the Credit Agreement.

"Pledged Company" means each Person listed on Schedule 6, together with each other Person, all or a portion of whose Equity Interests are acquired or otherwise owned by a Grantor after the Closing Date.

"Pledged Interests" means all of each Grantor's right, title and interest in and to all of the Equity Interests now owned or hereafter acquired by such Grantor, regardless of class or designation, including in each Pledged Company, and all substitutions therefor and replacements thereof, all proceeds thereof and all rights relating thereto, also including any certificates representing the Equity Interests, the right to receive any certificates representing any of the Equity Interests, all warrants, options, share appreciation rights and other rights, contractual or otherwise, in respect thereof and the right to receive all dividends,

distributions of income, profits, surplus, or other compensation by way of income or liquidating distributions, in cash or in kind, and all cash, instruments, and other property from time to time received, receivable, or otherwise distributed in respect of or in addition to, in substitution of, on account of, or in exchange for any or all of the foregoing.

"Pledged Interests Addendum" means a Pledged Interests Addendum substantially in the form of Exhibit A.

"Pledged Operating Agreements" means the limited liability company operating agreements of each Pledged Company that is a limited liability company and the partnership agreements of each Pledged Company that is a partnership.

"PPSA" means the *Personal Property Security Act* (Nova Scotia) and its regulations as in effect from time to time; provided that, if validity, perfection or the effect of perfection or non-perfection or opposability or the priority of the security interest in the relevant collateral is governed by the personal property security legislation or other applicable legislation with respect to personal property security in effect in a Canadian jurisdiction other than Nova Scotia, "PPSA" means the Personal Property Security Act or such other applicable legislation (including, without limitation, the *Civil Code of Québec*) in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such validity, perfection, effect of perfection or non-perfection or opposability or priority.

"Receiver" means an interim receiver, a receiver, a manager or a receiver and manager.

"Secured Obligations" means each and all of the following: (a) the prompt payment by each Grantor, as and when due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), of all amounts from time to time owing by the Borrower in respect of the Credit Agreement and/or the other Loan Documents, including, without limitation, (i) all Obligations, (ii) in the case of a Guarantor, all amounts from time to time owing by such Grantor in respect of its guaranty made pursuant to Article X of the Credit Agreement or under any other Guaranty to which it is a party, including, without limitation, all obligations guaranteed by such Grantor and (iii) all interest, fees, commissions, charges, expense reimbursements, indemnifications and all other amounts due or to become due under any Loan Document (including, without limitation, all interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts that accrue after the commencement of any Insolvency Proceeding of any Loan Party, whether or not the payment of such interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts are unenforceable or are not allowable, in whole or in part, due to the existence of such Insolvency Proceeding), and (b) the prompt payment and due performance and observance by each Grantor of all of its other obligations from time to time existing in respect of this Agreement and any other Loan Document. Without limiting the generality of the foregoing, Secured Obligations shall include all amounts that constitute part of the Secured Obligations and would be owed by any Grantor to the Collateral Agent but for the fact that they are unenforceable or not allowable, including due to the existence of a bankruptcy, reorganization, other Insolvency Proceeding or similar proceeding involving any Grantor or any other Person; provided that, notwithstanding anything to the contrary contained herein, the Secured Obligations shall exclude any Excluded Swap Obligation.

"Securities Account" shall mean "securities account" as defined in the STA.

"Security Entitlement" means any "security entitlement" as defined in the STA.

"STA" means the *Securities Transfer Act* (Nova Scotia), as such legislation may be amended, renamed or replaced from time to time, and includes all regulations from time to time made under such legislation or, as the context requires, the analogous statute of any other province or territory of Canada.

"Termination Date" has the meaning set forth in the Credit Agreement.

"Titled Collateral" means all Collateral for which the title to such Collateral is governed by a Certificate of Title or certificate of ownership, including, without limitation, all motor vehicles (including, without limitation, all trucks, trailers, tractors, service vehicles, automobiles and other mobile equipment) for which the title to such motor vehicles is governed by a Certificate of Title or certificate of ownership.

"Trademarks" means any and all trademarks, trade names, registered trademarks, trademark applications, service marks, registered service marks and service mark applications, including (a) the trade names, registered trademarks, trademark applications, registered service marks and service mark applications listed on Schedule 5, (b) all renewals thereof, (c) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (d) the right to sue for past, present and future infringements and dilutions thereof, (e) the goodwill of each Grantor's business symbolized by the foregoing or connected therewith, and (f) all of each Grantor's rights corresponding thereto throughout the world.

"Uncertificated Security" means "uncertificated security" as defined in the STA.

**1.2. Construction**. Capitalized terms used but not otherwise defined herein (including in the preamble and recitals hereof) that are defined in the Credit Agreement shall have the meanings given to them in the Credit Agreement. Unless otherwise defined herein or in the Credit Agreement, capitalized terms used herein that are defined in the PPSA shall have the meanings assigned to them in the PPSA. The rules of interpretation specified in the Credit Agreement (including Sections 1.2, 1.3, 1.4, 1.5 and 1.6 thereof) shall be applicable to this Agreement. All references in this Agreement to Sections are references to Sections of this Agreement unless otherwise specified. Each reference herein to any right granted to, benefit conferred upon or power exercisable by the "Collateral Agent" shall be a reference to the Collateral Agent, for the benefit of the Secured Parties. For purposes of this Agreement, except as may otherwise be specifically provided for herein, any reference to any document or Collateral being delivered "promptly" or action taken "promptly" shall mean as soon as possible, but in any event within five Business Days after the applicable event or request.

**1.3. Schedules**. The Collateral Agent and each Grantor agree that the schedules hereto and all descriptions of Collateral contained in such schedules and all amendments and supplements thereto are and shall at all times remain a part of this Agreement.

**1.4. Relation to Other Loan Documents**. In the event of any conflict between any provision in this Agreement and a provision in the Credit Agreement, such provision of the Credit Agreement shall control. The provisions of the Canadian Copyright Security Agreements, Canadian Trademark Security Agreements, or the Canadian Patent Security Agreements are supplemental to the provisions of this Agreement, and nothing contained in the Canadian Copyright Security Agreements, Canadian Trademark Security Agreements, or the Canadian Patent Security Agreements shall limit any of the rights or remedies of the Collateral Agent hereunder. In the event of any conflict between any provision in this Agreement and a provision in any Canadian Copyright Security Agreement, Canadian Trademark Security Agreement, or the Canadian Patent Security Agreement, such provision of this Agreement shall control.

2. **Grant of Security and Secured Obligations.**

**2.1. Grant of Security Interest**. Each Grantor hereby unconditionally grants, assigns as collateral, and pledges to the Collateral Agent to secure the Secured Obligations a continuing security interest in all of such Grantor's right, title, and interest in and to the following, whether now owned or hereafter acquired or arising and wherever located (the "Collateral")]:

(a) all Accounts;

(b) all Goods, including Equipment, Inventory and Fixtures;

(c) all Chattel Paper;

(d) [Reserved];

(e) all deposit accounts and Securities Accounts;

(f) all Intangibles, Intellectual Property, and Intellectual Property Licenses;

(g) all Investment Property;

(h) all Negotiable Collateral;

(i) all supporting obligations;

(j) all books and records;

(k) all of money or other assets of such Grantor that now or hereafter come into the possession, custody, or control of the Collateral Agent (or its designee); and

(l) all Proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance.

**2.2. Grantors Remain Liable**. Notwithstanding anything to the contrary contained herein, (a) each Grantor shall remain liable under the contracts and agreements included in the Collateral, including the Pledged Operating Agreements, to perform all of the duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Collateral Agent of any of the rights hereunder shall not release any Grantor from any of its duties or obligations under such contracts and agreements included in the Collateral, and (c) the Collateral Agent shall not have any obligation or liability under such contracts and agreements included in the Collateral by reason of this Agreement, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of any Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder. Until an Event of Default exists, except as otherwise provided in any Loan Document, Grantors shall have the right to possession and enjoyment of the Collateral for the purpose of conducting their respective businesses in the ordinary course, subject to and upon the terms of the Loan Documents. Without limiting the generality of the foregoing, the record and beneficial ownership of the Pledged Interests, including all voting, consensual, dividend, and distribution rights, shall remain in the applicable Grantor until (i) an Event of Default exists and (ii) the Collateral Agent has notified any Grantor of the Collateral Agent's election to exercise such rights with respect to the Pledged Interests.

**2.3. Attachment**. Each Grantor hereby acknowledges that (a) value has been given, (b) it has rights in the Collateral (other than after-acquired Collateral), (c) it has not agreed to postpone the time for attachment of the security interest, and (d) it has received a copy of each of this Agreement and the financing statement registered in connection with this Agreement.

3. **Representations and Warranties.**

Each Grantor represents and warrants to the Collateral Agent the following:

**3.1. Chief Executive Office; Name; Jurisdiction of Organization, Etc**. The name and jurisdiction of organization of each Grantor is set forth on Schedule 1, jurisdictions in which tangible Collateral of such Grantor is located is set forth on Schedule 1, the chief executive office of each Grantor is located at the address indicated on Schedule 1 and each Grantor's organizational identification numbers, if any, are identified on Schedule 1, subject in each case to modification in accordance with Section 4.9.

**3.2. [Reserved]**

**3.3. Deposit Accounts; Securities Accounts**. Set forth on Schedule 3 is a list of all of the deposit accounts and securities accounts of each Grantor, including, with respect to each bank or securities intermediary (a) the name and address of such Person, (b) the account numbers of the deposit accounts or securities accounts maintained with such Person and (c) the purpose or nature of the deposit account or securities account, subject in each case to the modification of Schedule 3 based on information provided to the Collateral Agent in accordance with Section 5.9 of the Credit Agreement in the case of deposit accounts or Schedule 5.1 of the Credit Agreement in the case of securities accounts.

**3.4. Real Property**. Schedule 4 sets forth all Real Property owned by any Grantor as of the Closing Date.

**3.5. Intellectual Property.**

(a) Set forth on Schedule 5 is a complete and correct list as of the Closing Date of: (i) all registered Copyrights owned by any Grantor, all applications for registration of Copyrights owned by any Grantor, and all other Copyrights owned or used by any Grantor and material to the conduct of the business of any Grantor, (ii) all Intellectual Property Licenses to which any Grantor is a party, (iii) all Patents owned or used by any Grantor and all applications for Patents owned by any Grantor, (iv) all Industrial Designs owned or used by any Grantor and all applications for Industrial Designs owned by any Grantor, and (v) all registered Trademarks owned by any Grantor, all applications for registration of Trademarks owned by any Grantor, and all other Trademarks owned or used by any Grantor and material to the conduct of the business of any Grantor.

(b) Each Grantor owns exclusively or holds licenses in all Intellectual Property that are necessary in or material to the conduct of its business.

(c) To each Grantor's knowledge, in each case except where such infringement or misappropriation either individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect, (i) no Person has infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights owned by such Grantor (ii) such Grantor has never infringed or misappropriated and is not currently infringing or misappropriating any Intellectual Property rights of any Person, (iii) no product manufactured, used, distributed, licensed, or sold by or service provided by such Grantor has ever infringed or misappropriated or is currently infringing or misappropriating any Intellectual Property rights of any Person, and (iv) there are no infringement or misappropriation claims or proceedings pending, or to any Grantor's knowledge, threatened in writing against any Grantor, and no Grantor has received any written notice or other communication of any actual or alleged infringement or misappropriation of any Intellectual Property rights of any Person.

(d) To each Grantor's knowledge, all registered Copyrights, registered Trademarks, and issued Patents that are owned by such Grantor and necessary in or material to the conduct of its business are valid, subsisting and enforceable and in compliance with all legal requirements, filings, and payments and other actions that are required to maintain such Intellectual Property in full force and effect.

**3.6. Valid and Perfected Security Interest**. This Agreement creates legal and valid security interests in all of the Collateral in favour of the Collateral Agent, for the benefit of the Secured Parties, and such security interests constitute perfected and continuing security interests on the Collateral, securing the Secured Obligations, enforceable against each Grantor and having priority over all other security interests on the Collateral, subject only to Permitted Liens which are non-consensual Permitted Liens, permitted purchase money security interests, or the interests of lessors under Capital Leases, subject only to the filing of appropriate financing statements in the jurisdictions listed on Schedule 1 and in the case of registered Copyrights upon the filing of any Canadian Copyright Security Agreement with the Canadian Intellectual Property Office, in the case of registered Patents, the filing of any Canadian Patent Security Agreement and in the case of registered Trademarks, any Canadian Trademark Security Agreement with the Canadian Intellectual Property Office, except for security interests (a) in respect of any property that is subject to a certificate of title, (b) letter-of-credit rights (other than supporting obligations), and (c) any deposit accounts and securities accounts not subject to a Control Agreement as permitted by any Loan Document. All action by any Grantor necessary to protect and perfect such security interest on each item of Collateral has been taken, except as expressly set forth above.

**3.7. Pledged Interests.**

(a) Each Grantor is and will at all times be the sole holder of record and the legal and beneficial owner of the Pledged Interests indicated on Schedule 6 as being owned by such Grantor and, when acquired by such Grantor, any Pledged Interests acquired after the Closing Date. All of the Pledged Interests are, and shall be, duly authorized, validly issued, fully paid and nonassessable and constitute (or will constitute) the percentage of the issued and outstanding Equity Interests of each Pledged Company of such Grantor identified on Schedule 6 as supplemented or modified by any Pledged Interests Addendum to this Agreement. Each Grantor has the right and requisite authority to pledge, the Investment Property pledged by such Grantor to the Collateral Agent as provided herein.

(b) Each Grantor has delivered to and deposited with the Collateral Agent all certificates representing the Pledged Interests owned by such Grantor to the extent such Pledged Interests are represented by certificates, and undated powers (or other documents of transfer acceptable to the Collateral Agent) endorsed in blank with respect to such certificates. None of the Pledged Interests owned or held by such Grantor has been issued or transferred in violation of any securities registration, securities disclosure, or similar laws of any jurisdiction to which such issuance or transfer may be subject.

(c) The Pledged Interests issued pursuant to any Pledged Operating Agreement (i) are not dealt in or traded on securities exchanges or in securities markets, (ii) do not constitute investment company securities, and (iii) are not held by such Grantor in a securities account. In addition, none of the Pledged Operating Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement, provide that such Pledged Interests are securities governed by the applicable STA as in effect in any relevant jurisdiction.

**3.8. Locations of Inventory and Equipment**. As of the Closing Date, all inventory and equipment of each Grantor is located only at, or in-transit between, the locations listed on Schedule 7 to this Agreement and is not stored with any bailee, warehouseman or other third party, or located within an FTZ, except, in each case, as set forth in such schedule.

**3.9. No Conflicts; Consents**. To the knowledge of each Grantor, no consent, approval, authorization, or other order or other action by, and no notice to or filing with, any Governmental Authority or any other Person is required (i) for the grant of a security interest by such Grantor in and to the Collateral pursuant to this Agreement or for the execution, delivery, or performance of this Agreement by such Grantor, or (ii) for the exercise by the Collateral Agent of the voting or other rights provided for in this Agreement with respect to the Investment Property or the remedies in respect of the Collateral pursuant to

this Agreement, except as may be required in connection with such disposition of Investment Property by laws affecting the offering and sale of securities generally and except for consents, approvals, authorizations, or other orders or actions that have been obtained or given (as applicable) and that are still in force. To the knowledge of each Grantor, no Intellectual Property License of any Grantor that is necessary in or material to the conduct of such Grantor's business requires any consent of any other Person that has not been obtained in order for such Grantor to grant the security interest granted hereunder in such Grantor's right, title or interest in or to such Intellectual Property License.

4. **Covenants.**

Each Grantor covenants and agrees with the Collateral Agent that:

**4.1. Possession of Collateral**. In the event that any Collateral is evidenced by or consists of Negotiable Collateral, Investment Property, or chattel paper, Grantors shall promptly after the acquisition thereof, notify the Collateral Agent thereof, and if and to the extent that possession thereof for purposes of the perfection or priority of the security interest of the Collateral Agent is necessary or desirable, the applicable Grantor shall execute such other documents and instruments as shall be requested by the Collateral Agent or, if applicable, endorse and deliver physical possession of such Negotiable Collateral, Investment Property, or chattel paper to the Collateral Agent, together with such undated powers (or other relevant document of transfer acceptable to the Collateral Agent) endorsed in blank promptly after the request of the Collateral Agent and shall do such other acts or things deemed necessary or desirable by the Collateral Agent to protect the security interest of the Collateral Agent therein.

**4.2. Chattel Paper**. Each Grantor shall take all steps reasonably necessary to grant the Collateral Agent control of all electronic chattel paper in accordance with the PPSA promptly after the request of the Collateral Agent. If any Grantor retains possession of any chattel paper or instruments (to the extent permitted hereunder), promptly upon the request of the Collateral Agent, such chattel paper and instruments shall be marked with the following legend: "This writing and the obligations evidenced or secured hereby are subject to the security interest of ACP Agency, LLC".

**4.3. Control Agreements**. Each Grantor shall obtain an authenticated Control Agreement from each depository bank maintaining a deposit account for such Grantor, other than Excluded Accounts, to the extent required under the Credit Agreement and from each Issuer of Uncertificated Securities, Securities Intermediary or Futures Intermediary issuing or holding any financial assets or commodities to or for any Grantor or maintaining a securities account for such Grantor, except as the Collateral Agent may otherwise expressly agree in writing.

**4.4. Letter-of-Credit Rights**. If a Grantor is or becomes the beneficiary of letters of credit, then such Grantor shall promptly after becoming a beneficiary, notify the Collateral Agent thereof and, promptly after the request of the Collateral Agent, deliver a tri-party agreement executed and delivered by such Grantor, the issuer or confirming bank with respect to letter-of-credit rights and the Collateral Agent, assigning such letter-of-credit rights to the Collateral Agent and directing all payments thereunder to the Collateral Agent's account, all in form and substance satisfactory to the Collateral Agent.

**4.5. Titled Collateral**.

(a) Each Grantor shall (i) cause all Collateral which under applicable law are required to be registered to be properly registered in the name of such Grantor, (ii) cause all Titled Collateral to be properly titled in the name of such Grantor, and if requested by the Collateral Agent in accordance with the terms hereof, with the security interests of the Collateral Agent noted thereon and (iii) if requested by the Collateral Agent in accordance with the terms hereof, promptly deliver to the Collateral Agent (or its

custodian) originals of any such Certificate of Title or certificates of ownership for such Titled Collateral, with the security interests of the Collateral Agent noted thereon.

(b) Upon the acquisition after the date hereof by any Grantor of any Titled Collateral with a value in excess of, individually, $100,000 and, in the aggregate, $250,000 (other than equipment to be acquired that is subject to a purchase money security interests that constitute a Permitted Liens under the Credit Agreement), such Grantor shall immediately notify the Collateral Agent of such acquisition, set forth a description of such Titled Collateral acquired and a good faith estimate of the current value of such Titled Collateral, and if so requested by the Collateral Agent, immediately deliver to the Collateral Agent (or its custodian) originals of the Certificate of Title or certificates of ownership for such Titled Collateral, together with the manufacturer's statement of origin, and an application duly executed by the appropriate Grantor to evidence the security interests of the Collateral Agent thereon.

(c) Each Grantor hereby appoints the Collateral Agent as its attorney-in-fact, effective the date hereof and terminating upon the Termination Date, for the purpose of (i) executing on behalf of such Grantor title or ownership applications for filing with appropriate Governmental Authority to enable Titled Collateral to be amended to reflect the Collateral Agent listed as lienholder thereof, (ii) filing such applications with such Governmental Authority, and (iii) executing such other documents and instruments on behalf of, and taking such other action in the name of, such Grantor as the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Section (including, without limitation, for the purpose of creating in favour of the Collateral Agent a perfected security interest on such Titled Collateral and exercising the rights and remedies of the Collateral Agent hereunder). This appointment as attorney-in-fact is coupled with an interest and is irrevocable until the Termination Date.

(d) With respect to motor vehicles, any Certificate of Title or ownership delivered pursuant to the terms hereof shall be accompanied by odometer statements for each motor vehicle covered thereby.

(e) So long as no Event of Default shall have occurred and be continuing, upon the request of any Grantor, the Collateral Agent shall execute and deliver to such Grantor such instruments as such Grantor shall reasonably request to remove the notation of the Collateral Agent as secured party on any Certificate of Title or certificate of ownership for any Titled Collateral; provided that any such instruments shall be delivered, and the release shall be effective, only upon receipt by the Collateral Agent of a certificate from such Grantor, stating that the Titled Collateral, the security interest on which is to be released, is to be sold in accordance with the terms of the Credit Agreement or has suffered a casualty loss (with title thereto passing to the casualty insurance company therefor in settlement of the claim for such loss), the amount that such Grantor will receive as sale proceeds or insurance proceeds and whether or not such sale proceeds or insurance proceeds are required by the Credit Agreement to be paid to the Collateral Agent to be applied to the Secured Obligations and, to the extent required by the Credit Agreement, any proceeds of such sale or casualty loss shall be paid to the Collateral Agent hereunder to be applied to the Secured Obligations in accordance with the terms of the Credit Agreement.

**4.6. Intellectual Property.**

(a) Each Grantor shall execute and deliver to the Collateral Agent one or more Canadian Copyright Security Agreements, Canadian Trademark Security Agreements, or Canadian Patent Security Agreements with respect to the Patents, Trademarks, Copyrights, and the General Intangibles of such Grantor relating thereto or represented thereby as soon as practicable after the request of the Collateral Agent, including with respect to any such Intellectual Property acquired after the Closing Date.

(b) Each Grantor shall, except as otherwise expressly permitted under the Credit Agreement, (i) take all reasonable and necessary action to preserve and maintain all of such Grantor's Intellectual Property and Intellectual Property Licenses that are necessary in or material to such Grantor's business,

including (A) the payment of all maintenance fees and filing of applications for renewal, affidavits of use, and affidavits of noncontestability, and (B) the diligent enforcement and defense thereof (including suing for infringement, misappropriation, or dilution against conflicting Intellectual Property rights of any Person) and (ii) not abandon any Intellectual Property or Intellectual Property License that is necessary in or material to such Grantor's business when taken as a whole.

(c) The Collateral Agent shall have no duties with respect to any Intellectual Property or Intellectual Property Licenses of any Grantor and the Collateral Agent shall not be under any obligation to take any steps necessary to preserve rights in Intellectual Property or Intellectual Property Licenses against any other Person, but the Collateral Agent may do so at its option at any time an Event of Default exists, and all expenses incurred in connection therewith (including reasonable fees and expenses of attorneys and other professionals) shall be Lender Expenses.

(d) No Grantor shall enter into any Intellectual Property License material to the conduct of the business to receive any license or rights in any Intellectual Property of any other Person unless such Grantor has used commercially reasonable efforts to permit the assignment of or grant of a security interest in such Intellectual Property License (and all rights of Grantor thereunder) to the Collateral Agent (and any transferees of the Collateral Agent).

**4.7. Investment Property.**

(a) If any Grantor shall acquire, obtain, receive or become entitled to receive any Pledged Interests after the Closing Date, it shall promptly after acquiring or obtaining such Collateral deliver to the Collateral Agent a duly executed Pledged Interests Addendum identifying such Pledged Interests.

(b) For so long as any Grantor shall have the right to vote the Pledged Interests owned by it, such Grantor shall not, without the prior written consent of the Collateral Agent, vote or take any consensual action with respect to such Pledged Interests which would adversely affect the rights of the Collateral Agent or the value of the Pledged Interests. Each Grantor agrees that it will cooperate with the Collateral Agent in obtaining all necessary approvals and making all necessary filings under federal, provincial, territorial, local, or foreign law to effect the perfection of the security interest of the Collateral Agent in the Investment Property or to effect any sale or transfer thereof.

(c) The Pledged Interests issued pursuant to any Pledged Operating Agreement, (i) are not and shall not be dealt in or traded on securities exchanges or in securities markets, (ii) do not and will not constitute investment company securities, and (iii) are not and will not be held by such Grantor in a securities account. None of the Pledged Operating Agreements, or any other agreements governing any of the Pledged Interests issued under any Pledged Operating Agreement, provide or shall provide that such Pledged Interests are securities governed by the applicable STA as in effect in any relevant jurisdiction.

**4.8. Real Property; Fixtures**. Upon the acquisition of any fee interest in Real Property by a Grantor having a fair market value in excess of $500,000, such Grantor will immediately after the acquisition of such Real Property notify the Collateral Agent of the acquisition of it and , upon the written request of the Collateral Agent, will grant to the Collateral Agent a first priority mortgage on each fee interest in Real Property now or hereafter owned by such Grantor and shall deliver such other documentation and opinions, in form and substance satisfactory to the Collateral Agent, in connection with the grant of such mortgage as the Collateral Agent shall request in its Permitted Discretion, including title insurance policies, financing statements, fixture filings and environmental audits and such Grantor shall pay all recording costs, intangible taxes and other fees and costs (including reasonable attorney's fees and expenses) incurred in connection therewith. Notwithstanding anything to the contrary contained herein, the Collateral Agent shall not accept a Lien on Real Property from any Grantor unless the Collateral Agent has completed its flood insurance due diligence, has received copies of all flood insurance documentation

and has confirmed that flood insurance compliance has been completed as required by applicable laws or as otherwise satisfactory to the Collateral Agent.

**4.9. Name, Etc.** Each Grantor shall provide the Collateral Agent not less than 10 days' prior written notice of any change in (a) its corporate name, (b) the location of its chief executive office or its principal place of business, (c) its identity or type of organization or corporate structure, (d) its organizational identification number or (e) its jurisdiction of organization (in each case, including by merging or amalgamating with or into any other entity, reorganizing, dissolving, liquidating, reincorporating or incorporating in any other jurisdiction), provided, that, (i) each Grantor shall take all action satisfactory to the Collateral Agent to maintain the perfection and priority of the security interest of the Collateral Agent, (ii) such Grantor promptly provides the Collateral Agent with certified Governing Documents reflecting any of the changes described in the preceding sentence and (iii) in no event shall any Grantor enter into any merger, amalgamation or similar transaction that would result in the organization of such Grantor in, or shall any Grantor reorganize or otherwise become incorporated or organized under the laws of, any jurisdiction outside of Canada.

**4.10. Account Verification**. At any time an Event of Default exists, each Grantor shall permit the Collateral Agent, in the Collateral Agent's name or in the name of a nominee of the Collateral Agent, to verify the validity, amount or any other matter relating to any account or payment intangible, by mail, telephone, facsimile transmission or otherwise and, promptly upon the request of the Collateral Agent, each Grantor shall send requests for verification of accounts and payment intangibles or send notices of assignment of accounts and payment intangibles to account debtors and other obligors.

**4.11. Insurance**. Each Grantor will, at its expense, maintain insurance with respect to all of its assets covering liabilities, losses or damages and in amounts as are customarily insured against by other Persons engaged in same or similar businesses and similarly situated with financially sound and reputable insurance companies acceptable to the Collateral Agent and in any event, in amount, adequacy, and scope satisfactory to the Collateral Agent (it being agreed that the amount, adequacy, and scope of the policies of insurance of Grantors in effect as of the Closing Date are acceptable to the Collateral Agent). All property insurance policies are to be made payable to the Collateral Agent, as its interests may appear, in case of loss, pursuant to a standard lender's loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may reasonably require. All certificates of property and general liability insurance are to be delivered to the Collateral Agent, with the lender's loss payable and additional insured endorsements in favour of the Collateral Agent and shall provide for not less than 30 days (10 days in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation. If any Grantor fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the expense of Grantors and without any responsibility for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. At any time an Event of Default exists, the Collateral Agent shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies. If at any time the area in which any Real Property that is subject to a Lien is located in a "flood hazard area" as designated by the appropriate Governmental Authority, the Grantor that is the owner of it shall obtain flood insurance in such amount and on terms that are satisfactory to the Collateral Agent.

**4.12. Locations of Inventory and Equipment; Collateral Access Agreements**. Each Grantor will keep its inventory and equipment only at the locations listed in Schedule 7 to this Agreement, other than documents of title, inventory or equipment in transit to or between such locations, equipment temporarily at third party locations for repair or maintenance, motor vehicles, vessels or aircraft; provided, that, a Grantor may have inventory or equipment at a new location upon not less than 10 days' prior written

notice to the Collateral Agent of its intention so to do, clearly describing such new location and providing such other information and documents to the Collateral Agent requested by the Collateral Agent in its Permitted Discretion and so long as such location is within a Qualified Jurisdiction. Each Grantor will use its commercially reasonable efforts to obtain Collateral Access Agreements for (a) each of the locations identified on Schedule 7 to this Agreement that are not owned and operated by a Grantor, and (b) for such new locations, in each case under clause (a) or (b), except as the Collateral Agent may otherwise agree in writing, and each Grantor shall, prior to any change described in the preceding sentence, take all actions requested by the Collateral Agent in its Permitted Discretion to maintain the validity, perfection and priority of the security interest of the Collateral Agent in the Collateral. For clarity, failure to obtain such Collateral Access Agreements after using commercially reasonable efforts shall not constitute an Event of Default.

5. **Further Assurances.**

**5.1. General.** Each Grantor agrees that from time to time, at its own expense, such Grantor will promptly execute and deliver all further instruments and documents, and take all further action, that the Collateral Agent may reasonably request, in order to create, perfect or protect the security interest of the Collateral Agent granted (or purported to be granted) in any Loan Document or to enable the Collateral Agent to exercise and enforce its rights and remedies with respect to any of the Collateral.

**5.2. Authorization to File Financing Statements, Etc.** Each Grantor authorizes the Collateral Agent at any time and from time to time to file, transmit, or communicate, as applicable, financing or financing change statements, or amendments thereto, (a) describing the Collateral as "all present and after-acquired personal property of debtor" or words of similar effect, (b) describing the Collateral as being of equal or lesser scope or with greater detail, or (c) that contain any information required by the PPSA for the sufficiency or filing office acceptance. Each Grantor (i) will promptly execute and deliver to the Collateral Agent such other instruments or notices, as the Collateral Agent may reasonably request, in order to perfect and preserve the security interest granted or purported to be granted hereby, (ii) ratifies any and all financing statements or financing change statements previously filed by the Collateral Agent in any jurisdiction and (iii) acknowledges that it is not authorized to file any financing statement or financing change statement or termination statement with respect to any financing statement filed in connection with any Loan Document without the prior written consent of the Collateral Agent, subject to such Grantor's rights under the PPSA.

**5.3. The Collateral Agent May Perform; The Collateral Agent's Duties**. If any Grantor fails to perform any agreement contained herein, the Collateral Agent may itself perform, or cause performance of, such agreement, and the reasonable expenses of the Collateral Agent incurred in connection therewith shall constitute Secured Obligations and be payable, jointly and severally, by Grantors. The powers conferred on the Collateral Agent hereunder are solely to protect the Collateral Agent's interest in the Collateral, and shall not impose any duty upon the Collateral Agent to exercise any such powers. Except for the safe custody of any Collateral in its actual possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral. The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its actual possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property.

6. **Remedies.**

**6.1. General**. At any time an Event of Default exists, the Collateral Agent may exercise all of the rights and remedies of a secured party under the PPSA or any other applicable law in respect of the Collateral upon a default, in addition to other rights and remedies provided for in the Loan Documents or otherwise available to it. Without limiting the generality of the foregoing, each Grantor expressly agrees that, in any such event, without demand of performance or other demand, advertisement or notice of any

kind (except a notice specified below of time and place of public or private sale) to or upon any Grantor or any other Person (all and each of which demands, advertisements and notices are hereby expressly waived to the maximum extent permitted by the PPSA or any other applicable law), the Collateral Agent may take immediate possession of all or any portion of the Collateral and (a) require each Grantor to, and each Grantor hereby agrees that it will at its own expense and upon the request of the Collateral Agent promptly, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at one or more locations where such Grantor regularly maintains inventory, and (b) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Collateral Agent's offices or elsewhere, for cash, on credit, and upon such other terms as the Collateral Agent may deem commercially reasonable. Each Grantor agrees that, to the extent notification of sale shall be required by law, at least 15 days notification by mail to such Grantor of the time and place of any public sale or the time after which any private sale is to be made shall constitute notification pursuant to the PPSA. The Collateral Agent shall not be obligated to make any sale of Collateral regardless of notification of sale having been given. The Collateral Agent may adjourn any public sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. Each Grantor agrees that (i) the internet shall constitute a "place" for purposes of the PPSA and (ii) to the extent notification of sale shall be required by law, notification by mail of the URL where a sale will occur and the time when a sale will commence at least 15 days prior to the sale shall constitute a notification for purposes of the PPSA. Each Grantor agrees that any sale of Collateral to a licensor pursuant to the terms of a license agreement between such licensor and a Grantor is sufficient to constitute a commercially reasonable sale (including as to method, terms, manner, and time) within the meaning of the PPSA.

**6.2. License for Intellectual Property**. At any time an Event of Default exists, the Collateral Agent is hereby granted a license or other right to use, without liability for royalties or any other charges, each Grantor's Intellectual Property, whether owned by any Grantor or with respect to which any Grantor has rights under any license, sublicense, or other agreement (including any Intellectual Property License) in preparing for sale, advertising for sale, selling or otherwise dealing with any Collateral, and each Grantor's rights under all licenses and all franchise agreements shall inure to the benefit of the Collateral Agent for such purposes.

**6.3. Deposit Accounts and Securities Accounts**. At any time an Event of Default exists, the Collateral Agent may, in addition to other rights and remedies provided for in the Loan Documents or otherwise available to it under applicable law and without the requirement of notice to or upon any Grantor or any other Person (which notice is hereby expressly waived to the maximum extent permitted by the PPSA or any other applicable law), (a) with respect to any Grantor's deposit accounts, instruct the bank maintaining such deposit account for such Grantor to pay the balance of such deposit account to or for the benefit of the Collateral Agent, and (b) with respect to any Grantor's securities accounts, instruct the securities intermediary maintaining such securities account for such Grantor to (i) transfer any cash in such securities account to or for the benefit of the Collateral Agent, or (ii) liquidate any financial assets in such securities account that are customarily sold on a recognized market and transfer the cash proceeds thereof to or for the benefit of the Collateral Agent.

**6.4. Investment Property**. At any time an Event of Default exists, immediately upon the request of the Collateral Agent, all sums of money and property paid or distributed in respect of any Investment Property that are received by any Grantor shall be held by such Grantor in trust for the benefit of the Collateral Agent segregated from such Grantor's other property, and such Grantor shall promptly deliver it to the Collateral Agent in the form received.

**6.5. Deficiency**. Any cash held by the Collateral Agent as Collateral and all cash proceeds received by the Collateral Agent in respect of any sale of, collection from, or other realization upon, all or any part of the Collateral shall be applied against the Secured Obligations in such order as the Collateral

Agent shall elect, consistent with the provisions of the Credit Agreement. In the event the proceeds of Collateral are insufficient to satisfy all of the Secured Obligations in full, each Grantor shall remain jointly and severally liable for any such deficiency.

**6.6. Possession; Receiver**. Each Grantor hereby acknowledges that the Secured Obligations arise out of a commercial transaction, and agrees that, if an Event of Default exists, the Collateral Agent shall have the right (a) to an immediate writ of possession without notice of a hearing and (b) to the appointment of a Receiver, *ex parte* without notice, for a Grantor or all or any portion of the Collateral (to which appointment each Grantor consents) without the necessity of posting a bond or other form of security (which each Grantor waives).

**6.7. The Collateral Agent's Right to Perform Contracts, Exercise Rights, Etc**. At any time an Event of Default exists, the Collateral Agent (or its designee) (a) may proceed to perform any and all of the obligations of any Grantor contained in any contract, lease, or other agreement and exercise any and all rights of any Grantor therein contained as fully as such Grantor itself could, (b) shall have the right to use any Grantor's rights under Intellectual Property Licenses in connection with the enforcement of the Collateral Agent's rights hereunder, including the right to prepare for sale and sell any and all inventory and equipment now or hereafter owned by any Grantor and now or hereafter covered by such licenses, and (c) shall have the right to request that any Equity Interests that are pledged hereunder be registered in the name of the Collateral Agent or any of its nominees.

**6.8. The Collateral Agent Appointed Attorney-in-Fact.**

(a) Each Grantor hereby irrevocably appoints the Collateral Agent its attorney-in-fact, with full authority in the place and stead of such Grantor and in the name of such Grantor or otherwise, to take any action and to execute any instrument which the Collateral Agent may, in its Permitted Discretion, deem necessary or advisable to accomplish the purposes of this Agreement, including:

(i) following an Event of Default, to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in connection with the accounts or any other Collateral of such Grantor;

(ii) following an Event of Default, to receive and open all mail addressed to such Grantor and to notify postal authorities to change the address for the delivery of mail to such Grantor to such address as the Collateral Agent may specify for such purpose;

(iii) to receive, indorse, and collect any drafts or other instruments, documents, Negotiable Collateral or chattel paper;

(iv) following an Event of Default, to file any claims or take any action or institute any proceedings which the Collateral Agent may deem necessary or desirable for the collection of any of the Collateral of such Grantor or otherwise to enforce the rights of the Collateral Agent with respect to any of the Collateral;

(v) to repair, alter, or supply goods, if any, necessary to fulfill in whole or in part the purchase order of any Person obligated to such Grantor in respect of any account of such Grantor;

(vi) to use any Intellectual Property or Intellectual Property Licenses of such Grantor, in preparing for sale, advertising for sale, or selling inventory or other Collateral and to collect any amounts due under accounts, contracts or Negotiable Collateral of such Grantor;

(vii) to bring suit in its own name to enforce the Intellectual Property and Intellectual Property Licenses (at its election, but without any obligation to do so); and

(viii) to pay or discharge taxes or liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Collateral Agent (in its sole discretion), and such payments made by the Collateral Agent shall constitute additional Secured Obligations of such Grantor to the Collateral Agent, be due and payable immediately without demand, and shall bear interest at the Post-Default Rate from the earlier of (A) the date payment of said amount is demanded in writing by the Collateral Agent to such Grantor and (B) the date that the Post-Default Rate is otherwise imposed pursuant to Section 2.4(c) of the Credit Agreement.

(b) If the Collateral Agent shall commence any such suit, each Grantor shall, at the request of the Collateral Agent, take any and all lawful acts and execute and deliver any and all documents required by the Collateral Agent in aid of such enforcement. To the extent permitted by law, each Grantor hereby ratifies all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. This power of attorney is coupled with an interest and shall be irrevocable.

**6.9. Voting and Other Rights in Respect of Pledged Interests.** At any time an Event of Default exists, (a) the Collateral Agent may, at its option, and in addition to all rights and remedies available to the Collateral Agent under any other agreement, at law, in equity, or otherwise, exercise all voting rights, or any other ownership or consensual rights (including any dividend or distribution rights) in respect of the Pledged Interests owned by such Grantor, but under no circumstances is the Collateral Agent obligated by the terms of this Agreement to exercise such rights, and (b) each Grantor hereby appoints the Collateral Agent such Grantor's true and lawful attorney-in-fact and IRREVOCABLE PROXY to vote such Pledged Interests in any manner the Collateral Agent deems advisable for or against all matters submitted or which may be submitted to a vote of shareholders, partners or members, as the case may be. The power-of-attorney and proxy granted hereby is coupled with an interest and shall be irrevocable.

**6.10. Disposition of Pledged Interests by the Collateral Agent**. None of the Pledged Interests existing as of the date of this Agreement are, and none of the Pledged Interests hereafter acquired on the date of acquisition thereof will be, registered or qualified under the STA and disposition thereof at any time an Event of Default exists may be restricted to one or more private (instead of public) sales in view of the lack of such registration. Each Grantor understands that in connection with such disposition, the Collateral Agent may approach only a restricted number of potential purchasers and further understands that a sale under such circumstances may yield a lower price for the Pledged Interests than if the Pledged Interests were registered and qualified pursuant to federal, provincial and territorial securities laws and sold on the open market. Each Grantor agrees that: (a) if the Collateral Agent shall sell or cause the Pledged Interests or any portion thereof to be sold at a private sale, the Collateral Agent shall have the right to rely upon the advice and opinion of any nationally recognized brokerage or investment firm (but shall not be obligated to seek such advice and the failure to do so shall not be considered in determining the commercial reasonableness of such action) as to the best manner in which to offer the Pledged Interest or any portion thereof for sale and as to the best price reasonably obtainable at the private sale thereof; and (b) such reliance shall be conclusive evidence that the Collateral Agent has handled the disposition in a commercially reasonable manner.

**6.11. Collection of Accounts, General Intangibles and Negotiable Collateral**. At any time an Event of Default exists, the Collateral Agent or the Collateral Agent's designee may (a) notify account debtors of any Grantor that the accounts, general intangibles, chattel paper or Negotiable Collateral of such Grantor have been assigned to the Collateral Agent, or that the Collateral Agent has a security interest therein, and (b) collect the accounts, general intangibles and Negotiable Collateral of any Grantor directly, and any collection costs and expenses shall constitute part of the Secured Obligations.

**6.12. Remedies Cumulative**. Each right, power, and remedy of the Collateral Agent as provided for in the Loan Documents now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for in the Loan Documents now or hereafter existing at law or in equity or by statute or otherwise, and the exercise or beginning of the exercise by the Collateral Agent, of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by the Collateral Agent of any or all such other rights, powers, or remedies.

**6.13. Marshaling**. The Collateral Agent shall not be required to marshal any present or future collateral security (including the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of its rights and remedies hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights and remedies, however existing or arising. To the extent that it lawfully may, each Grantor hereby agrees that it will not invoke any law relating to the marshaling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights and remedies under any Loan Document, and, to the extent that it lawfully may, each Grantor hereby irrevocably waives the benefits of all such laws.

**6.14. Expenses**. Each Grantor jointly and severally agrees to pay to the Collateral Agent's costs and expenses in accordance with Section 11.4 of the Credit Agreement.

7. **Continuing Security Interest: Assignments under Credit Agreement.**

**7.1. Continuing Security Interest; No Waiver**. This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until payment in full of the Secured Obligations, (b) be binding upon each Grantor, and its successors and assigns, and (c) inure to the benefit of, and be enforceable by, the Collateral Agent, and its successors, transferees and assigns. Without limiting the generality of the foregoing clause (c), the Collateral Agent may, in accordance with the provisions of the Credit Agreement, assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Collateral Agent herein or otherwise. After the payment in full of all Obligations, and the receipt by the Collateral Agent of a general release of all claims against the Collateral Agent and its Affiliates by each Grantor relating to the Credit Facility, the Collateral Agent will, at the expense of each Grantor, execute and deliver any termination statements and lien releases (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, notices of the security interest of the Collateral Agent previously filed by the Collateral Agent. No transfer or renewal, extension, assignment, or termination of any Loan Document, or any other instrument or document executed and delivered by any Grantor to the Collateral Agent nor any additional loans made by the Collateral Agent to a Grantor, nor the taking of further security, nor the retaking or re-delivery of the Collateral to any Grantor by the Collateral Agent, nor any other act of the Collateral Agent shall release any Grantor from any obligation, except a release or discharge executed in writing by the Collateral Agent in accordance with the provisions of the Credit Agreement. The Collateral Agent shall not by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies hereunder, unless such waiver is in writing and signed by the Collateral Agent and then only to the extent therein set forth. A waiver by the Collateral Agent of any right or remedy on any occasion shall not be construed as a bar to the exercise of any such right or remedy which the Collateral Agent would otherwise have had on any other occasion.

**7.2. Reinstatement**. Each Grantor agrees that, if any payment made by any Grantor or other Person and applied to the Secured Obligations is at any time annulled, avoided, set, aside, rescinded, invalidated, declared to be fraudulent or preferential or otherwise required to be refunded or repaid, or the proceeds of any Collateral are required to be returned by the Collateral Agent under any bankruptcy law,

federal, provincial or territorial law, common law or equitable cause, then, to the extent of such payment or repayment, any Lien or other Collateral securing any Secured Obligations shall be and remain in full force and effect, as fully as if such payment had never been made. If, prior to any of the foregoing, (a) any Lien or other Collateral securing any Secured Obligations shall have been released or terminated or (b) any provision of this Agreement or the Guaranty hereunder shall have been terminated, cancelled or surrendered, such Lien, other Collateral or provision shall be reinstated in full force and effect and such prior release, termination, cancellation or surrender shall not diminish, release, discharge, impair or otherwise affect the obligations of any such Grantor in respect of any Lien or other Collateral securing such obligation or the amount of such payment.

8. **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER, ETC.**

**8.1. GOVERNING LAW**. THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO, AND ANY CLAIMS, CONTROVERSIES OR DISPUTES ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE PROVINCE OF NOVA SCOTIA AND THE FEDERAL LAWS OF CANADA APPLICABLE THEREIN, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES.

**8.2. FORUM NON CONVENIENS**. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE PROVINCE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS OF CANADA; PROVIDED, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE COLLATERAL AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE THE COLLATERAL AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. EACH GRANTOR AND THE COLLATERAL AGENT WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION.

**8.3. WAIVER OF JURY TRIAL**. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EACH GRANTOR AND THE COLLATERAL AGENT HEREBY WAIVE THEIR RESPECTIVE RIGHTS, IF ANY, TO A JURY TRIAL OF ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS (EACH A "CLAIM"). EACH GRANTOR AND THE COLLATERAL AGENT REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**8.4. SUBMISSION TO JURISDICTION**. EACH GRANTOR HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE PROVINCE OF NOVA SCOTIA AND FEDERAL COURTS OF CANADA, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY

OTHER MANNER PROVIDED BY LAW. NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE COLLATERAL AGENT MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AGAINST ANY GRANTOR OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION.

**8.5. WAIVER OF CLAIMS**. NO CLAIM MAY BE MADE BY ANY GRANTOR AGAINST THE COLLATERAL AGENT OR ANY AFFILIATE, DIRECTOR, OFFICER, EMPLOYEE, COUNSEL, REPRESENTATIVE, AGENT, OR ATTORNEY-IN-FACT OF ANY OF THEM FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, OR PUNITIVE DAMAGES IN RESPECT OF ANY CLAIM FOR BREACH OF CONTRACT OR ANY OTHER THEORY OF LIABILITY ARISING OUT OF OR RELATED TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, OR ANY ACT, OMISSION, OR EVENT OCCURRING IN CONNECTION HEREWITH, AND EACH GRANTOR HEREBY WAIVES, RELEASES, AND AGREES NOT TO SUE UPON ANY CLAIM FOR SUCH DAMAGES, WHETHER OR NOT ACCRUED AND WHETHER OR NOT KNOWN OR SUSPECTED TO EXIST IN ITS FAVOUR.

9. **Miscellaneous.**

**9.1. Survival**. All representations and warranties made by a Grantor in this Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Collateral Agent and shall survive the execution and delivery of this Agreement and the making of any loans or other extension of credit, regardless of any investigation made by the Collateral Agent or on its behalf and notwithstanding that the Collateral Agent may have had notice or knowledge of any Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until payment in full of the Secured Obligations.

**9.2. Merger, Amendments; Etc**. THIS AGREEMENT, TOGETHER WITH THE OTHER LOAN DOCUMENTS, REPRESENTS THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS AMONG THE PARTIES. No waiver of any provision of this Agreement, and no consent to any departure by any Grantor from the terms hereof, shall in any event be effective unless the same shall be in writing and signed by the Collateral Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. No amendment of any provision of this Agreement shall be effective unless the same shall be in writing and signed by the Collateral Agent and each Grantor to which such amendment applies. This Agreement is a Loan Document.

**9.3. Addresses for Notices**. All notices and other communications provided for hereunder shall be given in the form and manner and delivered to the Collateral Agent at its address specified in the Credit Agreement, and to any Grantor at its addresses specified in the Credit Agreement or, as to any party, at such other address as shall be designated by such party in a written notice to the other parties.

**9.4. Counterparts**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

**9.5. Effectiveness; Severability; Section Headings**. This Agreement shall be binding and deemed effective when executed by any Grantor as to such Grantor (whether or any executed by any other Grantor) whose signature is provided for on the signature pages hereof and the Collateral Agent. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement. Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof in that jurisdiction or affecting the validity or enforceability of such provision in any other jurisdiction. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

[The remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the undersigned parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

**COLLATERAL AGENT:**

**ACP AGENCY, LLC**

By: ______________________________
Name: Peter Eschmann
Title: Authorized Person

**GRANTORS:**

**SYNERGY CHC CORP.**

By: ______________________________
Name: Jack Ross
Title: Chairman and Chief Executive Officer

**SYNERGY CHC INC.**

By: ______________________________
Name: Jack Ross
Title: Chairman and Chief Executive Officer

IN WITNESS WHEREOF, the undersigned parties hereto have caused this Agreement to be executed and delivered as of the day and year first above written.

**COLLATERAL AGENT:** **ACP AGENCY, LLC**

By: ______________________________
Name: Peter Eschmann
Title: Authorized Person

**GRANTORS:** **SYNERGY CHC CORP.**

Signed by:
By: ______________________________
CAE4FF7E52AA41F...
Name: Jack Ross
Title: Chairman and Chief Executive Officer

**SYNERGY CHC INC.**

Signed by:
By: ______________________________
CAE4FF7E52AA41F...
Name: Jack Ross
Title: Chairman and Chief Executive Officer

# EXHIBIT A

## PLEDGED INTERESTS ADDENDUM

This PLEDGED INTERESTS ADDENDUM, dated as of _________ __, 20___ (this "Pledged Interests Addendum"), is delivered pursuant to Section 4.7 of the Security Agreement referred to below.

The undersigned hereby agrees that this Pledged Interests Addendum may be attached to the Security Agreement, dated as of **[_________ __]**, 20**[__]**, (as amended, restated, supplemented, or otherwise modified from time to time, the "Security Agreement"), made by the undersigned, together with the other Grantors named therein, to ACP Agency, LLC, as the Collateral Agent. Initially capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Security Agreement or, if not defined therein, in the Credit Agreement, and this Pledged Interests Addendum shall be subject to the rules of construction set forth in Section 1.2 of the Security Agreement, which rules of construction are incorporated herein by this reference, mutatis mutandis. The undersigned hereby agrees that the additional interests listed on Schedule I shall be and become part of the Pledged Interests pledged by the undersigned to the Collateral Agent in the Security Agreement and any pledged company set forth on Schedule I shall be and become a "Pledged Company" under the Security Agreement, each with the same force and effect as if originally named therein.

This Pledged Interests Addendum is a Loan Document. Delivery of an executed counterpart of this Pledged Interests Addendum by telefacsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Pledged Interests Addendum. If the undersigned delivers an executed counterpart of this Pledged Interests Addendum by telefacsimile or other electronic method of transmission, the undersigned shall also deliver an original executed counterpart of this Pledged Interests Addendum but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Pledged Interests Addendum.

The undersigned hereby certifies that the representations and warranties set forth in Section 3 of the Security Agreement of the undersigned are true and correct as to the Pledged Interests listed herein on and as of the date hereof.

THIS PLEDGED INTERESTS ADDENDUM SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE, JURY TRIAL WAIVER, AND JUDICIAL REFERENCE SET FORTH IN SECTION 8 OF THE SECURITY AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, MUTATIS MUTANDIS.

[The remainder of this page intentionally left blank.]

IN WITNESS WHEREOF, the undersigned has caused this Pledged Interests Addendum to be executed and delivered as of the day and year first above written.

**[____________________________________]**

By: ___________________________________

Name: _________________________________

Title: __________________________________

SCHEDULE I
TO
PLEDGED INTERESTS ADDENDUM

PLEDGED INTERESTS

| Name of Grantor | Name of Pledged Company | Number of Shares/Units | Class of Interests | Percentage of Class Owned | Certificate Nos. |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

Schedule 1
to Security Agreement

Chief Executive Office, Jurisdiction of Organization, Etc.

| Grantor | Jurisdiction of organization or formation | Chief Executive Office | Tangible Collateral Locations | Organizational identification number or other applicable formation identification number |
|---|---|---|---|---|
| Synergy CHC Corp. | Nevada, United States | 3 Kimball Drive Standish, ME 04084 | 200 Docks Corner Road, Dayton, NJ 08810<br><br>9565 N. Virginia St, Suite 100, Reno, NV 89506 | NV20101902811 |
| Synergy CHC Inc. | Alberta, Canada | 3175 Highway 2, Fall River, Nova Scotia, B2T 1J5, Canada | 12 Cleve Court, Halton Hills, ON L7G 0L7 | 78053 1125 RT0001<br><br>Corporate Access Number: 2019531597 |

Schedule 2
[Reserved]

Schedule 3
Deposit Accounts; Securities Accounts

| Company | Bank | Address | Account Number |
|---|---|---|---|
| Synergy CHC Corp. | Banc of California | PO Box 131207, Carlsbad, CA 92013-1207 | 3111852 |
| Synergy CHC Inc. | Royal Bank | 200 Bay Street, Royal Bank Plaza, Toronto, ON, CA M5J 2J5 | 01793 102-418-1 |
| Synergy CHC Inc. (Focus Factor) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8015992 |
| Synergy CHC Corp. (Flat Tummy Tea) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8684416 |
| Synergy CHC Corp. (Hand MD) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8016007 |
| Synergy CHC Corp. (Think Fuel) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8489345 |
| Synergy CHC Corp. (The Synergy Effect) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8214396 |
| Synergy CHC Corp. (Perfekt Beauty) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8216061 |
| Synergy CHC Corp. (Coco White) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8489270 |
| Synergy CHC Corp. (Mane Game) | TD Bank | 835 Main St., Westbrook, ME 04092 | 242-8489189 |

Schedule 4
Real Property

None.

Schedule 5
Copyrights, Patents, Trademarks and Intellectual Property Licenses

| Grantor | Mark | Registration No. | Registration Date | Granting Jurisdiction |
|---|---|---|---|---|
| Synergy CHC Corp. | BLACKOTTER | TMA1101411 | 03-Jun-2021 | Canada |
| Synergy CHC Corp. | FLAT TUMMY | TMA1028125 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | FOCUS FACTOR | TMA1101412 | 03-Jun-2021 | Canada |
| Synergy CHC Corp. | SNEAKY VAUNT | TMA1028071 | 18-Jun-2019 | Canada |
| Synergy CHC Corp. | SYNERGY A CONSUMER HEALTHCARE COMPANY | TMA1046985 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | SYNERGY EFFECT | TMA1046990 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | SYNERGY EFFECT | TMA1046986 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1046991 | 05-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1047043 | 06-Aug-2019 | Canada |
| Synergy CHC Corp. | THE SYNERGY EFFECT | TMA1023459 | 04-Jun-2019 | Canada |
| Synergy CHC Corp. | FLAT TUMMY ABS | TMA1028111 | 18-Jun-2019 | Canada |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | URGENTRX | TMA926000 | 14-Jan-2016 | Canada |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | URGENTRX | TMA906488 | 17-Jun-2015 | Canada |

**Trade names**

Flat Tummy Tea

Focus Factor

Factor Nutrition Labs

Schedule 6
Pledged Interests

| Subsidiary | Description of Equity Interest | Certificated Y/N | Name of Grantor/Equity Holder | Number of Shares Held, if applicable | Percentage of Equity Held |
|---|---|---|---|---|---|
| NomadChoice Pty Limited | Shares | Yes | Synergy CHC Corp. | 1,200 | 100% |
| Synergy CHC Inc. | Shares | Yes | Synergy CHC Corp. | 100 | 100% |
| Hand MD Corp. | Shares | Yes | Synergy CHC Corp. | 2,000,000 | 100% |

Schedule 7
Locations of Inventory and Equipment

| Grantor | Address |
|---|---|
| Synergy CHC Inc. | 3470 Superior Court, Oakville, Ontario L6L 0C4 |
| Synergy CHC Corp. | 200 Docks Corner Road, Dayton, NJ 08810 |
| Synergy CHC Corp. | 9565 N. Virginia St, Suite 100, Reno, NV 89506 |

# EXHIBIT 6

# GUARANTEE

**THIS GUARANTEE** made as of the 30th day of May, 2025 by the undersigned (the "**Guarantor**") to ACP Agency, LLC ("**ACP**"), in its capacity as collateral agent for the lenders (collectively, the "**Lenders**") party to a credit agreement between the Borrower (as hereinafter defined), the Lenders and ACP (in such capacity, together with its successors and assigns in such capacity, if any, the "**Collateral Agent**").

**WHEREAS:**

A. The Lenders have agreed to extend certain term loans in such principal amount as same may be increased or decreased from time to time (collectively, the "**Loan**"), in favour of Synergy CHC Corp. (the "**Borrower**") on the terms and subject to the conditions as set out in a term loan credit agreement dated as of the 30th day of May, 2025, as may be amended from time to time, issued in connection with the Loan (collectively, the "**Credit Agreement**"), by and among the Borrower, the Guarantor, certain other affiliates of the Borrower from time to time party thereto as guarantors, the Lenders and ACP, in its capacity as Collateral Agent and as the administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, if any, the "**Administrative Agent**", and together with the Collateral Agent, the "**Agents**" and the Agents together with the Lenders, collectively, the "**Secured Parties**"); and

B. The Loan is being advanced to the Borrower by the Lenders and the Secured Parties are entering into the Credit Agreement on the condition that the Guarantor execute and deliver this Guarantee in favour of the Collateral Agent.

**NOW THEREFORE** in consideration of the Lenders making the advance of the Loan and for other good and valuable consideration (the receipt and sufficiency of which is hereby acknowledged by each of the parties hereto), the Guarantor hereby acknowledges and agrees as follows:

1. The Guarantor hereby guarantees as if the Guarantor was a principal debtor and not merely a surety, the due and punctual payment to the Collateral Agent, for the benefit of the Secured Parties, of the Loan and the other Guaranteed Obligations (as defined in the Credit Agreement), including with, without limitation, all present and future indebtedness and liability owing by the Borrower to the Secured Parties on account of the Loan and under the Credit Agreement and the other Loan Documents (as hereinafter defined) whether direct or indirect, absolute or contingent, matured or not including, without limitation:

   (a) all amounts expressed to be owing to the Secured Parties pursuant to the Credit Agreement and all agreements, instruments and other documents, whether referred to in the Credit Agreement or otherwise, that are now or may hereafter be delivered or assigned to any of the Secured Parties in connection with or as security for the Loan (the Credit Agreement and any such instrument and other documents are sometimes hereinafter collectively called the "**Loan Documents**");

   (b) all commissions, costs, charges, fees and other expenses (including legal fees and disbursements on a substantial indemnity basis) arising out of or incurred by the Collateral Agent in connection with any one or more of the following:

      (i) the collection of the amounts owing by the Borrower to the Secured Parties on account of the Loan;

      (ii) the enforcement of this Guarantee; and

      (iii) any action or other proceeding instituted by any of the Secured Parties, the Borrower, the Guarantor or any other person in any way relating to this Guarantee, the Loan, the Loan Documents or any part thereof,

2. This Guarantee is a specific guarantee of the Loan and shall only apply to and secure the amounts referred to in paragraph 1 hereof (collectively, the "**Liabilities**") and any ultimate balance due or

remaining unpaid to the Secured Parties thereunder. This Guarantee is irrevocable, absolute and unconditional and the obligation of the Guarantor hereunder is not cancellable or terminable by the Guarantor (whether or not the entire Loan has been advanced).

3. All indebtedness and liability, present and future, of the Borrower to the Guarantor are hereby assigned to the Collateral Agent and postponed to the Liabilities, and all moneys received by the Guarantor in respect thereof shall be received in trust for the Collateral Agent and forthwith upon receipt shall be paid over to the Collateral Agent, for the benefit of the Secured Parties, the whole without in any way limiting or lessening the liability of the Guarantor under this Guarantee; and this assignment and postponement is independent of this Guarantee and shall remain in full effect notwithstanding that the liability of the Guarantor under this Guarantee may be extinct.

4. The Guarantor's liability to make payment under this Guarantee shall arise forthwith after demand for payment has been given to the Guarantor. Such demand may be given by personal delivery to the Guarantor or by sending such demand to the Guarantor in accordance with Section 11.1 of the Credit Agreement.

5. The Guarantor expressly waives notice of the acceptance of this Guarantee and notice of non-performance, non-payment or non-observance on the part of the Borrower under the Loan or under the Loan Documents or any part thereof.

6. This Guarantee and the rights of the Collateral Agent hereunder shall not be released, discharged, mitigated, impaired or affected by:

(a) any grant of time, renewals, extensions, compromises, indulgences or modifications to; extending or failing to extend credit to; making or failing to make Loans or advances to; taking or failing to take securities from; releasing or discharging any securities to; failing to perfect or keep perfected or otherwise taking advantage of any securities received from; accepting compositions from; and releasing, discharging or otherwise dealing with; the Borrower, the Guarantor or any other person whatsoever;

(b) any failure of the Collateral Agent to prove a claim against the estate of the Borrower or any waiver or failure to enforce any of the terms, conditions or other provisions of, or any loss, diminution of value or unenforceability of, any of the Loan Documents;

(c) the application by the Collateral Agent of any monies received from the Borrower, the Guarantor or any other person or from securities on account of such part or parts of the Liabilities in such manner as the Collateral Agent deems best and the changing of such application in whole or in part at any time or from time to time;

(d) the death, incapacity, receivership, bankruptcy, insolvency, winding-up, dissolution or the loss of corporate existence of the Borrower or the Guarantor, the release or discharge of the Borrower or the Guarantor by operation of law or otherwise, any change in the name, objects, capital structure or constitution of the Borrower or any transfer of the assets or businesses of the Borrower to a partnership or to a corporation or any incorporation, amalgamation, continuance, arrangement or reorganization of the Borrower or the Guarantor; and/or

(e) the distribution of the assets of the Borrower (whether voluntary or compulsory) or upon the occurrence of a bulk sale of any of the Borrower's assets or any composition with the Collateral Agent or any scheme of arrangement; and in any such event the Collateral Agent shall have the right to rank in all respects in priority to the Guarantor for its full claim against the Borrower and to receive all dividends or other payments in respect thereof until the Collateral Agent's claim and all Liabilities have been paid in full; and the retention by the Collateral Agent of all or any part or parts of the Loan Documents shall not, as between the Collateral Agent and the Guarantor, be considered a purchase of such securities, or payment, satisfaction or reduction of the Liabilities or any part thereof.

7. Without prejudice to any of the rights or recourses which the Secured Parties may have against the Borrower, the Guarantor expressly waives any right to require the Secured Parties to initiate or exhaust any rights, remedies or recourses against the Borrower, the Guarantor or any other person, value, realize upon or dispose of any of the Loan Documents; or initiate or exhaust any other remedy which the Secured Parties may have at law or in equity before requiring or becoming entitled to demand and enforce payment from the Guarantor under this Guarantee; and the Guarantor renounces all benefits of discussion and division.

8. If for any reason the Borrower has no legal existence, or if the Borrower is or becomes under no legal obligation to discharge the Liabilities or if any of the Liabilities becomes statute barred or otherwise irrecoverable from the Borrower whether by operation of law or for any reason whatsoever including, without limitation, as a result of any lack or limitation of power, capacity or disability of the Borrower or its directors, partners, officers or agents or as a result of any irregularity, fraud, defect or informality in the obtaining of any advances, credits or renewals from the Secured Parties (whether or not the Secured Parties should have had knowledge thereof), this Guarantee and the covenants, agreements and obligations of the Guarantor set out herein shall nevertheless be binding upon the Guarantor as principal debtor until such time as such monies have been paid in full to the Collateral Agent, for the benefit of the Secured Parties, and all Liabilities have been discharged and the Guarantor shall be responsible for the payment thereof to the Collateral Agent upon demand.

9. The Guarantor hereby agrees on a joint and several basis, to indemnify, save, hold and keep the Secured Parties harmless from any and all claims, losses, damages, costs and expenses resulting from the non-payment to the Collateral Agent of all monies herein secured, and the liability of the Guarantor shall not be released, discharged, extinguished or diminished by any act whatsoever of the Borrower or any loss, avoidance, termination by operation of law or otherwise of the obligations of the Borrower or any other person, including, without limitation, any act of bankruptcy or insolvency, or any other act, matter or thing whatsoever, save only full payment in cash of all monies herein secured and full performance and observance of all covenants, terms and obligations pursuant to this Guarantee and all Loan and security documents related thereto.

10. The Guarantor agrees to file all claims against the Borrower in any bankruptcy or other proceeding in which the filing of claims is required or permitted by law with respect to any indebtedness owing by the Borrower to the Guarantor and will assign to the Collateral Agent all of the Guarantor's rights thereunder on demand. If the Guarantor does not file any such claim, the Collateral Agent, as attorney in fact of the Guarantor, is authorized to do so in the name of the Guarantor or in the Collateral Agent's discretion to assign the claim to and cause proof of claim to be filed in the name of the Collateral Agent's nominee. In all such cases, whether in administration, bankruptcy or otherwise, the person or persons authorized to pay such claim shall pay to the Collateral Agent the full amount of such claim in the proceeding before making any payment to any of the Guarantor, and to the full extent necessary for that purpose the Guarantor agrees to assign to the Collateral Agent on demand all of the Guarantor's right to any payments or distributions to which the Guarantor otherwise would be entitled. If the amount so paid is greater than the guaranteed obligations then outstanding, the Collateral Agent will pay the amount of the excess to the party entitled thereto.

11. All compositions and payments received by the Collateral Agent from the Borrower or from others or from estates shall be regarded for all purposes as payments in gross without any right on the part of the Guarantor to claim the benefit thereof in reduction of the Liabilities. The Guarantor shall not have any right to be subrogated to any rights of the Collateral Agent until all Liabilities have been discharged to the satisfaction of the Collateral Agent.

12. Upon this Guarantee bearing the signature of the Guarantor and being received by the Collateral Agent or any officer, agent or employee thereof, this Guarantee shall be deemed to be a deed signed and delivered by the Guarantor under seal and shall not be subject to or affected by any promise or condition affecting or limiting the Guarantor's liability hereunder except as may be

expressly provided for herein. No statement, representation, warranty, agreement or promise on the part of any officer, employee or agent of the Collateral Agent, unless expressly set out herein, forms any part of this Guarantee or has induced the entering into or execution of this Guarantee or shall be deemed in any way to affect the Guarantor's liability hereunder.

13. The Collateral Agent may, without notice of any kind, sell, assign or transfer all or any part of the Liabilities and, in such event, each and every immediate and successive assignee, transferee or holder of all or any part of the Liabilities shall have the right to enforce this Guarantee as fully and effectively as if such assignee, transferee or holder were specifically named herein in place of or together with the Collateral Agent.

14. No action or proceeding brought or instituted under this Guarantee and no recovery or judgment in pursuance thereof shall be a bar or defence to any further action or proceeding which may be brought under this Guarantee by reason of any further default or defaults under this Guarantee or in the payment of the Liabilities.

15. No failure to exercise and no delay in exercising, on the part of the Collateral Agent, any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege preclude any other or further exercise thereof, or the exercise of any other rights, powers or privileges. The rights and remedies herein provided for are cumulative and not exclusive of any rights or remedies provided at law or in equity.

16. This Guarantee shall be in addition to and not in substitution for the Loan Documents and any other guarantees which the Secured Parties may now or hereafter hold in respect of the Liabilities and the Collateral Agent shall be under no obligation to marshal in favour of the Guarantor any other guarantees or other securities or any moneys or other assets which the Collateral Agent may be entitled to receive or may have a claim upon.

17. Any term, condition or provision of this Guarantee which is held or deemed to be void, prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be severable herefrom and be ineffective to the extent of such avoidance, prohibition or unenforceability without invalidating the remaining terms, conditions and provisions hereof and any such avoidance, prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such term, condition or provision in any other jurisdiction.

18. This Guarantee shall be exclusively governed by and construed in accordance with the laws of the Province of Nova Scotia.

19. No modification of this Guarantee shall be effective unless it is in writing and signed by the Guarantor and the Collateral Agent.

20. The Collateral Agent shall not be concerned to see or inquire into the existence, powers or capacities of the Borrower, the Guarantor or their respective officers, directors or agents, acting or purporting to act on their respective behalf.

21. All terms, agreements and conditions of this Guarantee shall extend to and be binding upon the Guarantor and the Borrower and their respective successors and permitted assigns and shall enure to the benefit of and may be enforced by the Collateral Agent and its successors and assigns.

22. All nouns and personal pronouns herein including the defined terms "Guarantor" and "Borrower" shall be read and construed as the number and gender may require in each case and the verb shall be read and construed as agreeing with such noun or pronoun.

23. The words "herein", "hereof", "hereunder", "herefrom", "the Guarantee" and "this Guarantee" refer to this entire agreement and not to any particular paragraph or subparagraph unless the context so requires.

24. The Guarantor acknowledges receipt of a copy of this Guarantee.

25. This Guarantee may be signed in counterparts and by electronic transmission, each of which shall for all purposes be deemed to be an original, and all such separate counterparts shall together constitute one and the same instrument.

**DATED** as of the date first written above.

**SYNERGY CHC INC.**

Signed by:

Per: ______________________

CAE4FF7E52AA41F...

Name: Jack Ross
Title: Chairman and Chief Executive Officer

I have authority to bind the Corporation.

# EXHIBIT 7

Innovation, Sciences et Développement économique Canada
Office de la propriété Intellectuelle du Canada

Innovation, Science and Economic Development Canada
Canadian Intellectual Property Office

| Date |
|---|
| 30 mai/May 2025 |
| Votre référence - Your reference |
| Numéro de dossier - File number<br>1780879 |

Charlotte N. Henderson
STEWART MCKELVEY
600-1741 Lower Water Street
Halifax
NS
B3J3P6
CANADA

Vous êtes par la présente informé que l'accord sûreté (ACP Agency, LLP, as collateral agent for the lenders) a été versé au dossier le 30 mai/May 2025 à l'égard de la ou des marques de commerce mentionnées.

This is to inform you that the Security Agreement (ACP Agency, LLP, as collateral agent for the lenders) has been placed on file on 30 mai/May 2025 in respect of the mentioned trademark(s).

Marque(s) de commerce / Trademark(s) :

| | | |
|---|---|---|
| TMA1,023,459 | 1847584 | THE SYNERGY EFFECT |
| TMA1,028,071 | 1811715 | SNEAKY VAUNT |
| TMA1,028,111 | 1827470 | FLAT TUMMY ABS |
| TMA1,028,125 | 1827463 | FLAT TUMMY |
| TMA1,046,985 | 1824842 | SYNERGY A CONSUMER HEALTHCARE COMPANY |
| TMA1,046,986 | 1822010 | SYNERGY EFFECT |
| TMA1,046,990 | 1780879 | SYNERGY EFFECT |
| TMA1,046,991 | 1780883 | THE SYNERGY EFFECT |
| TMA1,047,043 | 1822013 | THE SYNERGY EFFECT |
| TMA1,101,411 | 1881477 | BLACKOTTER |
| TMA1,101,412 | 1827502 | FOCUS FACTOR |

Registraire des marques de commerce
Registrar of Trademarks

Contact: Section des cessions et renouvellements | Assignment and Renewal Section
Direction générale des marques de commerce et des dessins industriels | Trademarks and Industrial Designs Branch
Office de la propriété intellectuelle du Canada | Canadian Intellectual Property Office
50, Rue Victoria, Gatineau, (Québec) K1A 0C9 | 50 Victoria Street, Gatineau QC K1A 0C9
Téléphone | Telephone 1-866-997-1936
Télécopieur | Facsimile 1-819-953-2476
Téléimprimeur | Teletypewriter 1-866-442-2476
Gouvernement du Canada | Government of Canada

Innovation, Sciences et Développement économique Canada
Office de la propriété intellectuelle du Canada

Innovation, Science and Economic Development Canada
Canadian Intellectual Property Office

| Date |
|---|
| 3 juin/Jun 2025 |
| Votre référence - Your reference |
| |
| Numéro de dossier - File number |
| 1811715 |

Charlotte N. Henderson
STEWART MCKELVEY
600-1741 Lower Water Street
Halifax
NS
B3J3P6
CANADA

Vous êtes par la présente informé que l'accord sûreté (Knight Therapeutics International S. A. (formerly known as Knight Therapeutics (Barbados) Inc.) a été retiré à l'égard de la ou des marques de commerce mentionnées.

This is to inform you that the Security Agreement (Knight Therapeutics International S. A. (formerly known as Knight Therapeutics (Barbados) Inc.) has been removed in respect of the mentioned trademark(s).

Marque(s) de commerce / Trademark(s) :

TMA1,028,071 1811715 SNEAKY VAUNT

Registraire des marques de commerce
Registrar of Trademarks

Contact: Section des cessions et renouvellements | Assignment and Renewal Section
Direction générale des marques de commerce et des dessins industriels | Trademarks and Industrial Designs Branch
Office de la propriété intellectuelle du Canada | Canadian Intellectual Property Office
50, Rue Victoria, Gatineau, (Québec) K1A 0C9 | 50 Victoria Street, Gatineau QC K1A 0C9
Téléphone | Telephone 1-866-997-1936
Télécopieur | Facsimile 1-819-953-2476
Téléimprimeur | Teletypewriter 1-866-442-2476
Gouvernement du Canada | Government of Canada

Innovation, Sciences et Développement économique Canada
Office de la propriété intellectuelle du Canada

Innovation, Science and Economic Development Canada
Canadian Intellectual Property Office

| | |
|---|---|
| Date<br>11 juin/Jun 2025 | |
| Votre référence - Your reference | |
| Numéro de dossier - File number<br>1600756 | |

Charlotte N. Henderson
STEWART MCKELVEY
600-1741 Lower Water Street
Halifax
NS
B3J3P6
CANADA

Vous êtes par la présente informé que l'accord sûreté (ACP Agency, LLP) a été versé au dossier le 11 juin/Jun 2025 à l'égard de la ou des marques de commerce mentionnées.

This is to inform you that the Security Agreement (ACP Agency, LLP) has been placed on file on 11 juin/Jun 2025 in respect of the mentioned trademark(s).

Marque(s) de commerce / Trademark(s) :

| | | |
|---|---|---|
| TMA906,488 | 1600756 | URGENTRX |
| TMA926,000 | 1647123 | URGENTRX |

Registraire des marques de commerce
Registrar of Trademarks

Contact: Section des cessions et renouvellements | Assignment and Renewal Section
Direction générale des marques de commerce et des dessins industriels | Trademarks and Industrial Designs Branch
Office de la propriété intellectuelle du Canada | Canadian Intellectual Property Office
50, Rue Victoria, Gatineau, (Québec) K1A 0C9 | 50 Victoria Street, Gatineau QC K1A 0C9
Téléphone | Telephone 1-866-997-1936
Télécopieur | Facsimile 1-819-953-2476
Téléimprimeur | Teletypewriter 1-866-442-2476
Gouvernement du Canada | Government of Canada

**EXECUTION VERSION**

# CANADIAN TRADEMARK SECURITY AGREEMENT

This **CANADIAN TRADEMARK SECURITY AGREEMENT** (this "Canadian Trademark Security Agreement") is made as of May 30, 2025 by and among the Grantors listed on the signature pages hereof (collectively, jointly and severally, "Grantors" and each individually "Grantor"), and **ACP AGENCY, LLC** ("ACP"), in its capacity as collateral agent for the lenders (collectively, the "Lender") party to the Credit Agreement (as hereinafter defined) (in such capacity, together with its successors and assigns in such capacity, if any, the "Collateral Agent").

W I T N E S S E T H:

WHEREAS, ACP, in its capacities as the administrative agent for the Lender (in such capacity, together with its successors and assigns in such capacity, if any, the "Administrative Agent") and as the Collateral Agent and the Lender have agreed to make certain financial accommodations available to *inter alios* the Grantors from time to time pursuant to the terms and conditions of the Credit Agreement, dated of even date herewith, by and among the Administrative Agent, the Collateral Agent, the Lender, the Grantors and the other loan parties party thereto (as amended, restated, supplemented, or otherwise modified from time to time, the "Credit Agreement");

WHEREAS, in order to induce the Administrative Agent, the Collateral Agent and the Lender to enter into the Credit Agreement and to provide financial accommodations to *inter alios* the Grantors as set forth therein, the Grantors have agreed to execute and deliver to the Collateral Agent the Canadian Security Agreement, dated as of the date hereof (as amended, restated, supplemented, or otherwise modified from time to time, the "Security Agreement"); and

WHEREAS, pursuant to the Security Agreement, Grantors are required to execute and deliver this Canadian Trademark Security Agreement to the Collateral Agent, for the benefit of the Secured Parties.

NOW, THEREFORE, for and in consideration of the recitals made above and other good and valuable consideration,

1. DEFINED TERMS. All initially capitalized terms used but not otherwise defined herein have the meanings given to them in the Security Agreement or, if not defined therein, in the Credit Agreement, and this Canadian Trademark Security Agreement shall be subject to the rules of construction set forth in Sections 1.2 and 1.4 of the Security Agreement, which rules of construction are incorporated herein by this reference, *mutatis mutandis*.

2. GRANT OF SECURITY INTEREST IN TRADEMARK COLLATERAL. Each Grantor hereby unconditionally grants, assigns, and pledges to the Collateral Agent, for the benefit of the Secured Parties, to secure the Secured Obligations, a continuing security interest (referred to in this Canadian Trademark Security Agreement as the "Security Interest") in all of such Grantor's right, title and interest in and to the following, whether now owned or hereafter acquired or arising (collectively, the "Trademark Collateral"):

(a) (i) all of its Trademarks to which it is a party including those referred to on Schedule I, (ii) all renewals thereof, (iii) all income, royalties, damages and payments now and hereafter due or payable under and with respect thereto, including payments under all licenses entered into in connection therewith and damages and payments for past or future infringements or dilutions thereof, (iv) the right to sue for past, present and future infringements and dilutions thereof, (v) the goodwill of each Grantor's business symbolized by the foregoing or connected therewith, and (vi) all of each Grantor's rights corresponding thereto throughout the world; and

(b) all products and proceeds (as that term is defined in the PPSA) of the foregoing, including any claim by such Grantor against third parties for past, present or future (i) infringement or dilution of any Trademark or any Trademarks exclusively licensed under any Intellectual Property License, including right to receive any damages, (ii) injury to the goodwill associated with any Trademark, or (iii) right to receive license fees, royalties, and other compensation under any Intellectual Property License related to Trademarks.

3. SECURITY FOR SECURED OBLIGATIONS. This Canadian Trademark Security Agreement and the Security Interest created hereby secures the payment and performance of the Secured Obligations, whether now existing or arising hereafter. Without limiting the generality of the foregoing, this Canadian Trademark Security Agreement secures the payment of all amounts which constitute part of the Secured Obligations and would be owed by Grantors, or any of them to the Secured Parties, whether or not they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Grantor.

4. SECURITY AGREEMENT. The Security Interest granted pursuant to this Canadian Trademark Security Agreement is granted in conjunction with the security interests granted to the Collateral Agent, pursuant to the Security Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Collateral Agent with respect to the Security Interest in the Trademark Collateral made and granted hereby are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated by reference herein as if fully set forth herein. To the extent there is any inconsistency between this Canadian Trademark Security Agreement and the Security Agreement, the Security Agreement shall control.

5. AUTHORIZATION TO SUPPLEMENT. If any Grantor shall obtain rights to any new trademarks, the provisions of this Canadian Trademark Security Agreement shall automatically apply thereto. Grantors shall give prompt notice in writing to the Collateral Agent with respect to any such new trademarks or renewal or extension of any trademark registration. Without limiting Grantors' obligations under this Section, Grantors hereby authorize the Collateral Agent unilaterally to modify this Canadian Trademark Security Agreement by amending Schedule I to include any such new trademark rights of each Grantor. Notwithstanding the foregoing, no failure to so modify this Canadian Trademark Security Agreement or amend Schedule I shall in any way affect, invalidate or detract from the Collateral Agent's continuing security interest in all Collateral, whether or not listed on Schedule I.

6. COUNTERPARTS. This Canadian Trademark Security Agreement is a Loan Document. This Canadian Trademark Security Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, taken together, shall constitute but one and the same Canadian Trademark Security Agreement. Execution of any such counterpart may be by means of (a) an electronic signature that complies with the Electronic Transactions Act, as in effect from time to time, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature. Any party delivering an executed counterpart of this Canadian Trademark Security Agreement by faxed, scanned or photocopied manual signature shall also deliver an original manually executed counterpart, but the failure to deliver an original manually executed counterpart shall not affect the validity, enforceability and binding effect of this Canadian Trademark Security Agreement.

7. CHOICE OF LAW AND VENUE, JURY TRIAL WAIVER, AND JUDICIAL REFERENCE PROVISION. THIS CANADIAN TRADEMARK SECURITY AGREEMENT SHALL BE SUBJECT TO THE PROVISIONS REGARDING GOVERNING LAW, FORUM NON CONVENIENS, WAIVER OF

JURY TRIAL, SUBMISSIONS TO JURISDICTION AND WAIVER OF CLAIMS SET FORTH IN SECTION 8 OF THE SECURITY AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS*.

[signature page follows]

IN WITNESS WHEREOF, the parties hereto have caused this Canadian Trademark Security Agreement to be executed and delivered as of the day and year first above written.

**ACCEPTED AND ACKNOWLEDGED BY:**

**COLLATERAL AGENT:**

**ACP AGENCY, LLC**

By:____________________________
Name: Peter Eschmann
Title: Authorized Person

**GRANTORS:**

**SYNERGY CHC CORP.**, a Nevada corporation

By:____________________________
Name: Jack Ross
Title: Chairman and Chief Executive Officer

IN WITNESS WHEREOF, the parties hereto have caused this Canadian Trademark Security Agreement to be executed and delivered as of the day and year first above written.

**ACCEPTED AND ACKNOWLEDGED BY:**

**COLLATERAL AGENT:**

**ACP AGENCY, LLC**

By: ______________________________
Name: Peter Eschmann
Title: Authorized Person

**GRANTORS:**

**SYNERGY CHC CORP.**, a Nevada corporation

Signed by:

By: ______________________________
CAE4FF7E52AA41F...
Name: Jack Ross
Title: Chairman and Chief Executive Officer

**SCHEDULE I**
**to**
**CANADIAN TRADEMARK SECURITY AGREEMENT**

**Trademark Registrations/Applications**

| Grantor | Mark | Application No. | Application Date | Registration No. | Registration Date |
|---|---|---|---|---|---|
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1847584 | 2017-07-14 | TMA1023459 | 2019-06-04 |
| Synergy CHC Corp. | FLAT TUMMY | 1827463 | 2017-03-15 | TMA1028125 | 2019-06-18 |
| Synergy CHC Corp. | FOCUS FACTOR | 1827502 | 2017-03-15 | TMA1101412 | 2021-06-03 |
| Synergy CHC Corp. | SNEAKY VAUNT | 1811715 | 2016-11-29 | TMA1028071 | 2019-06-18 |
| Synergy CHC Corp. | BLACKOTTER | 1881477 | 2018-02-05 | TMA1101411 | 2021-06-03 |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1822013 | 2017-02-08 | TMA1047043 | 2019-08-06 |
| Synergy CHC Corp. | SYNERGY EFFECT | 1780879 | 2016-05-05 | TMA1046990 | 2019-08-05 |
| Synergy CHC Corp. | FLAT TUMMY ABS | 1827470 | 2017-03-15 | TMA1028111 | 2019-06-18 |
| Synergy CHC Corp. | SYNERGY A CONSUMER HEALTHCARE COMPANY | 1824842 | 2017-02-27 | TMA1046985 | 2019-08-05 |
| Synergy CHC Corp. | SYNERGY EFFECT | 1822010 | 2017-02-08 | TMA1046986 | 2019-08-05 |
| Synergy CHC Corp. | THE SYNERGY EFFECT | 1780883 | 2016-05-05 | TMA1046991 | 2019-08-05 |
| Breakthrough Products, Inc. (merged into | URGENTRX | 1647123 | 2013-10-09 | TMA926000 | 2016-01-14 |

| | | | | | |
|---|---|---|---|---|---|
| Synergy CHC Corp.) | | | | | |
| Breakthrough Products, Inc. (merged into Synergy CHC Corp.) | URGENTRX | 1600756 | 2012-11-01 | TMA906488 | 2015-06-17 |

# EXHIBIT 8

**NOTICE OF SECURITY INTEREST IN INTELLECTUAL PROPERTY**

**WHEREAS** Synergy CHC Corp. (the "**Debtor**") is the owner of the registered trademarks and patents set forth in Attachment 1 attached hereto (collectively, the "**Intellectual Property**");

**WHEREAS** ACP Agency, LLC (the "**Collateral Agent**") entered into, *inter alia*, a general security agreement and a trademark security agreement with the Debtor, each dated as of the date hereof (collectively, the "**Security Agreement**") by which the Debtor granted to the Collateral Agent a security interest and lien in all of its property, including the Intellectual Property;

**NOW THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in accordance with the terms and obligations set forth in the Security Agreement, the Debtor hereby confirms the granting of a security interest and lien in the Intellectual Property to the Collateral Agent.

**DATED**: May 30, 2025

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

**DATED** as of the date first written above.

**SYNERGY CHC CORP.**

Signed by:

Per: ______________________

CAE4FF7E52AA41F...

Name: Jack Ross
Title: Chairman and Chief Executive Officer

I have authority to bind the Corporation.

**Attachment 1**

Canadian Trade-marks

| Trademark | TMA Registration No. | Expiry/ Renewal Date | Registration Date | Application Serial No. |
|---|---|---|---|---|
| THE SYNERGY EFFECT | TMA1023459 | 2034-06-04 | 2019-06-04 | 1847584 |
| FLAT TUMMY | TMA1028125 | 2029-06-18 | 2019-06-18 | 1827463 |
| FOCUS FACTOR | TMA1101412 | 2031-06-03 | 2021-06-03 | 1827502 |
| SNEAKY VAUNT | TMA1028071 | 2029-06-18 | 2019-06-18 | 1811715 |
| BLACKOTTER | TMA1101411 | 2031-06-03 | 2021-06-03 | 1881477 |
| THE SYNERGY EFFECT | TMA1047043 | 2029-08-06 | 2019-08-06 | 1822013 |
| SYNERGY EFFECT | TMA1046990 | 2029-08-05 | 2019-08-05 | 1780879 |
| FLAT TUMMY ABS | TMA1028111 | 2029-06-18 | 2019-06-18 | 1827470 |
| SYNERGY A CONSUMER HEALTHCARE COMPANY | TMA1046985 | 2029-08-05 | 2019-08-05 | 1824842 |
| SYNERGY EFFECT | TMA1046986 | 2029-08-05 | 2019-08-05 | 1822010 |
| THE SYNERGY EFFECT | TMA1046991 | 2029-08-05 | 2019-08-05 | 1780883 |

Canadian Patents

| Patent | Patent Registration No. | Issued Date | Filed Date |
|---|---|---|---|
| N/A | | | |

# EXHIBIT 9

**STATE OF NEVADA**

***FRANCISCO V. AGUILAR***
*Secretary of State*

***RUBEN J. RODRIGUEZ***
*Deputy Secretary for Southern Nevada*

*2250 Las Vegas Blvd North, Suite 400*
*North Las Vegas, NV 89030*
*Telephone (702) 486-2880*
*Fax (702) 486-2452*

**OFFICE OF THE**
**SECRETARY OF STATE**

***GABRIEL DI CHIARA***
*Chief Deputy Secretary of State*

***DEANNA L. REYNOLDS***
*Deputy Secretary for Commercial Recordings*

*401 N. Carson Street*
*Carson City, NV 89701*
*Telephone (775) 684-5708*
*Fax (775) 684-7141*

# Filing Acknowledgement

May 30, 2025 12:04 PM

| | |
|---|---|
| **Work Order Number** | **Initial Filing Number** |
| W2025053002098 | 2025478218-3 |
| **Filing Description** | **Document Filing Number** |
| UCC-1 | 2025478218-3 |
| **Debtors** | |
| SYNERGY CHC CORP. | 3 KIMBALL DRIVE<br>STANDISH, ME 04084 |
| **Secured Parties** | |
| ACP AGENCY, LLC, AS COLLATERAL AGENT | 600 LEXINGTON AVENUE, 14TH FLOOR<br>NEW YORK, NY 10022 |

The Nevada Secretary of State, Uniform Commercial Code Division has filed the attached documents. The filing number, date, and time are shown on each document. The filing number can be used to reference the document in the future.

[redacted]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Jeffrey Speredelozzi 800-482-1497**

B. E-MAIL CONTACT AT FILER (optional)
**uccteam3@rasi.com**

C. SEND ACKNOWLEDGMENT TO: (Name and Address)
**Registered Agent Solutions, Inc.**
**720 14th Street**
**Sacramento, CA 95814, USA**

| Filed in the Office of | Initial Filing Number **2025478218-3** |
|---|---|
| [signature] | Filed On **May 30, 2025 12:04 PM** |
| Secretary of State State Of Nevada | Number of Pages **1** |

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME
**SYNERGY CHC CORP.**

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| **3 KIMBALL DRIVE** | **STANDISH** | **ME** | **04084** | **USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME
**ACP AGENCY, LLC, AS COLLATERAL AGENT**

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| **600 LEXINGTON AVENUE, 14TH FLOOR** | **NEW YORK** | **NY** | **10022** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
**ALL ASSETS OF THE DEBTOR OF EVERY KIND AND NATURE, WHETHER NOW OWNED OR HEREAFTER ACQUIRED AND WHEREVER LOCATED, AND ALL PROCEEDS AND PRODUCTS THEREOF.**

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**NEVADA SECRETARY OF STATE**

# EXHIBIT 10

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
(888) 716-7274

B. E-MAIL CONTACT AT FILER (optional)
UCCTEAM3@RASI.COM

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

REGISTERED AGENT SOLUTIONS, INC.
5301 SOUTHWEST PKWY.
SUITE 400
AUSTIN, TX 78735

Delaware Department of State
U.C.C. Filing Section
Filed: 06:11 PM 06/09/2025
U.C.C. Initial Filing No: 2025 4127426

Service Request No: 20253012796

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| HAND MD CORP. | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3 KIMBALL DRIVE | STANDISH | ME | 04084 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACP AGENCY, LLC, AS COLLATERAL AGENT | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 LEXINGTON AVENUE, 14TH FLOOR | NEW YORK | NY | 10022 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor of every kind and nature, whether now owned or hereafter acquired and wherever located, and all proceeds and products thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
DELAWARE SECRETARY OF STATE

# EXHIBIT 11

Doc #: 2025053272
05/30/2025 03:51 PM

[redacted]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
Registered Agent Solutions, Inc. 8004821497

B. E-MAIL CONTACT AT SUBMITTER (optional)
uccteam3@rasi.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Registered Agent Solutions, Inc.
720 14th Street
SACRAMENTO, CA 95814
US

**SEE BELOW FOR SECURED PARTY CONTACT INFORMATION**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Synergy CHC Inc. | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 3175 Highway 2 | Fall River | Nova Scotia | B2T 1J5 | Canada |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ACP Agency, LLC, as Collateral Agent | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| | | | | |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 600 Lexington Avenue, 14th Floor | New York | NY | 10022 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor of every kind and nature, whether now owned or hereafter acquired and wherever located, and all proceeds and products thereof.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
D.C. Secretary of State

Doc #: 2025053272
Filed & Recorded
05/30/2025 03:51 PM
IDA WILLIAMS
RECORDER OF DEEDS
WASH DC RECORDER OF DEEDS

| | |
|---|---|
| RECORDING FEES | $25.00 |
| SURCHARGE | $5.00 |
| TOTAL: | $30.00 |

# EXHIBIT 12

BANC OF CALIFORNIA

# Deposit Account Control Agreement – Shifting Control

Venture Banking and National Lending

## A. General Information

| June 5, 2025 | **3111852** |
|---|---|
| Agreement Date ("**Date**") | Account Number ("**Account**") |

## B. Company

| **SYNERGY CHC CORP. dba FACTOR NUTRITION** | | **98-1034085** |
|---|---|---|
| Company Name ("**Company**") | | Taxpayer Identification Number |
| **Corporation** | **Nevada** | |
| Entity Type | U.S. State of Formation | |

## C. Lender

**ACP AGENCY, LLC**
Lender/Agent Name (in its capacity as collateral agent under the Security Agreement, "**Lender**")

| **Limited Liability Company** | **Delaware** |
|---|---|
| Entity Type | U.S. State of Formation |

## D. Agreement

This Deposit Account Control Agreement – Shifting Control (the "**Agreement**") is entered into by and among Company, Lender and Banc of California, a California state-chartered bank ("**Bank**").

The parties hereto refer to the Account in the name of Company maintained at Bank (as such account may be renumbered by Bank) and hereby agree as follows:

1. Company and Lender notify Bank that by that certain Pledge and Security Agreement, dated as of May 30, 2025 (as amended, restated, supplemented or otherwise modified from time to time, the "**Security Agreement**") Company has granted Lender a security interest in the Account and all funds on deposit from time to time therein. Company acknowledges to all, and warrants and represents to Bank, that pursuant to the Security Agreement, Lender has a first priority security interest in the Account, in all funds now or hereafter held therein (including, without limitation, all federal wire transfers of funds and all cash, check, drafts, and other instruments now or hereafter deposited in the Account), in all proceeds thereof, and in all rights related thereto. Bank acknowledges the aforesaid security interest; provided, however, Bank does not warrant the existence, priority or perfection of such security interest. Bank shall not be bound in any way by the terms and provisions of any loan document or other agreements between Company and Lender, regardless of whether Bank has knowledge thereof. Notwithstanding anything set forth herein to the contrary, Company covenants to Lender it will not close the Account at any time during the term of the Security Agreement. Bank shall have no liability in the event Company breaches this covenant to Lender.

2. All parties agree that the Account is a "deposit account" within the meaning of Article 9 of the Uniform Commercial Code of the State of California (the "**UCC**"). It is the intent of the parties to this Agreement that Lender have control over the Account within the meaning of Section 9-104 of the UCC. Bank has not and will not agree with any third party to comply with instructions or other directions concerning the Account or the disposition of funds in the Account originated by such third party without the prior written consent of Lender.

3. Bank represents that it is not a party to any control agreement (other than this Agreement) related to the Account, and agrees that it will not enter into any other control agreement with respect to the Account while this Agreement remains in effect, without the prior written consent of Lender. Bank agrees that it will comply with instructions originated by Lender directing disposition of the funds in the Account without further consent by Company. Except as provided below, Bank will not permit the withdrawal or other disposition of any funds in the Account by Company without Lender's prior written consent. Prior to the Effective Time (as hereinafter defined), Bank may also honor all withdrawal, payment, transfer or other fund disposition or other instructions which Company is entitled to give under the Account Documentation (including but not limited to matters related to or associated with the Account) (collectively, "**instructions**") received from the Company concerning the Account. On and after the Effective Time, Bank shall cease complying with instructions concerning the Account or funds on deposit therein originated by the Company, and instead shall comply solely with instructions received from Lender concerning the Account without further consent by the Company or any other person. On and after the Effective Time, Company hereby authorizes and directs Bank to comply with all instructions of Lender pertaining to the

BANC OF CALIFORNIA

Account, without further consent by Company and notwithstanding any conflicting instructions, demands or claims by Company or any officer, director, partner, manager, agent, or other representative of Company.

For the purposes hereof, the "**Effective Time**" shall be the opening of business on the second (2nd) business day (as hereinafter defined) next succeeding the business day on which a notice purporting to be signed by Lender in substantially the same form as **Exhibit A**, attached hereto, with a copy of this Agreement attached thereto (a "**Shifting Control Notice**"), is actually received by the unit of Bank to whom the notice is required hereunder to be addressed; provided, however, that if any such notice is so received after 12:00 noon, Pacific time, on any business day, the "**Effective Time**" shall be the opening of business on the third (3rd) business day next succeeding the business day on which such receipt occurs; and, provided further, that a "**business day**" is any day other than a Saturday, Sunday or other day on which Bank is or is authorized or required by law to be closed. All payments or transfers of funds from the Account shall be subject to Bank's availability schedule of funds (i.e., the schedule maintained by Bank concerning the typical timing of collection by Bank of funds deposited by check drawn on the clearing banks listed therein).

Notwithstanding the foregoing: (i) all transactions involving or resulting in a transaction involving the Account duly commenced by Bank or any affiliate prior to the Effective Time and so consummated or processed thereafter shall be deemed not to constitute a violation of this Agreement; and (ii) Bank and/or any affiliate may (at its discretion and without any obligation to do so) (x) cease honoring Company's instructions and/or commence honoring solely Lender's instructions concerning the Account at any time or from time to time after it becomes aware that Lender has sent to it a Shifting Control Notice but prior to the Effective Time therefor (including without limitation halting, reversing or redirecting any transaction referred to in clause (i) above), or (y) deem a Shifting Control Notice to be received by it for purposes of the foregoing paragraph prior to the specified unit's actual receipt if otherwise actually received by Bank (or if such Shifting Control Notice does not comply with the form attached hereto as Exhibit A or does not attach an appropriate copy of this Agreement), with no liability whatsoever to Company or any other party for doing so.

4. This Agreement supplements, rather than replaces, Bank's deposit account agreement, terms and conditions and other standard documentation in effect from time to time with respect to the Account or services provided in connection with the Account (the "**Account Documentation**"), which Account Documentation will continue to apply to the Account and such services, and the respective rights, powers, duties, obligations, liabilities and responsibilities of the parties thereto and hereto, to the extent not expressly conflicting with the provisions of this Agreement (however, in the event of any such conflict, the provisions of this Agreement shall control). Prior to issuing any instructions on or after the Effective Time, Lender shall provide Bank with such documentation as Bank may reasonably request to establish the identity and authority of the individuals issuing instructions on behalf of Lender. Lender may request Bank to provide other services (such as automatic daily transfers) with respect to the Account on or after the Effective Time; however, if such services are not authorized or otherwise covered under the Account Documentation, Bank's decision to provide any such services shall be made in its sole discretion (including, without limitation, being subject to Company and/or Lender executing such Account Documentation or other documentation as Bank may require in connection therewith).

5. Bank agrees not to exercise or claim any right of offset, banker's lien or other like right against the Account for so long as this Agreement is in effect except with respect to (i) returned or charged-back items, reversals or cancellations of payment orders and other electronic fund transfers or other corrections or adjustments to the Account or transactions therein, (ii) overdrafts in the Account or (iii) Bank's charges, fees and expenses with respect to the Account or the services provided hereunder.

6. Notwithstanding anything to the contrary in this Agreement: (i) Bank shall have only the duties and responsibilities with respect to the matters set forth herein as is expressly set forth in writing herein and shall not be deemed to be an agent, bailee or fiduciary for any party hereto; (ii) Bank shall be fully protected in acting or refraining from acting in good faith without investigation on any notice (including without limitation a Shifting Control Notice), instruction or request purportedly furnished to it by Company or Lender in accordance with the terms hereof, in which case the parties hereto agree that Bank has no duty to make any further inquiry whatsoever; (iii) it is hereby acknowledged and agreed that Bank has no knowledge of (and is not required to know) the terms and provisions of the Security Agreement referred to in paragraph 1 above or any other related documentation or whether any actions by Lender (including without limitation the sending of a Shifting Control Notice), Company or any other person or entity are permitted or a breach thereunder or consistent or inconsistent therewith, (iv) Bank shall not be liable to any party hereto or any other person for any action or failure to act under or in connection with this Agreement except to the extent such conduct constitutes its own willful misconduct or gross negligence (and to the maximum extent permitted by law, shall under no circumstances be liable for any incidental, indirect, special, consequential or punitive damages); and (v) Bank shall not be liable for losses or delays caused by force majeure, interruption or malfunction of computer, transmission or communications facilities, labor difficulties, court order or decree, the commencement of bankruptcy or other similar proceedings or other matters beyond Bank's reasonable control.

7. Company hereby agrees to indemnify, defend and save harmless Bank against any loss, liability or expense (including reasonable fees and disbursements of counsel who may be an employee of Bank) (collectively, "**Covered Items**") incurred in connection with this Agreement or the Account (except to the extent due to Bank's willful misconduct or gross negligence) or any interpleader proceeding relating thereto or incurred as a result of following Company's direction or instruction. To the extent such amounts remain unreimbursed by Company within fifteen (15) days after written request by Bank therefor, Lender hereby agrees to indemnify, defend and save harmless Bank against any Covered Items incurred (i) on or after the Effective Time in connection with this Agreement or the Account (except to the extent due to Bank's willful misconduct or gross negligence) or any interpleader proceeding related thereto, (ii) as a result of following Lender's direction or instruction (including without limitation Bank's honoring of a Shifting Control Notice) or (iii) due to any claim by Lender of an interest in the Account or the funds on deposit therein.

BANC OF CALIFORNIA

8. Bank may terminate this Agreement (i) in its discretion upon the sending of at least thirty (30) days' advance written notice to the other parties hereto, (ii) upon the filing of an interpleader or (iii) because of a material breach by Company or Lender of any of the terms of this Agreement or the Account Documentation, upon the sending of at least five (5) days advance written notice to the other parties hereto. Lender may terminate this Agreement in its discretion upon the sending of at least three (3) days advance written notice to the other parties hereto, provided that Bank may shorten or waive the requirement that Lender's notice be in advance and any such shortening or waiver shall be binding on all parties. In connection with any such termination initiated by Bank, Bank will transfer all collected and available balances in the Account on the date of such termination in accordance with Lender's instructions. Any other termination or any amendment or waiver of this Agreement shall be effected solely by an instrument in writing executed by all the parties hereto. If a bankruptcy or insolvency proceeding shall be instituted by or against Company, or if any third party should assert an adverse claim against the Account or any sums on deposit therein, whether such a claim arises by tax lien, execution, attachment, garnishment, levy, the claim of a trustee in bankruptcy or debtor-in-possession, or a competing lien creditor or otherwise, and Bank determines that its interests may be prejudiced or harmed in any respect even if it takes the actions contemplated by paragraph 14 hereof with respect to the Account, then Bank, in addition to any other remedies it may possess under this Agreement or at law or in equity, may (and if Bank has taken or intends to take any such actions pursuant to paragraph 14 herein and Lender has requested Bank to terminate this Agreement, then Bank shall) immediately terminate all obligations of Bank under this Agreement by interpleading all funds then held in the Account into the registry of the appropriate court for the state which is Bank's jurisdiction as hereinbelow provided, and Company (or, if such interpleader shall be brought at Lender's request, Lender with reimbursement from Company) shall pay the reasonable costs, expenses and attorney's fees actually incurred by Bank related to such interpleader. In the event of a termination of all obligations of Bank under this Agreement in connection with an interpleader in accordance with the foregoing sentence, this Agreement shall be deemed to continue to constitute a control agreement for purposes of perfecting Lender's security interest in such funds. Upon such interpleader, Bank will be fully acquitted and discharged from all liability hereunder to Lender and Company for any obligation performable by Bank for the first time after the filing of such interpleader. The provisions of paragraphs 6 and 7 above shall survive any such termination. Notwithstanding the foregoing, Bank retains the right to terminate this Agreement as set forth in this paragraph 8.

9. Company shall compensate Bank for the opening and administration of the Account, including but not limited to, all reasonable and documented attorneys' fees and expenses with respect to the Account, and any and all services provided hereunder in accordance with Bank's fee schedules from time to time in effect ("**Bank's Expenses**"). Payment will be effected by a direct debit to the Account. If Company fails to reimburse Bank for Bank's Expenses within fifteen (15) days after written request by Bank therefor, and Bank has complied with instructions of Lender with respect to the disbursement of funds from the Account which leaves the Account with insufficient funds for Bank to recoup Bank's Expenses, then Lender will reimburse Bank for Bank's Expenses (x) solely with respect to the amount of proceeds which were received by Lender from the Account, and (y) solely to the extent requested in writing by Bank on or before the date that is ninety (90) days after the termination of this Agreement.

10. Bank shall send copies of the regular monthly bank statements to Company. During the term of this Agreement and to the extent Bank's system has the operational ability to do so, Bank agrees to allow Company (and Company agrees to grant to Lender upon Lender's written request) on-line, view only access to the Account, subject to Bank's standard agreements, terms and conditions, as applicable. Company hereby authorizes Bank to provide additional information relating to the Account to Lender upon Lender's written request without Company's further consent. Bank shall have no obligation to monitor Lender's online access to the Account information.

11. This Agreement and the instructions and notices required or permitted to be executed and delivered hereunder set forth the entire agreement of the parties with respect to the subject matter hereof and supersede any prior agreement and contemporaneous oral agreements of the parties concerning its subject matter. To the extent a provision of this Agreement is unenforceable, this Agreement will be construed as if the unenforceable provision were omitted. The terms of this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective successors or heirs and personal representatives. This Agreement may be assigned by Lender to any successor of Lender under its security agreement with Company, provided that prior written notice thereof is given by Lender to Bank.

12. This Agreement: (i) may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument; (ii) shall become effective when counterparts hereof have been signed by the parties hereto; and (iii) **shall be governed by and construed in accordance with the laws of the State of California. The parties agree that the State of California is the "bank's jurisdiction" for purposes of the Section 9-304 of the UCC. All parties hereby waive all rights to a trial by jury in any action or proceeding relating to the Account or this Agreement.** All notices under this Agreement shall be in writing and sent (including via emailed pdf or similar file or facsimile transmission) to the parties hereto at their respective addresses, email addresses or fax numbers set forth below (or to such other address, email address or fax number as any such party shall designate in writing to the other parties from time to time).

## Miscellaneous Provisions

13. Reporting of Interest Income. Interest income on funds in the Account shall be reported by Bank for federal and, if applicable, state income tax purposes as income of, and taxable to Company, the federal taxpayer identification number for which is set forth above.

14. Third Party Rights. If a bankruptcy or insolvency proceeding shall be instituted by or against Company, or if any third party should assert an adverse claim against the Account or any sums on deposit therein, whether such a claim arises by tax lien, execution, attachment, garnishment, levy, the claim of a trustee in bankruptcy or debtor-in-possession, or a competing lien creditor or otherwise, then Bank shall be entitled to refuse to permit any deposits, withdrawals and/or transfers from the Account without any liability until reasonably satisfactory documentation is provided to Bank that continued deposits, withdrawals, and/or transfers from the Account are authorized and do not violate any laws, regulations, or orders of any court.

15. Bankruptcy Notice/Effect of Filing. If Bank at any time receives notice of the commencement of a bankruptcy case or other insolvency or liquidation proceeding by or against Company (a "**Bankruptcy Notice**"), Bank will continue to comply with its obligations under this Agreement, except to the extent that any action required of Bank under this Agreement is prohibited under applicable bankruptcy laws or regulations or is stayed pursuant to the automatic stay imposed under the United States Bankruptcy Code or by order of any court or agency. With respect to any obligations of Bank hereunder or under the terms and conditions governing the Account which requires prior demand upon Company by Bank, the commencement of a bankruptcy case or other insolvency or liquidation proceeding by or against Company shall automatically eliminate the necessity of such demand upon Company and shall immediately entitle Bank to make demand on Lender with the same effect as if demand had been made upon Company and the time for Company's performance had expired.

16. Endorsements/Returned Items. Company hereby grants Bank for the term of this Agreement an irrevocable power of attorney, coupled with an interest, to endorse all checks, drafts, remittances and receipts of every kind and nature (collectively "**Items**") deposited in the Account. Bank may supply whatever endorsement it may deem necessary for such Items, provided such remittances are payable to Company in its name or a trade name of Company or any reasonable variation thereof, in order to deposit such Items to the Account. Company agrees that such endorsement shall constitute the proper endorsement of Company. Bank does not warrant any endorsements. Items returned or unpaid for whatever reason shall be debited to the Account under advice and returned to Company.

[The remainder of this page has intentionally been left blank]

BANC OF CALIFORNIA

## E. Signatures

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Deposit Account Control Agreement - Shifting Control as of the date first above written.

### A. Company: SYNERGY CHC CORP.

| X [signature] | Jack Ross | CEO | June 9 2025 |
|---|---|---|---|
| Signature | Printed Name | Title | Date |

Company's Address for Notices

| 865 Spring Street | | | |
|---|---|---|---|
| Street Address | | | Suite/Unit |
| Westbrook | ME | USA | 04092 |
| City | State/Province | Country | Zip/Postal Code |

### B. Lender: ACP AGENCY, LLC

| X | Peter Eschmann | Authorized Person | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |

Lender's Address for Notices

| 600 Lexington Ave | | | 14th Floor |
|---|---|---|---|
| Street Address | | | Suite/Unit |
| New York | NY | USA | 10022 |
| City | State/Province | Country | Zip/Postal Code |

### C. Bank: BANC OF CALIFORNIA

| X | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |

Bank's Address for Instructions, Notices and Terminations

Banc of California
Attn: Operations Support Group
130 South State College Blvd
Brea, CA 92821

Fax: (714) 989-4175
Email: OSG@bancofcal.com

**BANC OF CALIFORNIA**

## E. Signatures

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Deposit Account Control Agreement - Shifting Control as of the date first above written.

### A. Company: SYNERGY CHC CORP.

| X | | | |
|---|---|---|---|
| Signature | Printed Name | Title | Date |

Company's Address for Notices

| 865 Spring Street | | | |
|---|---|---|---|
| Street Address | | | Suite/Unit |
| Westbrook | ME | USA | 04092 |
| City | State/Province | Country | Zip/Postal Code |

### B. Lender: ACP AGENCY, LLC

| X [signature] | Peter Eschmann | Authorized Person | 6/10/25 |
|---|---|---|---|
| Signature | Printed Name | Title | Date |

Lender's Address for Notices

| 600 Lexington Ave | | | 14th Floor |
|---|---|---|---|
| Street Address | | | Suite/Unit |
| New York | NY | USA | 10022 |
| City | State/Province | Country | Zip/Postal Code |

### C. Bank: BANC OF CALIFORNIA

| X [signature] | Vicki Bryant | VP, Operations Support Manager | 6-11-25 |
|---|---|---|---|
| Signature | Printed Name | Title | Date |

Bank's Address for Instructions, Notices and Terminations

Banc of California
Attn: Operations Support Group
130 South State College Blvd
Brea, CA 92821

Fax: (714) 989-4175
Email: OSG@bancofcal.com

# Deposit Account Control Agreement – Shifting Control

## Venture Banking and National Lending

### Exhibit A – Shifting Control Notice

Date: ________________

Banc of California
Attn: Operations Support Group
130 South State College Blvd
Brea, CA 92821

Fax: (714) 989-4175
Email: OSG@bancofcal.com

Re: Deposit Account Control Agreement ("Shifting Control") dated as of June 5, 2025 (the "**Agreement**"), by and among Synergy CHC Corp., as Company, ACP Agency, LLC, as Lender, and Banc of California, as Bank, relating to Account Number 3111852

Ladies and Gentlemen:

This constitutes a Shifting Control Notice as referred to in paragraph 3 of the Agreement, a copy of which is attached hereto.

**ACP AGENCY, LLC**

By: ____________________________________ Date: ___________________
Signature

Name: __________________________________

Title: __________________________________